**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:26-cv-22257**

UNIDOSUS; LEAGUE OF WOMEN VOTERS OF
FLORIDA, INC.; LEAGUE OF WOMEN VOTERS OF
FLORIDA EDUCATION FUND, INC.; FLORIDA RISING
TOGETHER; FLORIDA RISING, INC.; HISPANIC
FEDERATION; FLORIDA IMMIGRANT COALITION;
FLIC VOTES, INC.; COMMON CAUSE; and COMMON
CAUSE EDUCATION FUND,

         *Plaintiffs*,

   *v.*

CORD BYRD, in his official capacity as Florida Secretary
of State, JOE SCOTT, in his official capacity as Broward
County Supervisor of Elections, ALINA GARCIA, in her
official capacity as Miami-Dade County Supervisor of
Elections, and WENDY SARTORY LINK, in her official
capacity as Palm Beach County Supervisor of Elections,

         *Defendants*.

                    /

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

   Plaintiffs UnidosUS, the League of Women Voters of Florida, the League of Women Voters of Florida Education Fund, Florida Rising Together, Florida Rising, Hispanic Federation, Florida Immigrant Coalition, FLIC Votes, Common Cause, and Common Cause Education Fund bring this action against Defendants Cord Byrd, Florida Secretary of State, and the Supervisors of Elections for Broward, Miami-Dade, and Palm Beach Counties. All Defendants are sued in their official capacities. Plaintiffs allege the following:

1

## PRELIMINARY STATEMENT

1.      Florida has enacted a law that will make it harder for eligible U.S. citizens to vote—and for some, impossible.[1] H.B. 991 conditions a citizen's ability to register, to update their registration, and to remain on the registration rolls on the production of specified forms of documentary proof of citizenship ("DPOC"). Many eligible voters do not have these documents and cannot obtain them for a variety of reasons—including because they were born without a birth certificate in the segregated South, because their documents were destroyed in a hurricane, or because they cannot afford the hundreds of dollars it costs to replace them. At the same time, the law directs election officials to verify registered voters' citizenship against government databases that were never designed for that purpose and that routinely misidentify citizens as noncitizens. The result is a system that burdens eligible voters, flagging them through unreliable data and then demanding documents that are difficult or nearly impossible to produce.

2.      H.B. 991 subjects every Florida voter—current and prospective—to a citizenship verification regime tied to the records of the Department of Highway Safety and Motor Vehicles ("DHSMV"). Under H.B. 991, every voter registration application, including updates to an existing voter registration, must be checked against DHSMV records for DPOC. For voters whose records already reflect acceptable DPOC, the check may be invisible. But for any voter whose DHSMV records do not confirm citizenship, the law requires them to produce acceptable DPOC or face removal from the rolls.

3.      To be clear, H.B. 991 does not stop at new or updated registrations. The law not only mandates that election officials verify the citizenship of newly registered voters, but also that they conduct a retroactive citizenship verification of every currently registered voter. On

---

[1]   The challenged provisions become effective on January 1, 2027.

information and belief, H.B. 991 therefore requires the removal of voters from the rolls based on the results of a database matching process. Many voters will struggle or be entirely unable to produce the required documentation through no fault of their own. Elderly Black voters may lack necessary documentation if they were born outside of hospitals during the Jim Crow era and never issued a birth certificate. Due to a law invalidating Puerto Rican birth certificates issued before July 1, 2010, eligible voters born in Puerto Rico will struggle to provide DPOC. Unhoused individuals, and people who previously were unhoused, may have lost their DPOC records. Students may lack easy access to any of the acceptable forms of DPOC specified in H.B. 991. And for all, it is unclear whether such documents could be submitted by mail or electronically.

4.      Some groups are also more likely to be flagged erroneously for removal than others. Naturalized citizens are at particular risk: As detailed below, the databases Florida has used and will continue to use to verify the citizenship of registered voters and applicants for registration are prone to numerous errors and inconsistencies. For example, neither the DHSMV database nor other databases that Florida has been using for voter roll citizenship verification, such as the federal Systematic Alien Verification for Entitlements ("SAVE") system operated by the Department of Homeland Security's ("DHS") United States Citizenship and Immigration Services, automatically capture naturalization data. This means that U.S. citizens could be erroneously reflected as noncitizens in these databases, as they often are in DHS's SAVE system, and would therefore be flagged for potential disenfranchisement. Other databases did not capture citizenship information at their inception—for example, the Social Security Administration (SSA) database did not require citizenship information until 1972 and did not collect it consistently until 1981, and the DHSMV database did not require people to furnish proof of citizenship until 2020. Elderly voters are therefore disproportionately likely to get flagged for removal because SAVE incorporates SSA data

as a primary source of information on the citizenship of U.S.-born citizens and therefore also lacks citizenship data about many U.S.-born citizens who were born before the 1970s.

5.      Still other groups—such as married women, transgender people, and others who have changed their legal names—are likely *both* to get flagged for removal and to have to provide multiple documents to prove their citizenship. Discrepancies in the names listed in various databases may lead to people who have changed their legal names being flagged for removal. Once flagged, these voters will have to provide one of the specified forms of DPOC, as well as legal documentation showing the changes in their names. For elderly women who are or were married and whose marriage and divorce records were never digitized, that may be all but impossible, particularly for elderly Black women who may never have been issued a birth certificate on top of these other issues.

6.      Of the many changes H.B. 991 makes to the voter registration process, Plaintiffs challenge four. First, Section 4 of H.B. 991 requires that all voter registration applications— including initial registrations, as well as changes in name, address, or party identification—be checked against DHSMV records. If those records do not show that the applicant previously provided proof of U.S. citizenship, the county supervisor of elections must attempt to verify the applicant's citizenship using state and federal data sources and, if unsuccessful, initiate a process to remove them from the rolls if they are already registered. Voters who are flagged for lack of DPOC may cast a provisional ballot, which will only be counted if they submit acceptable documentation within two days of the relevant election. *See* H.B. 991 § 4, *codified at* Fla. Stat. § 97.053(6) ("General DPOC Registration Provisions").

7.      Next, Section 3 of the law specifically addresses voters who attempt to register online. Such applications will be processed for registration only if DHSMV records indicate that

the voter has previously provided proof of U.S. citizenship. If the records do not show the registrant has previously provided DPOC, the Department of State must flag the issue for the relevant county supervisor. *See* H.B. 991 § 3, *codified at* Fla. Stat. § 97.0525(4) ("Online Voter Registration Application Provisions").

8.      Third, Section 8 of H.B. 991 also imposes a sweeping mandate on elections officials to engage in retroactive citizenship checks of all registered voters. The Department of State must use government databases to flag potentially ineligible voters and then transmit information on those voters to the relevant county supervisor, who then initiates a process to remove the voter from the rolls unless they can provide acceptable DPOC. *See* H.B. 991 § 8, *codified at* Fla. Stat. § 98.075(6)(a) ("Retroactive DPOC Provision").

9.      Finally, Section 1 of H.B. 991 specifies the types of documents that qualify as DPOC, limiting the ways that voters who are flagged erroneously as noncitizens can prove their citizenship. It also requires any discrepancy between a voter's legal name and the name listed on the document indicating their citizenship to be substantiated with official documentation regarding a name change. *See* H.B. 991 § 1, *codified at* Fla. Stat. § 97.021(10) ("DPOC Type Provision") (collectively, with the General DPOC Registration Provisions, the Online Voter Registration Application Provisions, and the Retroactive DPOC Provision, "the Challenged DPOC Provisions").

10.      These efforts will be guided by unreliable data sources that will result in foreseeable errors. There are predictable, systemic problems with this data on top of any issues that may result from human error and attempting to merge different complex systems.

11.      This is unlawful: The Challenged DPOC Provisions impose severe burdens on the right to vote—burdens that fall hardest on those least able to overcome them—without any justification sufficient to sustain them. There is no evidence that Florida's existing eligibility

5

verification processes are inadequate, and the systems H.B. 991 relies upon to replace them are demonstrably unreliable. This violates the First and Fourteenth Amendments to the U.S. Constitution.

12.     Plaintiffs bring this suit on behalf of their members and/or as organizations dedicated to protecting Floridians' right to vote, seeking declaratory and injunctive relief against the Challenged DPOC Provisions.

## JURISDICTION AND VENUE

13.     This action is brought under the Constitution and laws of the United States. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), and 1357, and 42 U.S.C. § 1983.

14.     This Court has authority to issue declaratory and injunctive relief in this action under 28 U.S.C. §§ 2201 and 2202.

15.     This Court has personal jurisdiction over each Defendant because each is a citizen of Florida.

16.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) because a majority of Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred or will occur in this District.

## PARTIES

### A.     Plaintiffs

17.     Plaintiff UnidosUS ("Unidos") is a nonprofit, nonpartisan organization, and one of the largest Latino civil rights and advocacy organizations in the country. Unidos has offices in Florida and 18 member-affiliate organizations based or working in the State. Unidos' mission is to build a stronger America by creating opportunities for Latinos.

18.     Unidos is a registered third-party voter organization ("3PVRO") in Florida that engages in extensive voter registration efforts, public education, and advocacy to encourage political participation among the communities it serves. Unidos conducts voter registration by community canvassing, placement of digital ads, mailers, and direct engagement with voters. Unidos provides support and technical assistance to affiliated non-profit members with which it works on voter registration. When Unidos and its canvassers and affiliate members register voters, they communicate a pro-voting message about the importance of participating in the electoral process. Unidos is responsible for over 400,000 voter registrations in Florida since 2008.

19.     H.B. 991 will limit Unidos' effectiveness in promoting democratic participation and make it costlier and more resource-intensive to conduct voter registration. The law will have a substantial chilling effect on voter registration for Unidos, likely resulting in lower registration of Latinos throughout the state of Florida.

20.     Unidos will have to curtail its voter registration activities and divert scarce resources to comply with the myriad regulations H.B. 991 imposes. This will include undertaking an entirely new process to vet DPOC documents that the law requires. Unidos will have to either hire an in-house specialist to verify the authenticity of DPOC documents submitted as proof of U.S. citizenship alongside collected voter registration applications or hire a costly third-party vendor to perform DPOC verification services. The new requirements will significantly and unnecessarily burden Unidos' scarce organizational resources that they would otherwise spend helping voters register, following up with voters, and undertaking other activities to advance their missions.

21.     Further, because H.B. 991 impacts naturalized U.S. citizens who registered through Unidos' voter registration drives, Unidos will suffer organizational harm in the communities where

it has worked and continues to work to secure trust. H.B. 991's processes will likely result in registration form rejections, the mandatory cancellation of registrations, referrals to law enforcement for investigation, and, potentially, mandatory prosecution. At a minimum, Unidos will have to explain to the community members it engages why their voter registrations are suddenly at risk. This will create fear and confusion among members, and it risks eroding Unidos' status as a trusted community voice, especially given the likely chilling effect this will have on its constituents' political participation.

22.     H.B. 991 will require Unidos to re-educate and re-train all of its staff and volunteers on the new DPOC requirements. H.B. 991 will also require the creation of new public-facing educational materials and flyers to guide voter registration applicants on the new DPOC requirements, including new bilingual materials to educate registration applicants it assists. Unidos will also have to expend more resources on community outreach and education for newly naturalized and limited English proficient voters to ensure their ability to stay registered to vote.

23.     Plaintiffs the League of Women Voters of Florida, Inc. and the League of Women Voters of Florida Education Fund, Inc. (together, "LWVFL") are nonprofit organizations formed under § 501(c)(4) and § 501(c)(3) of the Internal Revenue Code, respectively, and their office is located in Orlando, Florida. LWVFL is a nonpartisan, voter-focused, grassroots, membership-based organization.

24.     LWVFL's mission is to empower voters and defend democracy in Florida. This includes encouraging voter participation, increasing understanding of major policy issues, and advocating for legislative changes and policies for the public good. To accomplish this mission, LWVFL hosts voter education events to provide assistance and education about how to register to vote in Florida, registers voters, publishes voter guides and directories of elected officials,

organizes get-out-the-vote efforts, advocates for legislative priorities, and engages in the citizen petition process. Facilitation of participation in the electoral process is central to LWVFL's work.

25.     Conducting voter registration events is an important way through which LWVFL engages citizens on the importance of political participation and civic engagement.

26.     LWVFL is the Florida affiliate of the League of Women Voters, a national organization founded in 1920 as an outgrowth of the struggle to win voting rights for women.

27.     LWVFL has twenty-nine local Leagues across the state, including Leagues in Palm Beach, Miami-Dade, and Broward Counties. Local chapters conduct voter registration events in both the counties in which they are based and in other neighboring or nearby counties where there is not a local chapter.

28.     LWVFL currently has several thousand dues-paying members and an even greater number of supporters and volunteers, all of whom receive regular communications from LWVFL. LWVFL also serves and associates with non-member Floridians. LWVFL relies on both dues-paying members and non-member volunteers to conduct many of its activities. It particularly relies on members to carry out voter registration activities. In total, LWVFL has only two full-time paid staff members, three part-time staff members, and one contract bookkeeper. When financially able, LWVFL also has paid interns.

29.     LWVFL currently has 235 members in the Miami-Dade County League, 242 members in the Broward County League, and 544 members in the Palm Beach County League.

30.     LWVFL expects to have members who will be completely disenfranchised because they do not have access to the citizenship documents that will be required by H.B. 991's Online Voter Registration Application Provisions and General DPOC Registration Provisions. H.B. 991 § 3, 6, *codified at* Fla. Stat. §§ 97.0525(4), 97.053(6). LWVFL also has members who will be

9

unduly burdened by these same requirements of H.B. 991 due to lack of easy access to documents that H.B. 991 will require, such as the documents of married women who have changed their names. This includes members who do not have a driver license or an ID card issued by the DHSMV and also do not have a passport or access to their birth certificate with their current legal name, as well as members who have a driver license or ID card that has not been renewed since 2020, the year Florida began requiring DPOC to get a driver license or ID, and also lack a passport or access to a birth certificate with their current legal name. LWVFL also has members who were born before 1972, whose citizenship status is likely not available from Social Security Administration ("SSA") data, and members born between 1972 and 1981, whose citizenship status may well not be available from SSA data. In particular, this includes members who will be burdened or disenfranchised in their efforts to register or update their registration because their citizenship documents do not reflect their current name or the name on their DHSMV-issued identification—for example, because they changed their name when they got married and, in many cases, also when they got divorced.

31.      LWVFL and its local Leagues devote significant time and resources to encouraging voter participation by regularly providing the public with voter registration assistance and education about voter registration at a variety of public locations and events, including local high school, college, and university campuses; libraries; grocery stores; malls; public assistance offices; naturalization ceremonies; and community events such as fairs, festivals, and cookouts.

32.      In an average year, LWVFL conducts hundreds and sometimes thousands of voter registration assistance and education events across the state. LWVFL conducts voter registration events in an ongoing manner throughout the year, often with multiple events each week and sometimes multiple events in one day.

33.     At voter registration events, LWVFL members and volunteers do their best to assist as many prospective voters as they can in completing their voter registration applications.

34.     LWVFL has built a sterling reputation over many years as a trusted organization that will give voters the correct information about voter registration, act in accordance with the law, and not violate voters' privacy when assisting them with voter registration.

35.     The Challenged DPOC Provisions would require many prospective voters and registrants to provide sensitive personal documents, such as a passport or birth certificate, to register to vote or in order to remain registered to vote. This requirement would then mean that—to achieve their goal of helping individuals successfully register to vote—LWVFL members and volunteers would have to ask people about these sensitive personal documents. LWVFL members and volunteers would also have to help people locate these documents so potential voters can include them when mailing their voter registration forms to election officials or provide them as needed in response to notices.

36.     Asking and engaging with potential voters about these sensitive documents will jeopardize LWVFL's reputation for safeguarding voters' privacy. LWVFL has developed this trust with voters by making clear that it will not collect any personal information from a voter. That trust would be irreparably damaged if LWVFL started asking about documents even more sensitive than a voter registration form, such as a passport. This will inevitably lead to the diminished success of some voter registration events.

37.     LWVFL also regularly engages in other activities central to its mission, including community outreach, education, direct advocacy on local and statewide ballot initiatives, and legislative advocacy related to voting and elections.

38.     To facilitate voter registration work, LWVFL engages in comprehensive training of

members and volunteers. LWVFL members and volunteers have been trained on Florida's current process for registering votes; in response to H.B. 991, all members and volunteers will need to be retrained, diverting resources away from other vital work. This will entail a significant outlay of staff time, volunteer hours, effort, and financial resources that will have to be diverted from other programs and activities, including voter services and education, candidate forums, election protection, work with returning citizens, get-out-the-vote efforts, legislative and advocacy work, fundraising, and public communications, among others.

39. In response to H.B. 991, LWVFL will also have to expend considerable resources educating voters and applicants to register to vote about the DPOC requirements and educating its members on how to comply with them. This education work will require diverting resources from other aforementioned programs and activities.

40. The confusion and burdens caused by H.B. 991 may also hamper LWVFL's efforts to recruit more volunteers, as volunteers may be discouraged by being tasked with explaining to otherwise eligible voters who lack DPOC that they may not be able to cast a ballot without providing DPOC or by fear of miscommunicating the new law and its intimidating enforcement mechanisms.

41. H.B. 991 will discourage participation in the democratic process by making it significantly harder for eligible Floridians to register to vote and by confusing voters about the documents required to register to vote, harming both the franchise and LWVFL's core mission of increasing engagement in the democratic process.

42. Plaintiff Florida Rising Together is a nonprofit organization dedicated to advancing economic and racial justice across Florida by building power in historically marginalized communities. Florida Rising Together is a 501(c)(3) nonpartisan, grassroots organization with a

mission to increase the political power of marginalized people and excluded constituencies. To advance that mission, Florida Rising Together assists Floridians with registering to vote and conducts voter education, voter engagement, and election protection programs across Florida. Florida Rising Together educates and empowers Floridians to organize within their own communities to take collective action that advances equity and fairness across the state. Florida Rising Together is a leading voice for racial justice and expanding democracy in Florida.

43.     H.B. 991 will force Florida Rising Together to divert its scarce resources to resolve DPOC-related problems for the Floridians it assists with registering to vote. Florida Rising Together's ability to help its members, constituents, and members of the public get registered, stay registered, and vote is impaired by the need to specifically address the new burdens imposed by H.B. 991 and to divert resources in response. Individuals that Florida Rising Together helps register to vote will be at risk of having their voter registration applications denied due to H.B. 991's DPOC requirement. And individuals who were previously registered by Florida Rising Together or contacted by Florida Rising Together as part of their get-out-the-vote work will be at risk of being removed from the rolls due to H.B. 991's citizenship verification process.

44.     As a result of H.B. 991's passage, Florida Rising Together is being and will be forced to divert staff time and organizational resources from its 2026 voter education and mobilization programs to inform its constituents about the bill's DPOC requirements. These new voter education efforts include creating and distributing educational materials in the communities that Florida Rising Together serves and spending money on outreach and advertising targeted at the populations disproportionately impacted by H.B. 991, including minority voters, low-income voters, recently naturalized citizens, citizens who have changed their names or who have multiple last names, and seniors. Florida Rising Together will be required to divert financial resources and

staff time to prepare for and conduct the additional voter education and mobilization necessary to help voters comply with H.B. 991's requirements.

45. To address and mitigate the impact of H.B. 991's DPOC requirements, Florida Rising Together will be reaching out to its members and constituents to identify individuals who may be at risk of being removed from the voter rolls, have had their voter registration applications denied, or lack the DPOC required by H.B. 991. Florida Rising Together anticipates spending considerable resources contacting impacted individuals through electronic means and/or in-person canvassing. Florida Rising Together will also assist members and constituents who lack DPOC by helping them obtain the necessary documents. This assistance will include providing informational resources, transportation to government agency offices, and assistance with paying fees required to obtain the documents. Florida Rising Together will also be training staff and volunteers on how to assist voters affected by the DPOC requirement. These efforts to contact applicants and voters affected by H.B. 991 will divert resources away from, and come at the expense of, Florida Rising Together's core voter assistance, voter education, and get-out-the-vote activities.

46. Once H.B. 991 goes into effect, Florida Rising Together will conduct outreach to affected voters whose voter registration applications are denied and voters who are subject to removal from the voter rolls due to H.B. 991. This outreach will require Florida Rising Together to issue public records requests to Supervisors of Elections to obtain lists of affected applicants and voters, spend time cleaning the received data so that it is usable, and engage in multiple rounds of phone calls, emails, text messages, and door-knocking.

47. To coordinate these programs, Florida Rising Together has deployed and will continue to deploy staff and other resources that would otherwise be devoted to the organization's core voter assistance, voter education, and get-out-the-vote work. The resources Florida Rising

Together is diverting to educate its constituents and identify and assist individuals without DPOC, in addition to the resources Florida Rising Together will have to divert to identify and assist individuals whose voter registration applications are denied or who are removed from the voter rolls once H.B. 991 goes into effect, will cause Florida Rising Together's core voter assistance, education, and get-out-the-vote programs to reach and engage fewer Floridians than would be possible absent the harmful impact of H.B. 991 on its constituents.

48.     Florida Rising Together anticipates working in Broward, Duval, Hillsborough, Leon, Miami-Dade, Orange, Osceola, Palm Beach, and Pinellas Counties to, among other things, mobilize applicants and voters, help applicants navigate the DPOC requirement and make it onto the rolls, keep voters on the rolls, educate voters about their voting rights, and assist voters whom it has previously registered or assisted with a registration application to navigate the requirements and counteract the harms of H.B. 991.

49.     Plaintiff Florida Rising, Inc. ("Florida Rising") is a 501(c)(4) grassroots, membership organization. Its mission is to build independent political power that centers historically marginalized communities and everyday Floridians. Florida Rising organizes multi-racial movements, supports legislative and policy changes, and works to foster state and local policies that allow Floridians to be safe, happy, healthy, and whole. Florida Rising is a people-powered organization made up of members advancing economic and racial justice across Florida. Florida Rising and its members educate and mobilize voters as one important way of holding politicians accountable and making their voices heard. Florida Rising has more than 100,000 members. Many of those members live in Broward, Duval, Hillsborough, Leon, Miami-Dade, Orange, Osceola, Palm Beach, and Pinellas Counties; and the full membership spans most other counties in Florida.

50.     Florida Rising's membership and constituents include U.S. citizens who are at risk of being removed from the voter rolls or being denied access to the voter rolls in the first place due to H.B. 991's DPOC requirement and citizenship verification procedures. Florida Rising's members and constituents likely include U.S. citizens who are registered to vote or eligible to register to vote but do not possess any of the forms of DPOC required by H.B. 991, and Florida Rising Together will, as mentioned above, be conducting outreach to such identify. The interests Florida Rising seeks to protect are germane to its organizational purpose, and neither the claims asserted, nor the relief requested, requires the participation of Florida Rising's individual members in the lawsuit.

51.     Plaintiff Hispanic Federation, Inc. ("Hispanic Federation") is a nonprofit, nonpartisan, community organizing and advocacy organization. Hispanic Federation's mission is to empower and advance the Hispanic community, support Hispanic families, and strengthen Latino institutions. Hispanic Federation serves all individuals and communities that seek assistance in the areas of education, health, immigration, civic engagement, economic empowerment, and the environment, including by promoting voter engagement. It works nationally to strengthen Latino nonprofits, promote public policy advocacy, and bring to scale a portfolio of innovative community programs through three essential pillars: membership services, advocacy services, and community assistance programs. This work assists the Hispanic electorate and other marginalized communities with registering to vote, applying for vote-by-mail ballots, and voting in local and federal elections.

52.     Providing voter registration assistance is one of Hispanic Federation's core missions. One way it accomplishes this goal is through offering access to TurboVote, an online voter registration platform, on its website and at its events. TurboVote is based on the federal voter

registration form created by the National Voter Registration Act ("NVRA"), which does not require DPOC. Due to H.B. 991, TurboVote will no longer be an effective method for voter registration for many of the voters Hispanic Federation seeks to engage, who may lack proof of citizenship acceptable under the statute. Hispanic Federation will have to redirect some of its resources to update its website to either remove TurboVote or modify it such that it is useful to all potential Florida registrants. Hispanic Federation also will have to engage in the burdensome task of evaluating other ways it can provide voter registration information to ensure that the website provides information useful to all voters, even those without DPOC. This will prevent Hispanic Federation from registering more voters and will divert resources away from its other core activities, such as get-out-the-vote efforts and providing voter protection and other voter information.

53.     In addition, as part of its civic engagement program, Hispanic Federation provides in-person voter-registration assistance. Hispanic Federation engages with voters across Florida, but primarily operates in Broward, Hillsborough, Lake, Miami-Dade, Orange, Osceola, Polk, Seminole, and Volusia Counties. As part of these efforts, Hispanic Federation uses the state's voter registration form, which currently does not require DPOC. Due to H.B. 991, Hispanic Federation will have to update all Florida-specific registration assistance materials, create new protocols to help with verifying citizenship documentation, and organize new trainings for all personnel involved in voter registration efforts instead of using training materials it already has. In addition, Hispanic Federation's in-person events often have many attendees who recently moved from out of state. H.B. 991's changes will require Hispanic Federation to invest more time and resources explaining to new Florida residents the need to provide more documentation and prove citizenship.

54.     Hispanic Federation is a registered third-party voter registration organization. Since

17

2016, Hispanic Federation has registered over 98,000 voters in Florida.

55.     Since 2019, Hispanic Federation has expended a substantial amount of resources updating its materials in response to frequent changes in Florida election law. This trend will continue under H.B. 991. As a direct result of H.B. 991, Hispanic Federation will have to make extensive changes to its trainings and materials. H.B. 991 will require it to rewrite its training guides, its operation plans, and all of the public-facing materials that it uses for its voter registration and civic engagement activities. Creating these additional materials and complying with the updated Florida regulations and guidelines will require Hispanic Federation to divert resources away from its other core activities. The changes within H.B. 991 will impose a significant financial strain and operational burden on the organization. The increased burden of complying with H.B. 991 will also diminish the effectiveness of Hispanic Federation's events because staff and volunteers will be required to spend more time and resources verifying citizenship documentation, which many people do not carry with them at public events, diverting their time and attention away from other efforts and generally making such events less effective for voter registration.

56.     Hispanic Federation works closely with its member agencies and partners to provide technical assistance, trainings, and support for their voter registration efforts. The new requirements would force Hispanic Federation staff to train organizations all over the state on the new changes to voter registration law, which will include translating all materials to Spanish.

57.     Hispanic Federation will have to undertake an entirely new process to vet DPOC that the law requires. Hispanic Federation would have to either hire an in-house specialist to verify the authenticity of DPOC submitted as proof of U.S. citizenship alongside collected voter registration applications or hire a costly third-party vendor to perform DPOC verification services. The new requirements will significantly and unnecessarily burden Hispanic Federation's scarce

18

organizational resources that they would otherwise spend helping voters register, following up with voters, and undertaking other activities to advance their missions.

58.     Further, because H.B. 991 impacts all U.S. citizens who registered through Hispanic Federation's voter registration drives, Hispanic Federation will suffer organizational harm in the communities where they have worked and continue to work to secure trust. H.B. 991's processes will likely result in registration form rejections, the mandatory cancellation of registrations, referrals to law enforcement for investigation, and potentially mandatory prosecution. At a minimum, Hispanic Federation will have to explain to the community members it engages why their voter registrations are suddenly at risk. This will create fear and confusion among members, and it risks harming Hispanic Federation's status as a trusted community voice, especially given the likely chilling effect this will have on its constituents' political participation.

59.     H.B. 991 will also require Hispanic Federation to re-educate and re-train all of its staff and volunteers on the new DPOC requirements. Hispanic Federation will also have to expend more resources on community outreach and education for newly naturalized and limited English proficient voters to ensure their ability to stay registered to vote.

60.     Plaintiff Florida Immigrant Coalition, Inc. ("FLIC") is a 501(c)(3) multi-racial and multi-ethnic coalition of member organizations with the mission of growing the connection, capacity, and consciousness of communities to strengthen pro-immigrant power in Florida. FLIC works to strengthen community ties, enhance capabilities, and raise awareness to increase the impact of pro-immigrant initiatives across Florida, including by mobilizing naturalized citizens to register and vote.

61.     Plaintiff FLIC Votes, Inc. ("FLIC Votes") is a 501(c)(4) nonprofit organization whose mission is to mobilize ordinary citizens to enact extraordinary change through powerful

19

civic engagement, popular education, and building consciousness. FLIC Votes works to increase the civic participation of historically marginalized communities across Florida through statewide voter registration, voter education, and get-out-the-vote efforts, as well as by organizing and advocating about issues important to those communities.

62.     FLIC and FLIC Votes are based in Miami, Florida. FLIC and FLIC Votes staff operate in Miami-Dade, Broward, Palm Beach, Orange, Osceola, and Duval Counties.

63.     FLIC is comprised of eighty-three standing member organizations that work to support the immigrant community in Florida through a variety of programs, including by assisting with voter registration and education for eligible naturalized citizens. FLIC unifies those organizations and supports them in achieving their shared goals, including by operating a New American Voters Program, which supports eligible immigrants with naturalization and subsequent voter engagement. In addition to the many constituents FLIC serves directly and through its work with its eighty-three member organizations, FLIC also has approximately 120 individual members of its own who live in more than fifteen counties in Florida. FLIC's membership and constituents, as well as the membership of FLIC's member organizations, include many naturalized citizens who are at risk of being removed from the voter rolls or denied access to the voter rolls in the first place due to the Challenged DPOC Provisions. The interests FLIC seeks to protect are germane to its organizational purpose, and neither the claims asserted, nor the relief requested, require the participation of FLIC's individual members in the lawsuit.

64.     FLIC Votes supports voter registration by conducting outreach and educating voters about, and directing them to, Florida's online voter registration system, as well as by helping applicants and voters resolve issues affecting their registration status. FLIC Votes also holds educational events—including advocacy trainings and voter education workshops—to provide

Floridians with the tools to protect their right to vote. FLIC Votes also engages in get-out-the-vote activities, including text-banking, phone-banking, and door-knocking. During the 2020 election cycle, FLIC registered more than 40,000 new voters, turned out 200,000 voters, and canvassed approximately 162,000 voters. During the 2024 election cycle, FLIC Votes assisted individuals with the voter registration process in Miami-Dade, Broward, Palm Beach, Orange, Volusia, Alachua, Hillsborough, Pinellas, Duval, and Seminole Counties.

65.     As a result of H.B. 991's passage, FLIC Votes will be forced to expend considerable resources to help FLIC's members, constituents, members of its member organizations, and other applicants and voters comply with the new DPOC requirement. FLIC Votes will help eligible citizens register, stay on the voter rolls, and vote through text-banking, phone-banking, and door-knocking. FLIC Votes will target, among other constituents, the voters FLIC and FLIC Votes registered directly since 2020 who are at risk of being removed from the rolls due to the Challenged DPOC Provisions. FLIC Votes will also target voters it has helped navigate Florida's online voter registration system in the past who are similarly at risk of removal from the rolls due to H.B. 991's citizenship verification procedures. FLIC Votes will also assist voter registration applicants who wish to register to vote in Florida but who lack any of the forms of DPOC that are required by H.B. 991. FLIC Votes will conduct a campaign to educate naturalized citizens regarding the need to update their DHSMV record with DPOC and will assist naturalized citizens navigate the process for doing so on an as-needed basis. FLIC Votes will educate, train, and assist FLIC's members, constituents, members of member organizations, and other naturalized citizens who need help with providing DPOC to county supervisors of elections to comply with the Challenged DPOC Provisions. FLIC Votes will assist prospective voter registration applicants who are unable to register through the online portal due to the DPOC requirement in § 97.0525(4).

21

66.     H.B. 991 will cause FLIC Votes to expend additional resources, including money and staff and volunteer time, to protect eligible voters who face barriers registering to vote, staying on the voter rolls, and voting due to the Challenged DPOC Provisions—for example, by training staff and volunteers on how to assist voters affected by the requirement, as well as by educating voters on what to do if they are required to provide such proof of citizenship. H.B. 991 thwarts FLIC Votes' mission because FLIC Votes will be forced to assist constituents and other voters it previously helped register who are removed from the voter rolls as a result of the law's citizenship verification process. It will also be forced to assist individuals it helps register for the first time who are not able to make it onto or stay on the rolls due to H.B. 991. As a result, FLIC Votes is limited, and will continue to be limited, to devoting fewer resources to its core organizational activities, including voter registration, voter education, and get-out-the-vote efforts, unless the Challenged DPOC Provisions are enjoined.

67.     Plaintiff Common Cause is a nonpartisan, grassroots organization organized under the laws of the District of Columbia, that has a mission of upholding the core values of American democracy. Common Cause works to create open, honest, and accountable government that serves the public interest; promote equal rights, opportunity, and representation for all; and empower all people to make their voices heard in the political process.

68.     Plaintiff Common Cause Education Fund (the "Education Fund") was formed in 2000 as a nonprofit under the laws of the State of Delaware. The Education Fund provides education, engagement, and research to its members, constituents, partner organizations, and the public about voter registration and the electoral process. The Education Fund works to create public engagement on democracy issues and promote effective citizen participation, which is critical for a healthy and robust democratic society. Common Cause and the Common Cause

22

Education Fund (together "Common Cause") bring this action jointly.

69.    Common Cause has approximately 50,106 members in Florida, who live throughout all of its 67 counties. Common Cause also has Florida-based staff, including a state director, who focus on advancing the organization's mission in Florida. Common Cause's membership includes eligible voters who are at risk of being removed from the voter rolls, or denied access to the voter rolls in the first place, due to H.B. 991's DPOC requirement and citizenship verification procedures. The interests Common Cause seeks to protect are germane to its organizational purpose and neither the claims asserted nor the relief requested requires the participation of Common Cause's individual members in the lawsuit.

70.    In Florida, Common Cause supports voter registration efforts by conducting voter outreach, providing education to members and partner organizations, directing individuals to Florida's online registration system, and assisting Florida-based partner organizations that work with people attempting to register to vote. Common Cause also anchors a nonpartisan Election Protection program, which helps Florida voters who have voting-related questions to navigate the election process and cast a ballot. Common Cause provides its members, partner organizations, and the public with authoritative, deeply-researched resources and tools to facilitate the registration and voting process, such as materials that help individuals registering to vote via paper applications and through Florida's online registration system.   Common Cause holds educational events, including advocacy trainings and voter education workshops, to provide Floridians with the tools to protect their right to vote. Common Cause also engages in statewide civic engagement and education campaigns that help Floridians understand the registration and voting process and assist eligible voters with registration, including voter education activities such as text-banking and phone-banking to ensure voters are aware of changes in voting practices.

71.     H.B. 991 directly impacts Common Cause's core registration-related and voter education-related activities. The bill will force Common Cause to divert its scarce resources from its planned voter education campaigns and election protection work to help its members, constituents, and other Floridians to comply with the DPOC requirement. Common Cause will be forced to establish new procedures, such as a voter assistance escalation protocol for staff, volunteers, and partners who are helping voters impacted by the DPOC requirement. Common Cause will be forced to create new infrastructures, including a new website, and fact sheets and voter resources to help eligible citizens impacted by H.B. 991 register, stay on the voter rolls, and vote. Common Cause will launch an outreach campaign using mail and email to identify and assist members and constituents who lack DPOC and are at risk of being removed from the voter rolls or denied access to the rolls. Common Cause will assist impacted citizens by helping them identify what steps they need to take to obtain and submit DPOC to election officials. Separate and apart from those efforts, Common Cause will also train staff, partner staff, and volunteers assisting with voter registration and election protection hotlines about the new DPOC requirements. And Common Cause will be forced to update its extensive resources about the voting process and create new educational materials about voter registration and voting to help its members, the public, and its partner organizations comply with H.B. 991. Common Cause will also have to retrain volunteers for the Haitian-Creole voter support line and update guidance for election protection volunteers for other hotlines to prepare them to support voters impacted by H.B. 991.

72.     H.B. 991 thwarts Common Cause's mission and undermines its core activities because Common Cause will be forced to expend more of its limited resources to assist members and other Floridians who are at risk of being removed from the voter rolls as a result of the bill's citizenship verification procedure, including by providing them with educational materials on how

24

to comply with the new requirements of H.B. 991. This would mean that Common Cause will have fewer resources to devote to its existing core organizational activities. By way of example and not limitation, Common Cause will have fewer resources to assist individuals struggling with other sorts of voter access issues and barriers to the ballot, whether through Common Cause's voter registration, voter education, or election protection efforts. In addition, Common Cause's extra work to help individuals who may be impacted by H.B. 991 will also diminish the organization's work in other areas, such as advocating for or against specific Florida legislation, educating members of the public about that legislation, and engaging with civil rights advocacy.

**B.      Defendants**

73.      Defendant Cord Byrd is Florida's Secretary of State and is sued in his official capacity. The Secretary of State is the State's chief election officer. *See* Fla. Stat. § 97.012. His duties include "[o]btain[ing] and maintain[ing] uniformity in the interpretation and implementation of the election laws." *Id.* § 97.012(1). To that end, he may adopt "uniform standards for the proper and equitable interpretation and implementation" of the election laws. *Id.* Defendant Byrd maintains Florida's online voter registration system and Florida's statewide voter registration list. *Id.* § 97.0525. Defendant Byrd is charged with ensuring the accuracy of the statewide list. Defendant Byrd's office has signed memoranda of understanding with state and federal agencies to facilitate the sharing of information contained in the statewide voter registration database, as well as the driver license information necessary to conduct H.B. 991's citizenship verification protocol. H.B. 991's Online Verification Registration Application Provisions and Retroactive DPOC Provision charge the Department of State with making an initial determination as to whether information on voters' U.S. citizenship is credible and reliable, as well as with notifying supervisors of elections of its determination and providing the supervisor with a copy of

the supporting documentation.

74.     Defendants Joe Scott, Alina Garcia, and Wendy Sartory Link are the Supervisors of Elections for Broward, Miami-Dade, and Palm Beach Counties, respectively. In their official capacities, the Supervisors are responsible for conducting all federal and state elections in their counties. Under the terms of H.B. 991's General DPOC Registration Provisions and removal procedures at § 98.075(7), the Supervisors must verify the U.S. citizenship of applicants for voter registration flagged by the Department of State and must remove registered voters from the rolls if they are unable to provide accepted forms of DPOC.

<strong>FACTUAL BACKGROUND</strong>

**A.      H.B. 991's DPOC Requirements**

75.     On April 1, 2026, Florida enacted H.B. 991.

76.     H.B. 991 constitutes a major overhaul of Florida's voter registration system, requiring unprecedented efforts on the part of various election officials, administrators, and other state agencies to implement its provisions by its January 1, 2027, effective date, which is in less than nine months. It systematically disadvantages married women, naturalized citizens, low-income voters, voters of color, students, transgender people, and all others who have changed their legal name. Plaintiffs challenge four provisions of H.B. 991, as detailed below.

77.     **General DPOC Registration Provisions** – H.B. 991 changes the processing and acceptance of voter registrations to subject every Florida voter—currently registered or prospective—to a citizenship verification regime tied to the records of the DHSMV. County supervisors may not accept a voter registration application, whether an initial application to register or an application "with a change in name, address, or party affiliation," if DHSMV data "indicate[s] that the applicant is not a United States citizen or has not provided a document

26

acceptable as evidence of United States citizenship." H.B. 991 § 4, *codified at* Fla. Stat. § 97.053(6)(a). If the DHSMV records indicate the applicant is not a U.S. citizen or has not provided DPOC, "the applicant must be notified and must provide . . . if applicable . . . a document acceptable as evidence of United States citizenship." *Id.* § 97.053(6)(a). If the registrant cannot do so, they are given a provisional ballot, which is only counted if they "present[] a document acceptable as evidence of U.S. citizenship no later than 5 p.m. of the second day following the election." *Id.*

78.     In addition to requiring supervisors of elections to obtain DPOC from applicants who have not previously provided DPOC to the DHSMV, H.B. 991 requires supervisors to initiate proceedings to remove applicants from the voter rolls if they have not previously provided DPOC or their citizenship cannot be confirmed in a cross-referenced database. *Id.* § 97.053(6)(b). If an application indicates that the applicant has not been issued a current and valid Florida driver license, ID card, or Social Security number, or if DHSMV records indicate the applicant is not a U.S. citizen or has not provided DPOC, "the supervisor of election shall verify the voter's legal status as a United States citizen using available state and federal governmental sources, and, if applicable, initiate notice pursuant to s. 98.075(7)." *Id.* Under § 98.075, supervisors must notify the registered voter of their potential ineligibility by mail within seven days and notify the applicant that they must respond within thirty days. H.B. 991, § 8, *codified at* Fla. Stat. § 98.075(7)(a)(1). If the applicant fails to provide DPOC, the supervisor must make a final determination of the voter's eligibility within seven days after the expiration of the voter's timeframe to respond and must remove the voter from the statewide system within seven days. *Id.*, *codified at* § 98.075(7)(a)(3).

79.     **Online Voter Registration Application Provisions** – H.B. 991 requires the Florida Department of State, which operates Florida's online voter registration process, to ensure that any

27

potential voter using the online registration system has provided DPOC. When someone applies to register to vote via the online voter registration system, the Department of State may only accept the application if the applicant has previously provided an acceptable form of DPOC to the DHSMV. H.B. 991 § 3, *codified at* Fla. Stat. § 97.0525(4)(b). However, "if an applicant's name and date of birth match the records of the [DHSMV], but the records of the [DHSMV] indicate the applicant is not a United States citizen or has not provided a document acceptable as evidence of United States citizenship," then the Department of State "must notify the supervisor of elections that the applicant's legal status as a United States citizen could not be verified and transmit . . . the applicant's registration information . . . to the supervisor of elections." *Id.* § 97.0525(4)(c).

80.     **Retroactive DPOC Provisions** – H.B. 991 imposes an ongoing obligation to conduct retroactive checks of the citizenship status of registered Florida voters, subjecting them to possible removal from the rolls if they have not provided acceptable DPOC. The law mandates that the Florida Department of State (1) "shall identify those registered voters who are potentially ineligible based on their legal status regarding United States citizenship by comparing or receiving information from other governmental entities as authorized by s. 98.093"; (2) shall "review and make an initial determination as to whether the information is credible and reliable"; and (3) shall "notify the supervisor and provide a copy of the supporting documentation indicating potential ineligibility of the voter to be registered." *See* H.B. 991 § 8, *codified at* Fla. Stat. § 98.075(6)(a).

81.     Section 98.075(6) lays out the procedures that must be followed when a voter or registrant is flagged as potentially ineligible based on the Secretary of State's review of the citizenship status of voters contained in the statewide voter registration database. *See id.* First, the Department of State must use information received from "other governmental entities" to make an "initial determination" as to whether any information it has regarding a registrant's citizenship "is

28

credible and reliable." *Id.* § 98.075(6)(a). If the Department of State determines that it is credible, it must notify the county supervisor and send any supporting documentation regarding the potential ineligibility of the voter. *Id.* Once a supervisor is notified, they must notify the voter and require them to submit acceptable DPOC. *Id.* §§ 98.075(6)(a) & (7)(a).

82.     **DPOC Type Provision** – H.B. 991 circumscribes which documents will constitute sufficient proof of citizenship. Those documents are limited to the following: "(a) An original or certified copy of a United States birth certificate"; "(b) A valid, unexpired United States passport"; "(c) A naturalization certificate issued by the United States Department of Homeland Security [("DHS")]"; "(d) A Consular Report of Birth Abroad provided by the United States Department of State"; "(e) A current and valid Florida driver license or Florida identification card issued by the [DHSMV], if such license or identification card indicates United States citizenship"; "(f) A current and valid photo identification issued by the Federal Government or the state which indicates United States citizenship"; or "(g) An order from a federal court granting United States citizenship." H.B. 991 § 1, *codified at* Fla. Stat. § 97.021(10). In addition, the statute provides that any difference between an applicant's legal name and their name as it appears on their qualifying citizenship documentation must be substantiated by official documentation proving a legal name change. *Id.*

**B.     The Stale Naturalization Data of the DHSMV and DHS's SAVE System**

83.     H.B. 991 contemplates Florida officials relying on "available state and federal governmental sources" for its DPOC provisions. H.B. 991 § 4, *codified at* Fla. Stat. § 97.053(6)(b). However, the systems Florida is relying upon (including the DHSMV and DHS' SAVE system) are not consistently reliable indicators of citizenship, particularly for naturalized citizens. Instead, the databases represent—at best—snapshots of particular points in time, as they do not have

mechanisms for automatically tracking naturalization. They also have name matching and typographical errors common to databases not designed for this use.

84.     Federal law recognizes that databases maintained for purposes other than voter registration should not be used to disqualify registered voters.

85.     Through the Help America Vote Act ("HAVA"), federal law requires a state's chief state election official to enter into an agreement with the state's motor vehicle authority "to match information" in their respective databases "to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration." 52 U.S.C. § 21083(a)(5)(B). It further requires state motor vehicle authorities to enter into an agreement with the Commissioner of the Social Security Administration ("SSA") for the same purpose. *Id.* § 21083(a)(5)(B)(ii). This data matching is done for the purpose of determining "the validity of numbers provided." *Id.* § 21083(a)(5)(A)(iii).

86.     To facilitate this verification of voter registration *information*, HAVA requires voter registration applicants to provide their driver license or state identification number, if they have a current and valid license or state ID, or, if they do not, the last four digits of their Social Security number. *Id.* § 21083(a)(5)(A). If an applicant has not been issued a driver license or Social Security number, the state must nevertheless process the application and "assign the applicant a number which will serve to identify the applicant for voter registration purposes." *Id.*

87.     HAVA does not, however, contemplate denying voter registration applications or removing registered voters from the rolls based on any of this database matching. HAVA does not require states to take any action based on the results of attempts to match voter registration information with motor vehicle or Social Security records. *See id.* § 21083.

88.     A majority of states do not deny a voter registration application or remove a

registered voter from the rolls based on the comparison of information between the state's voter registration database and fields in the motor vehicle or Social Security Administration database. This is in recognition that information mismatches across databases should not be used to take action against voter registration applicants and registered voters and rooted in the reality that these databases, while useful tools for election officials, are not fully accurate, up-to-date, and reliable records reflecting individuals' current eligibility to vote.

89.     In Florida, the DHSMV is responsible for issuing Florida driver licenses and ID cards. Under current practice in Florida, all new driver licenses and IDs, and all renewed driver licenses and ID cards, must be REAL ID compliant.[2] This means that, starting in 2020, U.S. citizens were required to provide DPOC to obtain a driver license or ID card.

90.     Since 2020, for U.S. citizens to obtain a driver license or ID card from the DHSMV, they must provide one of the following documents that would demonstrative their citizenship: a U.S. birth certificate, a U.S. passport or passport card, a Consular Report of Birth Abroad, a Certificate of Naturalization, or a Certificate of Citizenship.[3] U.S. citizens will be issued driver licenses or ID cards that match the name assigned to their Social Security number, so "[c]ustomers who have recently changed their name" must "update their records with the [SSA]" before "applying for a driver license or ID card."[4]

91.     However, U.S. citizenship is not required to obtain a REAL ID in Florida. Immigrants can obtain a REAL ID-compliant Florida driver license or ID with a Green Card, a

---

[2]    *Driver Licenses & ID Cards: What to Bring*, Fla. Highway Safety & Motor Vehicles, www.flhsmv.gov/driver-licenses-id-cards/what-to-bring/ [https://perma.cc/Q8XK-4WH3].
[3]    *What to Bring: U.S. Citizen*, Fla. Highway Safety & Motor Vehicles, www.flhsmv.gov/driver-licenses-id-cards/what-to-bring/u-s-citizen/ [https://perma.cc/W27V-6YQC].
[4]    *Id.*

grant of asylum with a valid passport, or a grant of refugee status with a valid passport.[5]

92.     Since 2020, the DHSMV database has contains some information related to the citizenship status that a person had as of their most recent interaction with the DHSMV, but the DHSMV has no mechanism to update its database to indicate that a person has become a U.S. citizen since their last DHSMV transaction. And the extent to which the DHSMV can easily evaluate the information it has related to individuals who obtained Real IDs before they naturalized is not clear.

93.     In addition to DHSMV data, Florida has an agreement to use DHS's SAVE system for voter registration and list maintenance.[6] Upon information and belief, Florida entered into a settlement agreement with the federal government on November 28, 2025, along with Ohio, Idaho, and Iowa, in which both the federal government and these four states agreed to work together to develop DHS's SAVE system. Secretary of State Cord Byrd released a statement that "'Florida successfully led this multistate effort to help secure accurate voter rolls,'" and the Department of State touted that the "agreement requires DHS to offer SAVE at no cost," to "add the ability to search full or partial social security numbers," and to "process bulk requests."[7] Upon information and belief, in this settlement, all four states that had sued the federal government agreed to develop a new memorandum of understanding to use DHS's SAVE system. Florida has since executed such a document with the federal government and is making use of that system to verify the citizenship

---

[5]   *What to Bring: Immigrant*, Fla. Highway Safety & Motor Vehicles, www.flhsmv.gov/driver-licenses-id-cards/what-to-bring/immigrant/ [https://perma.cc/VZD6-HN27].

[6]   Fair Elections Ctr., Eligible Voters at Risk: Examining Changes to USCIS's SAVE System 1 (July 2025), https://fairelectionscenter.org/wp-content/uploads/2025/07/Examining-Changes-to-USCISs-SAVE-System.pdf [https://perma.cc/9R2V-G9Z7].

[7]   Press Release, Fla. Dep't of State, Secretary of State Cord Byrd Announces Landmark Settlement Agreement with DHS to Better Secure Elections (Dec. 3, 2025), https://dos.fl.gov/historical/meetings-and-events/news-and-press-releases/view-release/?id=71232 [https://perma.cc/D4KQ-VB64].

of existing voters on its voter rolls and applicants for voter registration.

94.     H.B. 991 does not explicitly mention DHS's SAVE system, but the law repeatedly references unspecified state and federal databases that can be used as sources of citizenship information.

95.     H.B. 991 allows the Department of State to identify potential noncitizens "by comparing or receiving information from other governmental entities as authorized by s. 98.093." *See, e.g.*, H.B. 991 § 8 (amending Fla. Stat. § 98.075(6)(a)).

96.     The existing language in Fla. Stat. § 98.075(6) (2023), the text of which H.B. 991 does not change, allows county supervisors to use and act on information from "any governmental entity that identifies a registered voter as potentially ineligible," clearly encompassing DHS's SAVE system and making it a permissible source of voter registration list maintenance. However, H.B. 991 takes the additional step of requiring that new steps be taken on the basis of information received from such databases.

97.     DHS's SAVE has built-in lags similar to those in the DHSMV database, as well as long-existing blind spots and missing data fields, that have, among other problems, repeatedly caused it to misidentify naturalized citizens as noncitizens.

98.     DHS's SAVE system was reconfigured last year to allow for searches using numbers other than DHS identifiers (originally a Social Security number, and now also a passport number and, increasingly, state driver license numbers) and to allow for bulk uploads of voter data instead of the previous limitation that only one individual could be searched for at a time.[8] These

---

[8]   *Id.* at 2–3; Hannah Fingerhut, *GOP-Led States Settle Lawsuit Against Federal Government Over Checking Citizenship Status of Voters*, AP News (Dec. 1, 2025), https://apnews.com/article/ voting-noncitizens-dhs-florida-indiana-iowa-ohio-fd202f16765456a33661e031c259f3b5 [https://perma.cc/SN79-99EA].

changes appear to be aimed at transforming DHS's SAVE system into a national database that could be used to attempt to verify the citizenship status of any person.

99.     DHS's SAVE system suffers from significant accuracy issues. First, the system is pulling much of its citizenship data from the SSA, and a USCIS Privacy Threshold Analysis of DHS's SAVE system found that existing issues with Social Security data are exacerbated by USCIS using such data because USCIS "'is not the source agency for [SSA]-related information' and therefore 'cannot verify accuracy' of SSA data.'"[9] In addition, election officials have raised concerns about DHS's SAVE system's ability to separately identify individuals whose entries in the system may appear identical.[10]

100.     Upon information and belief, the data DHS's SAVE system is pulling from the SSA is often unable to confirm the citizenship of Americans born before SSA began collecting citizenship information. This is a significant portion of the voting-age population; SSA did not require Social Security number applicants to provide their citizenship status until 1972 and did not consistently retain that information until 1981, "meaning SSA likely has no information regarding the citizenship status of U.S.-born voters older than their mid-forties."[11]

101.     DHS's SAVE system also often misidentifies naturalized citizens as noncitizens, in part due to its SSA data. The SSA's citizenship data often only reflects the citizenship status of a

---

[9]     Vittoria Elliott, *DHS's Data Grab Is Getting Citizens Kicked Off Voter Rolls, New Complaint Says*, Wired (Jan. 22, 2026), https://www.wired.com/story/dhs-data-grab-getting-citizens-kicked-off-voter-rolls/.

[10]    *See* Will Doran, *NC Election Officials to Take New Steps to Investigate Non-Citizen Voting*, WRAL News (Nov. 25, 2025), https://www.wral.com/news/state/nc-election-officials-investigate-non-citizen-voting-nov-2025/ [https://perma.cc/9L6H-AQL2] (North Carolina Board of Elections staffer Adam Steele noted that it was possible that "'there may be multiple people with the same name, date of birth, and last four of their social,'" and he said he therefore was unsure "what to expect once the database matches are in operation.").

[11]    Fair Elections Ctr., *supra* note 6, at 5.

34

person at the time they apply for a Social Security number and card because "SSA has no process for automatically updating the citizenship data it maintains; rather, SSA relies on SSN-holders to inform SSA of any changes in their status."[12] Because of this lag, SSA itself has stated that its citizenship records are merely "a snapshot" and "do not provide definitive information."[13]

102.    Immigrants obtain Social Security numbers upon becoming permanent residents, and, upon information and belief, this is the status that remains associated with a person's Social Security number, even after they naturalize, unless and until they affirmatively update it.[14]

103.    Across the country, where election administrators have attempted to implement citizenship checks via DHS's SAVE system, naturalized citizens have been flagged by these checks and subject to disenfranchisement proceedings. In Texas, several voters flagged by DHS's SAVE system already had proof of citizenship on file, had a U.S. passport, or had proven their citizenship to Texas's Department of Public Safety.[15] In Missouri, DHS's SAVE system generated an initial list of potential noncitizens that was replaced with a subsequent list, without any explanation, that was significantly shorter; in St. Louis County, the original "list of 691 potential noncitizens

---

[12]   *Id.* at 4.

[13]   *Id.*; *see also* Elliott, *supra* note 9 ("Social Security numbers are issued to people legally allowed to work in the US and do not change once someone naturalizes. Immigration and naturalization processes are managed by DHS, and naturalized citizens are not required to tell SSA if they naturalize, meaning SSA data may be out of date.").

[14]   *Social Security Numbers for U.S. Permanent Residents*, Soc. Sec. Admin., https://www.ssa. gov/ssnvisa/Handout_11_1.html [https://perma.cc/XQ4T-23VA].

[15]   Natalia Contreras, *Texas Flagged Some Voters as 'Potential Noncitizens' But They Had Already Provided Proof of Citizenship*, Votebeat Tex. & Tex. Trib. (Dec. 18, 2025), https://www. texastribune.org/2025/12/18/texas-voter-roll-citizens-investigation/ [https://perma.cc/8YDV-24DA] ("11 registered voters in Travis County flagged as potential noncitizens actually provided proof of citizenship while obtaining a driver license or state ID at the Texas Department of Public Safety.").

dropped to 133," and in Boone County, it dropped from 74 to 33.[16] Most relevantly, in Charlotte County, Florida, DHS's SAVE system identified 15 people as noncitizens (out of 176,000 names submitted), and Elections Supervisor Leah Valenti found "three were . . . mistakenly added . . . [and] never intended to register," and "[t]wo others already sent in documentation to prove their naturalized citizenship."[17]

104.    States that require people to affirmatively come forward and provide DPOC to remain on the rolls after being flagged in a check of DHS's SAVE system have had low response rates to these requests for DPOC, which may be connected to current federal immigration enforcement efforts. One Texas county election official said that "reports of arrests of U.S. citizens by federal immigration officials across the country could be a factor."[18] Cameron County, Texas election administrator Remi Garza "got a call from a family member of a registered voter who was hesitant to walk into a county building to turn in proof of citizenship documentation, even though they are an American citizen," because "'[t]hey were afraid that there were going to be federal officers that would approach them while they were trying to resolve this.'"[19]

### C.    Florida's Naturalized Citizen Population

105.    Florida has the third-highest number of immigrants of any state in the country at 5.4 million, after just California (11.3 million) and Texas (six million).[20] Many of those people are

---

[16]   Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.* ProPublica (Feb. 13, 2026), https://www.propublica.org/article/save-voter-citizenship-tool-mistakes-confusion [https://perma.cc/27G4-FFQ2].

[17]   Alexandra Berzon & Nick Corasaniti, *Initial Review Finds No Widespread Illegal Voting by Migrants, Puncturing a Trump Claim*, N.Y. Times (Jan. 14, 2026), https://www.nytimes.com/2026/01/14/us/politics/noncitizen-voters-save-tool.html.

[18]   Contreras, *supra* note 15.

[19]   Elliott, *supra* note 9; Contreras, *supra* note 15.

[20]   Stephanie Kramer & Jeffrey S. Passel, *What the Data Says About Immigrants in the U.S.*, Pew Rsch. Ctr. (Aug. 21, 2025), https://www.pewresearch.org/short-reads/2025/08/21/key-findings-about-us-immigrants/ [https://perma.cc/V9PL-TWJX].

lawful permanent residents, or Green Card holders, with Florida having approximately 155,500 Green Card holders as of 2023.[21]

106.    Generally, an immigrant with Green Cards becomes eligible to apply for naturalization five years after becoming a lawful permanent resident.[22] For some, the time may be shorter; for example, Green Card holders become eligible to apply for citizenship only three years after they become lawful permanent residents if they are the spouse of a U.S. citizen.[23] This would suggest that an average of at least some tens of thousands of people are naturalizing in Florida each year.

107.    Because DHSMV data does not automatically update when people naturalize, people who naturalize after obtaining or renewing their current license or ID could be listed as a noncitizens in the DHSMV, subjecting them to additional burdens and barriers to remaining registered to vote under the new DPOC list maintenance program. This includes both the Retroactive DPOC Provision for all existing registrants and the General DPOC Registration Provisions for any registrants who submit an application for a change in name, address, or party affiliation. The DHSMV allows individuals to obtain a new driver license or state ID once they become U.S. citizens without any fee, but, upon information and belief, it can be very difficult to obtain an appointment to

---

[21]    Matt Brooks & Karin Brewster, *Unpacking Florida's Immigration Trends – Demographers Take a Closer Look at the Legal and Undocumented Population*, The Conversation (July 29, 2025), https://theconversation.com/unpacking-floridas-immigration-trends-demographers-take-a-closer-look-at-the-legal-and-undocumented-population-261425 [https://perma.cc/A3QX-9J3E].
[22]    *I Am a Lawful Permanent Resident of 5 Years*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/citizenship/learn-about-citizenship/citizenship-and-naturalization/i-am-a-lawful-permanent-resident-of-5-years [https://perma.cc/KR26-WET8].
[23]    *Chapter 3 – Spouses of U.S. Citizens Residing in the United States*, U.S. Citizenship & Immigr. Servs.: Pol'y Manual, https://www.uscis.gov/policy-manual/volume-12-part-g-chapter-3 [https://perma.cc/QJT3-8YSL].

108.     In sum, there is no requirement for individuals to provide the DHSMV with current information regarding their citizenship status if they have a still-valid license or ID. As such, DHSMV is not a reliable source of current citizenship information for many individuals.

109.     If a naturalized citizen wishes to use a naturalization certificate, that certificate costs $555 to replace or amend, and the process may take upwards of seven months.[24]

**D.     Challenges for Floridians Born in Puerto Rico**

110.     In addition, Florida has the largest Puerto Rican population of any U.S. mainland state, at 1.3 million people.[25]

111.     Access to birth certificates for Puerto Ricans has a complicated history. In 2009, the Commonwealth of Puerto Rico passed Law 191, which invalidated all Puerto Rican birth certificates issued before July 1, 2010. This law has led to confusion, frustration, and access gaps which persist.[26] Additionally, the process to get a Puerto Rican birth certificate is complicated because Puerto Rican birth certificates are not automatically conferred. VitalChek, the company that processes requests for Puerto Rico birth certificates through its partnership with the Puerto Rican Department of Health, states on its website that "processing times can vary depending on

---

[24] *See* U.S. Dep't of Homeland Sec., *G-1055, Fee Schedule, N-565, Application for Replacement Naturalization/Citizenship Document*, https://www.uscis.gov/g-1055?form=n-565 [https://perma.cc/27N9-FXCJ]  (last visited Mar. 23, 2026) (documenting the filing fee); U.S. Citizenship and Immigr. Servs., *Case Processing Times*, https://egov.uscis.gov/processing-times/ (last visited Mar. 23, 2026) (check for most current processing time by form).

[25] Jenn Hatfield & Jeffrey S. Passel, *Key Findings About Puerto Rico*, Pew Rsch. Ctr. (Feb. 5, 2026), https://www.pewresearch.org/short-reads/2026/02/05/key-findings-about-puerto-rico/ [https://perma.cc/K3B3-Z4BK].

[26] Luis Fieldman, *Puerto Ricans Face Issues Renewing Driver's Licenses due to 2010 Birth Certificate Law: "It's Extremely Frustrating"*, Mass Live (Sep. 20, 2022), https://www.masslive.com/springfield/2022/09/puerto-ricans-face-issues-renewing-drivers-licenses-due-to-2010-birth-certificate-law-its-extremely-frustrating.html  [https://perma.cc/MZ5M-36VK].

the type of certificate" and that "actual times may vary from a day to several weeks."[27] The company also has a notice on its landing page clarifying that "VitalChek makes no representations or warranties as to the accuracy, completeness or timeliness of the information herein . . ."[28] Taken together, these facts suggest that an individual requesting such a Puerto Rican birth certificate may not receive the documentation necessary to establish U.S. citizenship for an indeterminate amount of time. H.B. 991's DPOC requirement thus imposes an unnecessarily high burden on Puerto Rican born voters.

112.    Natural disasters have exacerbated access gaps for Puerto Ricans. Hurricane Maria caused an extensive exodus of Puerto Ricans to the U.S. mainland.[29] Florida was the largest recipient of Puerto Ricans that migrated to the U.S. mainland from Puerto Rico after Hurricane Maria.[30] Between 2017 to 2019, it is estimated that the Florida received between 114,396 to 212,607 Puerto Rican born individuals. Approximately ninety-three percent of the post-Maria Puerto Rico population that left Puerto Rico for the state of Florida was above 18 years old, according to that same report.[31] Just looking at this small sample size, it is possible that nearly 90,000 to 180,000 Puerto Rican born voters in the state could face difficulties accessing a copy of their Puerto Rican birth certificates because of Law 191's invalidation of Puerto Rican birth

---

[27]  *Timing and Pricing*, VitalChek, https://www.vitalchek.com/v/timing-and-pricing [https://perma.cc/XAN6-PRAQ].

[28]  *See Puerto Rico Department of Health (PR) Order Certificates – VitalChek*, https://www.vitalchek.com/v/birth-certificates/puerto-rico/puerto-rico-department-of-health?gad_source=1&gad_campaignid=23530588464&gbraid=0AAAAAD_dlYmm0kIHEOuF7VsdH023egHf2&gclid=Cj0KCQjwmunNBhDbARIsAOndKpnFHAHt10vVQET3TuEnsWGlhEPDesyCau4e2KGzmMPCEvofuXI8w7caAuYVEALw_wcB (last visited Mar. 24, 2026).

[29]  *See* Edwin Melendez & Jennifer Hinojosa, *Estimates of Post-Hurricane Maria Exodus from Puerto Rico* (Ctr. for Puerto Rican Stud., Research Br.), https://centropr.hunter.cuny.edu/app/uploads/2023/03/RB2017-01-POST-MARIA-EXODUS_V3.pdf https://perma.cc/DH65-7WW3].

[30]  *Id*.

[31]  *Id*. at 2, 6.

certificates, the inability to access those documents because they were impacted by Hurricane Maria, or some combination of the two.[32] This figure is likely an underestimate, considering that migration from Puerto Rico to the U.S. mainland has been a consistent trend, leading to significant population gain for the state of Florida historically.[33]

113. Puerto Ricans have also faced a long history of discrimination. They have struggled to access democracy and basic services, including access to driver licenses. In August of 2018, Puerto Rican voters sued thirty-two supervisors of elections across the state of Florida to ensure access to basic bilingual voting materials that federal law required but that were not administered until the parties reached a settlement agreement on the matter.[34] In 2019, in Georgia, the Department of Driver Services subjected Puerto Rican-born individuals to more onerous requirements for receiving driver licenses despite their eligibility to obtain such documents.[35]

**E. Burdens on Older Voters in Florida**

114. H.B. 991 places particular burdens on older citizens. Older citizens who have not yet obtained Real ID from DHSMV and potentially will not obtain this ID will be burdened if they want to register to vote for the first time in Florida, if they need to update their existing Florida voter registration because they move or want to change political party, and are particularly at risk for possible removal for indications of noncitizenship when the State makes use of SSA data through DHS's SAVE system. This is because SSA data does not capture the citizenship status of many Americans, including older Americans.

---

[32] *Id*. at 5–6.

[33] *See* Jenn Hatfield & Jeffrey S. Passel, *Key Findings About Puerto Rico*, Pew Rsch. Ctr. (Feb. 5, 2026), https://www.pewresearch.org/short-reads/2026/02/05/key-findings-about-puerto-rico/ [https://perma.cc/UD7D-Y8Q8] (finding that Puerto Rican population decreased from 3.8 million in 2004 to 3.2 million in 2025).

[34] *See* Compl., *Rivera-Madera v. Detzner*, No. 1:18-cv-152 (N.D. Fla. 2018).

[35] *See* Compl., *Caban Gonzalez v. Moore*, No. 1:19-cv-3035 (N.D. Ga. 2019).

115.     SSA was not even required to collect citizenship information from applicants until the Social Security Amendments of 1972 mandated that "applicants for social security account numbers [provide] such evidence as may be necessary to establish the age, citizenship, or alien status, and true identity of such applicants."[36] And even after that, SSA did not begin to consistently maintain citizenship information until 1981.[37]

116.     Because SSA data did not include citizenship status until the 1972 and did not consistently retain that data until 1981, DHS's SAVE system may not be able to confirm the citizenship status of many U.S.-born citizens older than their mid-forties or of U.S. citizens who naturalized before the SSA data included citizenship data.

117.     In a recent review, the SSA estimated that "approximately ¼ of [its] records do not have an indication of citizenship present." [38] Therefore, unless a person whose SSA records were created before the agency collected citizenship data has previously provided DPOC to the DHSMV, when a state official attempts to check their citizenship status to newly register them to vote or determine if they are eligible to remain registered and cast a regular ballot, there may not be a state or federal database that confirms their citizenship status. And, while those at the younger end of the age group whose citizenship is not recorded in SSA records may be more likely, upon information and belief, to have provided DPOC to the DHSMV because they have obtained a

---

[36]   Social Security Amendments of 1972, Pub. L. 92-603, § 137(2), 86 Stat. 1329, 1364–65 (1972).

[37]   Soc. Sec. Admin., *Social Security Number Chronology*, https://www.ssa.gov/history/ssn/ssnchron.html [https://perma.cc/7KXL-UQ4Z] (last visited Mar. 24, 2026) (explaining that SSA requirements regarding citizenship arose in the 1970s).

[38]   Soc. Sec. Admin., *Computer Matching Agreement Between Department of Health and Human Services, Centers for Medicare & Medicaid Services, and Social Security Administration for Determining Enrollment or Eligibility for Insurance Affordability Programs under the Patient Protection and Affordable Care Act* 16, https://www.ssa.gov/privacy/cma/CMS%20SSA%20CM A%20Re-establishment.ACA%202008.Final.Signed%20by%20DIBs%209.29.20%20(002).pdf (last visited Mar. 23, 2026).

REAL ID, people who are experiencing vision, cognitive, and/or mobility impairments as they age that have prevented them from continuing to drive may be less likely to have provided DPOC to the DHSMV in the past, especially if they have a retirement home ID that they can use for most purposes in lieu of a state ID. Thus, the greatest burden to exercise their fundamental right to vote may be on those who would have the hardest time satisfying it.

118.    Florida has one of the largest populations of people over the age of sixty-five in the country, both by absolute numbers and by percentage. Florida has 4.8 million residents age sixty-five or older, comprising twenty-two percent of its population—the second-highest absolute number and second-largest percentage of any state.[39]

### F.    Jim Crow's Lasting Effects on SSA Data and Access to DPOC

119.    In Florida, and its neighboring states, segregation that persisted through the mid-twentieth century precluded some Black citizens from obtaining a key form of DPOC: a birth certificate. As State Representative Ashley V. Gantt pointed out during debate on H.B. 991, "We are not far beyond the impacts of Jim Crow, especially here in the South."[40] Some of those who were born without access to a birth certificate are now older Black voters in Florida, who are not and have never been able to access that documentation. Gantt explained that "many Black families in the South relied on midwives because segregated hospitals denied them care, leaving some people without birth certificates," including her aunt, "a Florida resident born in South Carolina,

---

[39]   U.S. Dep't of Health and Hum. Servs., Admin. for Cmty. Living, *2023 Profile of Older Americans* 8 (2023), https://acl.gov/sites/default/files/Profile%20of%20OA/ACL_ProfileOlder Americans2023_508.pdf.

[40]   Amelia Orjuela Da Silva, *Florida Proof-of-Citizenship Election Bill Raises Fears for Black, Low-Income and Naturalized Voters*, Mia. Times (Mar. 10, 2026), https://www.miamitimesonline.com/news/local/florida-proof-of-citizenship-election-bill-raises-fears-for-black-low-income-and-naturalized-voters/article_3a59458d-4e4c-4582-b87b-b6f1c86d 2b84.html.

who was recently denied an ID renewal because she could not produce a birth certificate."[41]

120.    For voters without a birth certificate, the process to obtain a document that will be accepted as proof of citizenship under H.B. 991's DPOC Type Provision is complex, time-consuming, and resource-intensive.

121.    If a person was never issued a birth certificate and wishes to obtain a passport to use as DPOC, they must provide secondary evidence of U.S. citizenship to the federal government. This must include a "Letter of No Record" from the registrar of vital statistics in the state where a person was born indicating that there is no birth certificate for that person on file, and, unless a "close blood relative or the attending physician" is still alive and available to attest to having "personal knowledge of" and memory of "the passport applicant's birth,"[42] the applicant must provide an "early public record or document."[43] Early public records must be "from the first five years of an applicant's life" and "should include the applicant's full name, date of birth, and place of birth."[44] Examples provided are a baptism certificate, U.S. Census record, and early school records.[45]

122.    Because many Black voters who were unable to obtain a birth certificate due to racial segregation are now elderly, the difficulty of getting another form of acceptable DPOC, assuming the materials needed to obtain it still exist and can be both located and accessed, may be exacerbated by mobility challenges, lack of access to transportation, and disability or illness. The passage of decades since one's birth, the death of family members, and possible changes in location

---

[41]   *Id.*
[42]   Form DS-10: Birth Affidavit.
[43]   *Citizenship Evidence*, U.S. Dep't of State: Travel.State.Gov, https://travel.state.gov/content/travel/en/passports/how-apply/citizenship-evidence.html.
[44]   *Id.*
[45]   *Id.*

in the intervening years may make it impossible to locate or access documents that may allow one to obtain DPOC. These documents may also simply have never existed or may no longer exist.

123. In response to multiple Florida House members sharing information about family members who did not have birth certificates because of this legacy of Jim Crow, one of the bill sponsors admitted that she "was actually really shocked and didn't know about what happened with birth certificates during the Jim Crow era," but insisted that no changes were necessary to the law to account for that. In that same hearing, one member also noted that with this bill, "[w]e are disenfranchising a population of people, and most of them are going to be older [B]lack voters."

### G.   The Difficulty of Accessing Certain DPOC

124. H.B. 991's requirement of DPOC imposes a severe burden on many Florida voters who do not have and who cannot easily obtain the required documents.

125. Roughly half of Americans, including fifty-six percent of Black Americans, lack a valid passport.[46] The application and execution fees for a new passport book can cost $165, and it can take up to two months to receive a passport.[47] Expedited service for a passport costs an extra

---

[46]   Nathan Diller, *Americans Want to See the World, but Only 51% Took This Important Step to Do It*, USA Today (Oct. 23, 2024), https://www.usatoday.com/story/travel/news/2024/10/23/state-department-issues-record-us-passports/75794556007/ [https://perma.cc/SU4K-9K3K]; YouGov, *Adults Under 30 Are More Likely Than Older Americans to Have a Current U.S. Passport*, (Aug. 31, 2023), https://yougov.com/en-us/articles/46028-adults-under-30-more-likely-have-us-passport [https://perma.cc/5845-LNRK]. *See also* U.S. Census Bureau, *Census Bureau Projects U.S. and World Populations on New Year's Day* (Dec. 30, 2024), https://www.census.gov/newsroom/press-releases/2024/population-new-years-day.html [https://perma.cc/26B8-794R] (U.S. Census Bureau estimates population at 341,554,209); U.S. Dep't of State, Bur. of Consular Affs., *Reports and Statistics*, https://travel.state.gov/content/travel/en/about-us/reports-and-statistics.html [https://perma.cc/8A9R-59KY] (169,915,821 valid passports in circulation in Fiscal Year 2024).
[47]   Bur. of Consular Affs., *Passport Fees*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/passports/how-apply/fees.html [https://perma.cc/9BDE-2ANH]; Bur. of Consular Affs., *Get Your Processing Time*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/passports/how-apply/processing-times.html [https://perma.cc/L988-P8Y5].

sixty dollars on top of the application and execution fees, and the time to process an expedited request varies depending on demand, at one point taking up to twelve weeks to process a request, and that is after the application is received by the passport agency.[48]

126.    Indeed, the Legislature heard testimony that "[m]ore than 8 million Floridians do not have a valid passport." In order to obtain a U.S. passport, one must provide other DPOC—specifically, a U.S. birth certificate, an undamaged U.S. passport that was valid for a certain number of years, a consular report of birth abroad, or a certificate of naturalization or citizenship—or go through an often complex and not always possible process of obtaining other evidence of citizenship.

127.    More than 21 million American citizens do not have a birth certificate, a passport, or naturalization papers readily available, according to a recent survey.[49]

128.    At a Senate hearing, one of the bill's co-sponsors acknowledged that she did not know how many Florida voters lack a REAL ID.

### H.    Impact on Voters with Disabilities

129.    The Legislature also heard testimony about the detrimental impact H.B. 991 would have on voters with disabilities.

---

[48]  Bur. of Consular Affs., *Passport Fees*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/passports/how-apply/fees.html [https://perma.cc/9BDE-2ANH]; *see, e.g.*, District Update, Off. of Congressman Jim McGovern, https://mcgovern.house.gov/news/email/show.aspx?ID=S4GTPSKFBP6BSN243T5UX67PBI [https://perma.cc/2AKS-VEW7].
[49]  Kevin Morris & Cora Henry, *Millions of Americans Don't Have Documents Proving Their Citizenship Readily Available*, Brennan Ctr. for Just. (June 11, 2024), https://www.brennancenter.org/our-work/analysis-opinion/millions-americans-dont-have-documents-proving-their-citizenship-readily [https://perma.cc/A2WQ-49X4].

130.    A representative from Disability Rights Florida testified that "[m]any people with disabilities do not have IDs or ability to get the documents requirement," and that "paper forms are also inaccessible to some of those with physical disabilities such as blind voters."

**I.        Natural Disaster Displacement and Homelessness in Florida**

131.    It is particularly difficult to comply with requirements to provide DPOC for those who have been displaced from their home temporarily or permanently due to natural disasters and for those who are homeless and must move frequently or do not have an indoor residence.

132.    Florida's climate creates additional barriers to retaining DPOC. In Florida, there is significant displacement due to hurricanes and associated flooding. For example, six million people in Florida had to evacuate from Hurricane Milton in 2024,[50] and 125 homes were ultimately destroyed.[51] Florida also received among the largest share of Puerto Ricans who migrated from the i mainland in the aftermath of Hurricane Maria, which had also destroyed many homes and forced people to evacuate quickly.[52]

133.    Florida has the fourth-largest population of unhoused individuals in the country at approximately 31,362.[53] For such populations, the lack of a permanent mailing address or a safe place to store documents, as well as costs associated with obtaining necessary documents, can be

---

[50]   Chelsea Harvey, *Disasters Displaced a Record 46 Million People Last Year*, SCIAM (May 13, 2025), https://www.scientificamerican.com/article/hurricanes-wildfires-and-other-disasters-displaced-a-record-46-million/ [https://perma.cc/EVQ2-4W45].

[51]   Tural Ahmedzade, et al., *A Visual Guide to the Damage Caused by Hurricane Milton*, The Guardian (Oct. 10, 2024), https://www.theguardian.com/us-news/2024/oct/10/hurricane-milton-maps-charts-graphics-damage [https://perma.cc/P4ZB-AGXK].

[52]   Edwin Mélendez & Jennifer Hinojosa, Ctr. for Puerto Rican Studs. at CUNY, Estimates of Post-Hurricane Maria Exodus from Puerto Rico, https://centropr.hunter.cuny.edu/app/uploads/2023/03/RB2017-01-POST-MARIA-EXODUS_V3.pdf [https://perma.cc/XAE8-85V3].

[53]   Elliott Davis Jr. et al., *States with the Largest Homeless Populations*, U.S. News & World Rep. (Jan. 13, 2025), https://www.usnews.com/news/best-states/articles/states-with-the-most-homeless-people.

prohibitive. Indeed, "less than 10% of people experiencing homelessness vote because of challenges related to cost, transportation, physical and health limitations, and more."[54]

134. The Legislature heard testimony from one formerly homeless Florida resident who testified that "a lot of" homeless people "don't have documents or access to documents," and that "[a] lot of these documents get wiped away when you are homeless. A lot of these documents get lost."

135. In a separate hearing, a member noted that "[h]urricane season is, you know, late October," shortly before November elections, and asked what a Florida voter was supposed to do in the event that they were required to produce birth certificate but "everything's gone in a hurricane." In response, one of the bill sponsors responded: "I think that the intention is not to—I don't know. Is there a specific section of the bill in which you think that they will just get flagged and that will occur? I mean this is really about making sure that we're using – and there's the sharing of information."

### J.        Impact on Those with Name Changes and More Than One Surname

136. Under H.B. 991, if a voter must provide DPOC and their "legal name is different from the name that appears on the document, official legal documentation providing proof of legal name change is also required to constitute acceptable evidence of United States citizenship." H.B. 991 § 1, *codified at* Fla. Stat. § 97.021(10).

137. This will disproportionately impact populations that are more likely to have changed their names, such as married people (particularly married women) and transgender or nonbinary individuals who may have changed their name to conform with their gender identity.

---

[54] *Can Unhoused People Vote?*, VoteRiders, https://voteriders.org/article/can-unhoused-people-vote/ [https://perma.cc/49KB-U2GV].

The same concern exists for individuals with more than one surname, common among Hispanic and Latino individuals. These individuals will need to provide extra documentation to be able to register to vote.

138.    If a U.S. citizen has changed their name because of marriage or any other reason but their only proof of citizenship is their birth certificate reflecting their older name, they will need to take additional steps and face additional burdens before they can register to vote or update their registration or avoid an incorrect purge. These individuals will need to track down and provide election officials with copies of additional documents, such as their marriage or divorce certificates. These voters will thus need to provide copies of more than one external document before they can exercise their right to vote. This creates an additional burden on the right to vote.

139.    Millions of Americans have changed their legal name and therefore are unable to register to vote with their birth certificates. For example, roughly eighty-four percent of married women and six percent of married men in opposite-sex marriages in the United States changed their name when they got married.[55] According to one survey, one third of voting-age women do not have proof of citizenship that reflects their current name.[56]

140.    The Legislature heard testimony that "[m]ore than 4.7 million women in Florida do not have a birth certificate with their current legal name," as well as examples of several specific female voters in Florida who do not have DPOC that matches their current name.

141.    In addition, of the roughly 1.3 million American adults who identify as

---

[55]  Luona Lin, *About 8 in 10 Women in Opposite-Sex Marriages Say They Took Their Husband's Last Name*, Pew Rsch. Ctr. (Sep. 7, 2023), https://www.pewresearch.org/short-reads/2023/09/07/about-eight-in-ten-women-in-opposite-sex-marriages-say-they-took-their-husbands-last-name/ [https://perma.cc/UDK5-EXNM].
[56]  Ian Vandewalker, *Analysis: The Effects of Requiring Documentary Proof of Citizenship to Register to Vote*, Brennan Ctr. for Just., https://www.scribd.com/document/354176622/The-Effects-of-Requiring-Documentary-Proof-of-Citizenship [https://perma.cc/W2YC-AZPF].

transgender,[57] many have changed their legal names and are therefore unable to register to vote with their birth certificates.

### K.   Unsuccessful Expansive List Maintenance Using Federal Data and Stale DMV Data

142.    There is a long and unfortunate history—in Florida and elsewhere—of states relying on outdated or otherwise inaccurate citizenship data to remove eligible voters from the rolls. Indeed, in 2012, Florida officials used driver license information to identify almost 180,000 purported noncitizens on the rolls.[58] Upon further review, officials dramatically shrank that number to 2,625 voters who they claimed were ineligible to vote.[59] After the then-Florida Secretary of State had already sent the list of 2,625 voters to county election officials and directing them to begin initiating removal proceedings,[60] officials rechecked the list and discovered that the number of noncitizens allegedly registered to vote was just 207 people, and in the end, just eighty-five people were removed from the rolls for allegedly being noncitizens.[61] The efforts by election officials in Florida in 2012 to purge alleged noncitizens from the voter rolls were eventually found by the Eleventh Circuit to violate federal law (the National Voter Registration Act).[62] This largely failed purge attempt was much more likely to impact Hispanic voters and other voters of color; a

---

[57]   UCLA Sch. of L., Williams Inst., *How Many Adults and Youth Identify as Transgender in the United States?* (June 2022), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf [https://perma.cc/S5LV-LVYG].

[58]   Gary Fineout, *Nearly 200,000 Florida Voters May Not be Citizens*, NBC Mia. (May 11, 2012), http://www.nbcmiami.com/news/local/Nearly-200000-Florida-Voters-May-Not-Be-Citizens-151212725.html.

[59]   *Id.*

[60]   *See* Rachel Weiner, *Florida's Voter Purge Explained*, Wash. Post (June 18, 2012), https://www.washingtonpost.com/blogs/the-fix/post/floridas-voter-purge-explained/2012/06/18/gJQAhvcNlV_blog.html.

[61]   *See* Amy Sherman, *Homeland Security Warned That the SAVE Database is Not Foolproof Way to Verify the Voter Rolls*, LWV says, PolitiFact: Fla. (Oct. 30, 2013), http://www.politifact.com/florida/statements/2013/oct/30/leaguewomen-voters-florida/league-women-voters-says-homeland-security-warned-/.

[62]   *See Arcia v. Detzner*, 772 F.3d 1335 (11th Cir. 2014).

49

Miami Herald poll found that eighty-seven percent of those the State identified as noncitizens were people of color and fifty-eight percent were Hispanic.[63]

143.    In the last decade, other states have instituted similar programs, which also have resulted in election officials greatly overstating the number of alleged non-citizens registered to vote. For example, in January 2019, Texas Attorney General Ken Paxton announced that nearly 100,000 registered voters in Texas had been identified as noncitizens,[64] and days later President Trump claimed that 58,000 noncitizens had voted in Texas.[65] This effort by Texas resulted in litigation in which a federal judge noted that, as a result of Texas' efforts, "perfectly legal naturalized Americans were burdened with what the Court finds to be ham-handed and threatening correspondence from the state which did not politely ask for information but rather exemplifies the power of government to strike fear and anxiety and to intimidate the least powerful among us."[66] Per a cursory inspection, "the number of registered voters flagged by the state began to plummet"; more than half of the 30,000 flagged in Harris County were confirmed naturalized citizens, leaving 12,000 possible noncitizens, but when that group was randomly audited, officials found no noncitizens, so they declined to take further action.[67]

---

[63]   Marc Caputo & Patricia Mazzei, *Voter Roll Purge Most Likely to Target Hispanics, Democrats, Analysis Finds*, The Ledger (May 23, 2012), https://www.theledger.com/story/news/2012/05/23/voter-roll-purge-most-likely-to-target-hispanics-democrats-analysis-finds/26496994007/.

[64]   Ken Paxton (@KenPaxtonTX), Twitter (Jan. 25, 2019), https://x.com/kenpaxtontx/status/1088898595653386240.

[65]   Donald J. Trump (@realDonaldTrump), Twitter (Jan. 27, 2019), https://x.com/realDonald Trump/status/1089513936435716096.

[66]   *LULAC v. Whitley*, No. SA-19-CA-074-FB, 2019 WL 7938511, at *1, (W.D. Tex. Feb. 27, 2019).

[67]   Alexa Ura, *'Someone Did Not Do Their Due Diligence': How An Attempt To Review Texas' Voter Rolls Turned Into A Debacle*, Tex. Trib. (Feb. 1, 2019), https://www.texastribune.org/2019/02/01/texas-citizenship-voter-rollreview-how-it-turned-boondoggle/ [https://perma.cc/V3RC-ZE

144.    This history of Florida and other states using highly inaccurate processes to attempt to identify and remove voters suggests a similarly grave risk of errors and disenfranchisement here.

**L.      The Lack of State Interest in H.B. 991**

145.    The Florida Legislature heard considerable testimony from witnesses discussing how a DPOC requirement would increase the burdens on naturalized citizens in Florida—in terms of financial, time, and bureaucratic costs—in a political environment in which naturalized citizens increasingly and reasonably fear under attack. But there still there was not sufficient evidence provided by the Legislature providing any complying state interest for why the changes required by H.B. 991 are needed.

146.    In fact, government officials in Florida have publicly noted how well Florida's election are already working.

147.    Defendant Byrd has stated that "Florida's elections are the gold standard for the nation."[68]

148.    Governor Ron DeSantis has stated that Florida has "become a national leader by running the most secure elections in the country."[69]

149.    Several of H.B. 991's sponsors testified that Florida has been "the gold standard" of elections prior to the passage of the bill, indicating there is no need for H.B. 991's passage.

---

BA]; *see also Summary*, UCLA Latino Pol'y & Pol. Inst. (Apr. 26, 2019), https://latino.ucla.edu/research/texas-lulac-vs-whitley/ (noting that Texas Secretary of State David Whitley abandoned this effort and reached a settlement agreement through related litigation).

[68]   Press Release, Fla. Dep't of State, In 2022, Florida Again Showed the Nation How to Count Votes, Fairly, Lawfully, and on Time (Jan. 9, 2023), https://dos.fl.gov/communications/press-releases/2023/press-release-in-2022-florida-again-showed-the-nation-how-to-count-votes-fairly-lawfully-and-on-time/.

[69]   Press Release, Exec. Off. of the Governor, Governor Ron DeSantis Signs Bill to Strengthen Florida's Election Integrity (Apr. 25, 2022), https://www.flgov.com/eog/news/press/2022/governor-ron-desantis-signs-bill-strengthen-floridas-election-integrity.

150.    As Senator Tina Scott Polsky testified, H.B. 991 is "rushed, it's dangerous. It is going to cause massive chaos and confusion. . . . Everyone's been voting just fine. We haven't heard of one instance of a noncitizen voting that's the basis for this bill."

**M.      Poor Implementation of H.B. 991 Will Further Burden Voters**

151.    Per Section 34 of H.B. 991, most of the significant new changes to voter registration and list maintenance must be in place by January 1, 2027. That is only eight months from now. H.B. 991 requires that government officials engage in significant changes, including widespread, expansive database interfacing with federal agencies and new immediate real time interactions with DHSMV. It is unlikely that officials will be able to implement these changes in such a short period of time. This timing is particularly concerning because Florida has no control over the federal government database it is proposing to rely upon heavily; and because H.B. 991 provides no additional funding to DHSMV for the significant changes to and increase use of their files and database that is proposed.

152.    The last time Florida implemented such a major change to its voter registration process was the enactment of online voter registration, and that process took more than two years. Online voter registration was approved by the Legislature in May of 2015 and not active and available to the public until October 2017.[70]

153.    These implementation challenges mean that H.B. 991 is likely to burden an even more significant number of voters in Florida.

---

[70]    *See* Pew, *Florida Approves Online Voter Registration* (May 15, 2015), https://www.pew.org/en/research-and-analysis/articles/2015/05/19/florida-approves-online-voter-registration; Press Release, Fla. Dep't of State, Florida Department of State Announces Upcoming Launch of New Online Voter Registration Website – RegisterToVoteFlorida.gov – on Sunday, October 1 (Sep. 28, 2017), https://dos.fl.gov/communications/press-releases/2017/florida-department-of-state-announces-upcoming-launch-of-new-online-voter-registration-website-registertovotefloridagov-on-sunday-october-1/.

154.     The Legislature rejected an amendment that would move H.B. 991's effective date to January 1, 2029, to allow for more time to ensure proper implementation. One member stated that: "Supervisors [of Elections] are already raising questions. I know because they've reached out to me about staffing capacity, system readiness, and the implementation costs. And yet this entire structure is scheduled to take effect in 2027 in the middle of major election cycles without a full runway for rulemaking, testing, budgeting, and voter education." The amendment to move the effective date back failed.

**COUNT ONE**
**Violation of the First and Fourteenth Amendments**
**Protections Against Undue Burden on the Right to Vote**
**(Against all Defendants)**

155.     Plaintiffs incorporate and reallege Paragraphs 1 through 154 of this Complaint into this section by reference.

156.     The First and Fourteenth Amendments guarantee the fundamental right to vote. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

157.     To evaluate a state law challenged as a violation of the fundamental right to vote, a court must "weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burden imposed by the rule, taking into consideration the extent to which those justifications require the burden to plaintiffs' rights." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). If a law severely burdens the right to vote, it must "be narrowly drawn to serve a compelling state interest." *Id.* When "a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Id.* at 1318–19. This is a sliding scale analysis, such that "[t]he more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." *Id.* (citing *Stein v. Ala. Sec'y of State*, 774 F.3d 689, 694 (11th Cir. 2014)).

53

158.    The Challenged DPOC Provisions in H.B. 991 impose a significant burden on the right to vote and should therefore be subject to strict scrutiny. However, even if they are seen as imposing a more minimal burden, Florida cannot produce any legitimate state interest that would allow this law to stand.

159.    In particular, the Challenged DPOC Provisions will force naturalized citizen voters to take extra steps to register to vote and remain registered to vote to cast a regular ballot to which other citizen voters are not subject simply because of their place of birth. This is because the Online Voter Registration Application Provisions and the General DPOC Registration Provisions require DPOC to be solicited from naturalized citizen voters if they last received a driver license or ID card before naturalizing, they have not affirmatively provided DPOC to the Department of State or their supervisor since naturalizing, and their citizenship cannot be verified in another way. They are also more likely to be caught up in the Retroactive DPOC Provision, requiring the same extra steps to register to vote and remain registered to vote to cast a regular ballot, because that process is only triggered if a voter emerges as "potentially ineligible based on their legal status" through the Department of State "comparing or receiving information from other governmental entities," which, upon information and belief, includes stale DHSMV and, possibly, DHS's SAVE system data.

160.    H.B. 991's requirement that many voters provide acceptable DPOC to successfully register using the online voter registration system, as well as provide acceptable DPOC to successfully register to vote other ways, to update their voter registration per § 97.053(6), or to remain registered per § 98.075, create an undue burden on the right to vote because many individuals do not have any access to the required citizenship documents. Additionally, many voters cannot access the required citizenship documents without significant undue burden. To

comply with the Challenged DPOC Provisions, many voters must take additional burdensome steps to track down and present to election officials their citizenship documents. Many may be unable to comply due to the documents not existing and never having existed or having been destroyed or lost, financial limitations, and mobility or health effects associated with aging that prevent one from traveling and searching through troves of old documents.

161.    While the Challenged DPOC Provisions contain several provisions which purport to allow election officials to confirm the citizenship status of prospective voters or voters seeking to update their existing registration through the use of data without burdening voters, including § 98.075 ("The department shall identify those registered voters who are potentially ineligible based on their legal status regarding United States citizenship by comparing or receiving information from other governmental entities"), none of those processes currently exists, and a significant number of U.S. citizens' citizenship status is not captured by the available data. For example, Florida's current online voter registration system does not have the ability to check the data in the possession of DHSMV, and even if it did, DHSMV does not have the current citizenship status for all voters. Because DHSMV has no automatic mechanism for capturing naturalization data, it may have stale data for some naturalized citizens. U.S. citizen Florida residents who are eligible to vote but not able to rely on these data checks will have to endure the undue burden of tracking down and presenting actual documents to establish citizenship. Some will have no way to obtain the required documentation.

162.    Because the Challenged DPOC Provisions will make it much harder, if not impossible, to register to vote or update registrations, this law will frustrate Plaintiffs' core missions to increase voter registration.

163.    Second, the Challenged DPOC Provisions require that state officials in Florida rely

upon a system that includes outdated data to conduct list maintenance on the basis of citizenship and will therefore foreseeably make a significant number of errors. This required list maintenance creates a significant undue burden on the right to vote because the risk is extremely high that many eligible U.S. citizens will be mistakenly removed from the rolls through this list maintenance.

164.   U.S. citizens who naturalized after they obtained a Social Security number and since their last interaction with the DHSMV (and those who may never have interacted with the DHSMV at all) are subject to possible removal from the voter rolls on the basis of citizenship status. H.B. 991 § 8, *codified at* Fla. Stat. § 98.075.

165.   Some individuals may be entirely unable to provide DPOC that would be acceptable to their county supervisor of elections, making the Challenged DPOC Provisions an insurmountable burden on their right to vote. For example, some Black voters who were not issued a birth certificate due to lack of hospital access when they were born into the segregated South may not have the documents required to get a U.S. passport, and they may not be able to ever get those documents. It is possible that such documentation was never created, and even if it was, it may not be possible for a voter to locate it due to lack of knowledge of its location, documents being moved over the course of decades of a person's and family's life, and possible physical disability and illness associated with aging. No matter the State's interest in ensuring that all voters can adequately prove their citizenship, the State cannot assert any proper justification for creating a system that leaves some voters *entirely* without ability to exercise their fundamental right to vote, particularly when voters may lack access to these documents precisely because of the same system of segregation that produced decades of brutal, violent voter suppression against Black Americans.

166.   There are additional U.S. citizens who may be entirely unable to comply with the Challenged DPOC Provisions. For one, Puerto Ricans living in Florida may not have birth

certificates that would be accepted as DPOC, and, upon information and belief, Puerto Rican Floridians are more likely to have name mismatches in their citizenship documentation that are not due to a legal name change. In this situation, it is unclear how they could ever provide the necessary proof of the connection between their identity and citizenship to satisfy H.B. 991.

167. For another, those who have been displaced due to natural disasters may lack DPOC because necessary documents were destroyed or misplaced during a rushed relocation. This is also true for those who may have migrated from a natural disaster elsewhere, like Puerto Ricans who migrated to Florida after Hurricane Maria and who also face the particular burdens on Puerto Rican voters outlined above. In addition, an unhoused person may lack any private and safe place to keep personal documents. Relatedly, people of limited means, including those experiencing homelessness, may not be able to afford the documents required to prove their citizenship.

168. The potential use of data from DHS's SAVE system, which is known to be particularly unreliable for proving the citizenship of older Americans, will impose a heavy burden on elderly voters whose citizenship status cannot be confirmed by this process and have not previously submitted DPOC to the DHSMV. Difficulty with technology, disability and illness related to aging, and transportation and mobility challenges may impose additional barriers to complying with requirements to provide DPOC to register to vote, remain registered to vote, or have one's ballot counted.

169. Individuals who have changed their name due to marriage, gender identity, or another reason such that their legal name "is different from the name that appears on" their DPOC will have to provide additional "official legal documentation providing proof of legal name change" for "acceptable evidence of United States citizenship." H.B. 991 § 1, *codified at* Fla. Stat. § 97.021(10). For example, a married woman whose name on her birth certificate does not match

57

the name on her driver license will need to provide a marriage license or record of legal name change. This will impose an additional barrier that will be imposed on Plaintiffs, including members of the LWVFL, by requiring the provision of additional materials to be able to register to vote, remain registered to vote, and have one's ballot counted.

170. It is also possible for a person to be subject to a number of these burdens at the same time. For example, a naturalized citizen who had to relocate due to a natural disaster and therefore no longer has their certificate of naturalization must pay over $500 for that replacement document,[71] while replacing a lost passport for an adult costs $165.[72] For many Floridians, $165 may still be prohibitive, let alone an amount over four times that. There are numerous possible permutations like this that could subject any number of people to compounding logistical, temporal, and financial burdens.

171. The fact that significant populations of Floridians may be entirely disenfranchised by this law suggests that it should be subject to strict scrutiny. However, even if it is subject to a more minimal burden, there is not any legitimate state interest in relying on outdated data to check current citizenship status and then use the results of such a search to disenfranchise potentially eligible voters. Instead of serving any legitimate government goal of list maintenance, this simply targets thousands, if not more, of the most vulnerable Floridians for disenfranchisement, leaving some quite literally without any path to casting a ballot that will be counted.

172. Defendants' justifications for this undue burden on the right to vote do not survive strict scrutiny or even rational basis review.

173. The harms Plaintiffs will experience of possible disenfranchisement and

---

[71]  *G-1055, Fee Schedule*, U.S. Citizenship & Immigr. Servs., https://perma.cc/E5AY-8TK4.
[72]  *Passport Fees*, U.S. Dep't of State: Travel.State.Gov, https://travel.state.gov/content/travel/en/passports/how-apply/fees.html.

experiencing an undue burden in an attempt to register or remain registered are irreparable, and they are traceable to the Challenged DPOC Provisions.

174.   Accordingly, Plaintiffs are entitled to a declaration that the Challenged DPOC Provisions are unconstitutional and an order permanently enjoining their enforcement.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in their favor and:

1. Declare the Challenged DPOC Provisions illegal and unconstitutional as described above, in violation of the First and Fourteenth Amendments;

2. Permanently enjoin Defendant Byrd, his agents, employees, and anyone acting in concert with him from enforcing or giving any effect to the Challenged DPOC Provisions, including by conducting any elections utilizing those provisions;

3. Permanently enjoin Defendants Scott, Garcia, and Link, their agents, employees, and anyone acting in concert with them from enforcing or giving any effect to the General DPOC Registration Provisions or the Retroactive DPOC Provision, including by conducting any elections utilizing those provisions;

4. Award Plaintiffs' costs and reasonable attorneys' fees; and

5. Grant any such other and further relief as may be just and equitable.

Respectfully submitted April 1, 2026,

/s/ Caroline McNamara

Sophia Lin Lakin*
Jonathan Topaz*
William Hughes*
Nina Nayiri McKay*
**American Civil Liberties
Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

Caroline McNamara (FBN 1038312)
Nicholas L.V. Warren (FBN 1019018)
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, Florida 33134
(786) 363-2738
cmcnamara@aclufl.org
nwarren@aclufl.org

slakin@aclu.org
jtopaz@aclu.org
whughes@aclu.org
nmckay@aclu.org

Sarah Brannon*
**American Civil Liberties
Union Foundation**
915 15th Street NW
Washington, D.C. 20005
(740) 632-0671
sbrannon@aclu.org

John A. Freedman*
Rachel L. Forman (FBN 105347)
Jeremy Karpatkin*
Nicholas Casmier Anway*
Connor J. Morgan*
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Rachel.Forman@arnoldporter.com
Jeremy.Karpatkin@arnoldporter.com
Nicholas.Casmier.Anway@arnoldporter.com
Connor.Morgan@arnoldporter.com

Jeffrey A. Miller*
**Arnold & Porter Kaye Scholer LLP**
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306
(650) 319-4500
Jeff.Miller@arnoldporter.com

Eric Padilla (FBN 1044216)
**Arnold & Porter Kaye Scholer LLP**
250 West 55th Street
New York, NY 10019
(212) 836-8000
Eric.Padilla@arnoldporter.com

dtilley@aclufl.org

John Powers*
Hani Mirza*
Sonali Seth*
Nikole Miller (FBN 1031826)
Peter Ketcham-Colwill*
**Advancement Project**
1220 L Street NW, Suite 850
Washington, DC 20005
(202) 728-9557
jpowers@advancementproject.org
hmirza@advancementproject.org
sseth@advancementproject.org
nmiller@advancementproject.org
pketchamcolwill@advancementproject.org

Cesar Z. Ruiz*
Delmarie Alicea (FBN 1024650)
Jose Perez*
**Latino Justice PRLDEF**
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
cruiz@latinojustice.org
dalicea@latinojustice.org
jperez@latinojustice.org

*\* Pro hac vice motions forthcoming*

*Attorneys for Plaintiffs*