**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 26-cv-22257-JB

UNIDOSUS; LEAGUE OF WOMEN VOTERS OF
FLORIDA, INC.; LEAGUE OF WOMEN VOTERS OF
FLORIDA EDUCATION FUND, INC.; FLORIDA RISING
TOGETHER; FLORIDA RISING, INC.; HISPANIC
FEDERATION; FLORIDA IMMIGRANT COALITION;
FLIC VOTES, INC.; COMMON CAUSE; and COMMON
CAUSE EDUCATION FUND,

  *Plaintiffs*,

*v.*

CORD BYRD, in his official capacity as Florida Secretary
of State; DAVE KERNER, in his official capacity as
Executive Director of the Florida Department of Highway
Safety and Motor Vehicles; KATHRYN WILLIAMS, in her
official capacity as Deputy Secretary of the Florida
Department of Children and Families; KIM BARTON, in
her official capacity as Alachua County Supervisor of
Elections; CHRISTOPHER MILTON, in his official
capacity as Baker County Supervisor of Elections; NINA
WARD, in her official capacity as Bay County Supervisor of
Elections; AMANDA SEYFANG, in her official capacity as
Bradford County Supervisor of Elections; TIMOTHY
BOBANIC, in his official capacity as Brevard County
Supervisor of Elections; JOE SCOTT, in his official capacity
as Broward County Supervisor of Elections; SHARON
CHASON, in her official capacity as Calhoun County
Supervisor of Elections; LEAH VALENTI, in her official
capacity as Charlotte County Supervisor of Elections;
MAUREEN BAIRD, in her official capacity as Citrus
County Supervisor of Elections; CHRIS CHAMBLESS, in
his official capacity as Clay County Supervisor of Elections;
MELISSA BLAZIER, in her official capacity as Collier
County Supervisor of Elections; TOMI BROWN, in her
official capacity as Columbia County Supervisor of
Elections; DEBBIE WERTZ, in her official capacity as
DeSoto County Supervisor of Elections; DARBI CHAIRES,
in her official capacity as Dixie County Supervisor of
Elections; JERRY HOLLAND, in his official capacity as

1

Duval County Supervisor of Elections; ROBERT BENDER, in his official capacity as Escambia County Supervisor of Elections; KAITLYN LENHART, in her official capacity as Flagler County Supervisor of Elections; HEATHER RILEY, in her official capacity as Franklin County Supervisor of Elections; KENYA WILLIAMS, in her official capacity as Gadsden County Supervisor of Elections; LISA DARUS, in her official capacity as Gilchrist County Supervisor of Elections; ALETRIS FARNAM, in her official capacity as Glades County Supervisor of Elections; RHONDA PIERCE, in her official capacity as Gulf County Supervisor of Elections; LAURA HUTTO, in her official capacity as Hamilton County Supervisor of Elections; DIANE SMITH, in her official capacity as Hardee County Supervisor of Elections; SHERRY TAYLOR, in her official capacity as Hendry County Supervisor of Elections; DENISE LAVANCHER, in her official capacity as Hernando County Supervisor of Elections; KAREN HEALY, in her official capacity as Highlands County Supervisor of Elections; CRAIG LATIMER, in his official capacity as Hillsborough County Supervisor of Elections; HOWARD WILLIAMS, in his official capacity as Holmes County Supervisor of Elections; LESLIE SWAN, in her official capacity as Indian River County Supervisor of Elections; CAROL DUNAWAY, in her official capacity as Jackson County Supervisor of Elections; MICHELLE MILLIGAN, in her official capacity as Jefferson County Supervisor of Elections; TRAVIS HART, in his official capacity as Lafayette County Supervisor of Elections; ALAN HAYS, in his official capacity as Lake County Supervisor of Elections; JENNA PERSONS-MULICKA, in her official capacity as Lee County Supervisor of Elections; MARK EARLEY, in his official capacity as Leon County Supervisor of Elections; TAMMY JONES, in her official capacity as Levy County Supervisor of Elections; GRANT CONYERS, in his official capacity as Liberty County Supervisor of Elections; HEATH DRIGGERS, in his official capacity as Madison County Supervisor of Elections; SCOTT FARRINGTON, in his official capacity as Manatee County Supervisor of Elections; WESLEY WILCOX, in his official capacity as Marion County Supervisor of Elections; VICKI DAVIS, in her official capacity as Martin County Supervisor of Elections;

2

ALINA GARCIA, in her official capacity as Miami-Dade County Supervisor of Elections; SHERRIE HODIES, in her official capacity as Monroe County Supervisor of Elections; JANET ADKINS, in her official capacity as Nassau County Supervisor of Elections; PAUL LUX, in his official capacity as Okaloosa County Supervisor of Elections; DAVID MAY, in his official capacity as Okeechobee County Supervisor of Elections; KAREN CASTOR DENTEL, in her official capacity as Orange County Supervisor of Elections; MARY JANE ARRINGTON, in her official capacity as Osceola County Supervisor of Elections; WENDY SARTORY LINK, in her official capacity as Palm Beach County Supervisor of Elections; BRIAN CORLEY, in his official capacity as Pasco County Supervisor of Elections; JULIE MARCUS, in her official capacity as Pinellas County Supervisor of Elections; MELONY BELL, in her official capacity as Polk County Supervisor of Elections; CHARLES OVERTURF, in his official capacity as Putnam County Supervisor of Elections; TAPPIE VILLANE, in her official capacity as Santa Rosa County Supervisor of Elections; RON TURNER, in his official capacity as Sarasota County Supervisor of Elections; AMY PENNOCK, in her official capacity as Seminole County Supervisor of Elections; VICKY OAKES, in her official capacity as St. Johns County Supervisor of Elections; GERTRUDE WALKER, in her official capacity as St. Lucie County Supervisor of Elections; WILLIAM KEEN, in his official capacity as Sumter County Supervisor of Elections, JENNIFER MUSGROVE KINSEY, in her official capacity as Suwannee County Supervisor of Elections; DANA SOUTHERLAND, in her official capacity as Taylor County Supervisor of Elections; DEBORAH OSBORNE, in her official capacity as Union County Supervisor of Elections; LISA LEWIS, in her official capacity as Volusia County Supervisor of Elections; JOSEPH MORGAN, in his official capacity as Wakulla County Supervisor of Elections; RYAN MESSER, in his official capacity as Walton County Supervisor of Elections; and DEIDRA PETTIS, in her official capacity as Washington County Supervisor of Elections,

> *Defendants*.

_____/

3

**<u>FIRST AMENDED COMPLAINT</u>**

1.     Florida has enacted a law that will make it harder for eligible U.S. citizens to vote—and, for some, impossible.[1] H.B. 991 imposes new documentary proof of citizenship ("DPOC") requirements, making it difficult, unduly costly, or even impossible for Florida voters who lack access to the required documentation to register to vote or remain on the rolls. H.B. 991 also erects barriers at the ballot box itself, narrowing the types of acceptable voter ID and imposing a ban on the use of student ID to prove one's identity at the polls.

2.     First, H.B. 991 conditions a voter's ability to register, update their registration, and remain registered on the production of specified forms of DPOC. Many eligible voters do not have these documents and cannot obtain them for a variety of reasons, including because they were born without a birth certificate in the segregated South, because their documents were destroyed in a hurricane, or because they cannot afford the hundreds of dollars it costs to replace them. At the same time, the law directs election officials to verify registered voters' citizenship against government databases that were never designed for that purpose and that routinely misidentify citizens as noncitizens. The result is a system that burdens eligible voters by misidentifying them as ineligible using unreliable data and then demanding documents that are difficult or even impossible to produce.

3.     H.B. 991 subjects every Florida voter—current and prospective—to a citizenship verification regime tied to the records of the Department of Highway Safety and Motor Vehicles ("DHSMV"). Under H.B. 991, every voter registration application, including updates to an existing voter registration, must be checked against DHSMV records for DPOC. For voters whose records show they have previously submitted acceptable DPOC, the check may be invisible. But

---

[1]     The challenged provisions become effective on January 1, 2027.

for any voter whose DHSMV records do not include acceptable DPOC, the law requires them to produce acceptable DPOC before being allowed to vote. Voters updating their registration without DPOC on file will be required to produce acceptable DPOC or face removal from the rolls.

4.      To be clear, H.B. 991 does not stop at new or updated registrations. The law not only mandates that election officials verify the citizenship of newly registered voters, but also mandates that election officials retroactively verify the citizenship of every currently registered voter. On information and belief, H.B. 991 therefore requires the removal of voters from the rolls based on the results of a database-matching process.

5.      Many voters will struggle or be entirely unable to produce the required documentation through no fault of their own. Elderly Black voters may lack necessary documentation if they were born outside of hospitals during the Jim Crow era and never issued a birth certificate. Due to a law invalidating Puerto Rican birth certificates issued before July 1, 2010, eligible voters born in Puerto Rico will struggle to provide DPOC. Unhoused individuals and people who previously were unhoused may have lost their DPOC records. Students may lack easy access to any of the acceptable forms of DPOC specified in H.B. 991. And for all, it is unclear whether, under the law, such documents could be submitted by mail or electronically.

6.      Some groups are also more likely to be flagged erroneously for removal than others. Naturalized citizens are at particular risk: As detailed below, the databases Florida has used and will continue to use to verify the citizenship of registered voters and applicants for registration are prone to numerous errors and inconsistencies. For example, neither the DHSMV database nor other databases that Florida has been using for voter roll citizenship verification, such as the federal Systematic Alien Verification for Entitlements ("SAVE") system operated by the Department of Homeland Security's ("DHS") United States Citizenship and Immigration Services, automatically

capture naturalization data. This means that U.S. citizens could be erroneously identified as noncitizens in these databases, as they often are in DHS's SAVE system, and would therefore be at risk of disenfranchisement. Other databases did not capture citizenship information at their inception—for example, the Social Security Administration ("SSA") database did not require citizenship information until 1972 and did not collect it consistently until 1981, and the DHSMV database did not require everyone applying for or renewing a driver license or state ID to furnish proof of citizenship until 2020. Elderly voters are therefore disproportionately likely to get flagged for removal because SAVE incorporates SSA data as a primary source of information on the citizenship of U.S.-born citizens and therefore also lacks citizenship data about many U.S.-born citizens who were born before the 1970s.

7.      Still, other groups—such as married women, transgender people, and those who have changed their legal names, as well as voters with disabilities—are more likely *both* to get flagged for removal and to have difficulties proving their citizenship. Discrepancies in the names listed in various databases may flag for removal people who have changed their legal names. Once flagged, these voters will have to provide one of the specified forms of DPOC, as well as legal documentation showing the changes in their names. For elderly women who are or were married and whose marriage and divorce records were never digitized, providing such documentation may be all but impossible, particularly for elderly Black women who may never have been issued a birth certificate on top of these other issues. Disabled voters, who are less likely to have a driver license or state ID, are more likely to have to submit DPOC under H.B. 991 and more likely to face obstacles to obtaining the required documents.

8.      Plaintiffs challenge four changes H.B. 991 makes to the voter registration process, as part of its comprehensive scheme to require DPOC from all voters. First, Section 4 of H.B. 991

requires that all voter registration applications—including initial registrations, as well as changes in name, address, or party identification—be checked against DHSMV records. If those records do not show that the applicant previously provided proof of U.S. citizenship, the county Supervisor of Elections must attempt to verify the applicant's citizenship using state and federal data sources and, if unsuccessful, initiate a process to remove them from the rolls if they are already registered. Voters who are flagged for lack of DPOC may cast a provisional ballot, which will only be counted if they submit acceptable documentation within two days of the relevant election. *See* H.B. 991 § 4, *codified at* Fla. Stat. § 97.053(6) ("General DPOC Registration Provisions").

9.      Next, Section 3 of the law specifically addresses voters who attempt to register online. Such applications will be processed for registration only if DHSMV records indicate that the voter has previously provided proof of U.S. citizenship. If the records do not show the registrant has previously provided DPOC, the Department of State must flag the issue for the relevant county supervisor. *See* H.B. 991 § 3, *codified at* Fla. Stat. § 97.0525(4) ("Online Voter Registration Application Provisions"). The county supervisor is then required to notify the voter that they must provide DPOC and to verify the voter's legal status as a U.S. citizen. *Id.* § 4, *codified at* Fla. Stat. § 97.053(6)(a), (b).

10.     Third, Section 8 of H.B. 991 imposes a sweeping mandate on elections officials to engage in retroactive citizenship checks of all registered voters. The Department of State must use government databases to flag potentially ineligible voters and then transmit information on those voters to the relevant county supervisor, who then must initiate a process to remove such voters from the rolls unless they can provide acceptable DPOC. *See* H.B. 991 § 8, *codified at* Fla. Stat. § 98.075(6)(a) ("Retroactive DPOC Provision").

11. Relevant to each of these provisions, Section 1 of H.B. 991 specifies the types of documents that qualify as DPOC, limiting the ways that voters who are flagged as noncitizens can prove their citizenship. It also requires that any discrepancy between a voter's legal name and the name listed on the document indicating their citizenship be substantiated with official documentation regarding a name change. *See* H.B. 991 § 1, *codified at* Fla. Stat. § 97.021(10) ("DPOC Type Provision") (collectively, with the General DPOC Registration Provisions, the Online Voter Registration Application Provisions, and the Retroactive DPOC Provision, "the Challenged DPOC Provisions").

12. Enforcement of the Challenged DPOC Provisions will be guided by unreliable data sources that will result in foreseeable errors. There are predictable, systemic problems with these data that render them unreliable for voter verification—on top of any issues that may result from human error and attempting to merge different complex systems.

13. This is unlawful: The Challenged DPOC Provisions impose severe burdens on the right to vote—burdens that fall hardest on those least able to overcome them—without any justification sufficient to sustain them. There is no evidence that Florida's existing eligibility verification processes are inadequate; by contrast, the verification systems mandated by H.B. 991 are demonstrably unreliable. This violates the First and Fourteenth Amendments to the U.S. Constitution.

14. H.B. 991 also violates the National Voter Registration Act ("NVRA") in several ways. First, Section 9 of H.B. 991 mandates that when Floridians update their driver license or state ID card, the DHSMV must report all information relevant to a change of address to the Department of State. The Department of State must then report this information to the appropriate county supervisor, who must update the voter's registration records. *See* H.B. 991 § 9, *codified at*

Fla. Stat. § 98.093(8)(d) ("Mandatory Update Provision"). This violates Section 5 of the NVRA, which requires states to allow voters to opt out of updating their voting address when changing their driver license address.

15.     The Challenged DPOC Provisions also violate Section 6(a), which requires states to accept and use the Federal Form to register voters to vote for a federal office. Whereas the Federal Form simply requires attestation of citizenship, the Challenged DPOC Provisions are, by definition, more onerous. For this reason, the Challenged DPOC Provisions also violate Section 7 of the NVRA, which requires that public assistance agencies provide clients with the equivalent of the Federal Form. The Challenged DPOC Provisions additionally violate Section 8 of the NVRA, which prohibits nonuniform and discriminatory list maintenance programs and all systematic removal programs prior to an election, twice over. And they violate Section 6(b), which protects a right for third-party voter registration organizations ("3PVRO") to engage in registration efforts using the Federal Form.

16.     The Challenged DPOC Provisions and Mandatory Update Provision are not the only unlawful burden on voting rights H.B. 991 imposes. The law also eliminated student identification as a form of acceptable photo ID required to vote at the polls. *See* H.B. 991 § 13, *codified at* Fla. Stat. § 101.043(1)(a) ("Student ID Ban"). Despite Florida permitting the use of student ID as voter ID for over two decades without incident, H.B. 991 singles out student ID as the only form of photo ID excluded from otherwise acceptable government-issued IDs. Florida law does not exclude any other form of ID in this way.

17.     H.B. 991's Student ID Ban will impose severe burdens on young Floridians' ability to vote. More than 912,000 students attend Florida colleges and universities. These overwhelmingly young voters are less likely than the general population to have other forms of

acceptable ID and are less likely to have the documentation, money, and transportation necessary to obtain them. Prohibiting student IDs will disenfranchise qualified young voters who do not have and are unable to obtain alternative forms of ID.

18.     The State has no valid reason—much less a compelling one—to impose this severe and unnecessary burden on the right to vote. There is no evidence that eliminating student ID will effectively prevent fraud. Nor will eliminating student ID ensure that only Florida residents and U.S. citizens vote in Florida elections: many of the forms of voter ID accepted under H.B. 991, like concealed carry permits and certain ID types issued by the federal government, contain no information about residency or citizenship.

19.     By severely burdening young voters' ability to participate in elections with no valid justification, H.B. 991's Student ID Ban violates the First and Fourteenth Amendments.

20.     Plaintiffs bring this suit on behalf of their members and/or as organizations for declaratory and injunctive relief to ensure that their constituents and members can exercise their right to vote free of the unconstitutional and unlawful burdens imposed by the Challenged DPOC Provisions, the Mandatory Update Provision, and the Student ID Ban.

### JURISDICTION AND VENUE

21.     This action is brought under the Constitution and laws of the United States. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), and 1357; 42 U.S.C. § 1983; and 52 U.S.C. § 20510.

22.     This Court has authority to issue declaratory and injunctive relief in this action under 28 U.S.C. §§ 2201 and 2202.

23.     This Court has personal jurisdiction over each Defendant because each is a citizen of Florida.

24.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred or will occur in this District.

## PARTIES

### A.     Plaintiffs

25.     Plaintiff UnidosUS ("Unidos") is a nonprofit, nonpartisan organization, and one of the largest Latino civil rights and advocacy organizations in the country. Unidos has offices in Florida and 18 member-affiliate organizations based or working in the state. Unidos' mission is to build a stronger America by creating opportunities for Latinos.

26.     Unidos is a registered 3PVRO in Florida that engages in extensive voter registration efforts, public education, and advocacy to encourage political participation among the communities it serves. Unidos conducts voter registration by community canvassing, placement of digital ads, and direct engagement with voters. Unidos provides support and technical assistance to affiliated nonprofit members with which it works on voter registration. When Unidos and its canvassers and affiliate members register voters, they communicate a pro-voting message about the importance of participating in the electoral process. Unidos is responsible for over 400,000 voter registrations in Florida since 2008.

27.     H.B. 991 will limit Unidos' effectiveness in promoting democratic participation and make it costlier and more resource-intensive to conduct voter registration. The law will have a substantial chilling effect on voter registration for Unidos, likely resulting in lower registration of Latinos throughout Florida.

28.     Unidos will have to curtail its voter registration activities and divert scarce resources to comply with the myriad regulations H.B. 991 imposes. This will include undertaking

11

an entirely new process to vet the DPOC documents that the law requires. Unidos will have to either hire an in-house specialist to verify the authenticity of DPOC documents submitted as proof of U.S. citizenship alongside collected voter registration applications or hire a costly third-party vendor to perform DPOC verification services. The new requirements will significantly and unnecessarily burden Unidos' scarce organizational resources, which they would otherwise spend helping voters register, following up with voters, and undertaking other activities to advance their missions.

29.     Further, because H.B. 991 impacts naturalized U.S. citizens who registered through Unidos' voter registration drives, Unidos will suffer organizational harm in the communities where it has worked and continues to work to secure trust. H.B. 991's processes will likely result in registration form rejections, the mandatory cancellation of registrations, referrals to law enforcement for investigation, and, potentially, mandatory prosecution. At a minimum, Unidos will have to explain to the community members it engages why their voter registrations are suddenly at risk. This will create fear and confusion among members, and it risks eroding Unidos' status as a trusted community voice, especially given the likely chilling effect this will have on its constituents' political participation.

30.     H.B. 991 will require Unidos to re-educate and re-train all of its staff and volunteers on the new DPOC requirements. H.B. 991 will also require the creation of new, public-facing educational materials and flyers to guide voter registration applicants on the new DPOC requirements, including new bilingual materials to educate the registration applicants Unidos assists. Unidos will also have to expend more resources on community outreach and education for newly naturalized and limited English proficient voters to ensure their ability to stay registered to vote.

31.     Plaintiffs the League of Women Voters of Florida, Inc. and the League of Women Voters of Florida Education Fund, Inc. (together, "LWVFL") are nonprofit organizations formed under § 501(c)(4) and § 501(c)(3) of the Internal Revenue Code, respectively, and their office is located in Orlando, Florida. LWVFL is a nonpartisan, voter-focused, grassroots, membership-based organization.

32.     LWVFL's mission is to empower voters and defend democracy in Florida. This includes encouraging voter participation, increasing understanding of major policy issues, and advocating for legislative changes and policies for the public good. To accomplish this mission, LWVFL hosts voter education events to provide assistance and education about how to register to vote in Florida, assist voters with voter registration, publishes voter guides and directories of elected officials, organizes get-out-the-vote ("GOTV") efforts, advocates for legislative priorities, and engages in the citizen petition process. Facilitating participation in the electoral process is central to LWVFL's work.

33.     Conducting voter registration events where members assist citizens to register to vote is an important way through which LWVFL engages citizens on the importance of political participation and civic engagement.

34.     LWVFL is the Florida affiliate of the League of Women Voters, a national organization founded in 1920 as an outgrowth of the struggle to win voting rights for women.

35.     LWVFL has twenty-nine local Leagues across the state, including Leagues in Alachua, Bay, Brevard, Broward, Charlotte, Citrus, Clay, Collier, Duval, Escambia, Hillsborough, Lake, Lee, Leon, Manatee, Marion, Martin, Miami-Dade, Monroe, Nassau, Okaloosa, Orange, Palm Beach, Pasco, Pinellas, Polk, Santa Rosa, Sarasota, Seminole, St. Johns, St. Lucie, Sumter, Volusia, and Walton Counties. Local chapters assist voters at registration

events in both the counties in which they are based and in other neighboring or nearby counties where there is not a local chapter.

36. LWVFL currently has several thousand dues-paying members and an even greater number of supporters and volunteers, all of whom receive regular communications from LWVFL. LWVFL also serves and associates with non-member Floridians. LWVFL relies on both dues-paying members and non-member volunteers to conduct many of its activities. It particularly relies on members to carry out voter registration activities. In total, LWVFL has only two full-time paid staff members, and one contract bookkeeper. When financially able, LWVFL also has paid interns.

37. LWVFL expects to have members who will be completely disenfranchised because they do not have access to the citizenship documents that will be required by H.B. 991's Online Voter Registration Application Provisions and General DPOC Registration Provisions. H.B. 991 § 3, 6, *codified at* Fla. Stat. §§ 97.0525(4), 97.053(6). LWVFL also has members who will be unduly burdened by these same requirements of H.B. 991 due to lack of easy access to documents that H.B. 991 will require, such as the documents of married women who have changed their names. This includes members who do not have a driver license or an ID card issued by the DHSMV and also do not have a passport or access to their birth certificate with their current legal name, as well as members who have a driver license or ID card that has not been renewed since 2020, the year Florida began requiring DPOC to get a driver license or ID, and also lack a passport or access to a birth certificate with their current legal name. LWVFL also has members who were born before 1972 whose citizenship status is likely not available from SSA data, and members born between 1972 and 1981, whose citizenship status may well not be available from SSA data. In particular, this includes members who will be burdened or disenfranchised in their efforts to register or update

14

their registration because their citizenship documents do not reflect their current name or the name on their DHSMV-issued identification—for example, because they changed their name when they got married and, in many cases, also when they got divorced.

38. LWVFL and its local Leagues devote significant time and resources to encouraging voter participation by regularly providing the public with voter registration assistance and education about voter registration at a variety of public locations and events, including local high school, college, and university campuses; libraries; grocery stores; malls; public assistance offices; naturalization ceremonies; and community events such as fairs, festivals, and cookouts.

39. LWVFL through its local Leagues provides voter registration assistance to individuals with lower incomes. On information and belief, many of these individuals with low incomes have contact with the Florida Department of Children and Families ("DCF") when applying for public assistance benefits, where voter registration opportunities consistent with the requirements of the NVRA must be provided.

40. In an average year, LWVFL conducts hundreds and sometimes thousands of voter registration assistance and education events across the state. LWVFL conducts voter registration events in an ongoing manner throughout the year, often with multiple events each week and sometimes multiple events in one day.

41. At voter registration assistance events, LWVFL members and volunteers do their best to assist as many prospective voters as they can in completing their voter registration applications.

42. LWVFL has built a sterling reputation over many years as a trusted organization that will give voters the correct information about voter registration, act in accordance with the law, and not violate voters' privacy when assisting them with voter registration.

43.     The Challenged DPOC Provisions would require many prospective voters and registrants to provide sensitive personal documents, such as a passport or birth certificate, to register to vote or in order to remain registered to vote. This requirement would then mean that—to achieve their goal of helping individuals successfully register to vote—LWVFL members and volunteers would have to ask people about these sensitive personal documents. LWVFL members and volunteers would also have to help people locate these documents so potential voters can include them when potential voters mail their voter registration forms to election officials or provide them as needed in response to notices.

44.     Asking and engaging with potential voters about these sensitive documents will jeopardize LWVFL's reputation for safeguarding voters' privacy. LWVFL has developed this trust with voters by making clear that it will not collect any personal information from a voter. That trust would be irreparably damaged if LWVFL started asking about documents even more sensitive than a voter registration form, such as a passport. This will inevitably lead to the diminished success of some voter registration assistance events.

45.     LWVFL also regularly engages in other activities central to its mission, including community outreach, education, direct advocacy on local and statewide ballot initiatives, and legislative advocacy related to voting and elections.

46.     To facilitate voter registration assistance work, LWVFL engages in comprehensive training of members and volunteers. LWVFL members and volunteers have been trained on Florida's current process for registering votes; in response to H.B. 991, all members and volunteers will need to be retrained, diverting resources away from other vital work. This will entail a significant outlay of staff time, volunteer hours, effort, and financial resources that will have to be diverted from other programs and activities, including voter services and education, candidate

16

forums, election protection, work with returning citizens, GOTV efforts, legislative and advocacy work, fundraising, and public communications, among others.

47. In response to H.B. 991, LWVFL will also have to expend considerable resources educating voters and applicants to register to vote about the DPOC requirements and educating its members on how to comply with them. This education work will require diverting resources from other aforementioned programs and activities.

48. The confusion and burdens caused by H.B. 991 may also hamper LWVFL's efforts to recruit more volunteers, as volunteers may be discouraged by being tasked with explaining to otherwise eligible voters who lack DPOC that they may not be able to cast a ballot without providing DPOC or by fear of miscommunicating the new law and its intimidating enforcement mechanisms.

49. H.B. 991 will discourage participation in the democratic process by making it significantly harder for eligible Floridians to register to vote and by confusing voters about the documents required to register to vote, harming both the franchise and LWVFL's core mission of increasing engagement in the democratic process. The interests LWVFL seeks to protect are germane to its organizational purpose, and neither the claims asserted nor the relief requested requires the participation of individual voters in the lawsuit.

50. Plaintiff Florida Rising Together is a nonprofit organization dedicated to advancing economic and racial justice across Florida by building power in historically marginalized communities, including among Black and Brown people and people with lower incomes. Florida Rising Together is a 501(c)(3) nonpartisan, grassroots organization with a mission to increase the political power of marginalized people and excluded constituencies. To advance that mission, Florida Rising Together has conducted and will conduct massive voter registration, voter education,

voter engagement, and election protection programs in numerous counties across Florida. Florida Rising Together educates and empowers Floridians to organize within their own communities to take collective action that advances equity and fairness across the state. Florida Rising Together is a leading voice for racial justice and expanding democracy in Florida.

51.     One of Florida Rising Together's programs is the Florida Student Power Alliance, a youth-led and youth-centered membership program that works to build the power of young people in Florida by organizing Black, brown, and marginalized high school and college students. Florida Student Power Alliance conducts civic engagement, voter registration and vote-by-mail education, and election protection programs to train youth leaders and mobilize youth participation in the political process. Florida Student Power Alliance has thousands of members across Florida, including in Miami-Dade, Broward, Orange, Hillsborough, Duval, and Alachua counties. These members include youth voters who are at risk of disenfranchisement because they will no longer be able to vote with student ID and lack the forms of voter ID H.B. 991 requires.

52.     H.B. 991 will force Florida Rising Together, including its Florida Student Power Alliance program, to divert its scarce resources to resolve DPOC-related problems for the Floridians it has registered to vote, will register to vote, or has assisted with registering to vote. Florida Rising Together's ability to help its constituents, Florida Student Power Alliance members, and members of the public get registered, stay registered, and vote is impaired by the need to specifically address the new burdens imposed by H.B. 991 and to divert resources in response. Individuals that Florida Rising Together has registered, will register, or helps register to vote will be at risk of having their voter registration applications denied due to H.B. 991's DPOC requirement. And individuals who were previously registered by Florida Rising Together, individuals who will be registered by Florida Rising Together, and individuals contacted by

Florida Rising Together as part of their GOTV work will be at risk of being removed from the rolls due to H.B. 991's citizenship verification process.

53.     H.B. 991 will further force Florida Rising Together (and particularly the Florida Student Power Alliance) to divert resources to prevent its constituents, Florida Student Power Alliance members, and members of the public from being disenfranchised by the elimination of student ID from the forms of acceptable voter ID. Florida Rising Together will specifically inform student voters it engages with that student ID will no longer be accepted at the polls and ensure that these voters bring an accepted voter ID to the polls. For student voters who lack an accepted voter ID, Florida Rising Together will assist them with navigating the processes to obtain one. Individuals who previously used student ID at the polls and whom Florida Rising Together engages as part of its core voter registration, voter engagement, election protection, and GOTV activities, including Florida Student Power Alliance members, will be at risk of disenfranchisement if they cannot obtain H.B. 991's accepted voter ID.

54.     As a result of H.B. 991's passage, Florida Rising Together is being and will be forced to divert staff time and organizational resources from its voter registration, voter education, and voter mobilization programs to inform its constituents about the bill's DPOC and voter ID requirements. Florida Rising Together's new voter education efforts include creating and distributing educational materials in the communities that it serves and spending money on outreach and advertising targeted at the populations disproportionately impacted by H.B. 991, including minority voters, low-income voters, recently naturalized citizens, citizens who have changed their names or who have multiple last names, students, and seniors. Florida Rising Together will be required to divert financial resources and staff time to prepare for and conduct

the additional voter registration, voter education, and voter mobilization necessary to help voters comply with H.B. 991's requirements.

55.     In its voter registration and assistance work, Florida Rising Together traditionally targets individuals with lower incomes. Ensuring that voters with lower incomes are successfully registered to vote is a core part of Florida Rising Together's mission, in part because low-income voters are part of the organization's core constituents. On information and belief, many of these individuals and members with low incomes have contact with the DCF when applying for public assistance benefits, where voter registration opportunities consistent with the requirements of the NVRA must be provided.

56.     Voters with lower incomes are particularly likely to lack access to DPOC. For example, approximately 25% of Americans who have not attended college and approximately 20% of Americans with an income below $50,000 have a valid passport.[2] Nationally, only 17% of Americans who graduated college and 15% who have post-college education do not have a driver license with their current name and/or address, while 41% of people who did not complete high school lack such identification.[3] Similarly, only 9% of Americans making over $100,000 a year lack a driver license with their current name and/or address, while 39% of people making less than $30,000 lack such identification.[4]

---

[2]     Greta Bedekovics & Sydney Bryant, *The SAVE Act: Overview and Facts*, Ctr. for Am. Progress (Jan. 31, 2025), https://www.americanprogress.org/article/the-save-act-overview-and-facts/.

[3]     Jillian Andres Rothschild et al., *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge*, Fair Elections Ctr. (June 2024), https://fairelectionscenter.org/center-for-democracy-and-civic-engagement/ [https://perma.cc/M9GX-ZF43].

[4]     *Id.*

57.     To address and mitigate the impact of H.B. 991's DPOC requirements and Student ID Ban, Florida Rising Together has begun reaching out to Florida Student Alliance members and Florida Rising Together constituents to identify individuals who may be at risk of being removed from the voter rolls or of having their voter registration applications denied, or who lack the DPOC required by H.B. 991. Florida Rising Together anticipates spending considerable resources contacting impacted individuals through electronic means, by phone, and/or during in-person canvassing. Florida Rising Together will also assist members and constituents who lack DPOC by helping them obtain the necessary documents. This assistance will include providing informational resources, transportation to government agency offices, and assistance with paying fees required to obtain the documents. Florida Rising Together will also be training staff and volunteers on how to assist voters affected by the Challenged DPOC Provisions and the Student ID Ban. These efforts to contact applicants and voters affected by H.B. 991 will divert resources away from, and come at the expense of, Florida Rising Together's core voter assistance, voter education, and GOTV activities.

58.     Once H.B. 991 goes into effect, Florida Rising Together will conduct additional outreach to affected voters, focusing on those whose voter registration applications are denied and who are subject to removal from the voter rolls due to H.B. 991. This outreach will require Florida Rising Together to issue public records requests to Supervisors of Elections to obtain lists of affected applicants and voters, spend time cleaning the received data so that it is usable, and engage in multiple rounds of phone calls, emails, text messages, and door-knocking.

59.     For low-income voters specifically, who are disproportionately likely to lack access to DPOC, H.B. 991 will make the voter registration opportunities the DCF provides less effective. Florida Rising Together, therefore, is being and will be forced to divert staff time and

organizational resources from its 2026 voter education and mobilization programs to inform voters with low incomes about the bill's DPOC requirements. Once the Challenged DPOC Provisions go into effect, Florida Rising Together will be forced to divert more of its scarce resources, on top of those it is diverting to assist its constituents at all socioeconomic levels, toward efforts to ensure that lower-income voters can navigate the DPOC requirements. It will also be required to devote more of its resources to providing voter registration help to individuals who, absent H.B. 991, would have received an opportunity to effectively register to vote from the DCF.

60.     To address and mitigate the impact of H.B. 991's Student ID Ban, Florida Rising Together (via Florida Student Power Alliance) will conduct outreach to identify impacted youth voters and assist youth who lack one of H.B. 991's accepted voter IDs, such as students without cars or students from out-of-state who do not have a Florida ID, to obtain acceptable voter ID. Florida Rising Together will directly assist impacted Florida Student Alliance members, as well as other voters, with obtaining acceptable voter ID so that they are not disenfranchised by the Student ID Ban. Florida Rising Together further will be forced to develop and conduct new voter assistance and education programs related to the new voter ID requirements, including distributing train-the-trainer programs to allow Florida Student Alliance members to conduct voter education programs on their campuses. Florida Rising Together will also engage in advocacy and outreach to urge the university officials who serve Florida Student Power Alliance membership to provide voter assistance and education related to H.B. 991's voter ID requirements.

61.     To coordinate these programs, Florida Rising Together has deployed and will continue to deploy staff, volunteers, and other resources that would otherwise be devoted to the organization's core voter registration, voter assistance, voter education, and GOTV work. The resources Florida Rising Together is diverting to educate its constituents and identify and assist

22

individuals without DPOC or accepted voter ID, in addition to the resources Florida Rising Together will have to divert to identify and assist individuals whose voter registration applications are denied or who are removed from the voter rolls once H.B. 991 goes into effect, will cause Florida Rising Together's core voter registration, voter assistance, voter education, and GOTV programs to reach and engage fewer Floridians than would be possible absent the harmful impact of H.B. 991 on its constituents.

62. Florida Rising Together anticipates working in Broward, Duval, Hillsborough, Leon, Miami-Dade, Orange, Osceola, Palm Beach, and Pinellas Counties, at a minimum, to, among other things, mobilize applicants and voters, help applicants navigate the Challenged DPOC Provisions and make it onto the rolls, keep voters on the rolls, assist students who lack accepted voter ID under H.B. 991, educate voters about their voting rights, and assist voters whom it has previously registered or assisted with a registration application with navigating H.B. 991's requirements, all to counteract the bill's harms.

63. Florida Rising Together brings claims on behalf of itself and on behalf of Florida Student Power Alliance members.

64. Plaintiff Florida Rising, Inc. ("Florida Rising") is a 501(c)(4) grassroots membership organization. Its mission is to build independent political power that centers historically marginalized communities and everyday Floridians. Florida Rising organizes multi-racial movements, supports legislative and policy changes, and works to foster state and local policies that allow Floridians to be safe, happy, healthy, and whole. Florida Rising is a people-powered organization made up of members advancing economic and racial justice across Florida. Florida Rising and its members educate and mobilize voters as one important way of holding politicians accountable and making their voices heard. Florida Rising has more than 100,000

members. Many of those members live in Broward, Duval, Hillsborough, Leon, Miami-Dade, Orange, Osceola, Palm Beach, and Pinellas Counties; and the full membership spans most other counties in Florida.

65.     One of Florida Rising's initiatives is Florida Student Power Network (collectively, "Florida Rising"), a youth-led program to build youth political power through political education, organizing, and mobilizing youth voters in issue-based advocacy and electoral campaigns. Florida Student Power Network's GOTV and voter engagement programs mobilize youth of color and working-class youth, integrating legislative advocacy, campus organizing, and electoral advocacy to amplify the voice of youth in the political process and uplift their priorities in policymaking.

66.     Florida Rising brings claims on behalf of its members and on behalf of itself with regard to work under its Florida Student Power Network program.

67.     Florida Rising's membership includes U.S. citizens who are at risk of being removed from the voter rolls or being denied access to the voter rolls in the first place due to H.B. 991's DPOC requirement and citizenship verification procedures. Florida Rising's members likely include U.S. citizens who are registered to vote, who are eligible to register to vote, and/or who will attempt to register to vote, but do not possess any of the forms of DPOC required by H.B. 991. Florida Rising's members also include naturalized citizens, who are at heightened risk of being incorrectly identified as noncitizens and required to undertake the burden of proving their citizenship to register, update their registration, or remain registered to vote. Florida Rising's membership and constituents served through the Florida Student Power Network further include youth voters who are at risk of disenfranchisement because they will no longer be able to vote with student ID and lack the forms of voter ID required by H.B. 991. The interests Florida Rising seeks

24

to protect are germane to its organizational purpose, and neither the claims asserted nor the relief requested requires the participation of Florida Rising's individual members in the lawsuit.

68. Plaintiff Hispanic Federation, Inc. ("Hispanic Federation") is a nonprofit, nonpartisan, community organizing and advocacy organization. Hispanic Federation's mission is to empower and advance the Hispanic community, support Hispanic families, and strengthen Latino institutions. Hispanic Federation serves all individuals and communities that seek assistance in the areas of education, health, immigration, civic engagement, economic empowerment, and the environment, including by promoting voter engagement. It works nationally to strengthen Latino nonprofits, promote public policy advocacy, and bring to scale a portfolio of innovative community programs through three essential pillars: membership services, advocacy services, and community assistance programs. This work includes assisting the Hispanic electorate and other marginalized communities with registering to vote, applying for vote-by-mail ballots, and voting in local and federal elections.

69. Providing voter registration assistance is one of Hispanic Federation's core missions. One way it accomplishes this goal is through offering access to TurboVote, an online voter registration platform, on its website and at its events. TurboVote is based on the federal voter registration form created by the NVRA, which does not require DPOC. Due to H.B. 991, TurboVote will be less of an effective method for voter registration for many of the voters Hispanic Federation seeks to engage, who may lack proof of citizenship acceptable under the statute. Hispanic Federation will have to redirect some of its resources to update its website to either remove TurboVote or work with TurboVote to modify it such that it is useful to all potential Florida registrants. Hispanic Federation also will have to engage in the burdensome task of evaluating other ways it can provide voter registration information to ensure that the website

provides information useful to all voters, even those without DPOC. This will prevent Hispanic Federation from registering more voters and will divert resources away from its other core activities, such as GOTV efforts and providing voter protection and other voter information.

70.     In addition, as part of its civic engagement program, Hispanic Federation provides in-person voter-registration assistance. Hispanic Federation engages with voters across Florida, but it primarily operates in Palm Beach, Hillsborough, Lake, Miami-Dade, Orange, Osceola, Polk, Seminole, and Volusia Counties. As part of these efforts, Hispanic Federation uses the State's voter registration form, which currently does not require DPOC. Due to H.B. 991, Hispanic Federation will have to update all Florida-specific registration assistance materials; create new protocols to help guide voters on the next steps after registering to vote, including how to confirm that their citizenship and identification information is up to date with the DHSMV; and organize new trainings for all personnel involved in voter registration efforts instead of using training materials it already has. In addition, Hispanic Federation's in-person events often have many attendees who recently moved from out of state. H.B. 991's changes will require Hispanic Federation to invest more time and resources explaining to new Florida residents the importance of keeping their Florida driver license or state ID up to date. This includes ensuring that their legal name matches their identification and that their proof of citizenship documentation has been properly updated with the DHSMV, particularly after becoming a U.S. citizen or legally changing their name. Hispanic Federation is a registered 3PVRO. Since 2016, Hispanic Federation has registered over 98,000 voters in Florida.

71.     Since 2019, Hispanic Federation has expended a substantial amount of resources updating its materials in response to frequent changes in Florida election law. This trend will continue under H.B. 991. As a direct result of H.B. 991, Hispanic Federation will have to make

26

extensive changes to its trainings and materials. H.B. 991 will require it to rewrite its training guides, its operation plans, and all of the public-facing materials that it uses for its voter registration and civic engagement activities. Creating these additional materials and complying with the updated Florida regulations and guidelines will require Hispanic Federation to divert resources away from its other core activities. The changes within H.B. 991 will impose a significant financial strain and operational burden on the organization. The increased burden of complying with H.B. 991 will also diminish the effectiveness of Hispanic Federation's events because staff and volunteers will be required to spend more time explaining the next steps that voters need to take after they register to vote and how important it is for them to ensure that their citizenship documentation is up to date, diverting their time and attention away from other efforts and generally making such events less effective for voter registration.

72.     Hispanic Federation works closely with its member agencies and partners to provide technical assistance, trainings, and support for their voter registration efforts. The new requirements would force Hispanic Federation staff to train organizations all over the state on the new changes to voter registration law, which will include translating all materials to Spanish.

73.     Hispanic Federation will have to undertake an entirely new process to develop voter education materials that clearly explain the DPOC verification process and the steps voters must take to remain on the voter rolls and avoid delays when voting. These materials will include printed resources, presentations, workshops, and outreach specifically designed to educate new Florida residents and newly naturalized U.S. citizens about the documentation required under the law and how to keep their voter registration records current. These additional requirements would place a substantial financial and administrative burden on the organization, diverting limited resources away from direct voter outreach, registration, voter education, and follow-up efforts that are

essential to expanding civic participation in underserved communities. Further, because H.B. 991 impacts all U.S. citizens who registered through Hispanic Federation's voter registration drives, Hispanic Federation will suffer organizational harm in the communities where it has worked and continues to work to secure trust. H.B. 991's processes will likely result in registration form rejections, the mandatory cancellation of registrations, referrals to law enforcement for investigation, and potentially mandatory prosecution. At a minimum, Hispanic Federation will have to explain to the community members it engages why their voter registrations are suddenly at risk. This will create fear and confusion among members, and it risks harming Hispanic Federation's status as a trusted community voice, especially given the likely chilling effect this will have on its constituents' political participation.

74. H.B. 991 will also require Hispanic Federation to re-educate and re-train all of its staff and volunteers on the new DPOC requirements. Hispanic Federation will also have to expend more resources on community outreach and education for newly naturalized and limited English proficient voters to ensure their ability to stay registered to vote.

75. Hispanic Federation works closely with high school and college students through its year-round, nonpartisan civic engagement and voter education initiatives. Based on Hispanic Federation's experience working with students across Florida, its staff regularly encounter students who face financial and transportation barriers to obtaining or replacing a Florida-issued driver license or state identification card. For many of the students Hispanic Federation serves, particularly those with limited financial resources, a student identification card is often the only form of identification they carry consistently.

76. As a result of the student ID ban in H.B. 991, Hispanic Federation will need to redirect staff time and organizational resources to educate and engage student voters on the new

requirements. This will include revising, translating, and reprinting nonpartisan educational resources in English and Spanish to reflect Florida's updated voter identification requirements and student identification ban. It will also include incorporating information about the new identification requirements into workshops, campus outreach, community events, and other voter education activities to help students and first-time voters. The student ID ban will also cause Hispanic Federation staff to spend additional time answering questions, explaining acceptable forms of identification, and helping students understand the new requirement. As a result, staff interactions with students would become more time-intensive, reducing the number of individuals our team can assist through voter registration and voter education activities.

77. Hispanic Federation regularly engages low-income individuals and families through its community outreach, social service programs, and nonpartisan civic engagement initiatives. Many of the individuals Hispanic Federation serves seek public assistance with essential needs such as food, housing, health care, workforce development, and other community resources. As part of Hispanic Federation's programs, our Civic Engagement team provides nonpartisan voter registration and voter education to these eligible community members.

78. Based on Hispanic Federation's experience serving low-income communities across Florida, the Challenged DPOC Provisions would create additional barriers for eligible voters who seek public assistance. Many of the low-income community members Hispanic Federation serves are unfamiliar with the administrative processes involved in voter registration. This will likely discourage some otherwise eligible individuals from seeking public assistance and attempting to register or completing the voter registration process through these agencies. Operationally, Hispanic Federation anticipates that these changes would require additional staff time and organizational resources to answer questions, provide individualized assistance, explain

29

the new requirements, and connect eligible voters with organizations that can help them obtain the necessary documentation. These additional responsibilities would increase the time required for voter registration activities and divert resources from other civic engagement and community outreach efforts.

79.    Hispanic Federation also engages some individuals who have Florida driver licenses and/or identification cards issued by the DHSMV with addresses that differ from the address at which they seek to be registered to vote. From Hispanic Federation's experience engaging voters, members of many vulnerable communities move frequently for a variety of reasons, including changes in employment, housing affordability, or family circumstances. These frequent moves create additional financial burdens because individuals have to pay to update the address on their driver license or state ID each time they relocate. This affects many college students, who often have temporary housing and may need to update the address on their identification or driver license in order to keep their voter registration information current. Because Florida Law requires that one update their address on their identification or driver license within 30 days of moving, we recognize that this will be another cause of economic hardship among voters that may prevent or dissuade them from voting at all, despite their eligibility to do so. H.B. 991 would make it more difficult for Hispanic Federation to register these types of voters, and it is possible that these otherwise eligible voters would opt not to register at all. H.B. 991 is likely to cause Hispanic Federation to register and engage fewer voters, further harming its mission by decreasing its community outreach and civic engagement efforts.

80.    Plaintiff Florida Immigrant Coalition, Inc. ("FLIC") is a 501(c)(3) multi-racial and multi-ethnic coalition of member organizations with the mission of growing the connection, capacity, and consciousness of communities to strengthen pro-immigrant power in Florida. FLIC

30

works to strengthen community ties, enhance capabilities, and raise awareness to increase the impact of pro-immigrant initiatives across Florida, including by mobilizing naturalized citizens to register and vote.

81.     Plaintiff FLIC Votes, Inc. ("FLIC Votes") is a 501(c)(4) nonprofit organization whose mission is to mobilize ordinary citizens to enact extraordinary change through powerful civic engagement, popular education, and building consciousness. FLIC Votes works to increase the civic participation of historically marginalized communities across Florida through statewide voter registration, voter education, and GOTV efforts, as well as by organizing and advocating around issues important to those communities.

82.     FLIC and FLIC Votes are based in Miami, Florida. FLIC and FLIC Votes staff operate in Miami-Dade, Broward, Palm Beach, Orange, Osceola, and Duval Counties.

83.     FLIC is comprised of eighty-three standing member organizations that work to support the immigrant community in Florida through a variety of programs, including by assisting with voter registration and education for eligible naturalized citizens. FLIC unifies those organizations and supports them in achieving their shared goals, including by operating a New American Voters Program, which supports eligible immigrants with naturalization and subsequent voter engagement. In addition to the many people FLIC serves directly and through its work with its eighty-three member organizations, FLIC also has approximately 120 individual members of its own who live in more than fifteen counties in Florida. Both FLIC's and its member organizations' memberships include many naturalized citizens who are at risk of being removed from the voter rolls or denied access to the voter rolls in the first place due to the Challenged DPOC Provisions. The interests FLIC seeks to protect are germane to its organizational purpose,

and neither the claims asserted, nor the relief requested, require the participation of FLIC's individual members in the lawsuit.

84. FLIC Votes supports voter registration by conducting outreach and educating voters about, and directing them to, Florida's online voter registration system, as well as by helping applicants and voters resolve issues affecting their registration status. FLIC Votes also holds educational events—including advocacy trainings and voter education workshops—to provide Floridians with the tools to protect their right to vote. FLIC Votes also engages in GOTV activities, including text-banking, phone-banking, and door-knocking. During the 2020 election cycle, FLIC registered more than 40,000 new voters, turned out 200,000 voters, and canvassed approximately 162,000 voters. During the 2024 election cycle, FLIC Votes assisted individuals with the voter registration process in Miami-Dade, Broward, Palm Beach, Orange, Volusia, Alachua, Hillsborough, Pinellas, Duval, and Seminole Counties.

85. As a result of H.B. 991's passage, FLIC Votes will be forced to expend considerable resources to help its constituents, FLIC's members, members of FLIC's member organizations, and other applicants and voters comply with the new DPOC requirement. FLIC Votes will help eligible citizens register, stay on the voter rolls, and vote through text-banking, phone-banking, and door-knocking. FLIC Votes will target, among other constituents, the voters FLIC and FLIC Votes registered directly since 2020 who are at risk of being removed from the rolls due to the Challenged DPOC Provisions. FLIC Votes will also target voters it has helped navigate Florida's online voter registration system in the past who are similarly at risk of removal from the rolls due to H.B. 991's citizenship verification procedures. FLIC Votes will also assist voter registration applicants who wish to register to vote in Florida but who lack any of the forms of DPOC that are required by H.B. 991. FLIC Votes will conduct a campaign to educate naturalized citizens

32

regarding the need to update their DHSMV record with DPOC and will help naturalized citizens navigate the process for doing so on an as-needed basis. FLIC Votes will educate, train, and assist its constituents, FLIC's members, members of FLIC's member organizations, and other naturalized citizens who need help with providing DPOC to county Supervisors of Elections to comply with the Challenged DPOC Provisions. FLIC Votes will also assist prospective voter registration applicants who are unable to register through the online portal due to the DPOC requirement in § 97.0525(4).

86.     H.B. 991 will cause FLIC Votes to expend additional resources, including money and staff and volunteer time, to protect eligible voters who face barriers registering to vote, staying on the voter rolls, and voting due to the Challenged DPOC Provisions—for example, by training staff and volunteers on how to assist voters affected by the requirement, as well as by educating voters on what to do if they are required to provide DPOC. H.B. 991 thwarts FLIC Votes' mission because FLIC Votes will be forced to assist constituents and other voters it previously helped register who are removed from the voter rolls as a result of the law's citizenship verification process. It will also be forced to assist individuals it helps register for the first time who are not able to make it onto or stay on the rolls due to H.B. 991. As a result, FLIC Votes is limited, and will continue to be limited, to devoting fewer resources to its core organizational activities, including voter registration, voter education, and GOTV efforts, unless the Challenged DPOC Provisions are enjoined.

87.     Plaintiff Common Cause is a nonpartisan, grassroots organization organized under the laws of the District of Columbia that has a mission of upholding the core values of American democracy. Common Cause works to create open, honest, and accountable government that serves

33

the public interest; promote equal rights, opportunity, and representation for all; and empower all people to make their voices heard in the political process.

88.     Plaintiff Common Cause Education Fund (the "Education Fund") was formed in 2000 as a nonprofit under the laws of the State of Delaware. The Education Fund provides education, engagement, and research to its members, constituents, partner organizations, and the public about voter registration and the electoral process. The Education Fund works to create public engagement on democracy issues and promote effective citizen participation, which is critical for a healthy and robust democratic society. Common Cause and the Common Cause Education Fund (together "Common Cause") bring this action jointly.

89.     Common Cause has approximately 50,000 members in Florida who live throughout all of its sixty-seven counties. Common Cause also has Florida-based staff, including a state director, who focus on advancing the organization's mission in Florida. Common Cause's membership includes eligible voters who are at risk of being removed from or denied access to the voter rolls due to H.B. 991's DPOC requirement and citizenship verification procedures. The interests Common Cause seeks to protect are germane to its organizational purpose, and neither the claims asserted nor the relief requested requires the participation of Common Cause's individual members in the lawsuit.

90.     In Florida, Common Cause supports voter registration efforts by conducting voter outreach, providing education to members and partner organizations, directing individuals to Florida's online registration system, and assisting Florida-based partner organizations that work with people attempting to register to vote. Common Cause also anchors a statewide, coalition-based nonpartisan Election Protection program, which helps Florida voters who have voting-related questions navigate the election process and cast their ballots, including by supporting voters

34

with registration issues to access provisional ballots. Common Cause provides its members, partner organizations, and the public with authoritative, deeply researched resources and tools to facilitate the registration and voting process, such as materials that help individuals registering to vote via paper applications and through Florida's online registration system. Common Cause holds educational events, including advocacy trainings, and voter education workshops to provide Floridians with the tools to protect their right to vote. Common Cause also engages in statewide civic engagement and education campaigns that help Floridians understand the registration and voting processes and assist eligible voters with registration, including voter education activities such as text-banking and phone-banking to ensure voters are aware of changes in voting practices.

91.     H.B. 991 directly impacts Common Cause's core registration assistance-related and voter education-related activities. The bill will force Common Cause to divert its scarce resources from its planned voter education campaigns and election protection work to help its members, constituents, and other Floridians to comply with the DPOC requirements. Common Cause will be forced to establish new procedures, such as a voter assistance escalation protocol for staff, volunteers, and partners who are helping voters impacted by the DPOC requirement. Common Cause will be forced to create new infrastructure, including a new website, fact sheets, and voter resources, to help eligible citizens impacted by H.B. 991 register, stay on the voter rolls, and vote. Common Cause will launch an outreach campaign using mail and email to identify and assist members and constituents who lack DPOC and are at risk of being removed from or denied access to the voter rolls. Common Cause will assist impacted citizens by helping them identify what steps they need to take to obtain and submit DPOC to election officials. Separate and apart from those efforts, Common Cause will also train staff, partner staff, and volunteers assisting with voter registration and election protection hotlines about the new DPOC requirements. And Common

Cause will be forced to update its extensive resources about the voting process and create new educational materials about voter registration and voting to help its members, the public, and its partner organizations comply with H.B. 991. Common Cause will also have to retrain volunteers for the Haitian-Creole voter support line and update guidance for election protection volunteers for other hotlines to prepare them to support voters impacted by H.B. 991.

92.    H.B. 991 thwarts Common Cause's mission and undermines its core activities because Common Cause will be forced to expend more of its limited resources to assist members and other Floridians who are at risk of being removed from the voter rolls as a result of the bill's citizenship verification procedure, including by providing them with educational materials on how to comply with the new requirements of H.B. 991. This would mean that Common Cause will have fewer resources to devote to its existing core organizational activities. By way of example and not limitation, Common Cause will have fewer resources to assist individuals struggling with other sorts of voter access issues and barriers to the ballot, whether through Common Cause's voter registration assistance, voter education, or election protection efforts. In addition, Common Cause's extra work to help individuals who may be impacted by H.B. 991 will also diminish the organization's work in other areas, such as advocating for or against specific Florida legislation, educating members of the public about that legislation, and engaging with civil rights advocacy.

## B.    Defendants

93.    Defendant Cord Byrd is Florida's Secretary of State and is sued in his official capacity. The Secretary of State is the State's chief election officer. *See* Fla. Stat. § 97.012. His duties include "[o]btain[ing] and maintain[ing] uniformity in the interpretation and implementation of the election laws." *Id.* § 97.012(1). To that end, he may adopt "uniform standards for the proper and equitable interpretation and implementation" of the election laws,

36

including the Challenged DPOC Provisions, the Mandatory Update Provision, and the Student ID Ban. *Id.* Defendant Byrd maintains Florida's online voter registration system and Florida's statewide voter registration list. *Id.* § 97.0525. Defendant Byrd is charged with ensuring the accuracy of the statewide list. Defendant Byrd's office has signed memoranda of understanding with state and federal agencies to facilitate the sharing of information contained in the statewide voter registration database, as well as the driver license information necessary to conduct H.B. 991's citizenship verification protocol. H.B. 991's Online Verification Registration Application Provisions and Retroactive DPOC Provision charge the Department of State with making an initial determination as to whether information on voters' U.S. citizenship is credible and reliable, as well as with notifying Supervisors of Elections of its determination and providing the proper supervisor with a copy of the supporting documentation. *See* H.B. 991 § 3, *codified at* Fla. Stat. § 97.0525(4), *id.* § 8, *codified at* Fla. Stat. § 98.075(6)(a). In his role as Florida's chief election officer, Defendant Byrd is also responsible for ensuring compliance with the NVRA throughout the state. *See* Fla. Stat. § 97.012; 52 U.S.C. § 20509.

94.     Defendant Dave Kerner is the Executive Director of the DHSMV and is sued in his official capacity. H.B. 991 obligates the DHSMV to report voters' address information that it receives as part of applications for driver licenses and ID cards to the Department of State. H.B. 991 § 9, *codified at* Fla. Stat. § 98.093(8)(d).

95.     Defendant Kathryn Williams is the Deputy Secretary of the DCF and is sued in her official capacity as the DCF's current highest-ranking executive. The DCF is responsible for administering public benefit programs, including programs that have responsibilities under Section 7 of the NVRA to provide the federal voter registration form, or its equivalent, to prospective registered voters.

37

96.     Defendants Kim Barton, Christopher Milton, Nina Ward, Amanda Seyfang, Timothy Bobanic, Joe Scott, Sharon Chason, Leah Valenti, Maureen Baird, Chris Chambless, Melissa Blazier, Tomi Brown, Debbie Wertz, Darbi Chaires, Jerry Holland, Robert Bender, Kaitlyn Lenhart, Heather Riley, Kenya Williams, Lisa Darus, Aletris Farnam, Rhonda Pierce, Laura Hutto, Diane Smith, Sherry Taylor, Denise Lavancher, Karen Healy, Craig Latimer, Howard Williams, Leslie Swan, Carol Dunaway, Michelle Milligan, Travis Hart, Alan Hays, Jenna Persons-Mulicka, Mark Earley, Tammy Jones, Grant Conyers, Heath Driggers, Scott Farrington, Wesley Wilcox, Vicki Davis, Alina Garcia, Sherrie Hodies, Janet Adkins, Paul Lux, David May, Karen Castor Dentel, Mary Jane Arrington, Wendy Sartory Link, Brian Corley, Julie Marcus, Melony Bell, Charles Overturf, Tappie Villane, Ron Turner, Amy Pennock, Vicky Oakes, Gertrude Walker, William Keen, Jennifer Kinsey, Dana Southerland, Deborah Osborne, Lisa Lewis, Joseph Morgan, Ryan Messer, and Deidra Pettis are the Supervisors of Elections for Florida's sixty-seven counties (together, "County Defendants" or "Supervisors"). In their official capacities, the Supervisors are responsible for conducting all federal and state elections in their counties. Under the terms of H.B. 991's General DPOC Registration Provisions and removal procedures at § 98.075(7), the Supervisors must verify the U.S. citizenship of applicants for voter registration flagged by the Department of State and must remove registered voters from the rolls if they are unable to provide accepted forms of DPOC. These Supervisors of Elections are also responsible for the day-to-day enforcement of the Student ID Ban.

## FACTUAL BACKGROUND

### A.     H.B. 991's DPOC Requirements

97.     On April 1, 2026, Florida enacted H.B. 991.

98.     H.B. 991 constitutes a major overhaul of Florida's voter registration system, requiring unprecedented efforts on the part of various election officials, administrators, and other state agencies to implement its provisions by its January 1, 2027, effective date, which is in less than six months. It systematically disadvantages married women, naturalized citizens, low-income voters, voters of color, students, transgender people, and all others who have changed their legal name. Plaintiffs challenge four provisions of H.B. 991 relating to DPOC—the Challenged DPOC Provisions—as detailed below.

99.     **General DPOC Registration Provisions** – H.B. 991 changes the processing and acceptance of voter registrations to subject every Florida voter—currently registered or prospective—to a citizenship verification regime tied to the records of the DHSMV. County supervisors may not accept a voter registration application, whether an initial application to register or an application "with a change in name, address, or party affiliation," if DHSMV data "indicate that the applicant is not a United States citizen or has not provided a document acceptable as evidence of United States citizenship." H.B. 991 § 4, *codified at* Fla. Stat. § 97.053(6)(a). If the DHSMV records indicate the applicant is not a U.S. citizen or has not provided DPOC, "the applicant must be notified and must provide . . . if applicable . . . a document acceptable as evidence of United States citizenship." *Id.* § 97.053(6)(a). If the registrant cannot do so, they will be required to vote a provisional ballot, which is only counted if they "present[] a document acceptable as evidence of U.S. citizenship no later than 5 p.m. of the second day following the election." *Id.*

100.     In addition to requiring Supervisors of Elections to obtain DPOC from applicants who have not previously provided DPOC to the DHSMV, H.B. 991 requires supervisors to initiate proceedings to remove applicants from the voter rolls if they have not previously provided DPOC

or their citizenship cannot be confirmed in a cross-referenced database. *Id.* § 97.053(6)(b). If an application indicates that the applicant has not been issued a current and valid Florida driver license, ID card, or Social Security number, or if DHSMV records indicate the applicant is not a U.S. citizen or has not provided DPOC, "the supervisor of election shall verify the voter's legal status as a United States citizen using available state and federal governmental sources, and, if applicable, initiate notice pursuant to s. 98.075(7)." *Id.* Under § 98.075, supervisors must notify the registered voter of their potential ineligibility by mail within seven days and notify the applicant that they must respond within thirty days. H.B. 991, § 8, *codified at* Fla. Stat. § 98.075(7)(a)(1). If the applicant fails to provide DPOC, the supervisor must make a final determination of the voter's eligibility within seven days after the expiration of the voter's timeframe to respond and must remove the voter from the statewide voter registration system within seven days. *Id.*, *codified at* § 98.075(7)(a)(3).

101.   **Online Voter Registration Application Provisions** – Under H.B. 991, a voter cannot successfully register to vote or update their registration using Florida's online voter registration process unless they have previously provided DPOC to the DHSMV. When someone applies to register to vote or update their registration via the online voter registration system, the Department of State may only accept the application if the applicant has previously provided an acceptable form of DPOC to the DHSMV. H.B. 991 § 3, *codified at* Fla. Stat. § 97.0525(4)(b). However, "if an applicant's name and date of birth match the records of the [DHSMV], but the records of the [DHSMV] indicate the applicant is not a United States citizen or has not provided a document acceptable as evidence of United States citizenship," then the Department of State "must notify the supervisor of elections that the applicant's legal status as a United States citizen could not be verified and transmit . . . the applicant's registration information . . . to the supervisor

of elections." *Id.* § 3, *codified at* 97.0525(4)(c). The county supervisor is then required to notify the voter that they must provide DPOC and verify the voter's legal status as a U.S. citizen. *Id.* § 4, *codified at* Fla. Stat. § 97.053(6)(a), (b).

102.     **Retroactive DPOC Provisions** – H.B. 991 imposes an ongoing obligation on the Department of State to conduct retroactive checks of the citizenship status of registered Florida voters, subjecting them to possible removal from the rolls if they have not provided acceptable DPOC. The law mandates that the Department of State (1) "shall identify those registered voters who are potentially ineligible based on their legal status regarding United States citizenship by comparing or receiving information from other governmental entities as authorized by s. 98.093"; (2) shall "review and make an initial determination as to whether the information is credible and reliable"; and (3) shall "notify the supervisor and provide a copy of the supporting documentation indicating potential ineligibility of the voter to be registered." *See* H.B. 991 § 8, *codified at* Fla. Stat. § 98.075(6)(a).

103.     When the Department of State identifies a voter or when a registrant is flagged as potentially ineligible based on citizenship status, the Department of State must use information received from "other governmental entities" to make an "initial determination" as to whether any information it has regarding a registrant's citizenship "is credible and reliable." *Id.* § 8, *codified at* Fla. Stat. § 98.075(6)(a). If the Department of State determines that the information is credible, it must notify the appropriate county supervisor and send any supporting documentation regarding the voter's potential ineligibility. *Id.* Once the supervisor is notified, they must notify the voter and require them to submit acceptable DPOC. *Id.* § 98.075(6)(a) & (7)(a).

104.     **DPOC Type Provision** – H.B. 991 circumscribes which documents will constitute sufficient proof of citizenship. Those documents are limited to the following:

41

(a) An original or certified copy of a United States birth certificate; (b) A valid, unexpired United States passport; (c) A naturalization certificate issued by the [DHS]; (d) A Consular Report of Birth Abroad provided by the United States Department of State; (e) A current and valid Florida driver license or Florida identification card issued by the [DHSMV], if such license or identification card indicates United States citizenship; (f) A current and valid photo identification issued by the Federal Government or the state which indicates United States citizenship; or (g) An order from a federal court granting United States citizenship.

H.B. 991 § 1, *codified at* Fla. Stat. § 97.021(10). This list notably excludes a certificate of citizenship, a document issued by DHS establishing the legal status of individuals whose U.S. citizenship is derived through their parents.

105. In addition, the statute provides that any difference between an applicant's legal name and their name as it appears on their qualifying citizenship documentation must be substantiated by official documentation proving a legal name change. *Id.*

**B.      The Stale Naturalization Data of the DHSMV and DHS's SAVE System**

106. H.B. 991 contemplates Florida officials relying on "available state and federal governmental sources" for its DPOC provisions. H.B. 991 § 4, *codified at* Fla. Stat. § 97.053(6)(b). However, the citizenship information in the systems Florida is relying upon (including that in the DHSMV and DHS's SAVE systems) is not reliable, particularly for naturalized citizens. Instead, the databases represent—at best—snapshots of particular points in time, as they do not have mechanisms for automatically tracking naturalization. They also have name matching and typographical errors common to databases not designed for this use.

107. Federal law recognizes that databases maintained for purposes other than voter registration should not be used to disqualify registered voters.

108. Through the Help America Vote Act ("HAVA"), federal law requires a state's chief state election official to enter into an agreement with the state's motor vehicle authority "to match information" in their respective databases "to the extent required to enable each such official to

verify the accuracy of the information provided on applications for voter registration." 52 U.S.C. § 21083(a)(5)(B). It further requires state motor vehicle authorities to enter into an agreement with the Commissioner of the SSA for the same purpose. *Id.* § 21083(a)(5)(B)(ii). This data matching is done for the purpose of determining "the validity of numbers provided." *Id.* § 21083(a)(5)(A)(iii).

109.    To facilitate this verification of voter registration *information*, HAVA requires voter registration applicants to provide their driver license or state ID number if they have a current and valid license or state ID, or, if they do not, the last four digits of their Social Security number. *Id.* § 21083(a)(5)(A). If an applicant has not been issued a driver license or Social Security number, the state must nevertheless process the application and "assign the applicant a number which will serve to identify the applicant for voter registration purposes." *Id.*

110.    HAVA does not, however, contemplate denying voter registration applications or removing registered voters from the rolls based on any of this database-matching. HAVA does not require states to take any action based on the results of attempts to match voter registration information with motor vehicle or Social Security records. *See id.* § 21083.

111.    A majority of states do not deny a voter registration application or remove a registered voter from the rolls based on the comparison of information between the state's voter registration database and fields in the motor vehicle or SSA database. This is in recognition that information mismatches across databases should not be used to take action against voter registration applicants and registered voters and rooted in the reality that these databases, while useful tools for election officials, are not fully accurate, up-to-date, and reliable records reflecting individuals' current eligibility to vote.

112.    In Florida, the DHSMV is responsible for issuing Florida driver licenses and state ID cards. Under current practice in Florida, all new driver licenses and IDs, and all renewed driver licenses and ID cards, must be REAL ID compliant.[5] The DHSMV began requiring all U.S. citizens to provide DPOC to renew or obtain a driver license or ID card in 2020.

113.    Since 2020, all U.S. citizens applying for a driver license or ID card from the DHSMV have been required to provide one of the following documents that would demonstrate their citizenship: a U.S. birth certificate, a U.S. passport or passport card, a consular report of birth abroad, a certificate of naturalization, or a certificate of citizenship.[6] U.S. citizens are issued driver licenses or ID cards that match the name assigned to their Social Security number, so "[c]ustomers who have recently changed their name" must "update their records with the [SSA]" before "applying for a driver license or ID card."[7]

114.    However, U.S. citizenship is not required to obtain a REAL ID in Florida. Immigrants can obtain a REAL ID-compliant Florida driver license or ID with a Green Card, a grant of asylum with a valid passport, or a grant of refugee status with a valid passport.[8]

115.    While the DHSMV database thus may contain information reflecting the citizenship status a person had as of the date of their interaction with the DHSMV, the DHSMV has no mechanism to automatically update that information if a person's citizenship status subsequently changes.

---

[5]    *Driver Licenses & ID Cards: What to Bring*, DHSMV, www.flhsmv.gov/driver-licenses-id-cards/what-to-bring/ [https://perma.cc/Q8XK-4WH3] (last accessed July 22, 2026).
[6]    *What to Bring: U.S. Citizen*, DHSMV, www.flhsmv.gov/driver-licenses-id-cards/what-to-bring/u-s-citizen/ [https://perma.cc/W27V-6YQC] (last accessed July 22, 2026).
[7]    *Id.*
[8]    *What to Bring: Immigrant*, DHSMV, www.flhsmv.gov/driver-licenses-id-cards/what-to-bring/immigrant/ [https://perma.cc/VZD6-HN27] (last accessed July 22, 2026).

116.    In addition to DHSMV data, Florida uses DHS's SAVE system for voter registration and list maintenance.[9] On November 28, 2025, Florida and three other states entered into a settlement agreement with DHS in which DHS and the states agreed to work together to develop DHS's SAVE system.[10] Secretary of State Cord Byrd released a statement that "'Florida successfully led this multistate effort to help secure accurate voter rolls,'" and the Department of State touted that the "agreement requires DHS to offer SAVE at no cost," to "add the ability to search full or partial social security numbers," and to "process bulk requests."[11] Since entering into the settlement with DHS, Florida has used the SAVE system, including its bulk search functionality and its Social Security number search capabilities, to verify the citizenship of existing voters on its voter rolls and applicants for voter registration.[12]

117.    H.B. 991 does not explicitly mention DHS's SAVE system, but the law repeatedly references unspecified state and federal databases that can be used as sources of citizenship information.

---

[9]    Fair Elections Ctr., Eligible Voters at Risk: Examining Changes to USCIS's SAVE System 1 (July 2025), https://fairelectionscenter.org/wp-content/uploads/2025/07/Examining-Changes-to-USCISs-SAVE-System.pdf [https://perma.cc/9R2V-G9Z7].

[10]    Settlement Agreement, *Florida v. U.S. Dep't of Homeland Sec.*, No. 3:24-cv-509 (N.D. Fla. Nov. 28, 2025), Dkt. No. 30-1, https://storage.courtlistener.com/recap/gov.uscourts.flnd.527782/gov.uscourts.flnd.527782.30.1.pdf [https://perma.cc/M82Z-K3PR].

[11]    Press Release, Fla. Dep't of State, Secretary of State Cord Byrd Announces Landmark Settlement Agreement with DHS to Better Secure Elections (Dec. 3, 2025), https://dos.fl.gov/historical/meetings-and-events/news-and-press-releases/view-release/?id=71232 [https://perma.cc/D4KQ-VB64].

[12]    Decl. of Maria Matthews, Director of the Division of Elections, Department of State at 3, *Florida v. U.S. Dep't of Homeland Sec.*, No. 3:24-cv-509 (N.D. Fla. June 30, 2026), Dkt. No. 32-1.

118. H.B. 991 requires the Department of State to identify potential noncitizens "by comparing or receiving information from other governmental entities as authorized by s. 98.093." *See, e.g.*, H.B. 991 § 8 (*codified at* Fla. Stat. § 98.075(6)(a)).

119. Further, when DHSMV records indicate that a voter registration applicant has not submitted DPOC, H.B. 991 requires Supervisors of Elections to "verify the voter's legal status as a United States citizen using available state and federal governmental sources . . . ." H.B. 991 § 4, *codified at* Fla. Stat. § 97.053(6)(b).

120. The existing language in Fla. Stat. § 98.075(6) (2023), the text of which H.B. 991 does not change, further allows county supervisors to use and act on information from "any governmental entity that identifies a registered voter as potentially ineligible," clearly encompassing DHS's SAVE system and making it a permissible source of voter registration list maintenance.

121. DHS's SAVE system has built-in lags similar to those in the DHSMV database, as well as long-existing blind spots and missing data fields that have, among other problems, repeatedly caused it to misidentify naturalized citizens as noncitizens.

122. In 2025, DHS reconfigured the SAVE system to allow for searches using full or partial Social Security numbers and to allow for bulk searches of voter data.[13] These changes appear to be aimed at transforming DHS's SAVE system into a national database that could be used to attempt to verify the citizenship status of any person.

---

[13] *Id.* at 2–3; Hannah Fingerhut, *GOP-Led States Settle Lawsuit Against Federal Government Over Checking Citizenship Status of Voters*, AP News (Dec. 1, 2025), https://apnews.com/article/voting-noncitizens-dhs-florida-indiana-iowa-ohio-fd202f16765456a33661e031c259f3b5 [https://perma.cc/SN79-99EA].

123. DHS's reconfigured SAVE system suffers from significant accuracy issues. A federal judge recently found that inaccurate data contained in the SAVE system has already caused at least one state to wrongfully revoke the voter registrations of qualified voters and wrongfully require other qualified voters to confirm their citizenship to maintain their voter registrations. *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 25-3501, 2026 WL 1784297, at *15 (D.D.C. June 22, 2026).

124. The SAVE system's use of SSA data is particularly problematic. A USCIS Privacy Threshold Analysis of DHS's SAVE system found that "[s]hortfalls in data accuracy" in SSA's citizenship data "could cause incomplete or false results" when integrated into the SAVE system.[14] And because USCIS "is not the source agency for [SSA]-related information," it "cannot verify accuracy of SSA data" itself.[15] In addition, election officials have raised concerns about DHS's SAVE system's ability to separately identify individuals whose entries in the system may appear identical.[16]

125. DHS's SAVE system also often misidentifies naturalized citizens as noncitizens, due in part to its use of SSA data. SSA's citizenship data often only reflects the citizenship status of a person at the time they apply for a Social Security number and card because "SSA has no

---

[14] Privacy Off., U.S. Dep't of Homeland Sec., Privacy Threshold Analysis No. 02-2025 17 (2025), https://fairelectionscenter.org/wp-content/uploads/2025/07/Examining-Changes-to-USCISs-SAVE-System.pdf [https://perma.cc/5ZSA-KHLN].

[15] Vittoria Elliott, *DHS's Data Grab Is Getting Citizens Kicked Off Voter Rolls, New Complaint Says*, Wired (Jan. 22, 2026), https://www.wired.com/story/dhs-data-grab-getting-citizens-kicked-off-voter-rolls/ (internal quotations omitted).

[16] *See* Will Doran, *NC Election Officials to Take New Steps to Investigate Non-Citizen Voting*, WRAL News (Nov. 25, 2025), https://www.wral.com/news/state/nc-election-officials-investigate-non-citizen-voting-nov-2025/ [https://perma.cc/9L6H-AQL2] (North Carolina Board of Elections staffer Adam Steele noted that it was possible that "there may be multiple people with the same name, date of birth, and last four of their social," and he said he therefore was unsure "what to expect once the database matches are in operation.").

47

process for automatically updating the citizenship data it maintains; rather, SSA relies on SSN-holders to inform SSA of any changes in their status."[17] Critically, "[t]here is no obligation for an individual to report to SSA a change in their citizenship or immigration status until [they] request a replacement card or file a claim for a Social Security benefit."[18] SSA itself has stated that its citizenship records are merely "a snapshot" and "do not provide definitive information about an individual's citizenship status."[19]

126.   Immigrants obtain Social Security numbers upon becoming permanent residents, and, upon information and belief, this is the status that remains associated with a person's Social Security number after they naturalize, unless and until they affirmatively update it.[20]

127.   Across the country, where election administrators have attempted to implement citizenship checks via DHS's SAVE system, naturalized citizens have been misidentified as noncitizens and subject to disenfranchisement proceedings. In Texas, several voters flagged as potential noncitizens by DHS's SAVE system already had proof of citizenship on file, had a U.S. passport, or had proven their citizenship to Texas's Department of Public Safety.[21] In Missouri,

---

[17]   Fair Elections Ctr., Eligible Voters at Risk: Examining Changes to USCIS's SAVE System 4 (July 2025), https://fairelectionscenter.org/wp-content/uploads/2025/07/Examining-Changes-to-USCISs-SAVE-System.pdf [https://perma.cc/TM9M-4X2Z].

[18]   Letter from Nancy Morales Gonzalez, Assoc. Gen. Couns. for Gen. L., Div. 1, U.S. Soc. Sec. Admin., to Jon Sherman, Litig. Dir. & Senior Couns., Fair Elections Ctr. 2 (July 13, 2023), https://fairelectionscenter.org/wp-content/uploads/2025/07/SSA-Touhy-Decision-letter.July-13-2023-signed.pdf [https://perma.cc/YV6V-L6QV].

[19]   *Id.*; *see also* Elliott, *supra* note 15 ("Social Security numbers are issued to people legally allowed to work in the US and do not change once someone naturalizes. Immigration and naturalization processes are managed by DHS, and naturalized citizens are not required to tell SSA if they naturalize, meaning SSA data may be out of date.").

[20]   *Social Security Numbers for U.S. Permanent Residents*, Soc. Sec. Admin., https://www.ssa.gov/ssnvisa/Handout_11_1.html [https://perma.cc/XQ4T-23VA] (last accessed July 22, 2026).

[21]   Natalia Contreras, *Texas Flagged Some Voters as 'Potential Noncitizens' But They Had Already Provided Proof of Citizenship*, Votebeat Tex. & Tex. Trib. (Dec. 18, 2025), https://www.texastribune.org/2025/12/18/texas-voter-roll-citizens-investigation/ [https://perma.cc/8YDV-24DA] ("11 registered voters in Travis County flagged as potential noncitizens actually provided

DHS's SAVE system generated an initial list of potential noncitizens that was, without any explanation for the evident initial inaccuracies, subsequently replaced with a significantly shorter list; in St. Louis County, the original "list of 691 potential noncitizens dropped to 133," and in Boone County, it dropped from 74 to 33.[22] And in Charlotte County, Florida, after DHS's SAVE system identified 15 people as noncitizens, Supervisor of Elections Leah Valenti found two had "already sent in documentation to prove their naturalized citizenship."[23]

128.    States that require people to affirmatively come forward and provide DPOC to remain on the rolls after being flagged using DHS's SAVE system have had low response rates to these requests for DPOC, which may be connected to current federal immigration enforcement efforts. One Texas county election official said that "reports of arrests of U.S. citizens by federal immigration officials across the country could be a factor."[24] Cameron County, Texas election administrator Remi Garza "got a call from a family member of a registered voter who was hesitant to walk into a county building to turn in proof of citizenship documentation, even though they are an American citizen," because "'[t]hey were afraid that there were going to be federal officers that would approach them while they were trying to resolve this.'"[25]

---

proof of citizenship while obtaining a driver license or state ID at the Texas Department of Public Safety.").

[22]    Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026), https://www.propublica.org/article/save-voter-citizenship-tool-mistakes-confusion [https://perma.cc/27G4-FFQ2].

[23]    Alexandra Berzon & Nick Corasaniti, *Initial Review Finds No Widespread Illegal Voting by Migrants, Puncturing a Trump Claim*, N.Y. Times (Jan. 14, 2026), https://www.nytimes.com/2026/01/14/us/politics/noncitizen-voters-save-tool.html.

[24]    Contreras, *supra* note 21.

[25]    *Id.*; Elliott, *supra* note 15.

### C. Florida's Naturalized Citizen Population

129. Florida has the third-highest number of immigrants of any state in the country.[26] It also is near the top of the charts in the number of naturalizations each year: in the three years from 2022 to 2024, nearly 293,000 people became naturalized citizens in Florida, trailing only California. During the same period, the Miami-Fort Lauderdale-West Palm Beach metropolitan area ranked second in the country in the number of citizens naturalized, at over 170,000.[27]

130. As just discussed, Florida's naturalized citizens are particularly at risk of being incorrectly identified as noncitizens in the SAVE system because of that system's integration of unreliable SSA citizenship data.

131. Additionally, because DHSMV data does not automatically update when people naturalize, people who naturalize after obtaining or renewing their current license or ID could be erroneously listed as noncitizens in the DHSMV database, subjecting them to additional burdens and barriers to remaining registered to vote under H.B. 991's DPOC regime. For existing registrants, the Retroactive DPOC Provision will cause naturalized citizens to be wrongfully flagged for removal from the rolls and for existing and new registrants, the General DPOC Registration Provisions will subject naturalized citizen applicants to register to vote or to change their name, address, or party affiliation to rejection or removal.

132. Since February 2025, naturalized citizens with a Florida driver license or ID card have been required to obtain a replacement license or card reflecting their change in citizenship status with thirty days of naturalizing. Fla. Stat. § 322.19(3). The law does not specify whether this

---

[26] Stephanie Kramer & Jeffrey S. Passel, *What the Data Says About Immigrants in the U.S.*, Pew Rsch. Ctr. (Aug. 21, 2025), https://www.pewresearch.org/short-reads/2025/08/21/key-findings-about-us-immigrants/ [https://perma.cc/V9PL-TWJX].

[27] *Id.*

new requirement applies to such citizens who naturalized prior to its enactment, but it is most naturally read not to, because its requirements apply when "a person . . . *becomes* a citizen." *See id.* (emphasis added). On information and belief, the Florida naturalized citizens who obtained driver licenses or state IDs and naturalized before the law's enactment are not subject to this requirement. The DHSMV's records would not accurately reflect the citizenship status of this population, which, on information and belief, comprises the vast majority of Florida's naturalized citizens with driver licenses or state IDs, unless the naturalized citizen engaged in a DHSMV transaction requiring citizenship documentation after naturalizing.

133.    Even those naturalized citizens who attempt to update their citizenship records with the DHSMV may be unable to do so, or to do so quickly. As discussed in section O, *infra*, understaffing and systems outages at the DHSMV in the past year have caused lengthy delays and prevented many Floridians from timely accessing license and ID services.

### D.    Challenges for Floridians Born in Puerto Rico

134.    In addition, Florida has the largest Puerto Rican population of any U.S. mainland state, at 1.3 million people.[28]

135.    Access to birth certificates for Puerto Ricans has a complicated history. In 2009, the Commonwealth of Puerto Rico passed Law 191, which invalidated all Puerto Rican birth certificates issued before July 1, 2010. This law has led to confusion, frustration, and access gaps which persist.[29] Additionally, the process to get a Puerto Rican birth certificate is complicated

---

[28]    Jenn Hatfield & Jeffrey S. Passel, *Key Findings About Puerto Rico*, Pew Rsch. Ctr. (Feb. 5, 2026), https://www.pewresearch.org/short-reads/2026/02/05/key-findings-about-puerto-rico/ [https://perma.cc/K3B3-Z4BK].

[29]    Luis Fieldman, *Puerto Ricans Face Issues Renewing Driver's Licenses due to 2010 Birth Certificate Law: "It's Extremely Frustrating"*, Mass Live (Sep. 20, 2022), https://www.masslive.com/springfield/2022/09/puerto-ricans-face-issues-renewing-drivers-licenses-due-to-2010-birth-certificate-law-its-extremely-frustrating.html [https://perma.cc/MZ5M-36VK].

because Puerto Rican birth certificates are not automatically conferred. VitalChek, the company that processes requests for Puerto Rico birth certificates through its partnership with the Puerto Rican Department of Health, states on its website that "processing times can vary depending on the type of certificate" and that "actual times may vary from a day to several weeks."[30] The company also has a notice on its landing page clarifying that "VitalChek makes no representations or warranties as to the accuracy, completeness or timeliness of the information herein . . . . "[31] Taken together, these facts suggest that an individual requesting such a Puerto Rican birth certificate may not receive the documentation necessary to establish U.S. citizenship for an indeterminate amount of time. H.B. 991's DPOC requirement thus imposes an unnecessarily high burden on Puerto Rican born voters.

136.    Natural disasters have exacerbated access gaps for Puerto Ricans. Hurricane Maria caused an extensive exodus of Puerto Ricans to the U.S. mainland.[32] Florida was the largest recipient of Puerto Ricans that migrated to the U.S. mainland from Puerto Rico after Hurricane Maria.[33] American Community Survey data suggests that up to 82,000 plus Puerto Rican born individuals relocated to Florida through the end of 2016, and that, through 2019, over 182,000 Puerto Ricans would move to the state post-Maria. This figure is likely an underestimate,

---

[30]    *Timing and Pricing*, VitalChek, https://www.vitalchek.com/v/timing-and-pricing [https://perma.cc/XAN6-PRAQ].

[31]    *See Puerto Rico Department of Health (PR) Order Certificates – VitalChek*, VitalCheck, https://www.vitalchek.com/v/birth-certificates/puerto-rico/puerto-rico-department-of-health? gad_source=1&gad_campaignid=23530588464&gbraid=0AAAAAD_dlYmm0kIHEOuF7VsdH 023egHf2&gclid=Cj0KCQjwmunNBhDbARIsAOndKpnFHAHt10vVQET3TuEnsWGlhEPDes yCau4e2KGzmMPCEvofuXI8w7caAuYVEALw_wcB  [https://perma.cc/PS86-5GDF]  (last visited July 22, 2026).

[32]    *See* Edwin Melendez & Jennifer Hinojosa, Ctr. for Puerto Rican Stud., Estimates of Post-Hurricane Maria Exodus from Puerto Rico 1 (2017), https://centropr.hunter.cuny.edu/app/ uploads/2023/03/RB2017-01-POST-MARIA-EXODUS_V3.pdf [https://perma.cc/DH65-7WW3].

[33]    *Id*.

considering that migration from Puerto Rico to the U.S. mainland has been a consistent trend, leading to significant population gain for the state of Florida.[34] Many of these new residents could face difficulties accessing a copy of their birth certificates because of Law 191's invalidation of Puerto Rican birth certificates, the inability to access those documents because they were impacted by Hurricane Maria, or some combination of the two.[35]

137.    Puerto Ricans have also faced a long history of discrimination, including in Florida and the surrounding region. They have struggled to access democracy and basic services, including access to driver licenses. In August 2018, a group of Puerto Rican voters sued thirty-two Supervisors of Elections across the state of Florida to ensure access to basic bilingual voting materials that federal law required but that were not administered until the parties reached a settlement agreement on the matter.[36] In 2019, in Georgia, the Department of Driver Services subjected Puerto Rican-born individuals to more onerous requirements for receiving driver licenses despite their eligibility to obtain such documents.[37]

E.    **Burdens on Older Voters in Florida**

138.    H.B. 991's Challenged DPOC Provisions place particular burdens on older citizens. Older citizens who have not yet obtained Real ID from the DHSMV and potentially will not obtain this ID will be burdened if they want to register to vote for the first time in Florida or if they need to update their existing Florida voter registration because they move or want to change political party. They are also particularly at risk for possible removal for indications of noncitizenship when

---

[34]    *See* Jenn Hatfield & Jeffrey S. Passel, *Key Findings About Puerto Rico*, Pew Rsch. Ctr. (Feb. 5, 2026), https://www.pewresearch.org/short-reads/2026/02/05/key-findings-about-puerto-rico/ [https://perma.cc/UD7D-Y8Q8] (finding that Puerto Rican population decreased from 3.8 million in 2004 to 3.2 million in 2025).

[35]    *See* Melendez & Hinojosa, *supra* note 32, at 5–6.

[36]    *See* Compl., *Rivera-Madera v. Detzner*, No. 1:18-cv-152 (N.D. Fla. 2018).

[37]    *See* Compl., *Caban Gonzalez v. Moore*, No. 1:19-cv-3035 (N.D. Ga. 2019).

the State makes use of SSA data through DHS's SAVE system. This is because SSA data does not capture the citizenship status of many Americans, including older Americans.

139.    SSA was not even required to collect citizenship information from applicants until the Social Security Amendments of 1972 mandated that "applicants for social security account numbers [provide] such evidence as may be necessary to establish the age, citizenship, or alien status, and true identity of such applicants."[38] And even after that, the SSA did not begin to consistently maintain citizenship information until 1981.[39]

140.    Because the SSA data did not include citizenship status until 1972 and did not consistently retain that data until 1981, DHS's SAVE system may not be able to confirm the citizenship status of many U.S.-born citizens older than their mid-forties, including U.S. citizens who naturalized before the SSA data included citizenship data.

141.    In a recent review, the SSA estimated that "approximately ¼ of [its] records do not have an indication of citizenship present."[40] Therefore, unless a person whose SSA records were created before the agency collected citizenship data has previously provided DPOC to the DHSMV, when a state official attempts to check their citizenship status to newly register them to vote or determine if they are eligible to remain registered and cast a regular ballot, there may not be a state or federal database that confirms their citizenship status. And, while those at the younger end of

---

[38]    Social Security Amendments of 1972, Pub. L. 92-603, § 137(2), 86 Stat. 1329, 1364–65 (1972).

[39]    *Social Security Number Chronology*, Soc. Sec. Admin., https://www.ssa.gov/history/ssn/ssnchron.html [https://perma.cc/7KXL-UQ4Z] (last visited Mar. 24, 2026) (explaining that SSA requirements regarding citizenship arose in the 1970s).

[40]    Agreement between Dep't of Health & Hum. Servs., Ctrs. for Medicare & Medicaid Servs., and Soc. Sec. Admin. 16 (2020), https://www.ssa.gov/privacy/cma/CMS%20SSA%20CMA%20Re-establishment.ACA%202008.Final.Signed%20by%20DIBs%209.29.20%20(002).pdf (last visited July 22, 2026) (computer matching agreement for determining enrollment or eligibility for insurance affordability programs under the Patient Protection and Affordable Care Act).

the age group whose citizenship is not recorded in SSA records may be more likely, upon information and belief, to have provided DPOC to the DHSMV because they have obtained a REAL ID, people who are experiencing vision, cognitive, and/or mobility impairments as they age that have prevented them from continuing to drive may be less likely to have provided DPOC to the DHSMV in the past, especially if they have a retirement home ID that they can use for most purposes in lieu of a state ID. Thus, the greatest burden to exercise their fundamental right to vote may be on those who would have the hardest time satisfying it.

142. Florida has one of the largest populations of people over the age of sixty-five in the country, both by absolute numbers and by percentage. Florida has 4.8 million residents age sixty-five or older, comprising twenty-two percent of its population—the second-highest absolute number and second-largest percentage of any state.[41]

### F. Jim Crow's Lasting Effects on SSA Data and Access to DPOC

143. In Florida and its neighboring states, segregation that persisted through the mid-twentieth century precluded some Black citizens from obtaining a key form of DPOC: a birth certificate. As State Representative Ashley V. Gantt pointed out during debate on H.B. 991, "We are not far beyond the impacts of Jim Crow, especially here in the South."[42] Some of those who were born without access to a birth certificate are now older Black voters in Florida, who are not and have never been able to access that documentation. Rep. Gantt explained that "many Black

---

[41] Admin. for Cmty. Living, U.S. Dep't of Health & Hum. Servs., 2023 Profile of Older Americans 8 (2024), https://acl.gov/sites/default/files/Profile%20of%20OA/ACL_ProfileOlder Americans2023_508.pdf [https://perma.cc/X8BA-J4RV].

[42] Amelia Orjuela Da Silva, *Florida Proof-of-Citizenship Election Bill Raises Fears for Black, Low-Income and Naturalized Voters*, Mia. Times (Mar. 10, 2026), https://www.miamitimesonline. com/news/local/florida-proof-of-citizenship-election-bill-raises-fears-for-black-low-income-and-naturalized-voters/article_3a59458d-4e4c-4582-b87b-b6f1c86d2b84.html [https://perma.cc/78BH-S65E].

families in the South relied on midwives because segregated hospitals denied them care, leaving some people without birth certificates," including her aunt, "a Florida resident born in South Carolina, who was recently denied an ID renewal because she could not produce a birth certificate."[43]

144.    Because many Black voters who were unable to obtain a birth certificate due to racial segregation are now elderly, the difficulty of getting another form of acceptable DPOC may be exacerbated by mobility challenges, lack of access to transportation, and disability or illness. The passage of decades since one's birth, the death of family members, and possible changes in location in the intervening years may make it impossible to locate or access documents that may allow one to obtain DPOC. These documents may also simply have never existed or no longer exist.

145.    In response to multiple Florida House members sharing information about family members who did not have birth certificates because of this legacy of Jim Crow, one of the bill sponsors admitted that she "was actually really shocked and didn't know about what happened with birth certificates during the Jim Crow era," but she insisted that no changes were necessary to the law to account for that. In that same hearing, one member also noted that with this bill, "[w]e are disenfranchising a population of people, and most of them are going to be older [B]lack voters."

### G.    The Difficulty of Accessing Certain DPOC

146.    H.B. 991's requirement of DPOC imposes a severe burden on many Florida voters who do not have and cannot easily obtain the required documents. There are significant burdens associated with obtaining each of the accepted DPOC types that may be insurmountable for some

---

[43]    *Id.*

voters. Indeed, more than 21 million American citizens do not have a birth certificate, a passport, or naturalization papers readily available, according to a recent survey.[44]

147.    First, passports are expensive to obtain and require an applicant to already possess DPOC or equivalent documents. Roughly half of Americans, including fifty-six percent of Black Americans, lack a valid passport.[45] The application and execution fees for a new passport book can total $165, and it can take up to two months to receive a passport.[46] Expedited service for a passport costs an extra $60 on top of the application and execution fees, and the time to process an expedited request varies depending on demand. At one point, it took up to twelve weeks to process a request from the time the application was received by the passport agency and not including time for a voter to obtain, complete, and send in the application.[47]

---

[44]    Kevin Morris & Cora Henry, *Millions of Americans Don't Have Documents Proving Their Citizenship Readily Available*, Brennan Ctr. for Just. (June 11, 2024), https://www.brennancenter. org/our-work/analysis-opinion/millions-americans-dont-have-documents-proving-their-citizenship-readily [https://perma.cc/A2WQ-49X4].

[45]    Nathan Diller, *Americans Want to See the World, but Only 51% Took This Important Step to Do It*, USA Today (Oct. 23, 2024), https://www.usatoday.com/story/travel/news/2024/10/23/ state-department-issues-record-us-passports/75794556007/       [https://perma.cc/SU4K-9K3K]; Jamie Ballard, *Adults Under 30 Are More Likely Than Older Americans to Have a Current U.S. Passport*, YouGov, (Aug. 31, 2023), https://yougov.com/en-us/articles/46028-adults-under-30-more-likely-have-us-passport [https://perma.cc/5845-LNRK]. *See also* Press Release, U.S. Census Bureau, Census Bureau Projects U.S. and World Populations on New Year's Day (Dec. 30, 2024), https://www.census.gov/newsroom/press-releases/2024/population-new-years-day.html [https://perma.cc/26B8-794R] (U.S. Census Bureau estimates population at 341,554,209); U.S. Dep't of State, *Reports and Statistics*, U.S. Dep't of State (Oct. 17, 2025), https://travel.state.gov/content/travel/en/about-us/reports-and-statistics.html [https://perma.cc/8A9R-59KY] (169,915,821 valid passports in circulation in Fiscal Year 2024).

[46]    Passport Servs., *Passport Fees*, U.S. Dep't of State: Bur. of Consular Affs. (Mar. 19, 2026), https://travel.state.gov/content/travel/en/passports/how-apply/fees.html  [https://perma.cc/9BDE-2ANH]; Passport Servs., *Get Your Processing Time*, U.S. Dep't of State: Bur. of Consular Affs. (Apr. 16, 2026), https://travel.state.gov/content/travel/en/passports/how-apply/processing-times.html [https://perma.cc/L988-P8Y5].

[47]    Passport Servs., *Passport Fees*, U.S. Dep't of State: Bur. of Consular Affs. (Mar. 19, 2026), https://travel.state.gov/content/travel/en/passports/how-apply/fees.html  [https://perma.cc/9BDE-2ANH]; *see, e.g.*, District Update, Off. of Congressman Jim McGovern, https://mcgovern.house.gov/news/email/show.aspx?ID=S4GTPSKFBP6BSN243T5UX67PBI

148.    Indeed, the Legislature heard testimony that "[m]ore than 8 million Floridians do not have a valid passport." That amounts to an estimated 40% of the state's population.

149.    In order to obtain a U.S. passport, one must provide other DPOC—specifically, a U.S. birth certificate, an undamaged U.S. passport that was valid for a certain number of years, a consular report of birth abroad, or a certificate of naturalization or citizenship—or go through a complex, resource-intensive process of producing one of the specified types of secondary evidence of citizenship.[48]

150.    For example, if a person was never issued a birth certificate and wishes to obtain a passport to use as DPOC, they must provide secondary evidence of U.S. citizenship to the federal government. This must include a "Letter of No Record" from the registrar of vital statistics in the state where a person was born indicating that there is no birth certificate for that person on file, and, unless a "close blood relative or the attending physician" is still alive and available to attest to having "personal knowledge of" and memory of "the passport applicant's birth,"[49] the applicant must provide an "early public record or document."[50] Early public records must be "from the first 5 years of an applicant's life" and "should include the applicant's full name, date of birth, and place of birth."[51] Examples provided are a baptism certificate, U.S. Census record, and early school

---

[https://perma.cc/2AKS-VEW7] (last visited July 22, 2026).

[48]    Passport Servs., *Apply for Your Adult Passport*, U.S. Dep't of State: Bureau of Consular Affs. (May 4, 2026), https://travel.state.gov/en/passports/apply/adults.html#accordion-e38fdea780-item-31a64495cd. *See also* Passport Servs., *Citizenship Evidence*, U.S. Dep't of State: Bureau of Consular Affs. (May 23, 2026), https://travel.state.gov/en/passports/apply/help/citizenship-evidence.html.

[49]    Form DS-10: Birth Affidavit.

[50]    Passport Servs., *Citizenship Evidence*, U.S. Dep't of State: Bureau of Consular Affs. (May 23, 2026), https://travel.state.gov/content/travel/en/passports/how-apply/citizenship-evidence.html.

[51]    *Id.*

records.[52] Upon information and belief, if a passport applicant lacks any of these materials, they simply cannot obtain a passport.

151. If a naturalized citizen wishes to use a naturalization certificate to satisfy the DPOC Type Provision, a lost certificate costs $555 to replace or amend, and the process to obtain it may take upwards of seven months.[53]

152. Because voters now must have at least one of these documents to obtain a driver license or state ID, difficulty or impossibility accessing them will directly translate into an inability to obtain a REAL ID. At a Senate hearing, one of the bill's co-sponsors repeatedly touted the overall percentage of Florida driver licenses and state IDs that were real-ID compliant but acknowledged that she did not know how many Florida voters lack any valid state ID, including a REAL ID, because they have been unable to renew or obtain their driver license or ID once they had to provide DPOC to do so.

153. Nationwide, more than 15% of the driving-age population lacks driver licenses. Only 60% of eighteen-year-olds, 68.8% of nineteen-year-olds, 75.4% of twenty-year-olds, 79.3% of twenty-one-year-olds, and 80.4% of twenty-two-year-olds have driver's licenses.

154. Other than low-income voters, other voters who are disproportionately likely to lack access to a driver license include voters of color and voters with disabilities.[54]

---

[52] *Id.*

[53] *See G-1055, Fee Schedule, N-565, Application for Replacement Naturalization/Citizenship Document*, U.S. Dep't of Homeland Sec.: U.S. Citizenship & Immigr. Servs. (June 15, 2026), https://www.uscis.gov/g-1055?form=n-565 [https://perma.cc/27N9-FXCJ] (documenting the filing fee); *Case Processing Times*, US. Dep't of Homeland Sec.: U.S. Citizenship & Immigr. Servs., https://egov.uscis.gov/processing-times/ (last visited July 22, 2026) (check for most current processing time by form).

[54] *See* Jillian Andres Rothschild et al., Ctr. for Democracy & Civic Engagement, Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge 3–4 (2024),

### H.      Impact on Voters with Disabilities

155.    The Legislature also heard testimony about the detrimental impact H.B. 991 would have on voters with disabilities.

156.    Voters with disabilities are disproportionately likely to lack a driver's license, making it more likely that they will be required to submit DPOC to remain on the voter rolls under the Challenged DPOC Provisions.

157.    A representative from Disability Rights Florida testified that "[m]any people with disabilities do not have IDs or ability to get the documents requirement," and that "paper forms are also inaccessible to some of those with physical disabilities such as blind voters."

158.    It is particularly difficult for voters with disabilities to obtain DPOC because of challenges related to mobility and transportation.

### I.      Natural Disaster Displacement and Homelessness in Florida

159.    It is particularly difficult to comply with requirements to provide DPOC for those who have been displaced from their home temporarily or permanently due to natural disasters and for those who are homeless and must move frequently or do not have an indoor residence.

160.    Florida's climate creates additional barriers to retaining DPOC. In Florida, there is significant displacement due to hurricanes and associated flooding. For example, six million Floridians had to evacuate from Hurricane Milton in 2024,[55] and 125 homes were ultimately destroyed.[56] Florida also received among the largest share of Puerto Ricans who migrated from

---

https://cdce.umd.edu/sites/cdce.umd.edu/files/pubs/Voter%20ID%202023%20survey%20Key%2
0Results%20Jan%202024%20%281%29.pdf.

[55]    Chelsea Harvey, *Disasters Displaced a Record 46 Million People Last Year*, SCIAM (May 13, 2025), https://www.scientificamerican.com/article/hurricanes-wildfires-and-other-disasters-displaced-a-record-46-million/ [https://perma.cc/EVQ2-4W45].

[56]    Tural Ahmedzade et al., *A Visual Guide to the Damage Caused by Hurricane Milton*, The Guardian (Oct. 10, 2024), https://www.theguardian.com/us-news/2024/oct/10/hurricane-milton-

Puerto Rico to the U.S. mainland in the aftermath of Hurricane Maria, which had also destroyed many homes and forced people to evacuate quickly.[57]

161.   Florida is also home to approximately 31,362 unhoused individuals, which is the fourth-largest unhoused population in the country.[58] For such populations, the lack of a permanent mailing address or a safe place to store documents, as well as costs associated with obtaining necessary documents, can be prohibitive. Indeed, "less than 10% of people experiencing homelessness vote because of challenges related to cost, transportation, physical and health limitations, and more."[59]

162.   The Legislature heard testimony from one formerly homeless Florida resident who testified that "a lot of" homeless people "don't have documents or access to documents," and that "[a] lot of these documents get wiped away when you are homeless. A lot of these documents get lost."

163.   In a separate hearing, a member noted that "[h]urricane season is, you know, late October," shortly before November elections, and asked what a Florida voter was supposed to do in the event that they were required to produce birth certificate but "everything's gone in a hurricane." One of the bill sponsors attempted to, but did not, provide an answer, saying: "I think that the intention is not to—I don't know. Is there a specific section of the bill in which you think

---

maps-charts-graphics-damage [https://perma.cc/P4ZB-AGXK].

[57]   Edwin Mélendez & Jennifer Hinojosa, Ctr. for Puerto Rican Studs. at CUNY, Estimates of Post-Hurricane Maria Exodus from Puerto Rico (2017), https://centropr.hunter.cuny.edu/app/uploads/2023/03/RB2017-01-POST-MARIA-EXODUS_V3.pdf [https://perma.cc/XAE8-85V3].

[58]   Elliott Davis Jr., et al., *States with the Largest Homeless Populations*, U.S. News & World Rep. (Jan. 13, 2025), https://www.usnews.com/news/best-states/articles/states-with-the-most-homeless-people.

[59]   *Can Unhoused People Vote?*, VoteRiders, https://voteriders.org/article/can-unhoused-people-vote/ [https://perma.cc/49KB-U2GV].

that they will just get flagged and that will occur? I mean this is really about making sure that we're using—and there's the sharing of information."

### J.        Impact on Those with Name Changes and More Than One Surname

164.    Under H.B. 991, if a voter must provide DPOC and their "legal name is different from the name that appears on the document, official legal documentation providing proof of legal name change is also required to constitute acceptable evidence of United States citizenship." H.B. 991 § 1, *codified at* Fla. Stat. § 97.021(10).

165.    This will disproportionately impact populations that are more likely to have changed their names, such as married people (particularly married women) and transgender or nonbinary individuals who may have changed their name to conform with their gender identity. The same concern exists for individuals with more than one surname, common among Hispanic and Latino individuals. These individuals will need to provide extra documentation to be able to register to vote.

166.    If a U.S. citizen has changed their name because of marriage or any other reason but their only proof of citizenship is their birth certificate reflecting their older name, they will need to take additional steps and face additional burdens to register to vote, update their registration, or avoid an erroneous purge. These individuals will need to track down and provide election officials with copies of additional documents, such as their marriage or divorce certificates. Having to provide copies of more than one external document creates an additional burden on the right to vote.

167.    Millions of Americans have changed their legal name and therefore are unable to register to vote with their birth certificates. For example, roughly eighty-four percent of married women and six percent of married men in opposite-sex marriages in the United States changed

their name when they got married.[60] According to one survey, one third of voting-age women do not have proof of citizenship that reflects their current legal name.[61]

168.    The Legislature heard testimony that "[m]ore than 4.7 million women in Florida do not have a birth certificate with their current legal name," as well as examples of several specific female voters in Florida who do not have DPOC that matches their current name.

169.    In addition, of the roughly 1.3 million American adults who identify as transgender,[62] many have changed their legal names and are therefore unable to register to vote with their original birth certificates.

**K.      Unsuccessful Expansive List Maintenance Using Federal Data and Stale Motor Vehicle Data**

170.    There is a long and unfortunate history—in Florida and elsewhere—of states relying on outdated or otherwise inaccurate citizenship data to remove eligible voters from the rolls. Indeed, in 2012, Florida officials used driver license information to identify almost 180,000 purported noncitizens on the rolls.[63] Upon further review, officials dramatically shrank that number to 2,625 voters who they claimed were ineligible to vote.[64] After the then-Florida Secretary of

---

[60]     Luona Lin, *About 8 in 10 Women in Opposite-Sex Marriages Say They Took Their Husband's Last Name*, Pew Rsch. Ctr. (Sep. 7, 2023), https://www.pewresearch.org/short-reads/2023/09/07/about-eight-in-ten-women-in-opposite-sex-marriages-say-they-took-their-husbands-last-name/ [https://perma.cc/UDK5-EXNM].

[61]     Ian Vandewalker, *Analysis: The Effects of Requiring Documentary Proof of Citizenship to Register to Vote*, Brennan Ctr. for Just. (July 19, 2017), https://www.scribd.com/document/354176622/The-Effects-of-Requiring-Documentary-Proof-of-Citizenship [https://perma.cc/W2YC-AZPF].

[62]     Jody L. Herman et al., UCLA Sch. of L., Williams Inst., How Many Adults and Youth Identify as Transgender in the United States? 1 (June 2022), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf [https://perma.cc/S5LV-LVYG].

[63]     Gary Fineout, *Nearly 200,000 Florida Voters May Not be Citizens*, NBC Mia. (May 11, 2012), http://www.nbcmiami.com/news/local/Nearly-200000-Florida-Voters-May-Not-Be-Citizens-151212725.html.

[64]     *Id.*

State had already sent the list of 2,625 voters to county election officials and directed them to initiate removal proceedings,[65] officials rechecked the list and discovered that they only suspected 207 of those individuals of being noncitizens. In the end, just eighty-five people were removed from the rolls for allegedly being noncitizens.[66] The efforts by election officials in Florida in 2012 to purge alleged noncitizens from the voter rolls were eventually found by the Eleventh Circuit to violate federal law.[67] This largely failed purge attempt was much more likely to impact Hispanic voters and other voters of color; a Miami Herald poll found that eighty-seven percent of those the State identified as noncitizens were people of color and fifty-eight percent were Hispanic.[68]

171.     In the last decade, other states have instituted similar programs, which also have resulted in election officials greatly overstating the number of alleged noncitizens registered to vote. For example, in January 2019, Texas Attorney General Ken Paxton announced that nearly 100,000 registered  voters in Texas had been identified as noncitizens,[69] and days later President Trump claimed, without evidence, that 58,000 noncitizens had voted in Texas.[70] In subsequent litigation, a federal judge noted that, as a result of Texas'

[65]     *See* Rachel Weiner, *Florida's Voter Purge Explained*, Wash. Post (June 18, 2012), https://www.washingtonpost.com/blogs/the-fix/post/floridas-voter-purge-explained/2012/06/18/gJQAhvcNlV_blog.html.

[66]     *See* Amy Sherman, *Homeland Security Warned That the SAVE Database is Not Foolproof Way to Verify the Voter Rolls, LWV says*, PolitiFact: Fla. (Oct. 30, 2013), https://politifact.com/factchecks/2013/oct/30/league-women-voters-florida/league-women-voters-says-homeland-security-warned-/ [https://perma.cc/44WE-J79G]

[67]     This list maintenance was found to violate the NVRA. *See Arcia v. Detzner*, 772 F.3d 1335 (11th Cir. 2014).

[68]     Marc Caputo & Patricia Mazzei, *Voter Roll Purge Most Likely to Target Hispanics, Democrats, Analysis Finds*, The Ledger (May 23, 2012), https://www.theledger.com/story/news/2012/05/23/voter-roll-purge-most-likely-to-target-hispanics-democrats-analysis-finds/26496994007/ [https://perma.cc/NZ88-TVB3].

[69]     Ken Paxton (@KenPaxtonTX), Twitter (Jan. 25, 2019), https://x.com/kenpaxtontx/status/1088898595653386240 [https://perma.cc/XQ2H-7PDM].

[70]     Donald J. Trump (@realDonaldTrump), Twitter (Jan. 27, 2019), https://x.com/realDonaldTrump/status/1089513936435716096 [https://perma.cc/T3ZV-CNP7].

flawed efforts, "perfectly legal naturalized Americans were burdened with what the Court finds to be ham-handed and threatening correspondence from the State which did not politely ask for information but rather exemplifies the power of government to strike fear and anxiety and to intimidate the least powerful among us."[71] Per a cursory inspection, "the number of registered voters flagged by the state began to plummet"; more than half of the 30,000 flagged in Harris County were confirmed naturalized citizens, leaving 12,000 possible noncitizens, but when that group was randomly audited, officials found no noncitizens, so they declined to take further action.[72]

172.    This history of Florida and other states using highly inaccurate processes to attempt to identify and remove voters suggests a similarly grave risk of errors and disenfranchisement here.

**L.      The Lack of State Interest in H.B. 991**

173.    The Florida Legislature heard considerable testimony from witnesses discussing how a DPOC requirement would increase the burdens on naturalized citizens in Florida—in terms of finances, time, and bureaucratic costs—in a political environment in which naturalized citizens increasingly and reasonably feel under attack. On the other side of the ledger, the Legislature provided insufficient evidence of any state interest that H.B. 991 served.

174.    In fact, top government officials in Florida have publicly noted how well Florida's elections are already working prior to H.B. 991's passage.

---

[71]    *LULAC v. Whitley*, No. SA-19-CA-074-FB, 2019 WL 7938511, at \*1 (W.D. Tex. Feb. 27, 2019).

[72]    Alexa Ura, *'Someone Did Not Do Their Due Diligence': How An Attempt To Review Texas' Voter Rolls Turned Into A Debacle*, Tex. Trib. (Feb. 1, 2019), https://www.texastribune.org/2019/02/01/texas-citizenship-voter-rollreview-how-it-turned-boondoggle/ [https://perma.cc/V3RC-ZEBA]; *see also Summary*, UCLA Latino Pol'y & Pol. Inst. (Apr. 26, 2019), https://latino.ucla.edu/research/texas-lulac-vs-whitley/ [https://perma.cc/U5WZ-TP6J] (noting that Texas Secretary of State David Whitley abandoned this effort and reached a settlement agreement through related litigation).

175. Defendant Byrd has stated that "Florida's elections are the gold standard for the nation."[73]

176. Governor Ron DeSantis has stated that Florida has "become a national leader by running the most secure elections in the country."[74]

177. Several of H.B. 991's sponsors testified that Florida has been "the gold standard" of elections prior to the passage of the bill, indicating that there is no need for H.B. 991's passage.

178. As Senator Tina Scott Polsky testified, H.B. 991 is "rushed, it's dangerous. It is going to cause massive chaos and confusion . . . . Everyone's been voting just fine. We haven't heard of one instance of a noncitizen voting that's the basis for this bill."

**M.      Poor Implementation of H.B. 991 Will Further Burden Voters**

179. Per Section 34 of H.B. 991, most of the significant new changes to voter registration and list maintenance must be in place by January 1, 2027. That is less than six months from now. H.B. 991 requires that government officials engage in significant changes, including widespread, expansive database interfacing with federal agencies and new real-time interactions with the DHSMV. It is unlikely that officials will be able to implement these changes in such a short period of time. This timing is particularly concerning, both because Florida has no control over the federal government database upon which it is proposing to heavily rely and because H.B. 991 provides no

---

[73]     Press Release, Fla. Dep't of State, In 2022, Florida Again Showed the Nation How to Count Votes, Fairly, Lawfully, and on Time (Jan. 9, 2023), https://dos.fl.gov/communications/press-releases/2023/press-release-in-2022-florida-again-showed-the-nation-how-to-count-votes-fairly-lawfully-and-on-time/ [https://perma.cc/U6FR-9UMG].

[74]     Press Release, Exec. Off. of the Governor, Governor Ron DeSantis Signs Bill to Strengthen Florida's Election Integrity (Apr. 25, 2022), https://www.flgov.com/eog/news/press/2022/governor-ron-desantis-signs-bill-strengthen-floridas-election-integrity [https://perma.cc/3M9V-79QK].

additional funding to the DHSMV for the proposed significant changes to and increased use of their files and database.

180.    The last time Florida implemented such a major change to its voter registration process was the enactment of online voter registration, and that process took more than two years. Online voter registration was approved by the Legislature in May of 2015 and was not active and available to the public until October 2017.[75]

181.    These implementation challenges mean that H.B. 991 is likely to burden an even more significant number of voters in Florida.

182.    The Legislature rejected an amendment that would have moved H.B. 991's effective date to January 1, 2029, to allow for more time to ensure proper implementation. One member stated that: "Supervisors [of Elections] are already raising questions. I know because they've reached out to me about staffing capacity, system readiness, and the implementation costs. And yet this entire structure is scheduled to take effect in 2027 in the middle of major election cycles without a full runway for rulemaking, testing, budgeting, and voter education."

### N.    H.B. 991's Mandatory Update Provision Violates the NVRA

183.    Under pre-existing Florida law, when a voter applying for, renewing, or updating a driver license or ID card declines to update their voting record or address, the DHSMV "must note such declination on its records and . . . forward the declination to the statewide voter registration system." Fla. Stat. § 97.057(2)(b)(2). The pre-H.B. 991 statutory language gives Floridians who

---

[75]    *See* Pew, *Florida Approves Online Voter Registration* (May 15, 2015), https://www.pew.org/en/research-and-analysis/articles/2015/05/19/florida-approves-online-voter-registration; Press Release, Fla. Dep't of State, Florida Department of State Announces Upcoming Launch of New Online Voter Registration Website – RegisterToVoteFlorida.gov – on Sunday, October 1 (Sep. 28, 2017), https://dos.fl.gov/communications/press-releases/2017/florida-department-of-state-announces-upcoming-launch-of-new-online-voter-registration-website-registertovotefloridagov-on-sunday-october-1/ [https://perma.cc/RZ5A-T39P].

make a change of address to their Florida driver license or state ID card at the DHSMV the right to opt out of making equivalent changes to their voter registration information. This statutory language has not changed; however, H.B. 991 adds additional language to Fla. Stat. § 98.093 that functionally eliminates voters' right to opt out of updating their voter registration address by requiring DHSMV to report all information that identifies changes of residential address on Florida driver licenses and ID cards, including for voters who choose not to register or update their voter records under § 97.057(2), to the Department of State. H.B. 991 § 9, *codified at* Fla. Stat. § 98.093(8)(d). The provision then directs the Department of State to give this information to the appropriate Supervisor of Elections, who "must change the voter's registration records" to reflect the new address. *Id.*

**O.     H.B. 991's Elimination of Student ID Unconstitutionally Burdens Young Floridians' Right to Vote**

184.    Students in Florida have voted with student ID for more than twenty years. *See* 2003 Fla. Laws § 13, *codified at* Fla. Stat. § 101.043(1).

185.    Student ID is a reliable and secure form of identification. On information and belief, there has been virtually no voter fraud by students in Florida involving the use of student ID.

186.    Despite more than two decades of allowing the use of student ID to vote without incident, H.B. 991 eliminated student ID as an acceptable voter ID. *See* H.B. 991 § 13, *codified at* Fla. Stat. § 101.043(1)(a). The Student ID Ban goes into effect on January 1, 2027.

187.    H.B. 991 singled out student ID as the only form of voter ID excluded from the list of otherwise acceptable government-issued photo IDs. While the State will accept "any other identification card issued by any branch, department, agency, or entity of the Federal Government, the state, a county, or a municipality," these acceptable forms of government-issued ID "exclud[e] identification cards issued by an educational institution." *Id.* As a result, even students enrolled in

a public college or university in Florida—state government entities whose IDs would otherwise qualify as acceptable government-issued ID—are prohibited from using the IDs issued by their college or university.

188. H.B. 991's elimination of student ID thus targets students on its face. Because Florida students are overwhelmingly young, the Student ID Ban also targets young people.

189. H.B. 991's elimination of student ID will impose a significant burden on Florida's young voters.

190. More than 912,000 students attend Florida colleges and universities.

191. As of the fall of 2025, Florida's State University System enrolled more than 430,000 students. About 90% of these are Florida residents.

192. In the 2024–2025 school year, more than half a million students attended one of the 28 colleges in the Florida College System. Of these, more than 466,000 were Florida residents.

193. H.B. 991's ban on student ID will prevent Florida students who would have used their student ID from voting unless they have, or can obtain, one of the other forms of accepted voter ID.

194. Young adults are less likely to have a driver license than the general population. While 88.5% of Florida's driving-age population has driver licenses, less than 75% of Floridians ages 18–22 have driver licenses.

195. Students are also less likely than the general population to have other accepted forms of identification. College and university students, for example, are unlikely to be serving in the military and are less likely (given their age) to be military veterans, meaning they are unlikely to possess identification issued by the "United States uniformed services or Merchant Marine" or a "Veteran health identification card issued by the United States Department of Veterans Affairs."

196. H.B. 991 will thus require many young voters to obtain a form of acceptable voter ID that they do not currently possess to be able to vote. To do so, students will have to overcome barriers that disproportionately impact young voters.

197. To obtain a driver license or Florida ID card, for example, a student must visit a DHSMV office in person and present (1) documents that establish their lawful status in the United States, (2) proof of Social Security, and (3) proof of residential address. Each of these requirements presents hurdles for young voters.

198. Presenting a U.S. passport or birth certificate is the most common way of proving U.S. citizenship status. But an estimated 40% of Floridians do not have passports, and obtaining one requires attending an in-person meeting at which the applicant must submit proof of citizenship, a government-issued photo ID (which students seeking to obtain a driver license or Florida ID may not have), passport photos, and fees of up to $195. Passport applications typically take four to six weeks to process. And some students who have a passport do not keep it with them while at school. Students living in on-campus housing, particularly first-time voters, likely share a residence with one or multiple people whom they meet for the first time upon moving in, and they can expect not to have total privacy or security in their belongings given the communal nature of student housing and, often, lack of external locks on individual bedroom doors within a larger student apartment. It is therefore not simply a matter of a student taking responsibility for, or remembering to pack, their documentation; rather, it is likely much more difficult to find a safe and secure place for a passport at school than at a parental or family home, and students therefore must take a significant privacy risk by bringing their passport or struggle to prove their identity in order to vote without it.

199.     Similarly, many students also do not have easy access to their birth certificates while at school. For students born in Florida, ordering a certified copy of their birth certificate requires providing valid photo ID (which, again, students applying for a driver license or state ID may not have) and paying a fee.

200.     Providing proof of Social Security is similarly challenging for students, who are less likely than other working-age adults to be employed and are therefore less likely to have W-2 tax forms or pay stubs. And many students do not have, or do not have ready access to, their Social Security cards. Obtaining a replacement Social Security card requires providing proof of identity such as a driver license, state ID, or U.S. passport, and for some, other proof of citizenship.

201.      Finally, Florida driver license and state ID applicants must submit two different documents that establish proof of residency. Here, too, students are less likely to have the required documents. For example, students who live on campus do not have mortgage documents, rental or lease agreements, or utility bills. Many students who rent an apartment share it with roommates, and as a result, may not have a lease or utility bills in their name. Students are also less likely to have employment documentation, as discussed above. And because many students are covered by their parents' health insurance, they are unlikely to have medical bills in their name or health insurance cards with their college address.

202.     Those students who have or are able to obtain all of the required documents for an accepted form of photo ID still must spend time and money that many do not have and travel to an office many are unable to reach. A 2020 U.S. Education Department survey found that 23% of undergraduate students experience food insecurity, 18.5% would not be able to come up with $500 to pay for an unexpected financial need in the next month, and 8% experience homelessness. And just as students are less likely than the older adult population to have a driver license, they are less

71

likely to own or have access to a car, making travel to government offices to obtain accepted ID more challenging and time-consuming.

203. The State's own failures exacerbate the difficulty of obtaining acceptable ID. Outages and glitches in the customer service software maintained by the DHSMV frequently cause hours-long wait times at driver license offices and sometimes force them to turn applicants away. In 2025, inadequate staffing at DHSMV service centers in Broward and Miami-Dade Counties caused extremely long wait times for much of the year, turning what should be routine services into "all-day" ordeals.

204. The significant burdens H.B. 991's Student ID Ban imposes on students will result in disenfranchising young Florida voters no longer able to use the reliable and secure form of identification to which they have ready access.

205. During legislative debate on H.B. 991, Florida college students, including members of the Florida Student Power Alliance, described how the Student ID Ban would create barriers to their ability to vote. Multiple students highlighted the particular burden the Student ID Ban imposes on students from out-of-state, who frequently do not have Florida driver licenses or IDs but who live, attend college, and wish to vote in Florida.

206. Citing the "chilling effect" on the youth vote, one senator proposed an amendment that would have continued to allow for the use of student ID to vote. The Senate voted the amendment down.

207. H.B. 991's ban on student ID does not further any valid state interest.

208. During legislative debate on H.B. 991, the bill's proponents failed to offer any reasoned justification for eliminating student ID as acceptable photo ID. Instead, they argued that eliminating student ID was necessary to ensure that voters are U.S. citizens and Florida residents.

209.    In a legislative hearing, Senator Erin Grall, the sponsor of H.B. 991's Senate companion,[76] incorrectly asserted that students from out-of-state attending college in Florida must have a Florida driver license or ID card to qualify as Florida residents entitled to vote in Florida.

210.    During debate on the bill in the Senate, Senator Ralph Massullo defended the Student ID Ban by asserting the need to ensure that noncitizens do not vote. "We want people who are legal to vote, we want citizens to be able to vote. We don't just want just someone that might have an ID for whatever reason and maybe their ID doesn't necessarily identify that they're a citizen of this state."

211.    Governor DeSantis similarly argued that student ID is inadequate because it does not prove a student's Florida residency: "Student ID does not mean that you are a resident of the state of Florida. Student ID means you're going to school." According to DeSantis, "[y]ou gotta have a valid ID that proves that you are a resident of the state of Florida."

212.    But the purpose of Florida's voter ID requirements is to confirm a person's identity at the polls—that the person presenting themselves to vote is who they say they are. The voter ID requirement is not intended to verify that the person is a qualified voter.

213.    That limited purpose is confirmed by the Department of State's Polling Place Procedures Manual, which tells poll workers, "[w]hen a voter presents to vote, the voter must provide a current and valid photo ID with signature for you *to confirm identity*" (emphasis added).[77] The Broward Supervisor of Elections' website similarly confirms that the "ID required

---

[76]    In the Senate, the bill ultimately passed as H.B. 991 was introduced and debated as S.B. 1334.

[77]    Fla. Dep't of State, Polling Place Procedures Manual 17 (2024), https://files.floridados.gov/media/708161/final-ds-de-11-manual.pdf [https://perma.cc/84X6-TFQC] ("When a voter presents to vote, the voter must provide a current and valid photo ID with signature for you to confirm identity.").

and checked at the polls is used solely to confirm the voter's identity, not to verify the voter's ID number or address."

214. Underscoring that the purpose of voter ID is not to establish a voter's qualifications, even the limited forms of voter ID permitted under H.B. 991 include forms of ID that do not establish Florida residency, such as a concealed carry license (which may be issued to non-residents), U.S. passports, and "any other identification card issued by any branch, department, agency, or entity of the Federal Government," which cannot prove state residency and frequently include no address at all.

215. The accepted forms of voter ID under H.B. 991 similarly include forms of ID that do not establish a voter's citizenship, including a Florida driver license or state ID, a Veteran's Administration health identification card, and U.S. uniformed services identification.

216. The purported need to establish voters' residence or citizenship is thus not a valid basis for banning student ID—much less for singling out student ID issued by public educational institutions as the only government-issued ID not accepted to vote.

217. Even if Florida's photo ID requirements were intended to ensure that only qualified voters are allowed to vote by confirming their residency and citizenship, banning student ID would not further that goal. The sponsors and proponents of H.B. 991 pointed to no evidence that non-residents or noncitizens in Florida have used student ID to vote fraudulently—nor could they. Upon information and belief, there have been no convictions for voter fraud involving the use of student ID in Florida.

218. There is no widespread voter fraud in Florida—not by students, nor by non-residents, nor by noncitizens. In 2020, the then-Secretary of State told the public that Florida's election "was accurate, transparent, and conducted in compliance with Florida law. Florida

conducted both pre- and post-election audits, and we are confident in the security and integrity of our 2020 election results." As noted above, top Florida officials, including Secretary Byrd and Governor DeSantis, have called Florida's elections system prior to the passage of H.B. 991 the "gold standard" for the United States.

219.   Banning student ID does not further the purpose of preventing non-resident or noncitizen voting because, as noted above, voter ID only confirms the voter's identity, not their qualifications to vote.

220.   A voter's qualifications are established in the process of submitting and accepting a voter registration application. Florida law requires the statewide voter registration application to elicit, among other information, the applicant's name, date of birth, residence address, the last four digits of the applicant's Social Security number, whether the applicant is a U.S. citizen, and the applicant's signature, signed "under penalty for false swearing." Fla. Stat. § 97.052(2). A person registering to vote must swear or affirm that she is "qualified to register as an elector under the Constitution and laws of the State of Florida" and that the information provided in the registration application is true. *Id.* § 97.051. Under existing law, applications are accepted as valid "only after the department has verified the authenticity or nonexistence of the driver license number, the Florida identification card number, or the last four digits of the social security number provided by the applicant."[78] *Id.* § 97.053(6).

221.   As Representative Eskamani pointed out during the House debate on the bill, there is "no legitimate reason" to ban student ID. Given that H.B. 991 excludes educational institutions

---

[78]     As discussed above, H.B. 991 added to this provision the requirement that applicants must have provided a document acceptable as evidence of U.S. citizenship to the DHSMV before being permitted to vote a regular ballot. H.B. 991 § 4, *codified at* Fla. Stat. § 97.053(6)(a).

from otherwise-accepted government ID, she was left to conclude "that we just want to make it harder for students to vote."

**P.     Defendants Did Not Remedy Any of the NVRA Violations Outlined in Plaintiffs' 90-Day Notice Letter**

222.    On April 22, 2026, Plaintiffs sent Defendant Byrd a letter outlining how H.B. 991 violates the NVRA. *See* Notice Letter, Ex. 1; 52 U.S.C. § 20510(b)(1).

223.    The Secretary did not remedy these violations, and in fact, did not even respond to the notice. Because it has been more than 90 days since this notice was served, Plaintiffs bring claims under the NVRA to remedy these alleged violations. *See* 52 U.S.C. § 20510(b)(2).

**COUNT ONE**
**Violation of the First and Fourteenth Amendments'**
**Protections Against Undue Burden on the Right to Vote**
*Against Challenged DPOC Provisions*
**42 U.S.C. § 1983**
**(All Plaintiffs against Defendant Byrd, Defendant Kerner, and County Defendants)**

224.    Plaintiffs incorporate and reallege Paragraphs 1 through 94, 96 through 182, 194 through 195, 197 through 203, and 217 through 218 of this Complaint into this section by reference.

225.    The First and Fourteenth Amendments guarantee the fundamental right to vote. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

226.    To evaluate a state law challenged as a violation of the fundamental right to vote, a court must "weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burden imposed by the rule, taking into consideration the extent to which those justifications require the burden to plaintiffs' rights." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). If a law severely burdens the right to vote, it must "be narrowly drawn to serve a compelling state interest." *Id.* When "a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Id.* at 1318–19. This is a sliding scale analysis, such

that "[t]he more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." *Id.* (citing *Stein v. Ala. Sec'y of State*, 774 F.3d 689, 694 (11th Cir. 2014)).

227. The Challenged DPOC Provisions in H.B. 991 impose a significant burden on the right to vote and should therefore be subject to strict scrutiny. However, even if they are seen as imposing a more minimal burden, Florida cannot produce any legitimate state interest that would allow this law to stand.

228. The Challenged DPOC Provisions create two main types of burdens that, together and separately, constitute severe burdens on the right to vote.

229. *First*, H.B. 991's requirement that many voters provide acceptable DPOC to successfully register using the online voter registration system or to successfully register to vote other ways, to update their voter registration per § 97.053(6), or to remain registered per § 98.075 creates an undue burden on the right to vote because many individuals do not have any access to the required citizenship documents. Large swaths of the electorate either fully lack access to citizenship documents or would face significant burdens in attempting to access those documents. This applies both to new voters hoping to register to vote and to existing voters hoping to remain registered. Many may be unable to comply because the required documents never existed or have been destroyed or lost, or due to financial limitations, mobility limitations, or health effects associated with aging that prevent one from traveling and searching through troves of old documents.

230. The Challenged DPOC Provisions will particularly harm several groups of voters that are disproportionately unlikely to have access to citizenship documents and/or for whom it would be particularly burdensome to attempt to access them. This includes Black voters who were not issued a birth certificate due to lack of hospital access when they were born in the segregated

77

South and who may not have the documents required to get a U.S. passport. It is possible that such documentation was never created, and even if it was, it may not be possible for a voter to locate it due to lack of knowledge of its location, documents being moved over the course of decades of a person's and family's life, and possible physical disability and illness associated with aging. It includes Puerto Ricans living in Florida, many of whom do not have birth certificates that would be accepted as DPOC. Upon information and belief, Puerto Rican Floridians are also likelier to have name mismatches in their citizenship documentation that are not due to a legal name change.

231.    It also includes those who have been displaced due to natural disasters, who may lack DPOC because necessary documents were destroyed or misplaced during a rushed relocation. This is also true for those who may have migrated from a natural disaster elsewhere, like Puerto Ricans who migrated to Florida after Hurricane Maria and who also face the particular burdens on Puerto Rican voters outlined above. It includes unhoused persons and others who have limited means, who may lack any private and safe place to keep personal documents and/or not be able to afford the documents required to prove their citizenship. It also includes voters with disabilities.

232.    And it includes populations that are more likely to have changed their names. Individuals who have changed their name due to marriage, gender identity, or another reason such that their legal name "is different from the name that appears on" their DPOC will have to provide additional "official legal documentation providing proof of legal name change" for "acceptable evidence of United States citizenship." H.B. 991 § 1, *codified at* Fla. Stat. § 97.021(10). These individuals are particularly unlikely to have access to citizenship documents with their current name.

233.    It is also possible for a person to be subject to a number of these burdens at the same time. For example, a naturalized citizen who had to relocate due to a natural disaster and

therefore no longer has their certificate of naturalization must pay over $500 for that replacement document,[79] while replacing a lost passport for an adult costs $165.[80] For many Floridians, $165 may be prohibitive, let alone an amount over three times that. There are numerous possible permutations like this that could subject any number of people to compounding logistical, temporal, and financial burdens.

234.    For many of these and other individuals, the Challenged DPOC Provisions will constitute an insurmountable burden on their right to vote because they are entirely unable to provide DPOC that would be acceptable to their county Supervisor of Elections. No matter the State's interest in ensuring that all voters can adequately prove their citizenship, the State cannot assert any proper justification for creating a system that leaves some voters *entirely* without ability to exercise their fundamental right to vote. This is particularly true for voters who lack access to these documents precisely because of the same system of segregation that produced decades of brutal, violent voter suppression against Black Americans.

235.    Because the Challenged DPOC Provisions will make it much harder, if not impossible, for some Florida voters to register to vote or update registrations, this law will frustrate Plaintiffs' core missions to increase voter registration.

236.    *Second*, the Challenged DPOC Provisions constitute a severe burden on the right to vote because Florida is not equipped to implement this law without significant errors, creating an untenable risk of improper removal from the rolls and denial of new registrations from eligible voters.

---

[79]    *G-1055, Fee Schedule*, *supra* note 53.
[80]    Passport Servs., *Passport Fees*, U.S. Dep't of State: Bur. of Consular Affs. (Mar. 19, 2026), https://travel.state.gov/content/travel/en/passports/how-apply/fees.html   [https://perma.cc/9BDE-2ANH].

237.    The Challenged DPOC Provisions purport to allow election officials to confirm the citizenship status of prospective voters or voters seeking to update their existing registration through the use of data without burdening voters, such as the process outlined in § 98.075 ("The department shall identify those registered voters who are potentially ineligible based on their legal status regarding United States citizenship by comparing or receiving information from other governmental entities"). However, none of those processes currently exists, and a significant number of U.S. citizens' citizenship status is not captured by the available data. For example, Florida's current online voter registration system cannot currently check DHSMV data, and even if it could, the DHSMV does not have the current citizenship status for all voters. Because the DHSMV has no automatic mechanism for capturing naturalization data, it may have stale data for some naturalized citizens. U.S. citizen Florida residents who are eligible to vote but not able to rely on these data checks will have to endure the undue burden of tracking down and presenting actual documents to establish citizenship. Some will have no way to obtain the required documentation.

238.    The Challenged DPOC Provisions require that state officials in Florida rely upon a system that includes outdated data to conduct list maintenance on the basis of citizenship and will therefore foreseeably make a significant number of errors. This required list maintenance creates a significant undue burden on the right to vote because the risk is extremely high that eligible U.S. citizens will be mistakenly removed from the rolls through this list maintenance.

239.    This process will particularly harm naturalized citizen voters, who are disproportionately likely to be improperly flagged as noncitizens and thus will have to take extra steps to register to vote and remain registered simply because of their place of birth. This is because the Online Voter Registration Application Provisions and the General DPOC Registration

80

Provisions require DPOC to be solicited from naturalized voters if they last received a driver license or ID card before naturalizing, they have not affirmatively provided DPOC to the Department of State or their supervisor since naturalizing, and their citizenship cannot be verified in another way. They are also more likely to be caught up in the Retroactive DPOC Provision, which requires the same extra steps to remain registered to cast a regular ballot, because that process is only triggered if a voter emerges as "potentially ineligible based on their legal status" through the Department of State "comparing or receiving information from other governmental entities," which, upon information and belief, includes stale DHSMV and, likely, DHS's SAVE system data. U.S. citizens who naturalized after they obtained a Social Security number and since their last interaction with the DHSMV (and those who may never have interacted with the DHSMV at all) are subject to possible removal from the voter rolls on the basis of citizenship status. H.B. 991 § 8, *codified at* Fla. Stat. § 98.075.

240.     The potential use of data from DHS's SAVE system, which is known to be particularly unreliable for proving the citizenship of older Americans, will impose a heavy burden on elderly voters whose citizenship status cannot be confirmed by this process and have not previously submitted DPOC to the DHSMV. Difficulty with technology, disability and illness related to aging, and transportation and mobility challenges may impose additional barriers to complying with requirements to provide DPOC to register to vote, remain registered to vote, or have one's ballot counted.

241.     The burden imposed by Florida's inability to administer this law without significant errors is exacerbated both by (1) the limited time for implementation, and (2) Florida's unprecedented Retroactive DPOC Provision.

81

242.     As to the former, Florida has mere months to implement a massive overhaul of its system both for registering new voters and conducting list maintenance for currently registered voters. The Legislature rejected an amendment that would have moved H.B. 991's effective date to January 1, 2029, to allow for more time to ensure proper implementation. The Legislature heard testimony that "Supervisors [of Elections] are already raising questions. I know because they've reached out to me about staffing capacity, system readiness, and the implementation costs. And yet this entire structure is scheduled to take effect in 2027 in the middle of major election cycles without a full runway for rulemaking, testing, budgeting, and voter education."

243.     As to the latter, Florida's law differs from other states' DPOC provisions in part because of the Retroactive DPOC Provision, which implicates *all* registered voters in the state, rather than just affecting new registrants. Florida's law thus affects a much larger population than other DPOC laws and will accordingly impose greater burdens on Supervisors of Elections, increasing the likelihood of errors and widespread disenfranchisement.

244.     The fact that significant populations of Floridians may be entirely disenfranchised by this law suggests that it should be subject to strict scrutiny. However, even if it is subject to a lesser burden, it is still unlawful because there is not any legitimate state interest in relying on outdated data to check current citizenship status and then use the results of such a search to disenfranchise potentially eligible voters, some of whom may have been registered voters for decades. Instead of serving any legitimate government goal of list maintenance, this simply targets thousands, if not more, of the most vulnerable Floridians for disenfranchisement, leaving some quite literally without any path to casting a ballot that will be counted.

245.     Defendants' justifications for this undue burden on the right to vote do not survive strict scrutiny or lesser standards of review, including even rational basis review.

246. The harms Plaintiffs will experience of possible disenfranchisement and an undue burden in an attempt to register or remain registered are irreparable, and they are traceable to the Challenged DPOC Provisions.

**COUNT TWO**
**Violation of NVRA Section 5, 52 U.S.C. § 20504(d)**
*Against Mandatory Update Provision*
**(Plaintiff Hispanic Federation against Defendant Byrd, Defendant Kerner, and County Defendants)**

247. Plaintiffs incorporate and reallege Paragraphs 1 through 24, 68 through 79, 93 through 94, 96, 183, and 222 through 223 into this section by reference.

248. Section 5 of the NVRA provides that covered states, including Florida, must register voters simultaneously when they apply for a state driver license or ID card. 52 U.S.C. § 20504. As part of these requirements, Section 5(d) requires the following process for any address update reported by a registered voter to their state department of motor vehicles:

> Any change of address form submitted in accordance with State law for the purpose of a State motor vehicle driver's license shall serve as notification of change of address for voter registration with respect to elections for Federal office for the registrant involved unless the registrant states on the form that the change of address is not for voter registration purposes.

*Id.* § 20504(d).

249. Section 5 thus unambiguously requires that voters be able to opt out of having an address update for the purpose of a driver license apply to their voter registration.

250. In accordance with Section 5's mandate, Florida law directs that when a voter declines to update their voting record or address, the DHSMV "must note such declination on its records and . . . forward the declination to the statewide voter registration system." Fla. Stat. § 97.057(2)(b)(2). However, the Mandatory Update Provision requires the DHSMV to report information identifying changes of residential address on Florida driver licenses and ID cards for

all voters to the Department of State, which then gives this information to the appropriate Supervisor of Elections. The supervisor "must change the voter's registration records" to reflect the new address, regardless of whether the voter opted out of registering to vote or updating their voter record at the DHSMV. H.B. 991 § 9, *codified at* Fla. Stat. §§ 97.057(2)(b)(2), 98.093(8)(d).

251. The Mandatory Update Provision forces all voters who interact with the DHSMV for the purpose of updating the address on their driver licenses to update their voting address as well, directly contrary to Section 5(d)'s unambiguous instructions. It impermissibly prevents voters who update their residential address with the DHSMV for driver license and ID purposes from opting out of updating their voter records.

252. The Mandatory Update Provision will wrongfully burden voters who wish to remain on the rolls in their place of residency. Upon information and belief, many voters who apply for Florida driver licenses and ID cards rely on the opt-out provision to ensure their ability to vote in the jurisdictions in Florida where they have residency. This will no longer be a possibility under H.B. 991. Instead, those voters will have their voting addresses moved without their consent and risk disenfranchisement.

253. Accordingly, the Mandatory Update Provision conflicts with the NVRA, making it unlawful.

**COUNT THREE**
**Violation of NVRA Section 6(a), 52 U.S.C. § 20505(a)**
***Against Challenged DPOC Provisions***
**(All Plaintiffs against Defendant Byrd, Defendant Kerner, and County Defendants)**

254. Plaintiffs incorporate and reallege Paragraphs 1 through 94, 96 through 105, and 222 through 223 into this section by reference.

255. Section 6(a) of the NVRA requires states to "accept and use the mail voter registration application form prescribed . . . pursuant to [NVRA Section 9] for the registration of

voters in elections for Federal Office." 52 U.S.C. § 20505(a)(1). The mail voter registration application form is called the "Federal Form." The NVRA requires that if a state election official timely receives a valid Federal Form, the official must "ensure that any [such] eligible applicant is registered to vote . . . ." *Id.* § 20507. Section 9 requires only that an applicant attest under penalty of perjury that they meet the voting eligibility requirements. *Id.* § 20508(b). In alignment with that statutory instruction, the current Federal Form only requires attestation of citizenship, rather than DPOC. *See* 11 C.F.R. § 9428 Subpart B.

256.   In *Arizona v. Inter Tribal Council of Arizona*, the Supreme Court held that the NVRA prevents states from requiring voter registration applicants who submit the Federal Form to provide information beyond that required by the form itself. 570 U.S. 1, 15, 18 (2013). As the Court put it, the NVRA's requirement that states "accept and use" the Federal Form is "both a ceiling and floor" for registering to vote in federal elections. *Id.* at 18.

257.   Under NVRA Section 6(b), Florida must accept Federal Forms submitted by eligible voters, and those voters must be registered to vote in federal elections. This is true even if they are required by H.B. 991 to provide DPOC and they do not provide the additional documentation.

258.   Under H.B. 991, when the DHSMV records show that an applicant or registered voter is not a U.S. citizen or has not previously submitted DPOC, county supervisors must "verify the voter's legal status as a United States citizen using available state and federal governmental sources." H.B. 991 § 4, *codified at* Fla. Stat. § 97.053(6). Registrants whose citizenship cannot be confirmed through database verification will only be allowed to vote using a provisional ballot until they provide acceptable DPOC. *See id.* The State will only count this provisional ballot if the flagged voter "presents a document acceptable as evidence of United States citizenship." *Id.*

259. H.B. 991 does not carve out any exception for use of the Federal Form—in fact, it makes no reference to the Federal Form whatsoever. Accordingly, the citizenship verification regime of H.B. 991 means that Florida will no longer "use or accept" the Federal Form, violating Section 6(a) of the NVRA.

**COUNT FOUR**
**Violation of NVRA Section 6(b), 52 U.S.C. § 20505(b)**
*Against Challenged DPOC Provisions*
**(Plaintiff UnidosUS against Defendant Byrd, Defendant Kerner, and County Defendants)**

260. Plaintiffs incorporate and reallege Paragraphs 1 through 30, 93 through 94, 96 through 105, and 222 through 223 into this section by reference.

261. Section 6(b) of the NVRA requires that states make the Federal Form "available for distribution through governmental and private entities, *with particular emphasis on making them available for organized voter registration programs*." 52 U.S.C. § 20505(b) (emphasis added). This provision protects the rights of third parties to undertake voter registration drives and submit voter registration forms because it limits states' ability to reject forms that meet NVRA standards. *Id.* § 20507(a)(1)(D) (stating that the states "shall . . . ensure" that voters who complete timely, valid forms are registered); *id.* § 20505(a)(1)–(2) (states "shall accept" the Federal Forms).

262. The Eleventh Circuit has acknowledged this right, noting that the "right to conduct voter registration drives is a legally protected interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1353 (11th Cir. 2005). Accordingly, "when a state adopts measures that have the practical effect of preventing an organization from conducting a drive, collecting applications, and mailing them in, the state violates the NVRA." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1162–63 (N.D. Fla. 2012).

263. H.B. 991 leaves organizations that conduct voter registration drives, including registered 3PVROs like Plaintiff Unidos, unable to use the Federal Form to conduct voter

86

registration drives. Instead, as a result of the Challenged DPOC provisions, Plaintiffs must take numerous burdensome additional steps to ensure that the voter registration applicants whom they assist will make it onto and stay on Florida's voter rolls. Upon information and belief, those steps will include asking for and making copies of highly confidential personal documents, like birth certificates and passports. This will both require hiring additional staffers on limited organizational budgets and will erode the trust of the populations that voter registration groups serve. Upon information and belief, this will also likely make it more difficult for registered 3PVROs like Plaintiff UnidosUS to successfully register voters, which is core to their organizational missions.

264. Faced with an inability to meet H.B. 991's financial and administrative burdens, many voter registration organizations will be left entirely unable to conduct voter registration drives. The imposition of this undue barrier violates 3PVROs' rights under Section 6(b) of the NVRA.

## COUNT FIVE
### Violation of NVRA Section 7, 52 U.S.C. § 20506
### *Against Challenged DPOC Provisions*
### (Plaintiffs LWVFL, Florida Rising, Florida Rising Together, and Hispanic Federation against all Defendants)

265. Plaintiffs incorporate and reallege Paragraphs 1 through 24, 31 through 79, 93 through 105, and 222 through 223 by reference.

266. Section 7 of the NVRA requires that "all offices in the State that provide public assistance operate as "voter registration agencies." 52 U.S.C. § 20506(a)(2). These agencies must provide specific voter registration services in tandem with "each application for . . . service or assistance, and with each recertification, renewal, or change of address form relating to such service or assistance . . . ." *Id.* § 20506(a)(6). Among the required voter registration services, agencies must distribute the Federal Form or its "equivalent." *Id.* § 20506(a)(6)(A)(ii).

87

267. Section 6 of the NVRA allows states to create their own mail-in voter registration forms for federal elections, so long as the state form "meets all of the criteria" for the Federal Form laid out in Section 9. *Id.* §§ 20505(a), 20508(b)(1). Section 7, in contrast, requires that voter registration forms provided by public benefit agencies be "equivalent" to the Federal Form described in Section 9. *Id.* § 20506(a)(6)(A)(ii). This difference in statutory text is key: Section 7 gives public benefit agencies even less discretion over the content of the forms they distribute. *Id.*

268. The Challenged DPOC Provisions require voters, both prospective registrants and people who have already registered, to submit acceptable DPOC either to become or remain registered to vote if DHSMV data does not reflect that they have already provided DPOC. This provision violates Section 7 because it imposes an additional requirement on the state form provided by public assistance agencies beyond what is required by the Federal Form. The process of registering to vote in Florida violates Section 7 because it will no longer be an "equivalent" of what is required under Section 9.

**COUNT SIX**
**Violation of NVRA Section 8, 52 U.S.C. § 20507(b)(1), (c)(2)(A)**
*Against Challenged DPOC Provisions*
**(All Plaintiffs against Defendant Byrd, Defendant Kerner, and County Defendants)**

269. Plaintiffs incorporate and reallege Paragraphs 1 through 94, 96 through 182, and 222 and 223 into this section by reference.

270. H.B. 991's Challenged DPOC Provisions violate at least two different aspects of Section 8 of the NVRA: (A) the uniformity and nondiscriminatory provision under Section 8(b)(1), and (B) the "90-day quiet period" under Section 8(c).

### A. Violation of the Uniform and Nondiscriminatory Requirement

271. Under Section 8(b)(1), all state voter list maintenance programs must be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1).

272.     Section 8's anti-discrimination requirement protects voter groups from inequitable list maintenance practices that disproportionately burden or target certain groups of eligible voters. The statue's uniformity requirement is violated when a voter roll maintenance program singles out particular groups of voters for different treatment. *See Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006); *see also United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012) ("[A] state cannot properly impose burdensome demands in a discriminatory manner.").

273.     H.B. 991 subjects certain Florida voters to discriminatory list maintenance in two ways. First, it creates a regime of voter citizenship verification based on unreliable data, disproportionately flagging naturalized citizens, older Floridians, and those with name changes or multiple last names for production of DPOC. Next, it requires flagged voters to provide DPOC that certain groups of Floridians disproportionately cannot access, such as voters born in Puerto Rico, elderly Black voters, disabled and unhoused voters, and others, disenfranchising them by default.

274.     As to the first, many of the databases Florida currently uses to flag registered voters as potential noncitizens, such as the SAVE system, mistakenly flag naturalized citizens for removal because they do not reflect naturalization data. Neither the DHSMV nor SAVE automatically capture citizenship information, and both are infamous for containing stale data. H.B. 991's reliance on this fundamentally unreliable data makes it "likely that the properly registered citizens who would be required to respond and provide documentation [will] be primarily newly naturalized citizens." *Florida*, 870 F. Supp. 2d at 1350. The erroneous flagging will result in naturalized Floridians being disproportionately swept up in the Challenged DPOC provisions in violation of Section 8(b)(1)'s nondiscrimination provision.

89

275.    Elderly voters will similarly be disproportionately flagged under these databases. The SSA did not consistently collect citizenship information until 1981, and the DHSMV did not require proof of citizenship for identification transactions until 2020. Subjecting these voters to DPOC requirements in light of these data deficiencies violates Section 8(b)(1); it discriminatorily exposes Florida's large population of elderly voters to serious risk of erroneous flagging for removal from the state voter rolls.

276.    Other groups will face disproportionate burdens once they are selected. For example, Puerto Rican-born voters will face significant obstacles in producing acceptable DPOC due to legal and environmental hurdles. Puerto Rican Law 191 invalidated all Puerto Rican birth certificates issued prior to July 1, 2010. The Law provides no automatic conferral of new documentation. Puerto Ricans who wish to obtain a new birth certificate face a slow and labyrinthine bureaucratic process to obtain new birth certificates with "no representations or warranties as to the accuracy, completeness, or timeliness" of requested birth certificate data.[81] Upon information and belief, many Florida voters born in Puerto Rico will be unable to timely provide DPOC as required by the Challenged DPOC Provisions. These difficulties are further compounded by increasingly intense and frequent hurricanes in Puerto Rico and Florida, which have also destroyed birth certificates and other identification. Taken together, this will disenfranchise many Florida Puerto Ricans in violation of Section 8(b).

277.    The Challenged DPOC Provisions also place a severe burden on flagged voters in communities of color, in particular older Black Floridians born in the Jim Crow South. Segregated hospitals denied Black mothers care, resulting in a generation of many Black Floridians who have never received and/or been able to access birth certificates. And for those who need to procure a

---

[81]    *Puerto Rico Department of Health (PR) Order Certificates, supra* note 31, at 52.

document that meets H.B. 991's DPOC type provision, the process is administratively and financially burdensome. To obtain a passport, a person who was never issued a birth certificate must include a Letter of No Record from the state registrar of vital statistics or an "early public record or document" from a "close blood relative or physician" who can attest to having "personal knowledge of the passport applicant's birth."[82] Many Black voters who were denied birth certificates are now elderly, facing mobility challenges, lack of transportation, disability, and illness. The advanced age of Black individuals born during the *de jure* segregated South will present an additional difficulty in obtaining and accessing the required documentation or testimony.

278. More broadly, more than half of Black Americans lack a valid passport, and Black Floridians will face undue financial burdens to remain on the voter rolls if flagged—from paying a steep application and execution fee, to the additional processing fee to obtain a passport within twelve weeks.

279. Many Florida voters with disabilities do not have IDs or the ability to obtain the documentation required to comply with H.B. 991 if they are flagged during list maintenance. Disabled Floridians will thus be disproportionately disenfranchised by the discriminatory list maintenance provision in H.B. 991.

280. Still other groups will be disproportionately flagged and burdened by the requirement to produce DPOC.

281. For example, unhoused voters will be burdened at both steps. Many unhoused Floridians lack a permanent mailing address, a problem that has been exacerbated by an uptick in natural disasters. Upon information and belief, DHSMV and federal databases are likely to contain outdated data about unhoused Floridians' current places of residence. The Challenged DPOC

---

[82]    *See* Form DS-10: Birth Affidavit, *supra* note 49, at 58.

91

Provisions will therefore flag a disproportionate number of unhoused voters for production of DPOC. Once they are flagged, it will be very difficult for them to produce the required DPOC. Unhoused individuals often lack a safe storage place for sensitive documentation like birth certificates and passports and face significant financial barriers to replacing them.

282.     Voters who have changed their names or who have more than one surname will also be disproportionately flagged. State and federal databases often contain outdated names for women who change their surnames after marriage or divorce; transgender individuals who change their names to reflect their gender identities; and Latino individuals with multiple last names. When a voter in one of these groups goes to the DHSMV and provides a name for a state driver license or ID card that does not match state or federal data on that voter, they are significantly more likely to be erroneously flagged for removal from state voter rolls. Under the Challenged DPOC Provisions, the flagged voter must then submit additional, official legal documentation evidencing a name change before the documentation will be accepted as proof of United States citizenship. The voter must foot the bill and jump through bureaucratic hoops to produce proof of a name change to election officials.

283.     Women, trans individuals, and Latino voters with multiple last names face a dual burden from H.B. 991's list maintenance regime: the increased risk of being flagged; and, if flagged, the need to provide proof of a name change to regain the right to vote at voter's own expense. The statute will thus impermissibly leave a disproportionate number of women, trans individuals, and Latinos with multiple last names at the mercy of an astoundingly unreliable data matching system. *See Blackwell,* 455 F. Supp. 2d 694, 703; *Florida*, 870 F. Supp. 2d 1347–48 (listing "major flaws" with the compiling of a list to identify voters for possible removal from the statewide voter registration system based on data from the DHSMV).

92

284.   In sum, the Challenged DPOC Provisions subject myriad groups—including naturalized citizens, older Black voters, Puerto Ricans, communities of color, disabled voters, unhoused individuals, and those with name changes or more than one surname—to unlawful discrimination and a lack of uniformity in violation of NVRA Section 8(1)(b). The Challenged DPOC Provisions violate Section 8(b)(1)'s requirement that all list maintenance programs be uniform and nondiscriminatory because they impose unequal treatment and deny certain otherwise eligible voters the opportunity to vote using a regular ballot. *See, e.g.*, *Blackwell*, 455 F. Supp. 2d at 703.

285.   In addition to being discriminatory, the Challenged DPOC Provisions are non-uniform, due to the lack of specified processes and standards to ensure accurate name matching. Absent any procedural instructions provided under the statute, state officials may exercise their own biased, arbitrary, and uneven assessments of whether a particular voter has accurately matched with information in antiquated state and federal databases.

286.   Upon information and belief, election officials will be left to their own devices to check as few or as many databases as they wish when verifying a voter's eligibility. With many Boards of Elections facing staffing crises, the new administrative burden of verifying voter eligibility for all existing and newly registered voters could lead overworked public servants to review data quickly to try to keep up with H.B. 911's mandate.[83] Even absent any animus, an election official's implicit bias or inferred understanding of H.B. 991 could lead to drastically different decisions as to which voters should be flagged from one county to another. The Challenged DPOC Provisions further violate Section 8(b)(1)'s uniformity requirement.

---

[83]   Anna Diaz, *Election Offices Need Staff*, Issue One (Aug. 17, 2023), https://issueone.org/articles/election-offices-need-staff-colleges-universities/ [https://perma.cc/TJ7B-YR7W].

### B. Violation of the Quiet Period Limitation

287.    The Challenged DPOC Provisions also violate Section 8(c)(2), which limits when states may conduct list maintenance programs. 52 U.S.C. § 20507(c)(2)(A). States must "complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." *Id.* Once a federal election is fewer than 90 days away, a "Quiet Period" begins, and systematic state list maintenance efforts that process and remove individuals from the voter rolls must stop.

288.    The Challenged DPOC Provisions require systematic list maintenance of Florida's voter rolls within 90 days of a federal election. Under Section (8)(c)(2), systematic list maintenance and removal programs are prohibited during the 90-day "Quiet Period." *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1345 (11th Cir. 2014).

289.    Courts define a systematic removal program as one that involves cancelling batches of registrations based on a set procedure, such as "us[ing] a mass computerized data-matching process to compare the voter rolls with other state and federal databases." *Id.* at 1344. In *Arcia*, the Eleventh Circuit specifically held that using the federal SAVE system for data matching with voter rolls is systematic list maintenance under the NVRA and is therefore prohibited during the 90-day "Quiet Period" before federal elections. *Id.* ("Certainly, it is telling that the database that Secretary Detzner used before the general election—SAVE—stands for *Systematic* Alien Verification for Entitlements.").

290.    H.B. 991 creates the very kind of program that *Arcia* found violative of Section 8(c)(2): It imposes a new, continuous obligation on election officials to conduct ongoing retroactive checks of new and existing Florida voters' citizenship status, requiring those officials to conduct

related removals on a continuous basis irrespective of the 90-Day "Quiet Period." The Challenged DPOC Provisions do not carve out any exception or modification to the voter verification and removal process during the 90 days before a federal election. Instead, the DHSMV must provide the Department of State with new weekly reports of citizenship information on DHSMV users. Upon information and belief, eligible voters flagged by H.B. 991's citizenship verification scheme may face a complete cancellation of their voter registration, even within 90 days of a federal election. Accordingly, the Challenged DPOC Provisions violate NVRA Section 8(c)(2)'s required cessation of list maintenance activities 90 days before federal elections.

**COUNT SEVEN**
**Violation of the First and Fourteenth Amendments**
**Protections Against Undue Burden on the Right to Vote**
*Against Student ID Ban*
**42 U.S.C. § 1983**
**(Florida Rising, Florida Rising Together, and Hispanic Federation against Defendant Byrd and County Defendants)**

291. Plaintiffs incorporate and reallege Paragraphs 1 through 24, 50 through 79, 93, 96, and 184 through 221 of this Complaint into this section by reference.

292. The First and Fourteenth Amendments guarantee the fundamental right to vote. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

293. To evaluate a state law challenged as violating the fundamental right to vote, a court must "weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burden imposed by the rule, taking into consideration the extent to which those justifications require the burden to plaintiffs' rights." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). If a law severely burdens the right to vote, it must "be narrowly drawn to serve a compelling state interest." *Id.* When "a law imposes only a slight burden on the right to vote, relevant and legitimate interests of

sufficient weight still must justify that burden." *Id.* at 1318–19. This is a sliding scale analysis, such that "[t]he more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." *Id.* (citation omitted).

294. The Student ID Ban imposes a substantial, disproportionate, and unjustified burden on young voters' right to vote. Specifically, it requires students to obtain an alternative form of ID that they are less likely to have and that will be harder to obtain given their disproportionate lack of access to required records, transportation, and financial resources. Many Florida students will be unable to navigate these obstacles in time to vote, resulting in their disenfranchisement.

295. The State has no legitimate interest in eliminating student ID as accepted voter ID, much less a compelling one, and the Student ID Ban is not adequately tailored to justify the severe burdens imposed on young voters' right to vote.

296. The harms Plaintiffs, their members, and their constituents will suffer from the disenfranchisement of young voters and the undue burden on their ability to vote are irreparable and are traceable to the Student ID Ban.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in their favor and:

1. Declare the Challenged DPOC Provisions, the Mandatory Update Provision, and the Student ID Ban illegal and unconstitutional as described above, in violation of the First and Fourteenth Amendments and the NVRA;

2. Permanently enjoin Defendants Byrd, Kerner, and Williams, and their agents, employees, and anyone acting in concert with them from enforcing or giving any effect to the Challenged DPOC Provisions, the Mandatory Update Provision, and the Student ID Ban, including by conducting any elections utilizing those provisions;

3. Permanently enjoin the County Defendants and their agents, employees, and anyone acting in concert with them from enforcing or giving any effect to the General DPOC Registration Provisions, the Retroactive DPOC Provision, or the Student ID Ban, including by conducting any elections utilizing those provisions;

4. Award Plaintiffs' costs and reasonable attorneys' fees; and

5. Grant any such other and further relief as may be just and equitable.

Respectfully submitted July 22, 2026,

Jonathan Topaz*
William Hughes*
Nina Nayiri McKay*
Sophia Lin Lakin*
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
jtopaz@aclu.org
whughes@aclu.org
nmckay@aclu.org
slakin@aclu.org

Sarah Brannon*
**American Civil Liberties Union Foundation**
915 15th Street NW
Washington, D.C. 20005
(740) 632-0671
sbrannon@aclu.org

John A. Freedman*
Rachel L. Forman (FBN 105347)
Jeremy Karpatkin*
Nicholas Casmier Anway*
Connor J. Morgan*
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5000

/s/ Caroline McNamara
Caroline McNamara (FBN 1038312)
Nicholas L.V. Warren (FBN 1019018)
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, Florida 33134
(786) 363-2738
cmcnamara@aclufl.org
nwarren@aclufl.org
dtilley@aclufl.org

John Powers*
Hani Mirza*
Sonali Seth*
Nikole Miller (FBN 1031826)
Peter Ketcham-Colwill*
**Advancement Project**
1220 L Street NW, Suite 850
Washington, DC 20005
(202) 728-9557
jpowers@advancementproject.org
hmirza@advancementproject.org
sseth@advancementproject.org
nmiller@advancementproject.org
pketchamcolwill@advancementproject.org

Cesar Z. Ruiz*
Delmarie Alicea (FBN 1024650)
Jose Perez*
**Latino Justice PRLDEF**
475 Riverside Drive, Suite 1901

97

john.freedman@arnoldporter.com
rachel.forman@arnoldporter.com
jeremy.karpatkin@arnoldporter.com
nicholas.casmier.anway@arnoldporter.com
connor.morgan@arnoldporter.com

Jeffrey A. Miller*
**Arnold & Porter Kaye Scholer LLP**
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306
(650) 319-4500
jeffrey.miller@arnoldporter.com

New York, NY 10115
(212) 392-4752
cruiz@latinojustice.org
dalicea@latinojustice.org
jperez@latinojustice.org

Eric Padilla (FBN 1044216)
**Arnold & Porter Kaye Scholer LLP**
250 West 55th Street
New York, NY 10019
(212) 836-8000
eric.padilla@arnoldporter.com

*\* Admitted pro hac vice*

*Attorneys for Plaintiffs*