# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### CASE NO. 1:26-cv-22257-JB/Torres

FLORIDA STATE CONFERENCE OF
BRANCHES AND YOUTH UNITS OF THE
NAACP and FLORIDA ALLIANCE FOR
RETIRED AMERICANS,

*Plaintiffs*,

v.

CORD BYRD, in his official capacity as
Secretary of State of Florida; KIM BARTON, in
her official capacity as Supervisor of Elections for
Alachua County; CHRISTOPHER MILTON, in
his official capacity as Supervisor of Elections for
Baker County; NINA WARD, in her official
capacity as Supervisor of Elections for Bay
County; AMANDA SEYFANG, in her official
capacity as Supervisor of Elections for Bradford
County; TIM BOBANIC, in his official capacity
as Supervisor of Elections for Brevard County;
JOE SCOTT, in his official capacity as
Supervisor of Elections for Broward County;
SHARON CHASON, in her official capacity as
Supervisor of Elections for Calhoun County;
LEAH VALENTI, in her official capacity as
Supervisor of Elections for Charlotte County;
MAUREEN "MO" BAIRD, in her official
capacity as Supervisor of Elections for Citrus
County; CHRIS H. CHAMBLESS, in his official
capacity as Supervisor of Elections for Clay
County; MELISSA BLAZIER, in her official
capacity as Supervisor of Elections for Collier
County; TOMI STINSON BROWN, in her
official capacity as Supervisor for Columbia
County; DEBBIE WERTZ, in her official
capacity as Supervisor of Elections for DeSoto
County; DARBI CHAIRES, in her official
capacity as Supervisor of Elections for Dixie
County; JERRY HOLLAND, in his official
capacity as Supervisor of Elections for Duval

County; ROBERT BENDER, in his official capacity as Supervisor of Elections for Escambia County; KAITLYN LENHART, in her official capacity as Supervisor of Elections for Flagler County; HEATHER RILEY, in her official capacity as Supervisor of Elections for Franklin County; KENYA WILLIAMS, in her official capacity as Supervisor of Elections for Gadsden County; LISA DARUS, in her official capacity as Supervisor of Elections for Gilchrist County; ALETRIS FARNAM, in her official capacity as Supervisor of Elections for Glades County; RHONDA PIERCE, in her official capacity as Supervisor of Elections for Gulf County; LAURA HUTTO, in her official capacity as Supervisor of Elections for Hamilton County; DIANE SMITH, in her official capacity as Supervisor of Elections for Hardee County; SHERRY TAYLOR, in her official capacity as Supervisor of Elections for Hendry County; DENISE LAVANCHER, in her official capacity as Supervisor of Elections for Hernando County; KAREN HEALY, in her official capacity as Supervisor of Elections for Highlands County; CRAIG LATIMER, in his official capacity as Supervisor of Elections for Hillsborough County; H. RUSSELL WILLIAMS, in his official capacity as Supervisor of Elections for Holmes County; LESLIE R. SWAN, in her official capacity as Supervisor of Elections for Indian River County; CAROL A. DUNAWAY, in her official capacity as Supervisor of Elections for Jackson County; MICHELLE MILLIGAN, in her official capacity as Supervisor of Elections for Jefferson County; TRAVIS HART, in his official capacity as Supervisor of Elections for Lafayette County; ALAN HAYS, in his official capacity as Supervisor of Elections for Lake County; JENNA PERSONS-MULICKA, in her official capacity as Supervisor of Elections for Lee County; MARK EARLEY, in his official capacity as Supervisor of Elections for Leon County; TAMMY JONES, in her official capacity as Supervisor of Elections for Levy County; GRANT CONYERS, in his official capacity as Supervisor of Elections for Liberty County; HEATH DRIGGERS, in his official capacity as Supervisor of Elections for Madison

County; SCOTT FARRINGTON, in his official capacity as Supervisor of Elections for Manatee County; WESLEY WILCOX, in his official capacity as Supervisor of Elections for Marion County; VICKI DAVIS, in her official capacity as Supervisor of Elections for Martin County; ALINA GARCIA, in her official capacity as Supervisor of Elections for Miami-Dade County; SHERRI HODIES, in her official capacity as Supervisor of Elections for Monroe County; JANET H. ADKINS, in her official capacity as Supervisor of Elections for Nassau County; PAUL A. LUX, in his official capacity as Supervisor of Elections for Okaloosa County; DAVID MAY, in his official capacity as Supervisor of Elections for Okeechobee County; KAREN CASTOR DENTEL, in her official capacity as Supervisor of Elections for Orange County; MARY JANE ARRINGTON, in her official capacity as Supervisor of Elections for Osceola County; WENDY SARTORY LINK, in her official capacity as Supervisor of Elections for Palm Beach County; BRIAN CORLEY, in his official capacity as Supervisor of Elections for Pasco County; JULIE MARCUS, in her official capacity as Supervisor of Elections for Pinellas County; MELONY BELL, in her official capacity as Supervisor of Elections for Polk County; CHARLES OVERTURF, in his official capacity as Supervisor of Elections for Putnam County; TAPPIE VILLANE, in her official capacity as Supervisor of Elections for Santa Rosa County; RON TURNER, in his official capacity as Supervisor of Elections for Sarasota County; AMY PENNOCK, in her official capacity as Supervisor of Elections for Seminole County; VICKY OAKES, in her official capacity as Supervisor of Elections for St. Johns County; GERTRUDE WALKER, in her official capacity as Supervisor of Elections for St. Lucie County; WILLIAM KEEN, in his official capacity as Supervisor of Elections for Sumter County; JENNIFER KINSEY, in her official capacity as Supervisor of Elections for Suwannee County; DANA SOUTHERLAND, in her official capacity as Supervisor of Elections for Taylor County;

DEBORAH OSBORNE, in her official capacity as Supervisor of Elections for Union County; LISA LEWIS, in her official capacity as Supervisor of Elections for Volusia County; JOSEPH R. MORGAN, in his official capacity as Supervisor of Elections for Wakulla County; RYAN MESSER, in his official capacity as Supervisor of Elections for Walton County; DEIDRA PETTIS, in her official capacity as Supervisor of Elections for Washington County; and DAVE KERNER, in his official capacity as Executive Director of the Florida Department of Highway Safety and Motor Vehicles,

*Defendants*.

## FLORIDA NAACP PLAINTIFFS' FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs Florida State Conference of Branches and Youth Units of the NAACP and the Florida Alliance for Retired Americans (collectively, "FL NAACP Plaintiffs"), file this Complaint for Injunctive and Declaratory Relief against Defendants Cord Byrd, in his official capacity as Florida Secretary of State (the "Secretary"), Florida's 67 Supervisors of Elections, each in their official capacities as Supervisors for their respective counties (collectively, "Supervisors"), and Dave Kerner, in his official capacity as Executive Director of the Florida Department of Highway Safety and Motor Vehicles.

### NATURE OF THE CASE

1. Florida House Bill 991 is the latest in a wave of Florida legislation that purports to advance "election integrity"—this time, in the name of stopping the fictional threat of widespread noncitizen voting. But far from safeguarding Florida elections from unlawful voters, HB 991's new requirements will exclude *citizens* from the electoral process, violating both the National Voter Registration Act ("NVRA") and Florida voters' First and Fourteenth Amendment rights, and undermining the integrity of Florida elections in the process.

2.    HB 991 requires, for the first time, that prospective voters and *existing* Florida voters who update their registrations submit documentary "proof" of their citizenship ("DPOC"), beyond the sworn statement of eligibility that has long sufficed under Florida law, unless the State already possesses affirmative evidence of their citizenship.

3.    With this requirement, the new law will bar otherwise qualified Floridians from casting a ballot that will be counted unless they can first produce a specific form of DPOC that the new law deems acceptable (the "DPOC requirement"), imposing an undue burden on the right to vote and violating federal law.

4.    In addition, HB 991 requires the Florida Department of State to conduct a sweeping "eligibility" check on *all existing voters* that threatens the voting eligibility of anyone whom the Department deems "potentially ineligible," requiring those voters to similarly produce acceptable DPOC to remain on the rolls. A scheme that permits the Department to impose a DPOC requirement on voters for whom it possesses no actual evidence of ineligibility, or for whom it possesses incomplete or outdated information about their citizenship status, likewise imposes an undue burden on the right to vote and violates federal law.

5.    Florida is not the first state to try to inject a DPOC requirement into its voting system based on unfounded fears of widespread noncitizen voting. A handful of other states have tried this approach—almost all of which have resulted in the disenfranchisement of thousands of qualified voters.

6.    For instance, after Kansas passed a similar DPOC law in 2011, *over 30,000* would-be voters were excluded from the franchise, virtually all of whom were eligible citizens. The Tenth Circuit affirmed the district court's finding that the law violated both the NVRA and the U.S. Constitution. *See Fish v. Schwab*, 957 F.3d 1105, 1136 (10th Cir. 2020). More recently, New Hampshire enacted a similar law in 2024. In the first elections to take place subject to the new

2

requirements, substantial numbers of citizens were unable to vote because of it. In some towns, non-partisan election observers found that as many as 25% to 30% of new registrants were turned away because of the new DPOC requirements.

7.     There is no reason to conclude that the result of Florida's law will be meaningfully different than the experience in these other states. If anything, HB 991 is even more onerous than DPOC laws enacted elsewhere, as it applies not only to new registrants but to *existing voters* as well. And unlike DPOC laws in other states, Florida's new law requires those voters who must prove their citizenship status to do so through a narrow set of documents, rather than allowing the voter to present any reasonable evidence of citizenship, as other states have allowed.

8.     Although HB 991 will burden all Florida voters who must now provide DPOC to be eligible to vote, HB 991 is more likely to impose significant burdens on specific classes of voters—including minority voters, low-income voters, and both younger and senior voters—who are less likely to have acceptable documentation and, in many cases, face greater hurdles to obtaining it.

9.     FL NAACP Plaintiffs bring this lawsuit to safeguard their members' and constituents' right to vote from HB 991's undue burdens and protect their investments in their critical voter registration and get-out-the-vote programs. FL NAACP Plaintiffs seek a declaratory judgment that the law violates the NVRA and the U.S. Constitution, as well as injunctive relief against its enforcement.

**JURISDICTION AND VENUE**

10.     FL NAACP Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the U.S. Constitution, specifically by the First and Fourteenth Amendments. They further bring this action pursuant to 52 U.S.C. § 20510(b), which authorizes a private right of action when a State's chief election official fails to remedy a violation of the NVRA within 90 days of receiving notice. FL NAACP Plaintiffs provided such

3

notice on April 1, 2026, via letter to Secretary Byrd, who failed to take any corrective action prior to the filing of this lawsuit. *See* Ex. 1.

11. This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matter in controversy arises under the Constitution and laws of the United States and asserts the deprivation under color of state law of rights under the U.S. Constitution and the NVRA.

12. Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendants are residents of Florida and numerous Defendants reside in this judicial district. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to FL NAACP Plaintiffs' claims for relief occurred in this district.

13. This Court has the authority to enter declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

**PARTIES**

14. Plaintiff Florida State Conference of Branches and Youth Units of the NAACP ("Florida NAACP") is a nonprofit, nonpartisan civil rights organization in Florida. Founded in 1909, Florida NAACP is the oldest civil rights organization in Florida and serves as the umbrella organization for local branch units throughout the State. Florida NAACP is headquartered in Fort Lauderdale, Florida, and its 12,000 members are predominantly Black and other minority individuals who reside in all 67 of Florida's counties. Its mission is to ensure the political, social, educational, and economic equality of all persons and to eliminate race-based discrimination.

15. For decades, Florida NAACP has engaged in statewide voter registration, public education, and advocacy to encourage civic and electoral participation among its members and other voters. For example, Florida NAACP holds registration events in coordination with local partners such as the Divine-Nine Pan-Hellenic Council, the Links, Masonic Lodges, and others. Florida

4

NAACP also works with churches and other faith-based organizations to help register voters within the communities it serves. When Florida NAACP and its members and volunteers assist voters in registering to vote, they communicate a pro-voting message about the importance of political participation.

16.     Florida NAACP engages in other voting-related advocacy as well, such as facilitating trainings to help its members understand election-related bills, amendments, and other issues affecting the voting process. Florida NAACP also holds get-out-the vote ("GOTV") events, such as "souls to the polls," where Florida NAACP offers transportation from local churches to polling places. Outside of the electoral sphere, Florida NAACP also engages in advocacy work involving health care, criminal justice, the school-to-prison pipeline, education, environmental justice, climate change, and the economy.

17.     HB 991's DPOC requirement for both prospective and existing voters threatens substantial harm to Florida NAACP's members. The overwhelming majority of Florida NAACP members are registered Florida voters who regularly participate in elections. Under HB 991, all of those members will be subject to the State's new DPOC requirement if they update their registration in any way and will be required to comply to continue to exercise their right to vote. And all of those members will be subject to HB 991's sweeping "eligibility" check for citizenship and will be required to provide DPOC if the State deems them "potentially ineligible." For some, the burden of compliance with the new law will be severe. Florida NAACP's membership includes voters who lack acceptable documentation of their U.S. citizenship under HB 991 and would have difficulty obtaining it. As just one example, some older Florida NAACP members were born at home—not at a hospital—and did not receive a birth certificate. And other Florida NAACP members do not have a current, valid passport or possess ready access to other acceptable citizenship documents under HB 991. Florida's DPOC requirement will consequently burden the voting rights of Florida NAACP's

5

members. Without the political participation of all its members, Florida NAACP's ability to fight race-based discrimination is greatly diminished.

18.    HB 991's DPOC requirement will also affect the magnitude and impact of Florida NAACP's voter registration and get-out-the-vote efforts. Although Florida NAACP will still strive to successfully assist voters in both registering and turning out to vote, its efforts will be frustrated by the DPOC requirement. In particular, the DPOC requirement will prevent any voter Florida NAACP assists from successfully voting to the extent that voter's citizenship information cannot be independently verified with acceptable documentation. And the DPOC requirement may also dissuade other voters from registering or voting at all, even if those voters are technically able to comply.

19.    HB 991's DPOC requirement will force Florida NAACP to expend its limited resources to create entirely new educational resources attempting to explain the new DPOC requirement to its members and constituents, as well as to those whom Florida NAACP assists to register to vote. This education will be no easy task. In the course of helping register a new voter or explaining the requirement to an existing voter, for example, Florida NAACP will have no way to know in advance whether that specific voter will be required to provide citizenship in the event the State's records do not reflect their citizenship status. Florida NAACP also anticipates that some voters will be reluctant to discuss private issues raised by the DPOC requirement (such as why one might lack a birth certificate or the financial resources to obtain acceptable identification), limiting Florida NAACP's ability to either help register or turn out those voters.

20.    For those voters who are required to provide DPOC, Florida NAACP will need to assist its members, constituents, and other voters attempting to comply. This, too, will require new educational resources and limited staff and volunteer time dedicated to helping voters understand the

6

various forms of acceptable documentation, persuading them to comply, helping them obtain it, and assisting them in providing such documentation to their Supervisor.

21. These efforts will deplete Florida NAACP's existing resources and will result in fewer voters who are registered and who can vote in upcoming elections. Given the importance of civic engagement to Florida NAACP, these efforts will have to be prioritized at the expense of the organization's other educational programming on policy issues that are important to its communities, such as healthcare and SNAP benefits.

22. Plaintiff Florida Alliance for Retired Americans ("Florida Alliance") is a 501(c)(4) nonprofit, social welfare organization. It has over 200,000 members throughout Florida's 67 counties, including retirees from public and private sector unions and community organizations, and is a chartered state affiliate of the Alliance for Retired Americans. The Florida Alliance's mission is to ensure social and economic justice and full civil rights that retirees have earned after a lifetime of work.

23. The Florida Alliance accomplishes this mission by actively pursuing and promoting legislation and public policies that are in the best interest of current and future retired Floridians. The Florida Alliance also accomplishes its mission by ensuring that its members are able to meaningfully and actively participate and vote in Florida's elections.

24. HB 991's DPOC requirement for both prospective and existing voters threatens substantial harm to the Florida Alliance's members. The Florida Alliance's members are civically and politically engaged; the majority of them are registered Florida voters who regularly participate in the State's elections, and some of them have been voting in Florida for many decades. Under HB 991, all of those members will be subject to the State's new DPOC requirement if they update their registration in any way and will be required to comply to continue to exercise their right to vote. And

all of those members will be subject to HB 991's sweeping "eligibility" check for citizenship and will be required to provide DPOC if the State deems them "potentially ineligible."

25.    Most of the Florida Alliance's members are between 65 and 85 years of age and many have disabilities. Given these realities, the Florida Alliance's members are especially likely to be burdened by the new DPOC requirement. Many Alliance members do not drive and will not have their citizenship information on file or up to date with the Florida Department of Highway Safety and Motor Vehicles ("Florida DMV"). And the Florida Alliance's membership includes voters who lack acceptable documentation of their U.S. citizenship under HB 991 and would have difficulty obtaining it. Some Florida Alliance members no longer have access to an original or certified copy of their birth certificate, and others do not have a U.S. passport—let alone a current, unexpired passport. Many Florida Alliance members, as seniors, are on a reduced or fixed income; the burden of obtaining new documentation would be severe, if it is even possible at all. Florida's DPOC requirement will consequently burden the voting rights of the Florida Alliance's members and will frustrate the Florida Alliance's mission by making it more difficult for its members to cast their ballots.

26.    The DPOC requirement will also require the Florida Alliance to devote time and resources to educating its members about these new requirements and assisting them in complying (to the extent a member is even *able* to comply) so that their members can successfully cast their ballots. These efforts will reduce the time and resources the Florida Alliance has to educate its members, legislators, and the public on legislation that threatens Florida's seniors.

27.    Defendant Cord Byrd is sued in his official capacity as Secretary of State of Florida. Defendant Byrd is the head of the Florida Department of State ("the Department") and the chief election officer of the State. Fla. Stat. § 97.012. The Secretary is responsible for ensuring uniform interpretation and implementation of election laws. *Id.* § 97.012(1)–(2). The Secretary is also

responsible for ensuring all registration applications and forms prescribed or approved by the Department comply with the NVRA. *Id.* § 97.012(9).

28.     The Department, in conjunction with the Florida DMV, implements Florida's online voter registration system, which processes the registrations of both prospective voters and existing voters who update their registration to account for a change in address, name, or party. Under HB 991, Florida's online voter registration system will attempt to compare the voter's information with existing information on file about a voter's citizenship status from the Florida DMV; if the voter's citizenship cannot be verified through that agency, the voter's Supervisor will be notified and the voter will be not be eligible to cast a ballot that will be counted unless they provide acceptable DPOC as defined by HB 991.

29.     Additionally, under HB 991, the Department must attempt to verify the citizenship status of every Florida voter who has already registered—no matter how long they have been registered—and notify Supervisors of Elections of those voters the Department deems "potentially ineligible" based on the Department's initial review of the voter's citizenship status. Upon notice from the Department that a voter is "potentially ineligible," Supervisors of Elections are required to initiate removal proceedings, such that a voter will need to provide acceptable DPOC within 30 days to remain on the voting rolls.

30.     Defendants Supervisors of Elections, who are sued in their official capacities only, are responsible for administering elections and maintaining voter rolls in each of Florida's 67 counties. Fla. Stat. § 98.015. Under HB 991, Defendant Supervisors are responsible for (1) reviewing DPOC submissions from new and existing registrants for whom the Florida DMV cannot affirmatively verify citizenship, (2) conducting their own review of citizenship status using "available state and federal government[] sources" for those voters whose citizenship has not been verified, and (3) initiating removal proceedings for those voters.

31.     Defendants Supervisors of Elections are: Kim Barton, for Alachua County; Christopher Milton, for Baker County; Nina Ward, for Bay County; Amanda Seyfang, Bradford County; Tim Bobanic, for Brevard County; Joe Scott, for Broward County; Sharon Chason, for Calhoun County; Leah Valenti, for Charlotte County; Maureen "Mo" Baird, for Citrus County; Chris H. Chambless, for Clay County; Melissa Blazier, for Collier County; Tomi Stinson Brown, for Columbia County; Debbie Wertz, for DeSoto County; Darbi Chaires, for Dixie County; Jerry Holland, for Duval County; Robert Bender, for Escambia County; Kaitlyn Lenhart, for Flagler County; Heather Riley, for Franklin County; Kenya Williams, for Gadsden County; Lisa Darus, for Gilchrist County; Aletris Farnam, for Glades County; Rhonda Pierce for Gulf County; Laura Hutto, for Hamilton County; Diane Smith, for Hardee County; Sherry Taylor, for Hendry County; Denise LaVancher, for Hernando County; Karen Healy, for Highlands County; Craig Latimer, for Hillsborough County; H. Russell Williams, for Holmes County; Leslie R. Swan, for Indian River County; Carol A. Dunaway, for Jackson County; Michelle Milligan, for Jefferson County; Travis Hart, for Lafayette County; Alan Hays, for Lake County; Jenna Persons-Mulicka, as Supervisor for Lee County; Mark Earley, for Leon County; Tammy Jones, for Levy County; Grant Conyers, for Liberty County; Heath Driggers, for Madison County; Scott Farrington, for Manatee County; Wesley Wilcox, for Marion County; Vicki Davis, for Martin County; Alina Garcia, for Miami-Dade County; Sherri Hodie, for Monroe County; Janet H. Adkins, for Nassau County; Paul A. Lux, for Okaloosa County; David May, for Okeechobee County; Karen Castor Dentel, for Orange County; Mary Jane Arrington, for Osceola County; Wendy Link, for Palm Beach County; Brian Corley, for Pasco County; Julie Marcus, for Pinellas County; Melony Bell, for Polk County; Charles Overturf, for Putnam County; Tappie Villane, for Santa Rosa County; Ron Turner, for Sarasota County; Amy Pennock, for Seminole County; Vicky Oakes, for St. Johns County; Gertrude Walker, for St. Lucie County; William Keen, for Sumter County; Jennifer Kinsey, for Suwannee County; Dana

10

Southerland, for Taylor County; Deborah Osborne, for Union County; Lisa Lewis, for Volusia County; Joseph R. Morgan, for Wakulla County; Ryan Messer, for Walton County; Deidra Pettis, for Washington County.

32.     Defendant Dave Kerner is sued in his official capacity as the appointed head of the Florida DMV. Under HB 991, the Florida DMV is tasked with attempting to confirm the citizenship status of Florida voters. And, by July 1, 2027, the DMV must issue driver's licenses and identification cards that indicate the individual's citizenship status—information that is not currently provided on existing Florida licenses and state IDs.

## STATEMENT OF FACTS AND LAW

**I.      The National Voter Registration Act restricts the ability of states to add unnecessary burdens to the voter registration process.**

33.     Florida is subject to the NVRA, which streamlines the voter registration process and requires states to provide simplified, voter-friendly systems for registering to vote. *See generally* Pub. L. No. 103-31, 107 Stat. 77 (1993).

34.     Congress enacted the NVRA to protect voters from "unfair registration laws" that may "have a direct and damaging effect on voter participation," 52 U.S.C. § 20501(a)(3), and to improve access to the franchise by establishing "procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," *id.* § 20501(b)(1). The NVRA enacts numerous requirements relevant here to achieve these stated goals.

**A.      The NVRA requires states to "accept and use" the Federal Form without documentary proof of citizenship.**

35.     The NVRA directs the U.S. Election Assistance Commission ("EAC") to "develop a mail voter registration application form for elections for Federal office" in consultation with state election officials. *Id.* § 20508(a)(2).

11

36.     This "Federal Form" must meet several parameters. It "may require *only* such identifying information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id*. § 20508(b)(1). It must also include a statement that "specifies each eligibility requirement (including citizenship)" and requires the applicant to attest, under penalty of perjury, "that the applicant meets each such requirement." *Id*. § 20508(b)(2); *see also id.* § 20508(b)(3), (4).

37.     The Federal Form does not require (and has never required) applicants to submit any "proof" of eligibility beyond the attestation requirement. Indeed, the EAC has expressly refused to impose a proof-of-citizenship requirement. *See, e.g.*, *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1196–98 (10th Cir. 2014).

38.     States subject to the NVRA are required to "accept and use" the Federal Form for voter registration by mail. 52 U.S.C. § 20505(a)(1).[1] To comply with this directive, a state cannot "requir[e] a Federal Form applicant to submit information beyond that required by the form itself." *Arizona v. Inter Tribal Council of Ariz., Inc.* ("*ITCA*"), 570 U.S. 1, 20 (2013).

39.     Instead, to impose any requirement that the Federal Form does not currently require, "a State may request that the EAC alter the Federal Form to include information the State deems necessary to determine eligibility," and if that request is rejected, may challenge that decision "in a suit under the Administrative Procedure Act." *Id.* at 19.

40.     Thus, because the Federal Form does not require applicants to submit any "proof" of eligibility beyond the attestation requirement, a state cannot require an applicant using the Federal Form to provide such "proof," including through a documentary proof-of-citizenship requirement.

---

[1] A small handful of states—not including Florida—are exempt from the NVRA. *See* 52 U.S.C. § 20503(b)(2) (exempting states that allow voters to "register to vote at the polling place at the time of voting").

**B.  The NVRA permits the development of State Forms, but they can require only "necessary" information.**

41.   The NVRA also permits states to develop and use their own forms for voter registration by mail. *See* 52 U.S.C. § 20505(a)(2). These "State Forms," however, must themselves "meet[] all of the criteria" that Federal law requires the Federal Form to meet. *Id.* As such, they can "require only such identifying information . . . and other information . . . *as is necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration." 52 U.S.C. § 20508(b)(1) (emphasis added).

42.   The attestation requirement set forth in the NVRA is the "presumptive minimum amount of information necessary for a state to carry out its eligibility-assessment and registration duties." *Fish v. Kobach* ("*Fish I*"), 840 F.3d 710, 737, 738 (10th Cir. 2016).

43.   Because the "attestation sufficiently confirms the eligibility of registered voters," a State Form cannot require an applicant to furnish any additional "proof" of their qualifications to vote. *Mi Familia Vota v. Fontes* ("*MFV*"), 129 F.4th 691, 713 (9th Cir. 2025) (citing 52 U.S.C. § 20508(b)(1)).

44.   To rebut the presumption that the NVRA-required citizenship attestation is the minimum amount of information necessary for a state to verify a voter's eligibility, and instead require additional "proof" of citizenship, a state would need to show that "a substantial number of noncitizens ha[d] successfully registered" despite the attestation requirement. *Fish I*, 840 F.3d at 739.

**C.  The NVRA requires certain state agencies to offer voter registration forms to citizens.**

45.   The NVRA also requires states to offer voter registration forms to citizens (1) when they apply for (or apply to renew) a driver's license or other identification document at a state motor vehicle authority; and (2) at certain offices the State designates as "voter registration agencies,"

which must include all public assistance agencies and agencies that provide services to people with disabilities. 52 U.S.C. § 20504 (motor vehicle authorities); § 20506 ("voter registration agencies").

46.     But again, these registration forms are subject to parameters that limit what information and material they can demand from an applicant. Like the Federal Form, voter registration applications offered at state motor vehicle authorities "may require only the minimum amount of information necessary to . . . enable State election officials to assess the eligibility of the applicant." *Id*. § 20504(c)(2)(B)(ii).

47.     State-designated "voter registration agencies" are permitted under the NVRA to offer prospective voters either the Federal Form or their own registration form, so long as it is "equivalent" to the Federal Form. 52 U.S.C. § 20506(a)(6)(A)(ii). Voter registration agencies can also offer the State Form but it, too, must be "equivalent" to the Federal Form. *Id.*; *see also MFV*, 129 F.4th at 713.[2]

48.     A form that requires additional information—like documentary proof of citizenship—is not "equivalent" to the Federal Form. *See MFV*, 129 F.4th at 713.

**II.     Courts have repeatedly found that past efforts to impose documentary proof-of-citizenship requirements violate the NVRA and disenfranchise citizens in violation of the First and Fourteenth Amendments.**

49.     Federal courts have held that other states' proof-of-citizenship requirements for voter registration violated the NVRA and/or unduly burden the right to vote.

50.     Arizona was the first to pass a law requiring proof of citizenship for voter registration, which initially took effect in 2004. The U.S. Supreme Court held that it violated the NVRA as applied to applicants who registered to vote using the Federal Form. *See ITCA*, 570 U.S. at 20. Arizona's "state-imposed requirement of evidence of citizenship not required by the Federal Form," the Court

---

[2] Florida law specifically limits voter registration agencies to offering either the State Form or an equivalent approved by the Secretary of State. Fla. Stat. § 97.058(3)(a).

explained, was "'inconsistent with' the NVRA's mandate that States 'accept and use' the Federal Form." *Id.* at 15 (quoting *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 397 (2001)).

51.    In 2022, Arizona enacted a new law requiring State Form applicants to provide documentary proof of citizenship and documentary proof of residency, while also making it a felony for county recorders to accept State Form applications without proof of citizenship. *MFV*, 129 F.4th at 704–05. The law also barred Federal Form applicants without documentary proof of citizenship on record from voting by mail or voting for president. A federal district court found that these provisions violated the NVRA and enjoined their enforcement. *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1088–96 (D. Ariz. 2023).[3]

52.    The Ninth Circuit affirmed the district court's judgment. It explained that requiring "proof" of citizenship to vote by mail and to vote for President violated the NVRA's requirement that states "accept and use" the Federal Form (which has never required documentary proof of citizenship) for registration by mail. *MFV*, 129 F.4th at 710–12.

53.    These requirements also violated the NVRA by demanding more information than "'necessary' to assess an applicant's eligibility." *Id.* at 712–13. Additional proof of citizenship was not necessary, the Court explained, because "attestation sufficiently confirms the eligibility of registered voters." *Id.*

54.    Finally, the "proof" requirements violated the NVRA's mandate that voter registration forms offered at state-designated "voter registration agencies" be "equivalent" to the Federal Form, since Arizona's form contained "unnecessary additional requirements," including documentary proof of citizenship, that the Federal Form did not. *Id.*

---

[3] Because the district court found that Arizona's DPOC laws violated the NVRA, it did not reach the plaintiffs' alternative claims that they also violated the federal constitution. *Mi Familia Vota*, 691 F. Supp. 3d at 1090 n.7.

55. Arizona's first-in-the-nation experimentation with documentary proof-of-citizenship requirements has demonstrated its harmful and burdensome effects. After the Supreme Court's decision in *ITCA*, Arizona elected to continue requiring DPOC on its State Form applications for purposes of *state elections*, and therefore implemented a voter registration system with two classes of voters: voters who provided DPOC when they registered and could vote in any election, while those voters who did not were designated as "federal only" voters and allowed to vote only for federal offices.

56. By July 2023, there were 19,439 active "federal only" voters in Arizona. There is *zero* evidence that even one "federal only" voter in Arizona is not a citizen. *See Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 1011 (D. Ariz. 2024) (noting "the absence of evidence that Arizona's 19,439 Federal-Only Voters are non-citizens"), *judgment entered*, No. CV-22-00509-PHX-SRB, 2024 WL 2244338 (D. Ariz. May 2, 2024), *aff'd in part, vacated in part on other grounds*, *remanded*, 129 F.4th 691 (9th Cir. 2025), *cert. granted sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, No. 25-1017 (U.S. June 29, 2026).

57. But while there is no evidence that the people the DPOC law excluded were noncitizens, there is ample evidence that Arizona's law prevented many citizens from casting a ballot in state elections, worsening racial disparities in the voting population. By July 2023, although nonwhite voters comprised only 28.8% of eligible voters in Arizona, an estimated 46.7% of Arizona's 19,439 "federal only" voters were nonwhite. *Mi Familia Vota*, 719 F. Supp. 3d at 948 n.5.

58. Kansas imposed documentary proof-of-citizenship requirements for voter registration in 2011, despite "incredibly slight evidence" of noncitizen voting in the state. *Fish v. Schwab* ("*Fish II*"), 957 F.3d 1105, 1134 (10th Cir. 2020). The impact was again dramatic. After the law took effect, *31,089* people had their voter registration applications rejected because they did not provide satisfactory DPOC. *Fish II*, 957 F.3d at 1128. Ultimately, "approximately 12% of the total voter

16

registration applications submitted [after] the law was implemented" were suspended or canceled. *Id.* (citation omitted).

59.     The Kansas law would have disenfranchised far more people save for a preliminary injunction enjoining the law's operation as inconsistent with the NVRA. *See Fish I*, 840 F.3d at 732–51 (affirming entry of the preliminary injunction). After the district court permanently enjoined the law, the Tenth Circuit affirmed again, finding that Kansas's law violated the NVRA and imposed an unconstitutional burden on the right to vote. *See Fish II*, 957 F.3d at 1121–44.

60.     Most recently, New Hampshire passed a DPOC law in 2024, which took effect in 2025 and required new registrants to produce DPOC.

61.     The first elections held in New Hampshire subject to its new DPOC law were an array of local elections held on March 11, 2025. The disenfranchising effects were severe. Nonpartisan election observers found that 25% to 30% of voters in some New Hampshire towns were turned away because they did not have DPOC. Election officials reported similar effects: in two New Hampshire towns, election officials reported that around 20% of New Hampshirites who tried to register at the polls were turned away because of the new law.

62.     After a full trial on the merits, the District of New Hampshire found that the State's DPOC requirement presented a "considerable" burden for voters without "in any way" serving the interests the State put forward to defend the requirement. *N.H. Youth Movement v. Scanlan*, No. 24-cv-291, --- F. Supp. 3d ---, 2026 WL 1500857, at *39 (D.N.H. May 28, 2026), *appeal pending* No. 26-1740 (1st Cir. June 22, 2026). It issued a final judgment that the State's DPOC law imposed an unconstitutional burden on the right to vote and therefore violated the First and Fourteenth Amendments to the U.S. Constitution. *Id.*[4]

---

[4] The court did not consider whether New Hampshire's law violated the NVRA because the state is one of those states exempt from the NVRA. *See* 52 U.S.C. § 20503(b)(2).

63.    The experiences with DPOC requirements in Arizona, Kansas, and New Hampshire have left a grim—but consistent—record about their burdensome effects on voter registration and participation among new voters. Notably, the laws enacted in Arizona, Kansas, and New Hampshire were not retroactive and applied only to new voter registration applicants. Their harmful and burdensome effects on voters would have been even more severe if applied to already registered voters.

64.    President Trump recently issued an executive order purporting to require the EAC to add a DPOC requirement to the Federal Form. *See* Exec. Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025). In April 2025, a federal district court preliminarily enjoined this order as a violation of separation-of-powers principles, in part because Congress had already exercised its authority in this area through the NVRA. *League of United Latin Am. Citizens v. Exec. Off. of the President ("LULAC")*, 780 F. Supp. 3d 135, 195–96 (D.D.C. 2025). In doing so, the court observed that, "when enacting the NVRA, Congress considered and rejected a proposal that would have allowed States to impose exactly the kind of documentary-proof-of-citizenship requirement that the President's Executive Order now directs the EAC to adopt, concluding that such a requirement was 'not necessary or consistent with the purposes of [the] Act.'" *Id.* at 196 (quoting H.R. Rep. No. 103–66, at 23 (1993) (Conf. Rep.)).

## III.    Consistent with the NVRA, Florida has long permitted voters to register and vote without providing documentary proof of citizenship.

65.    Florida, like nearly all other states, has long permitted voters to register to vote (and cast their ballots) without providing documentary proof of citizenship. Instead, Florida has required the prospective voter to attest, under penalty of perjury and threat of criminal prosecution, that they are a citizen of the United States.

66.    In addition, Florida conducts routine voter registration list maintenance to check voter rolls against state and federal data sources. Under existing law, if a Florida Supervisor receives information that a voter is a noncitizen, the Supervisor must initiate proceedings to remove that voter from the rolls. *See* Fla. Stat. § 98.075(6). And Florida specifically requires the Florida DMV to "furnish weekly to the [D]epartment" a list of noncitizens who obtained or renewed a state driver's license or state identification card so those individuals can be checked against the State's voter rolls. *See* Fla. Stat. § 98.093(8).

67.    Shortly before HB 991 passed in the Legislature, Secretary Byrd boasted that Florida's existing measures ensured that Florida had "the cleanest voter rolls possible."

68.    Florida's historic practice also conformed with the NVRA's requirements for mail voter registration, as well as voter registration at the Florida DMV and at state voter registration agencies.

69.    At no point prior to enacting HB 991 did Florida request that the EAC add a documentary proof-of-citizenship requirement to the Federal Form and, consequently, did not seek judicial review of any denial under the APA.

70.    In enacting HB 991, Florida lawmakers offered no "proof" that "a substantial number of noncitizens ha[d] successfully registered" to vote. *Fish I*, 840 F.3d at 739. The bill's proponents instead pointed to the Florida Secretary of State's Office of Election Crimes and Security's 2025 report, which identified 198 "likely noncitizens" who purportedly "registered and/or voted in Florida." Even taking that figure at face value, it represents an infinitesimal fraction of Florida's more than 13 million registered voters.

**IV.    HB 991 introduces a new DPOC requirement for prospective and existing Florida voters.**

71.    On March 12, 2026, the Florida Legislature passed (and the Governor later signed) HB 991, requiring for the first time both prospective voters and existing voters who update their registration to provide documentary proof of citizenship if the State or the voter's Supervisor cannot independently verify the voter's citizenship status.

72.    Specifically, under HB 991, when a Floridian registers to vote for the first time or updates their existing registration (to account for a change in address, name, or party), the voter registration system will attempt to affirmatively verify that voter's citizenship status using existing Florida DMV records. If that voter's citizenship status cannot be affirmatively verified, both the voter and the relevant Supervisor will be notified. Unless and until the voter provides acceptable DPOC (as defined by HB 991) to their Supervisor, they cannot be placed on the voter rolls as an active voter and will not be permitted to cast a ballot that will be counted.

73.    Under HB 991, Supervisors have an independent obligation to attempt to "verify the voter's legal status as a United States citizen using available state and federal governmental sources[.]" But if such information cannot be verified for a registrant, the Supervisor must initiate removal proceedings, requiring the voter to provide acceptable DPOC (as defined by HB 991) within 30 days to remain on the voter rolls.

74.    If a voter does need to prove their citizenship under HB 991, only the following documents suffice: (1) an original or certified copy of a U.S. birth certificate, (2) a valid and unexpired U.S. passport, (3) a naturalization certificate from the U.S. Department of Homeland Security, (4) a Consular Report of Birth Abroad provided by the U.S. Department of State, (5) a current and valid Florida driver license or Florida identification card issued by the Department of Highway Safety and Motor Vehicles if such driver license or identification card indicates U.S.

20

citizenship, (6) a current and valid photo identification issued by the federal or state government which indicates U.S. citizenship, or (7) an order from a federal court granting U.S. citizenship.

75. Under HB 991, a voter's name on their citizenship documentation must also match the voter's current legal name. If the voter's name is different between those documents, such as for married women, the voter must provide official legal documentation of the name change, in addition to proof of citizenship, to comply with the law.

76. For voters to whom the DPOC requirement applies, the law does not specify whether they must provide their Supervisor of Elections proof of citizenship in-person at the Supervisor's office or by some other method. But if the voter is required to provide DPOC and fails to do so, they may cast only a provisional ballot, which will be counted only if they provide sufficient documentary proof of citizenship, as defined by HB 991, to their Supervisor by 5 P.M. on the second day after Election Day.

77. HB 991 is not limited to prospective voters or existing voters who need to update their registration; it also subjects *all voters* to the DPOC requirement, as defined by HB 991, if the Department determines the voter may be "potentially ineligible." Specifically, under HB 991, the Department "shall identify those registered voters who are potentially ineligible based on their legal status regarding United States citizenship by comparing or receiving information from other governmental entities as authorized by s. 98.093." Florida Statute 98.093, in turn, requires the Department to consult with various agencies, including but not limited to the Florida DMV, to determine voters' eligibility. To the extent those government sources "indicat[e] a voter may be ineligible" and the Department deems that information "credible and reliable," the Department must notify the voter's Supervisor, who must initiate removal proceedings, requiring the voter to provide DPOC within 30 days or be removed from the rolls.

21

78.     HB 991 does not define what it means for a voter to be "potentially ineligible" to vote. To the extent HB 991 permits the Department to deem a voter "potentially ineligible" solely because the Department lacks affirmative evidence of the voter's citizenship, or else permits the Department to rely on outdated or incomplete information about a voter's citizenship status, HB 991 violates Section 8 of the NVRA and imposes an undue burden on the right to vote in that regard as well.

**V.      HB 991's DPOC requirement will disenfranchise lawful Florida voters.**

79.     Because requiring DPOC to register to vote is both substantively unlawful and simply unnecessary to safeguard elections, few states have attempted it. And in those that have, discussed *supra* ¶¶ 49–64, the results have been as troubling as they were predictable: scores of eligible *citizen* voters have been systematically disenfranchised.

80.     Under HB 991, Florida voters will suffer the same burdens as voters in other states—like Arizona, Kansas, and New Hampshire—that have imposed DPOC requirements. Indeed, Florida's DPOC requirement is even more burdensome than DPOC laws in other states, as it applies uniquely onerous DPOC requirements not just on new voters but on existing voters who have been casting ballots in Florida for decades, threatening to purge them from the voter rolls if they cannot comply.

81.     In Florida, as in these other states, lawful, eligible voters will struggle to comply with the DPOC requirement, and the result will be that Florida elections are less accessible and less reflective of the will of the eligible, qualified electorate.

**A.      Florida's DPOC requirement is stricter than the laws in other states that broadly disenfranchised lawful voters.**

82.     In several ways, HB 991 is even stricter than DPOC laws passed in other states that broadly disenfranchised voters.

83.     Unlike the DPOC laws enacted in Arizona, Kansas, and New Hampshire, Florida's DPOC requirement applies not just to new registrants but to existing voters as well.

22

84. Additionally, the list of acceptable documentation is far more restrictive in Florida than in these other states. Arizona's law, for example, did not restrict proof to "current and valid" identification, making clear that expired IDs could suffice. The Kansas DPOC law included a residual clause allowing voters to submit "*any evidence*" that they believed demonstrated their citizenship if they lacked the enumerated papers, and election officials had broad discretion to accept it. Kan. Stat. Ann. § 25-2309(m) (emphasis added). New Hampshire likewise allowed voters to prove their citizenship with "*any* . . . reasonable documentation which indicates the applicant is a United States citizen." N.H. Rev. Stat. Ann. § 654:12(I)(a) (emphasis added). Florida's HB 991 contains no such failsafe.

85. Unlike Florida's new law, Kansas also allowed voters to resolve inconsistencies between the applicant's name or sex on DPOC versus their voter registration application by affidavit, instead of requiring yet more documentation to support the change. This provision specifically protected against the disenfranchisement of women who changed their name when they married, among other scenarios. Kan. Stat. Ann. § 25-2309(q).

86. Despite the far broader array of options that the Kansas DPOC law provided prospective voters to prove citizenship, it still broadly disenfranchised citizens and was held to be facially unconstitutional.

87. Finally, in accordance Supreme Court precedent, Arizona's DPOC law presently permits voters to participate in federal elections if they are unable to provide DPOC. Florida's new DPOC law, however, takes no account of this binding precedent and bars citizens who lack acceptable DPOC from voting in *all* elections—state and federal alike.

**B.      HB 991's DPOC requirement will similarly, if not more severely, burden lawful voters.**

88.      As the experiences of other states show, even when DPOC laws have been more lenient than the law enacted by Florida, the result has been to burden and entirely disenfranchise thousands of lawful, citizen voters.

89.      There is no reason to expect that the results will be different in Florida. To the contrary, for many Florida voters, the new DPOC requirement will present a significant obstacle to their ability to exercise their fundamental right to vote.

90.      Although HB 991 will burden all Florida voters who must show DPOC to register to vote or to remain eligible to vote, HB 991 is more likely to impose significant burdens on specific classes of voters, including newly naturalized citizens, voters with disabilities, low-income voters, minority voters, married women, and both younger and senior voters.

91.      The first types of voters who are disproportionately likely to be burdened by HB 991 are those who do not possess a Florida driver's license or state ID in the first place—and whose citizenship information consequently cannot be verified by the Florida DMV.

92.      Of course, a valid Florida driver's license number or Florida state identification number is not required to vote. *See* Fla. Stat. § 97.052(2)(o).

93.      There are many reasons why a Florida voter would not possess a Florida driver's license or state ID. The voter may not drive, whether because of age, income, disability, or personal choice, and therefore not require a license. Or the voter may have recently moved to Florida and simply have not yet obtained one. Indeed, although new Florida residents are required to obtain a driver's license within 30 days if they intend to drive on Florida roads, there is no requirement that any new resident obtain a state ID card—at any point.

24

94.     A recent nationwide study found that 15% of adult citizens either lack a state ID or driver's license altogether or do not have one that matches their current name and address. *See* Jillian Andres Rothschild, Samuel B. Novey & Michael J. Hanmer, Ctr. for Democracy & Civic Engagement, *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge* 5 (2024), https://cdce.umd.edu/sites/cdce.umd.edu/files/pubs/Voter%20ID%20survey%20Key%20Results%20June%202024.pdf.

95.     Voters who are disproportionately likely to lack a driver's license (because they do not or cannot drive) include voters with disabilities, low-income voters, minority voters, and both particularly young and old voters. Indeed, 30% of young Black Americans (aged 18–29) do not have a license at all, compared to only 5% of white Americans the same age. *See* Rothschild et al., *supra*, at 3.

96.     Even among long-time Florida voters who *do* have a driver's license or state ID, those voters may not have provided evidence of it at the time of registration. Before July 1999, Florida's registration form did not request a Florida driver's license or state ID number. Today, there are nearly 2.4 million active registered Florida voters who registered prior to 1999.

97.     As of January 2026, Florida has over 13.3 million voters. There is no reason to believe—and HB 991's sponsors gave none—that the Florida DMV in fact has citizenship verification information for all 13.3 million of those voters, let alone Florida's prospective voters who have yet to register. To the contrary, the bill's sponsors speculated that up to 10% of Florida voters—that is, over one million voters—would *not* have an associated record in the Florida DMV database from which their citizenship could be confirmed.

98.     To be sure, the Florida DMV and HB 991's sponsors have touted that Florida is "99% . . . REAL ID compliant," suggesting that the Florida DMV possesses *some* information about

25

whether an ID holder lawfully resides in the United States. But this observation is limited to those Floridians who *in fact possess a Floridia license or Florida state ID card in the first place*. And even then, Florida DMV's information will only be accurate as of the date the ID was issued, which could predate that person's citizenship, particularly for newly naturalized citizens. These new citizens represent a significant portion of the State's population: over the past five years, for example, Florida has gained nearly 100,000 newly naturalized citizens each year.

99.   The Florida DMV's information is also likely to be outdated for the countless Florida seniors who, for reason of age or disability, no longer drive and have no need to update their information with the Florida DMV on an ongoing basis. Indeed, maintaining a driver's license after age 80 requires additional hurdles; such licenses cannot be renewed online and require an in-person vision test. *See Driver License Renewal Requirements/Options for Older Drivers*, Fla. Highway Safety and Motor Vehicles, https://www.flhsmv.gov/driver-licenses-id-cards/mature-driver/driver-license-renewal-requirements-options-older-drivers.

100.   In other words, even if it is true that Florida is "99% . . . REAL ID compliant," that does *not* mean that the Florida DMV possesses the necessary information to authenticate the citizenship of 99% of Floridians who possess a Florida driver's license or state ID card—let alone authenticate the citizenship status of 99% of *Florida voters*, the more important metric.

101.   Although HB 991 also allows a voter's Supervisor to attempt to verify a voter's citizenship status through "available state and federal government sources" if a voter's citizenship status cannot be affirmatively verified through the Florida DMV, the bill's sponsors did not indicate what sources would affirmatively indicate a voter's citizenship *other* than the Florida DMV.

102.   Although some Florida counties have recently begun to use the SAVE database (Systematic Alien Verification for Entitlements) maintained by the U.S. Citizenship and Immigration Services (USCIS) to conduct voter eligibility checks, USCIS itself warns that the SAVE database is

26

only as good as the information available to it. USCIS warns, for example, that "SAVE may not be able to confirm U.S. citizenship for an individual who: (1) is not designated as a U.S. citizen in [Social Security Administration] records, (2) has not received a Certificate of Citizenship or Naturalization from USCIS, and (3) has never been issued evidence of U.S. citizenship by [the U.S. Department of State]." *Voter Registration and Voter List Maintenance Fact Sheet*, USCIS (Feb. 2, 2026), https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet.

103.   To the extent it is even used to implement HB 991, which is not clear from the bill itself, the SAVE database is notorious for misidentifying current U.S. citizens as noncitizens when states have attempted to use it to identify eligible voters. *See* Jen Fifeld & Zach Despart, *A Federal Tool to Check Voter Citizenship Keeps Making Mistakes, It Led to Confusion in Texas*, Tex. Tribune (Feb. 13, 2026, at 4:30 CT), https://www.texastribune.org/2026/02/13/save-voter-citizenship-tool-mistakes-confusion/.

104.   These are, of course, likely the same tools that the Department of State will have available to it when it surveys all existing voters to identify "potentially ineligible" voters on the basis of citizenship and when Supervisors attempt to verify citizenship using "available state and federal governmental sources"—tools that have significant shortcomings to the extent an official is attempting to use them to identify affirmative evidence of citizenship, whether because the database has no record or an outdated record of the voter (as may be the case of the Florida DMV), or because the database is not well-equipped to identify all actual U.S. citizens (in the case of SAVE).

105.   As a consequence, under HB 991, scores of Florida voters will need to show DPOC to either register to vote or remain an active voter who is entitled to cast a ballot that will be counted.

106.   But many qualified voters do not have the documents that HB 991 requires. Many more do not have ready access to them.

27

107.   If a voter does need to prove their citizenship under HB 991, only the specifically enumerated documents will suffice, such as a current and valid U.S. passport, an original or certified copy of a birth certificate, or a current and valid Florida driver's license or Florida identification card *if* such driver's license or identification card indicates U.S. citizenship.

108.   As an initial matter, Florida driver's licenses and state identification cards do not currently indicate citizenship on their face. Instead, the bill contemplates that such IDs issued by the Florida DMV would need to indicate citizenship *moving forward*, starting in July 2027. And, of course, this kind of ID is useless to someone who does not possess a Florida driver's license or state ID card (and whose citizenship could not be verified by the Florida DMV in the first place).

109.   Under HB 991, a "valid, unexpired United States passport" would suffice as proof of citizenship—but an expired passport would not. Nor is it commonplace for U.S. citizens to have a passport. A recent study indicates that over 8 million citizens in Florida lack a valid U.S. passport. *See Passport Possession, by State*, Ctr. for Am. Progress (2025), https://www.americanprogress.org/wp-content/uploads/sites/2/2025/01/SAVEact-tables.pdf.

110.   Of course, a passport is also expensive and time consuming to acquire. The fee for a new passport is $165, and it currently takes up to four weeks for mailing and four to six weeks for processing, for a total of eight to ten weeks to receive a passport. *See Passport Fees*, U.S. Dep't of State (Feb. 10, 2026), https://travel.state.gov/content/travel/en/passports/how-apply/fees.html; *Processing Times for U.S. Passports*, U.S. Dep't of State (Jan. 28, 2026), https://travel.state.gov/content/travel/en/passports/how-apply/processing-times.html.

111.   Further, Black Americans disproportionately lack access to citizenship documents like passports. A recent survey found that Black Americans were less likely than other groups to have a current U.S. passport. *See* Jamie Ballard, *Adults Under 30 Are More Likely Than Older*

28

*Americans    to    Have    a    Current    U.S.    Passport*, YouGov    (Aug.    31,    2023),

https://today.yougov.com/travel/articles/46028-adults-under-30-more-likely-have-us-passport.

112.   Education levels (and of course, income levels) also correspond highly to the likelihood that one possesses a current passport. That same study found that although 71% of Americans with postgraduate degrees have current passports, just 24% of Americans with only a high school degree or less have one. *See id.*

113.   HB 991 contemplates that an original or certified copy of a U.S. birth certificate would provide sufficient proof of citizenship. But some citizens entirely lack a birth certificate and would only be able to obtain a Letter of No Record from their birth state, which would not prove their citizenship under HB 991. *See Prove Your Citizenship: Born in the U.S. with no Birth Certificate*, Usa.Gov (Nov. 17, 2025), https://www.usa.gov/citizenship-no-birth-certificate.

114.   This is a particularly acute concern for older Black American citizens. A substantial number of older Black Americans were never issued birth certificates at all because they were born at home, in large measure as a result of racial discrimination or poverty that kept their mothers from delivering in hospitals (especially in the South). One study estimated that nearly one-fifth of nonwhite Americans born during a four-month sample period in 1939–1940 were never issued birth certificates. *See* Sam Shapiro, *Development of Birth Registration and Birth Statistics in the United States*, 4 Population Stud. 86, 98 (1950). Indeed, according to the Census Bureau, as late as 1967 approximately 7% of nonwhite births occurred outside hospital settings, which substantially increases the likelihood that such individuals were never issued birth certificates. *See* United States Bureau of the Census, *Test of Birth Registration Completeness, 1964 to 1968* at 4 (U.S. Dept. of Commerce 1973).

115.   Even if a birth certificate is available, it takes financial resources and time to obtain one. The cost and time will vary depending on the State. Obtaining a birth certificate from the State

29

of Florida, for instance, requires a minimum $9 fee by check or money order, a notarized form, and a copy of valid photo ID, such as a driver's license, state identification card, passport, or military identification card. *See Birth Certificates*, Florida Health, https://www.floridahealth.gov/certificates-records/birth-certificates/ (last visited Mar. 6, 2026).

116. Additionally, even an existing birth certificate is not enough under HB 991 for those voters whose names have changed since birth. Over 80% of American women change their names when they marry. *See* Luona Lin, *About 8 in 10 Women in Opposite-Sex Marriages Say They Took Their Husband's Last Name*, Pew Rsch. Ctr. (Sep. 7, 2023), https://www.pewresearch.org/short-reads/2023/09/07/about-eight-in-ten-women-in-opposite-sex-marriages-say-they-took-their-husbands-last-name/.

117. As a direct consequence, a significant portion of American women do not have documents that match their current legal name. Nationwide, an estimated 69 million women—but only five million men—have legal names that do not match the name on their birth certificates. *See* Greta Bedekovics & Sydney Bryant, *The SAVE Act Would Disenfranchise Millions of Citizens*, Ctr. for Am. Progress (Jan. 26, 2026), https://www.americanprogress.org/article/the-save-act-would-disenfranchise-millions-of-citizens/. In Florida specifically, there are an estimated 4.7 million female citizens whose names do not match the name on their birth certificate. *See* Ctr. for Am. Progress, *Female U.S. Citizens Without a Valid Birth Certificate, by State* (2025), https://www.americanprogress.org/wp-content/uploads/sites/2/2025/01/SAVEact-tables.pdf.

118. Under HB 991, these women, along with any other voter whose legal name does not match their birth certificate, must provide official documentation with proof of legal name change, in addition to proof of citizenship.

119. There is significant time and expense associated with replacing other forms of permissible citizenship documentation under HB 991, such as a Certificate of Naturalization (N-565

30

form), for which the filing fee is over $500 and the current processing time is seven months. *Case Processing Times*, U.S. Citizenship & Immigr. Servs., https://egov.uscis.gov/processing-times/ (last visited Mar. 6, 2026) (processing time for N-565 form).

120.   Overall, recent studies indicate that 3.8 million U.S. citizens lack *any* form of DPOC, including a birth certificate, passport, naturalization certificate, or a certificate of citizenship. And far more U.S. citizens (estimated at over 20 million) cannot readily access DPOC. *See* Rothschild et al., *supra*, at 6.

121.   Of course, Florida's DPOC requirement does not just require a voter to obtain these citizenship documents; it also requires them to provide such proof of citizenship to their Supervisor of Elections. The law does not specify *how* a voter may provide this documentation, including whether it will require an in-person visit to the Supervisor during business hours. But given the sensitivity of the documents involved, it may require such a visit, particularly because the law calls for documents such as an "original or certified copy" of a birth certificate (that is, not clearly encompassing a photocopy of a birth certificate). If Supervisors implement the law in this way, the cost and time to travel to a Supervisor's office—like the cost and time to obtain one of the qualifying documents—will be a hardship felt most by those already economically disadvantaged or voters who do not have access to independent transportation, including many of Florida's seniors.

122.   Even if a voter need only provide a photocopy of a citizenship document and may do so via mail or email, doing so of course requires the voter to scan and send in those documents, which will still require expense and time, particularly for those who do not have easy access to a scanner or printer.

123.   In addition to the burden on Florida voters, the law is also likely to impose significant burden and administrative expense on Florida's 67 Supervisors, each of whom must now notify those

31

voters whose citizenship cannot be affirmatively verified and review their citizenship documentation—a substantial undertaking for already under-resourced offices.

**VI.    HB 991's DPOC requirement does not advance legitimate state interests.**

124.    Although HB 991 will have serious consequences for Florida voters, it does little to advance any genuine state interests.

125.    The proponents of HB 991 contend that the bill is necessary to weed out and deter noncitizen voting. In reality, HB 991 is a solution in search of a problem.

126.    Both Florida and federal law already prohibit noncitizens from voting in Florida and federal elections, and pre-existing enforcement mechanisms, including both criminal penalties and active list maintenance procedures, have long effectively ensured that those rules are followed.

127.    There is scant evidence of noncitizens voting in Florida elections and no evidence at all that noncitizen voting has had a material effect on any Florida election.

128.    There is also little evidence that imposing burdensome DPOC requirements on vast swathes of Florida's eligible voting population will make elections more fair or secure.

129.    Because HB 991's DPOC requirement does not meaningfully advance any state interest in preventing fraudulent voting, the substantial burdens imposed by the requirements on eligible Florida voters are not justified, and the law violates the First and Fourteenth Amendments.

> **A.    Lawmakers dismissed the burdens Florida's DPOC requirement would impose, while amplifying largely unfounded concerns of noncitizen voter fraud.**

130.    This year, inspired by the proposed federal SAVE America Act and exaggerated claims about noncitizens voting, lawmakers in Florida brought forward legislation purporting to address the same unfounded concerns.

131.    HB 991's proponents invoked the specter of voter fraud—and specifically voting by noncitizens—to justify the law. But when pressed to identify examples of noncitizen voting, it became clear that lawmakers' concerns were backed only by thin evidence.

132.   OECS's 2025 report identified only 198 "likely noncitizens" who purportedly "registered and/or voted in Florida." But the bill's sponsors eschewed important context. For one, not all 198 individuals are proven wrongdoers, and not all were referred to law enforcement. And if past is prologue, little can be gleaned from the mere fact that OECS has referred an individual to law enforcement. In its 2024 report, OECS reported only 25 felony convictions out of "thousands" of law enforcement referrals—for *any* election-related offense.

133.   Even at face value, the OECS report is poor evidence indeed that noncitizens meaningfully threaten the integrity of Florida elections. One hundred ninety-eight voters, even if each of them were indeed a noncitizen who voted in Florida's elections (and FL NAACP Plaintiffs are not aware of evidence that would support such a conclusion), represent an imperceptible fraction of Florida's *13.3 million* active registered voters—0.001%, to be precise. With results like these, it is hardly surprising that the report touts Florida elections as "lead[ing] the nation in election security and integrity." Indeed, OECS's own proposals for election reform did not include a DPOC requirement.

134.   Lacking any real evidence of a meaningful problem with voter fraud, HB 991's proponents fell back on the State's constitutional provision that limits voting to U.S. citizens, a provision that has been in place for many years and says nothing about requiring documentary proof of citizenship for new or existing voters. *See* Fla. Const. art. VI, § 2.

135.   At the same time, HB 991's proponents dismissed concerns about the law's consequences. In the legislature, the overwhelming number of individuals who provided testimony to committees appeared in opposition to the bill for various reasons, including the economic hardship it will impose, the communities it will disproportionately affect, and the confusion it will cause. Among them was a poll worker of two decades who vehemently opposed the bill as an "unnecessary burden upon voters." And another—a U.S. citizen and former Kansas voter—shared that she herself

was prevented from voting in Kansas in 2014 by that state's similar law, which has since been struck down. *See supra* ¶¶ 58–59.

136.   On the House floor, Representative Gantt told the story of her aunt who was born at home in 1950 because there was no hospital in her area that would admit Black patients. As a result, Representative Gantt explained, her aunt has struggled to obtain a birth certificate (and other documentation) despite contacting numerous state agencies.

137.   On the Senate floor, Senator Osgood asked how she herself could verify her citizenship as a woman who has been married and changed her name twice. She noted that she did not still have a court order, a final dissolution of marriage, or other legal record of name change as required by HB 991.

138.   When given the opportunity to respond to opposition to HB 991—and specifically concerns about the law's burden on eligible voters—lawmakers either dismissed them or pleaded ignorance on the subject. When asked in committee about how similar laws had fared in Arizona and Kansas, the bill's proponents said they did not know. Another sponsor acknowledged that many Black citizens did not receive birth certificates during the Jim Crow era but dismissed that concern as a thing of the past. And another admitted that, if a woman did not have a final court order or dissolution of marriage, nothing in the bill could help her account for her name change.

139.   The bill's sponsor also seemed to misunderstand requirements of Florida law, wrongly asserting that "to be a Florida resident, you have to have a Florida Identification Card." Nor did proponents know how many Florida voters lack a license that could be used to verify their citizenship status through Florida DMV, but they estimated it could be up to 10% of all voters—in other words, potentially more than a million Floridians.

140.   These responses (and misunderstandings) are not surprising given the bill sponsors' limited understanding of how the bill would work in practice. As one of HB 991's sponsors admitted

34

moments before the bill's passage in the House, although the bill gave the Florida DMV a critical role in the citizenship verification process, she had not spoken with Florida DMV—ever—about how it would be able to verify voters' citizenship status or what kinds of voters might be left out in such a system.

**B.      Existing measures adequately protect against noncitizen voting.**

141.    Even if noncitizen voting was a real problem (it is not), HB 991's DPOC requirement is not a reasonable remedy.

142.    Proponents of DPOC laws purport to presume that significant numbers of noncitizens are voting (or that they *may* be voting), but the very idea is illogical.

143.    There is no incentive to try to vote as a noncitizen, as the consequences are severe. For nearly 30 years, it has been a federal crime "for any alien to vote in any [federal] election."18 U.S.C. § 611(a). A noncitizen who violates this law faces both jail time and serious immigration consequences, including deportation, for any violation. *See* 8 U.S.C. § 1227(a)(6).

144.    Florida similarly prohibits noncitizen voting. Both its Constitution and its criminal laws prohibit voting by noncitizens. *See* Fla. Const. art. VI, § 2; Fla. Stat. § 104.155 ("Any person who is not a qualified elector because he or she is not a citizen of the United States and who willfully votes in any election is guilty of a felony of the third degree . . . ."). Violation of this law is punishable by up to five years' imprisonment. Fla. Stat. § 775.082(3)(e).

145.    Moreover, Florida has active and ongoing list maintenance procedures that attempt to identify any noncitizens who try to register. Indeed, shortly before HB 991 passed, Secretary Byrd boasted that Florida has "the cleanest voter rolls possible."

146.    The 2025 OECS report itself makes clear exactly how existing Florida administrative and legal procedures adequately safeguard Florida elections. OECS reported investigating (of Florida's 13.3 million voters) 835 potential noncitizens. Of those 835, more than *three quarters* have

35

been cleared of wrongdoing through OECS's own investigation. Far from justifying HB 991's DPOC requirement, this track record lays plain precisely why it is simply unnecessary. Florida is well-equipped to respond appropriately when there is evidence of noncitizens on Florida's voter rolls.

147.    The OECS report forecasts that HB 991's DPOC requirement—like those imposed in other states—will vastly overcorrect an issue that has *zero* measurable impact on Florida elections. OECS exhibited a more than *75% error rate* in identifying suspected noncitizen voters for further investigation. The State's track record in this regard bodes poorly for its ability to implement a DPOC requirement that is narrowly tailored to weeding out noncitizen voters.

148.    Indeed, HB 991's proponents often referred to Florida's system as the "gold standard on election integrity"—hardly the circumstances that would justify a sweeping and unprecedented law that will disenfranchise lawful voters.

149.    As multiple legislators who opposed the bill pointed out, it was difficult to understand how Florida's elections could simultaneously be the "gold standard" that HB 991's proponents claimed but also so "fragile" as to require this dramatic and unprecedented law.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of National Voter Registration Act of 1993**
**52 U.S.C. § 20504(c)(2)(B)(ii) (Section 5)**
**(Against Secretary of State Byrd and Executive Director Kerner)**

150.    FL NAACP Plaintiffs incorporate Paragraphs 1 through 149 as if set forth fully herein.

151.    Section 5 of the NVRA provides that voter registration applications offered at state motor vehicle authorities "may require only the minimum information necessary to . . . enable state election officials to assess the eligibility of the applicant." 52 U.S.C. § 20504(c)(2)(B)(ii).

152.    HB 991's requirement that voters produce documentary proof of citizenship to register to vote at the FL DMV violates Section 5 because proof of citizenship is not "necessary" to assess prospective voters' eligibility.

36

153. Consistent with the NVRA, prospective voters are already required under Florida law to attest that they are U.S. citizens and sign the attestation under penalty of perjury. *See* 52 U.S.C. § 20504(c)(2)(C); Fla. Stat. § 97.053(5)(a)(4).

154. Florida has not—and cannot—establish that the attestation requirement is inadequate to ensure that only citizens vote. *See Fish I*, 840 F.3d at 737, 739 (finding that Congress made the attestation requirement the "presumptive minimum amount of information necessary for a state to carry out its eligibility-assessment and registration duties," and that to rebut that presumption, a state would have to show that "a substantial number of noncitizens ha[d] successfully registered" despite that requirement).

155. Florida similarly has not—and cannot—overcome the presumption that attestation constitutes the minimum amount of information necessary for a state to carry out its eligibility assessment and registration duties and has not demonstrated that substantial numbers of noncitizens successfully registered to vote notwithstanding the already-existing attestation requirement.

156. Accordingly, HB 991's proof-of-citizenship requirement violates Section 5 of the NVRA because it requires more than the minimum amount of information necessary to assess the eligibility of applicants.

## COUNT II
### Violation of National Voter Registration Act of 1993
### 52 U.S.C. §§ 20505(a), 20508(b) (Section 9 – "Necessary to Assess" Provision)
### (Against Secretary of State Byrd)

157. FL NAACP Plaintiffs incorporate Paragraphs 1 through 149 as if set forth fully herein.

158. States may, under Section 6 of the NVRA, develop and use their own mail voter registration form. *See* 52 U.S.C. § 20505(a)(2).

159. But a state's voter registration form must still comply with Section 9 of the NVRA, which provides that the State Form may require only the information "necessary to enable the

appropriate State election official to assess the eligibility of the applicant." 52 U.S.C. § 20508(b)(1); *see also MFV*, 129 F.4th at 710 (citing 52 U.S.C. §§ 20505(a)(2)).

160. The meaning of "necessary" is "essential," so a requirement is not "necessary" where "attestation sufficiently confirms the eligibility of registered voters." *MFV*, 129 F.4th at 713 (citing 52 U.S.C. § 20508(b)(1) and collecting dictionary citations).

161. HB 991's proof-of-citizenship requirement violates 52 U.S.C. § 20508(b)(1) because additional proof of citizenship is not "necessary" to assess prospective voters' eligibility.

162. That proof of citizenship is not necessary under the NVRA is consistent with the NVRA's Conference Committee Report, which concluded that requiring such proof was "not necessary or consistent with the purposes of this Act." H.R. Rep. No. 103-66, 1993 WL 235764, at *23 (1993) (Conf. Rep.) (emphasis added); *cf. MFV*, 129 F.4th at 719 ("The ordinary meaning of 'necessary' is 'essential,' and the challenged requirement of [proof of citizenship] . . . is not 'essential' because the checkbox requirement already gives proof of citizenship.").

163. Neither Defendant Byrd, nor HB 991's proponents in the legislature, nor any other representative of Florida have offered any evidence that a proof-of-citizenship requirement above attestation is "necessary" to assess voting eligibility.

164. Neither Defendant Byrd nor any of HB 991's legislative proponents advanced evidence that attestation has been insufficient to ensure that only citizens can register to vote.

165. Any additional proof of citizenship required by HB 991 beyond attestation is not necessary for Florida to assess voter eligibility, and as such, HB 991 violates Section 6 of the NVRA.

**COUNT III**
**Violation of National Voter Registration Act of 1993**
**52 U.S.C. § 20505(a)(1) (Section 6 – "Accept and Use" Provision)**
**(Against Secretary of State Byrd)**

166. FL NAACP Plaintiffs incorporate Paragraphs 1 through 149 as if set forth fully herein.

38

167. Section 6 of the NVRA requires states to "accept and use" the federal mail voter registration form developed by the EAC. 52 U.S.C. § 20505(a)(1).

168. To comply with this directive, a state cannot "requir[e] a Federal Form applicant to submit information beyond that required by the form itself." *ITCA*, 570 U.S. at 20.

169. The Federal Form does not require applicants to attach or include any additional documentation with their application to register to vote.

170. To the extent HB 991 requires individuals registering to vote via the Federal Form to provide proof of citizenship as a condition on registration, that requirement is unlawful under Section 6 of the NVRA.

**COUNT IV**
**Violation of National Voter Registration Act of 1993**
**52 U.S.C. § 20506(a)(6)(A)(ii) (Section 7)**
**(Against Secretary of State Byrd)**

171. FL NAACP Plaintiffs incorporate Paragraphs 1 through 149 as if set forth fully herein.

172. Section 7 of the NVRA requires each state to designate agencies for the registration of voters in elections for federal office: (A) all offices in the state that provide public assistance; and (B) all offices in the state that provide state-funded programs primarily engaged in providing services to persons with disabilities. 52 U.S.C. § 20506(a)(1)–(2). The NVRA further requires states to designate additional voter registration agencies but allows them discretion in deciding which agencies to designate. *See id.* § 20506(a)(3); *see also* Fl. Stat. § 97.021 (defining "voter registration agency" as "any office that provides public assistance, any office that serves persons with disabilities, any center for independent living, or any public library").

173. These state agencies are designated under the NVRA as "voter registration agencies" and they must, among other things, distribute voter registration forms, assist people with completing

them, and accept the completed forms. 52 U.S.C. § 20506(a)(4)(A); *see also* 1 Fla. Admin. Code R. 1S-2.048.

174.    Public assistance offices in Florida that are required to provide voter registration services include, but are not limited to, the Supplemental Nutrition Assistance Program (SNAP), the Temporary Cash Assistance Program (TANF), Florida Kidcare, the Medicaid Program, the Special Supplemental Food Program for Women, Infants, and Children, and the Florida Department of Children and Families (DCF).  *See* 1 Fla. Admin. Code R. 1S-2.048(1)(a).

175.    Disability offices required to provide voter registration services include, but are not limited to, the Agency for Persons with Disabilities, any state-funded college or university that serves persons with disabilities, the Florida Department of Veterans' Affairs, the Florida Department of Children and Family Services, the Florida Department of Education's Division of Blind Services, and Florida's Division of Vocational Rehabilitation. 1 Fla. Admin. Code R. 1S-2.048(1)(b).

176.    Florida has further designated "[a]ny center for independent living as defined in Section 413.20, F.S.," "[a]ny public library," and "[a]ny armed forces recruitment office" to serve as voter registration agencies. 1 Fla. Admin. Code R. 1S-2.048(1)(c)-(e).

177.    The NVRA allows voter registration agencies to offer prospective voters either the Federal Form or the State Form, so long as the State Form is "equivalent" to the Federal Form. 52 U.S.C. § 20506(a)(6)(A)(ii).

178.    But HB 991 requires that each voter registration applicant—including those who apply at "voter registration agencies"—provide proof of citizenship along with any voter registration form.

179.    Any voter registration form offered at a voter registration agency that requires additional proof of citizenship is not "equivalent" to the Federal Form.

180. Any additional proof-of-citizenship requirement imposed by HB 991 on individuals applying at voter registration agencies thus violates Section 7 of the NVRA.

**COUNT V**
**Violation of National Voter Registration Act of 1993**
**52 U.S.C. § 20507(a)(1) (Section 8)**
**(Against Secretary of State Byrd and Supervisors of Elections)**

181. FL NAACP Plaintiffs incorporate Paragraphs 1 through 149 as if set forth fully herein.

182. Section 8 of the NVRA sets forth requirements that states must follow when administering voter registration for federal elections. It requires that states "ensure that any eligible applicant is registered to vote in an election" within a certain timeframe, depending on how they submitted their application. 52 U.S.C. § 20507(a)(1).

183. A registrant demonstrates their voting eligibility by submitting a registration form attesting to eligibility.

184. Under Section 8 of the NVRA, it is unlawful to deny registration to eligible applicants for failing to submit additional proof of citizenship beyond attestation. Additionally, while Section 8 allows states to remove *ineligible* voters from its rolls, it does not permit states to initiate removal proceedings based solely on the absence of any DPOC in existing databases.

185. Florida's failure to register eligible applicants for failing to submit additional proof of citizenship pursuant to HB 991 and removal of voters based on the lack of affirmative proof of citizenship violates Section 8 of the NVRA.

**COUNT VI**
**Undue Burden on the Right to Vote**
**U.S. Const. amends. I, XIV; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201–2202**

186. FL NAACP Plaintiffs incorporate Paragraphs 1 through 149 as if set forth fully herein.

41

187. The general "right to vote" is "implicit in our constitutional system." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 n.78 (1973). And courts afford special protections for this "precious" and "fundamental" right. *Harper v. Va. State Bd. Elections*, 383 U.S. 663, 670 (1966).

188. Under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, a court considering a challenge to a state election law must carefully balance the character and magnitude of the injury to First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). To do so, the court "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789. The court "must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*

189. Election practices imposing severe burdens on the right to vote "[must] be narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289 (1992).

190. But even less severe burdens remain subject to balancing: "[h]owever slight" the burden on voting rights may appear, "it must be justified by relevant and legitimate state interests '*sufficiently weighty to justify the limitation.*'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (plurality opinion) (emphasis added) (quoting *Norman*, 502 U.S. at 288–89). That is, "even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Democratic Exec. Comm. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019); *see also Eakin v. Adams Cnty. Bd. of Elections*, 149 F.4th 291, 306 (3d Cir. 2025) (noting that "[t]he relevant burden need not be severe" to trigger *Anderson-Burdick* balancing), *petitions for cert. pending sub nom Republican Nat'l Comm. v. Eakin*, No. 25-962, 25-

42

967 (U.S. Feb. 13, 2026). "The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." *Lee*, 915 F.3d at 1319. In all cases, the question is whether "the proffered State interests justify the burden the [restriction] imposes." *Eakin*, 149 F.4th at 314.

191.   A burden on the right to vote need not be insurmountable before it can be deemed a more-than-minimal burden. *See, e.g.*, *Perez-Guzman v. Gracia*, 346 F.3d 229, 241 (1st Cir. 2003). Rather, the risk that "legitimate[ly]" cast votes will be "rejected" due to "factors out of [the voter's] control" imposes a "serious burden on the right to vote." *Lee*, 915 F.3d at 1321; *see also Democratic Exec. Comm. v. Detzner*, 347 F. Supp. 3d 1017, 1030 (N.D. Fl. 2018) ("Disenfranchisement of approximately 5,000 voters based on a signature mismatch is a substantial burden.").

192.   Courts need not accept a state's justifications at face value, particularly where those justifications are "speculative," otherwise it "would convert *Anderson*[-]*Burdick*'s means-end fit framework into ordinary rational-basis review wherever the burden a challenged regulation imposes is less than severe." *Soltysik v. Padilla*, 910 F.3d 438, 448–49 (9th Cir. 2018) (citing *Pub. Integrity All. v. City of Tucson*, 836 F.3d 1019, 1024–25 (9th Cir. 2016) (en banc)).

193.   The DPOC requirement imposes at least a "serious," if not a severe, burden on prospective and existing Florida voters, up to and including full exclusion from the franchise if a voter is not able to provide sufficient DPOC in a timely fashion. *See Lee*, 915 F.3d at 1321. And even those who will be able to comply will endure significant expense, time, and resources to obtain the correct documentation and ensure it reaches their Supervisor of Elections in sufficient time to be registered or have their ballot counted.

194.   No state interest adequately justifies the DPOC requirement. Both federal law and Florida law adequately deter noncitizen voting, which is exceedingly rare in the first place. And rather than promote public confidence in Florida's elections and ensure election integrity, the DPOC requirement will make voting more difficult for eligible voters, result in disenfranchisement, and

diminish voter confidence in Florida's elections. It will also make it more difficult for elections administrators to successfully administer the State's elections.

195.   The DPOC requirement is not supported by any state interest sufficient to justify the resulting restrictions on the franchise, and it unduly burdens FL NAACP Plaintiffs' members' right to vote, as well as the rights of other Florida voters, in violation of the First and Fourteenth Amendments.

**COUNT VII**
**Disparate Treatment in Violation of the Right to Equal Protection**
**U.S. Const. amend. XIV; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201–2202**

196.   FL NAACP Plaintiffs incorporate Paragraphs 1 through 149 as if set forth fully herein.

197.   The Equal Protection Clause of the Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

198.   This constitutional provision requires "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Bush v. Gore*, 531 U.S. 98, 104–05 (2000) (per curiam) (holding Equal Protection Clause applies to "the manner of [the] exercise [of voting]" and "once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another").

199.   Under the NVRA, for those voters who complete and submit the Federal Form, Florida has the obligation to register voters and permit them to vote—for at least federal elections—even if those voters do not provide documentary proof of citizenship.

200.   Even if Florida could deny registration and eligibility to voters who do not provide adequate documentary proof of citizenship in their own *state elections*, *but see supra* Count I, it cannot arbitrarily treat its voters differently based solely on which voter registration form the voter happens to use. Those voters registering using the Federal Form whose citizenship is not

44

independently verified will be entitled to vote in federal elections, while the same voter presenting the same proof of eligibility but using a State Form will not be eligible to vote.

201.   These burdens and disparate treatment are not justified by any sufficient state interest and consequently violate the Equal Protection Clause.

**PRAYER FOR RELIEF**

**WHEREFORE**, FL NAACP Plaintiffs respectfully request that this Court enter judgment in their favor and:

a)   Declare that HB 991's proof-of-citizenship requirements violate the NVRA;

b)   Declare that HB 991's proof-of-citizenship requirements violate the First and Fourteenth Amendments to the U.S. Constitution;

c)   Permanently enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing HB 991's proof-of-citizenship requirements;

d)   Award FL NAACP Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and any other applicable laws; and

e)   Granting such other and further relief as the Court deems just and proper.

Dated: July 22, 2026

Respectfully submitted,

*/s/ Frederick S. Wermuth*
**FREDERICK S. WERMUTH**
FL. Bar No. 0184111
**QUINN B. RITTER**
FL Bar No. 1018135
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
25 East Pine Street
Orlando, FL 32801
Telephone: (407) 422-2472
fwermuth@kbzwlaw.com
qritter@kbzwlaw.com

45

**ABHA KHANNA\***
**WALKER McKUSICK\***
ELIAS LAW GROUP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
akhanna@elias.law
wmckusick@elias.law

**CHRISTINA FORD**
FL Bar No. 1011634
**NICOLE WITTSTEIN\***
ELIAS LAW GROUP
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
cford@elias.law
nwittstein@elias.law

*\* Admitted Pro Hac Vice*

*Attorneys for Plaintiffs Florida State Conference of
Branches and Youth Units of the NAACP and Florida
Alliance for Retired Americans*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of July, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*s/ Frederick S. Wermuth*
**FREDERICK S. WERMUTH**
Florida Bar No. 0184111
**QUINN B. RITTER**
FL Bar No. 1018135
**KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.**
25 E. Pine Street
Orlando, FL 32801
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com
qritter@kbzwlaw.com
courtfilings@kbzwlaw.com
agonzalez@kbzwlaw.com

46