**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 1:26-cv-22257-JB/Torres**

UNIDOSUS, et al.,

     *Plaintiffs*,

and

FLORIDA STATE CONFERENCE OF
BRANCHES AND YOUTH UNITS
OF THE NAACP, et al.,

     *Consolidated Plaintiffs*,

v.

CORD BYRD, in his official capacity as
Florida Secretary of State, et al.,

     *Defendants*.

_____/

### DEFENDANTS SECRETARY BYRD, EXECUTIVE DIRECTOR KERNER, AND DEPUTY SECRETARY WILLIAMS' MOTION TO DISMISS

Secretary of State Cord Byrd, Florida Department of Highway Safety and Motor Vehicles Executive Director Dave Kerner, and Florida Department of Children and Families Deputy Secretary Kathryn Williams—the State Officials—move to dismiss the claims in Unidos Plaintiffs' First Amended Complaint, Doc.89, and NAACP Plaintiffs' First Amended Complaint, Doc.90. As detailed in the incorporated memorandum of law, dismissal is appropriate and necessary under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

1

### *Introduction*

Plaintiffs challenge HB 991 based on a false premise. They say that HB 991 "conditions a voter's ability to register" "on the production of specified forms of" documentary proof of citizenship before registration. Doc.89 at ¶ 2 (Unidos); *see also* Doc.90 at ¶ 2 (NAACP). They repeatedly compare HB 991 to the law struck down in *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013)—a law that required officials to "reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship." *Id.* at 6. But that isn't what HB 991 does. The distinction proves dispositive of almost every claim in both complaints.

HB 991 leaves undisturbed the only citizenship requirement that Florida has long imposed on those registering to vote: a checked box, signed under penalty of law, attesting that the applicant is a U.S. citizen. Fla. Stat. § 97.053(5)(a)4. Nothing in HB 991 requires the applicant to attach a birth certificate, passport, or any other documentary proof of citizenship when registering to vote. Nothing in HB 991 stops a person from filling out the federal voter registration form. Nor does HB 991 allow election officials to reject a form—state or federal—for lack of documentary proof.

What HB 991 does is add a verification step *after* an applicant submits a completed form. Among other things, information on the form is checked through the Department of Highway Safety and Motor Vehicles' database. DHSMV's information is sent to the state's sixty-seven supervisors of elections. And only when there's credible and reliable information that someone isn't a citizen can the supervisor *initiate* the process to remove that person from the voter rolls—a long-established process that preserves the right to vote a provisional ballot and entitles a person to notice and an opportunity to present contrary evidence. Fla. Stat. §§ 97.053(6), 98.075(6)-(7).

Florida's Secretary of State—the state's chief election officer charged with "[o]btain[ing] and maintain[ing] uniformity in the interpretation and implementation of the election laws," Fla.

2

Stat. § 97.012(1)—confirmed this reading in a directive issued to all supervisors under Florida Statutes § 97.012(16). Directive 2026-03 states that "HB 991 does not prohibit registration" and that "[p]ursuant to federal and state law, Supervisors of Elections must register every applicant just as you always have." Directive 2026-03 at ¶¶ 2, 7. It further explains that "HB 991 does not condition registration on an applicant's submission of documentary proof of citizenship along with the voter registration application," but rather "operates post-registration, requiring Supervisors to notify the applicant of potential ineligibility, to allow provisional ballot voting until US citizenship is verified, and to perform removal proceedings (if applicable)." Directive 2026-03 at ¶ 3.

HB 991's burdens thus run to supervisors—who must check databases, send notices, and administer provisional ballots and removal hearings. Voters don't have to do anything differently when registering. Both complaints proceed as though the law says otherwise and imposes an Arizona-like pre-registration documentary requirement. *See, e.g.*, Doc.89 at ¶ 3 (alleging that "for any voter whose DHSMV records do not include acceptable [documentary proof of citizenship], the law requires them to produce acceptable DPOC before being allowed to vote"); Doc.90 at ¶ 2 (alleging that "HB 991 requires, for the first time, that prospective voters and existing Florida voters" "submit documentary 'proof' of their citizenship" "beyond the sworn statement").

Because almost every count in the complaints remains grounded in a false premise, the complaints fail to state a claim. They attack a regime that HB 991 doesn't create. And once HB 991's actual, post-registration architecture is considered, Plaintiffs' claims fail as a matter of law.

Separately, Unidos Plaintiffs' claim against Kathryn Williams, Florida Department of Children and Families Deputy Secretary, fails for lack of standing and Eleventh Amendment immunity. Pled generically "against all Defendants," Count Five of their complaint fails to state a claim against Ms. Williams; she doesn't enforce the relevant provisions. *See* Doc.89 at ¶¶ 265-68.

***Legal Standard***

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action" and "mere conclusory statements" will not do. *Id.* Nor must this Court accept as true conclusory allegations that specific words as used in the challenged text have a certain meaning when the text is available for the Court's review. *Id.* And, even at the motion to dismiss stage, this Court should consider the Secretary's directive implementing HB 991 through direction to the supervisors. That's because the directive is a public document issued consistent with the Secretary's statutory obligations and the document's authenticity isn't in dispute. *See, e.g.*, *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (allowing judicial notice of a public document filed with the Securities and Exchange Commission whose authenticity wasn't at issue); *Learning Connections, Inc. v. Kaufman, Englett & Lynd, PLLC*, No. 6:11-CV-00368, 2012 WL 13103015, at *6 (M.D. Fla. Jan. 18, 2012) ("[O]fficial documents from the Secretary of State possess the requisite level of reliability required for a court to take judicial notice." (quotation removed)).

***Background***

HB 991 is a comprehensive election reform bill. *See* Ch. 2026-26, Laws of Fla. Plaintiffs challenge only a subset of its provisions, namely those addressing citizenship verification and a provision concerning the types of approved voter identifications. *See generally* Doc.89 at ¶¶ 8-20; Doc.90 at ¶¶ 71-78. Relevant here are the following:

- The definition of "[d]ocument acceptable as evidence of United States citizenship" as (a) a birth certificate, (b) a passport, (c) a naturalization certificate, (d) a consular report of birth abroad, (e) a Florida driver license or Florida identification card that indicates citizenship, (f) a photo identification issued by the federal government or the state that indicates citizenship, or (g) a federal court order. HB 991 § 1, codified at Fla. Stat. § 97.021(10).

4

- The requirement that "[i]f the voter registration applicant's or the voter's legal name is different from the name that appears on the document," the applicant or voter must also supply "official legal documentation providing proof of legal name change." HB 991 § 1, codified at Fla. Stat. § 97.021(10).

- A checkbox on the state voter registration form where the applicant acknowledges that submitting false information is a third-degree felony, though the law previously said the form was being completed under penalty of perjury. HB 991 § 2, codified at Fla. Stat. § 97.052(2)(q); *see also* Fla. Stat. § 97.052(2)(q) (2025).

- Whether registering online, at DHSMV, or on paper, a requirement that citizenship automatically be checked through information available from the DHSMV. HB 991 § 3, codified at Fla. Stat. § 97.0525(4) (online registration); HB 991 § 4, codified at Fla. Stat. § 97.053(6) (paper registration).

- If citizenship is established, the requirement that "legal status as a United States citizen must be recorded in the statewide voter registration system." HB 991 § 3, codified at Fla. Stat. § 97.0525(4)(b) (online registration); HB 991 § 5, codified at Fla. Stat. § 97.057(11) (paper registrations "as required in s. 97.053" are checked against DHSMV database).

- If citizenship status can't be verified through information from DHSMV, the supervisors' obligation to verify citizenship "using available state and federal governmental sources." HB 991 § 4, codified at Fla. Stat. § 97.053(6)(b). And if the research is inconclusive, the supervisors' obligation to provide notice to applicants of what documents will verify their citizenship; the right of an applicant to request a hearing; and the right of an applicant to cast a provisional vote. HB 991 § 4, codified at Fla. Stat. § 97.053(6).

- The Department of State's obligation to "identify those registered voters who are potentially ineligible based on their legal status regarding United States citizenship by comparing or receiving information from other governmental entities." HB 991 § 8, codified at Fla. Stat. § 98.075(6)(a). Though receipt of such information does not itself trigger removal, the Department must "review and make an initial determination as to whether the information is credible and reliable," and notify supervisors of this information if it's credible and reliable so that the supervisors can initiate the notice and removal process. HB 991 § 8, codified at Fla. Stat. § 98.075(6)(a), (7)(a).

- The elimination of student identification cards from the list of accepted types of voter identification at the polls. HB 991 § 13, codified at Fla. Stat.

§ 101.043(1)(a). But Florida driver licenses, Florida identification cards, passports, passport cards, military identification cards, and other government-issued identifications can be used. HB 991 § 13, codified at Fla. Stat. § 101.043(1)(a). HB 991 also maintains the existing provisional ballot cure process, under which the voter may cast a provisional ballot and cure any identification deficiency by submitting an acceptable identification within two days after the election. Fla. Stat. § 101.048.

The Secretary of State, as the state's chief election officer charged with "[o]btain[ing] and maintain[ing] uniformity in the interpretation and implementation of the election laws," Fla. Stat. § 97.012(1), issued a directive to address any misunderstanding among the supervisors about HB 991, Fla. Stat. § 97.012(16) (allowing same). Directive 2026-03 states that "[s]pecifically, the misinformed Supervisors believe that HB 991 prohibits registration of applicants who have not been verified as United States citizens, and that this prohibition conflicts with federal law requiring their registration for federal elections." Directive 2026-03 at ¶ 2. "HB 991 does not prohibit registration," the directive makes plain. Directive 2026-03 at ¶ 2. Invoking *ITCA*'s holding that federal law requires a state "to register every applicant to vote in federal elections upon the applicant's submission of a complete application based solely on an affirmation, under penalty of law, that he or she satisfies all eligibility requirements," the directive confirms that "[t]he amendments made by HB 991 do not conflict with federal law." Directive 2026-03 at ¶ 3. "HB 991 does not condition registration on an applicant's submission of documentary proof of citizenship along with the voter registration application," but rather, "the law operates post-registration." Directive 2026-03 at ¶ 3.

Directive 2026-03 then instructs the supervisors that they "must register every applicant just as you always have." Directive 2026-03 at ¶ 7. Only *after* registration, if DHSMV information indicates the applicant's citizenship is unknown or in question, must the supervisor attempt verification, provide notice, ensure provisional ballot access, and, where non-citizenship is affirmatively indicated, initiate the pre-existing removal process. Directive 2026-03 at ¶ 7.

### *Argument*

In their complaints, Plaintiffs ignore the text of HB 991, the broader election code, and the Secretary's directive. They read HB 991 as requiring proof of citizenship *before* someone is registered to vote. Their National Voter Registration Act claims are grounded in this fundamental mistake. Like the NVRA claims, Plaintiffs' right-to-vote claims under the First and Fourteenth Amendments rely on this mistaken reading—they imagine an unjustified burden that tilts the balance against the State under *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). But considering the law as it actually works, the State easily satisfies the *Anderson-Burdick* test for the challenged provisions, including Unidos Plaintiffs' claim concerning the elimination of one form of voter identification accepted at the polls. NAACP Plaintiffs' standalone equal protection claim fares no better. And Unidos Plaintiffs' claim against Deputy Secretary Williams fails under *Jacobson v. Florida Secretary of State*, 974 F.3d 1236 (11th Cir. 2020), because they lack standing to sue her and the Eleventh Amendment otherwise bars the claim.

### I.      The NVRA claims fail as a matter of law.

Between the two complaints, Plaintiffs make several NVRA claims. Like claims are grouped together below. Every one of those claims fails as a matter of law.

#### A.      Accept-and-Use Claims (Unidos' Count Three & NAACP's Count III)

Section 6(a) of the NVRA requires that a state "accept and use" the federal voter registration form created by the U.S. Election Assistance Commission. 52 U.S.C. § 20505(a)(1). The Supreme Court has said that states cannot "requir[e] a Federal Form applicant to submit information beyond that required by the form itself." *ITCA*, 570 U.S. at 20. Both complaints allege that HB 991's citizenship verification provisions violate the statute and *ITCA* because Florida will no

longer accept a completed federal form as sufficient for a person to register. *See* Doc.89 at ¶¶ 254-59; Doc.90 at ¶¶ 166-70. But that simply isn't true.

HB 991's citizenship verification provisions say nothing about rejecting a voter registration form. The federal form will continue being accepted. Only *after* a form—federal or state—is submitted are HB 991's provisions triggered and, as Plaintiffs themselves acknowledge, "the check may be invisible" for voters when proof of citizenship has already been submitted to DHSMV. Doc.89 at ¶ 3. These individuals don't need to do anything more to confirm their citizenship, regardless of how they registered to vote; their "legal status as a United States citizen must be recorded in the statewide voter registration system." HB 991 § 3, codified at Fla. Stat. § 97.0525(4)(b) (online registrations checked against DHSMV database); HB 991 § 5, codified at Fla. Stat. § 97.057(11) (paper registrations checked against DHSMV database). This includes, for example, every individual who has provided documentary proof of citizenship to DHSMV under the REAL ID Act, which Florida began implementing in 2010.

Florida's system is thus unlike Arizona's system struck down in *ITCA*. As the Supreme Court explained, "Arizona law require[d] voter-registration officials to 'reject' any application for registration, including a Federal Form, that [wa]s not *accompanied by* concrete evidence of citizenship." 570 U.S. at 5 (emphasis added). What's more, *ITCA* rejected the position that the NVRA's accept-and-use requirement means that everyone who uses the federal form must be allowed to cast a vote: "The NVRA clearly contemplates that not every submitted Federal Form will result in registration." *Id.* at 15. The Supreme Court further warned that "it would raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications." *Id.* at 17.

The Eleventh Circuit similarly observed that "[t]he [NVRA] simply requires that valid registration forms delivered by mail and postmarked in time be processed." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005). There's nothing in the Eleventh Circuit's NVRA cases that prohibits post-registration verification and removal of ineligible voters.

And, as noted above, Florida accepts all registration forms, federal and state. Individuals are removed for being non-citizens through a separate, pre-existing notice-and-hearing process. In this way, Florida's post-registration removal regime is like the one upheld in *Virginia Coalition for Immigrant Rights v. Beals*, where the district court dismissed an accept-and-use challenge because "Plaintiffs d[id] not allege that Defendants' program prevented individuals from properly registering to vote in the first instance." 803 F. Supp. 3d 454, 477 (E.D. Va. 2025). After reviewing *ITCA*, the district court reasoned that it wasn't enough to "allege that Defendants' program removes voters from the voter rolls at some indeterminate point after registering." *Id.* Plaintiffs had to show a refusal to accept the federal form. The plaintiffs in *Virginia Coalition* failed to do that. Plaintiffs here have likewise failed to allege an accept-and-use claim—they've failed to show that HB 991 precludes the state's elections officials from accepting and using the federal form.

### B.      Necessary Information Claims (NAACP's Counts I and II)

NAACP Plaintiffs' minimum information claims fail for the same reason. Whether offered at motor vehicle authorities under Section 5, as a state form under Sections 6 and 9, or at voter registration agencies under Section 7, registration forms may require only the "minimum amount of information necessary" to assess an applicant's eligibility. 52 U.S.C. §§ 20504(c)(2)(B)(ii), 20505(a)(2), 20506(a)(6)(A)(ii), 20508(b)(1). Plaintiffs allege that HB 991 violates the minimum information requirement because the pre-existing citizenship attestation already "sufficiently

confirms the eligibility of registered voters." Doc.90 at ¶ 43. But that argument still confuses information required on a form with post-registration verification.

The "information" these provisions of the NVRA regulate is the information required on a form as a condition of completing that form. HB 991 doesn't add a documentary requirement to any registration form—federal or state—whether offered through a motor vehicle agency or some other voter registration agency. The only textual change that HB 991 makes to the state voter registration form is the addition of a felony-acknowledgment checkbox, one that mirrors what the NVRA already requires on the federal form. *Compare* 52 U.S.C. § 20508(b)(2) (requiring eligibility-related attestation under "penalty of perjury"), *with* HB 991 § 2, codified at Fla. Stat. § 97.052(2)(q) (requiring "[a]cknowledgment, by providing a box for the applicant to check, that it is a third degree felony under state and federal law to falsely swear or affirm" about eligibility). Because HB 991 doesn't impose an ex-ante documentary-proof condition for registration, it's unlike the regimes in cases like *Mi Familia Vota v. Fontes*, 129 F.4th 691, 704-05 (9th Cir. 2025), and *Fish v. Kobach*, 840 F.3d 710, 717 (10th Cir. 2016). Plaintiffs can't plead otherwise.

### C.      Eligible Voter Registration Claim (NAACP's Count V)

Nor can NAACP Plaintiffs state a claim under Section 8(a)(1) of the NVRA, Doc.90 at ¶¶ 181-85, which provides that "[i]n the administration of voter registration for elections for Federal office, each state shall" "ensure that any eligible applicant is registered to vote in an election" within specified timeframes, 52 U.S.C. § 20507(a)(1). HB 991 requires supervisors to register every completed, attested application—the very requirement that Section 8(a)(1) imposes—and it leaves unresolved citizenship questions for an individualized, post-registration process.

That individualized process requires election officials to act only on credible and reliable information, entitles every person to notice and a hearing, and allows every person to cast a

provisional ballot. It's the same process that Florida uses for other eligibility issues like residency or felony status. It's also the same process that's been tested and approved by the courts for those other eligibility issues—and Plaintiffs fail to plausibly allege that this process now violates the NVRA. *See, e.g.*, *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1168-69 (11th Cir. 2008) (rejecting argument that Florida's list verification requirements conflict with registration mandates under the Help America Vote Act); *Fla. State Conf. of the NAACP v. Browning*, 569 F. Supp. 2d 1237, 1257 (N.D. Fla. 2008) ("[t]he impact of non-verification" "is equal as to all applicants," who "validate their numbers in the same way").

### D.    Distribution Claims (Unidos' Count Five & NAACP's Count IV)

Section 7 of the NVRA requires states to designate voter registration agencies. 52 U.S.C. § 20506(a)(1)-(3). Those agencies, such as DCF, must distribute and accept voter registration applications and assist applicants in completing the form. 52 U.S.C. § 20506(a)(4)(A). They must distribute the federal form or a state equivalent. 52 U.S.C. § 20506(a)(6)(A). But Plaintiffs claim that HB 991 violates Section 7 because Florida's voter registration agencies are unable to distribute the federal form or an equivalent without documentary proof of citizenship. That's wrong.

Plaintiffs' allegations again rest on the same false premise. Nothing in HB 991 adds documentary proof of citizenship as a condition precedent to registration through the federal form or Florida's own form. Agencies such as DCF thus make these forms available to applicants and assist as needed. As a matter of Florida law, they play no role in verification.

The form itself is the responsibility of the Florida Department of State. It creates the form, prints the form, and distributes the form to other agencies such as DCF that have been designated as voter registration agencies. Fla. Stat. § 97.052(1)(b). That same form is available to third-party voter registration organizations under Florida law. Fla. Stat. § 97.0575(3).

11

And the State's form meets the NVRA's equivalency requirement. On the issue of citizenship, the form, like its federal counterpart, requires a signed attestation that the applicant meets the eligibility requirements. *Compare* 52 U.S.C. § 20508(b)(2), *with* Fla. Stat. § 97.052(2)(s). There's no documentary proof requirement. Plaintiffs' claim to the contrary thus fails.

### E.     Organized Voter Registration Programs Claim (Unidos' Count Four)

The Section 6(b) claim fails, too. That provision simply requires the Secretary to make the federal form or its state equivalent available for distribution through government and private entities, including those registered as third-party voter registration organizations. 52 U.S.C. § 20505(b). The state form—which is the equivalent of the federal form—remains available. Fla. Stat. § 97.0575(3); *see also* Fla. Stat. § 97.052(1)(b)2. There's no allegation in the complaint to the contrary. Count Four is premised on Unidos Plaintiffs' misapprehension that HB 991 requires it to collect and make copies of proof of citizenship at the time of registration. Doc.89 at ¶ 263. As explained above, HB 991 operates only after registration, so this claim fails as a matter of law.

### F.     No Opt-Out Claim (Unidos' Count Two)

Unidos Plaintiffs also allege that HB 991 violates Section 5(d) of the NVRA. That provision provides that "[a]ny change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of change of address for voter registration" "unless the registrant states on the form that the change of address is not for voter registration purposes." 52 U.S.C. § 20504(d). Here, Plaintiffs' mistake lies in reading snippets of HB 991 in isolation and ignoring relevant cross references.

It's true that HB 991 directs DHSMV to "furnish weekly" "[i]nformation identifying a change in residence address on the Florida driver license or Florida identification card of any person who declined pursuant to s. 97.057(2) to register or update his or her voter record." HB 991

12

§ 9, codified at Fla. Stat. § 98.093(8)(d). And it's true that the Secretary "must report each such change in residence address to the appropriate supervisor, who must change the voter's registration records in accordance with s. 98.065(4)." HB 991 § 9, codified at Fla. Stat. § 98.093(8)(d).

That cross reference matters. Section 98.065 is the State's existing list-maintenance process. It specifically states that the "general registration list maintenance program" conducted by supervisors must be "in compliance with" "the National Voter Registration Act." Fla. Stat. § 98.065(1). The process provides follow-up correspondence so the voter can confirm or correct the record; it doesn't convert a DHSMV address update into an irrevocable voter registration change. And the NVRA itself requires states to make a reasonable effort to remove names of voters who changed residence. 52 U.S.C. § 20507(a)(4); *see also Bellitto v. Snipes*, 935 F.3d 1192, 1210 (11th Cir. 2019) ("The National Voter Registration Act requires the states (and as delegated by Florida, the counties) to employ a general program of list maintenance that makes a reasonable effort to remove voters who become ineligible because of death or change of address.").

In ignoring the cross references within HB 991, Plaintiffs get the issue wrong. They allege that Florida law fails to allow opt-out when, in fact, it does.

### G.      Uniformity and Nondiscrimination Claim (Unidos' Count Six(A))

Nor does HB 991 violate Section 8(b)(1)'s requirement that "[a]ny State program or activity" related to voter roll maintenance "be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." 52 U.S.C. § 20507(b)(1). Florida imposes the same requirements for everyone when it comes to list maintenance. Fla. Stat. §§ 98.065(1), 98.075(1). The verification requirements apply regardless of whether someone uses the federal or state form. There aren't any distinctions based on race, sex, age, or birthplace. And "[t]he impact of non-verification" applies "equal[ly] as to all applicants" under the law. *Browning*, 569 F. Supp. 2d at 1257. Florida's regime

then isn't like the one in *Mi Familia Vota*, where Arizona singled out certain voters when an official had "reason to believe" that they weren't citizens. 129 F.4th at 714-15.

Allegations about possible database errors or voter-specific burdens don't change the analysis. On its face, read together with other provisions of Florida law, HB 991 requires credible and reliable information, notice, an opportunity to be heard, a chance to cast a provisional ballot, and a chance to correct errors. No group is targeted or more scrutinized. Plaintiffs' uniformity and nondiscrimination claim should therefore be dismissed.

### H.    90-Day Systematic List Maintenance Claim (Unidos' Count Six(B))

Section 8(c)(2)(A) of the NVRA provides that "[a] State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to *systematically* remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A) (emphasis added). The Eleventh Circuit's decision in *Arcia v. Florida Secretary of State*, 772 F.3d 1335 (11th Cir. 2014), clarifies what this provision prohibits and what it does not. It explains that the 90-day quiet period reaches systematic removals; removals based on individualized determinations may proceed at any time. *Id.* at 1344-48. Or, using the Eleventh Circuit's words, a program is "systematic" for purposes of the NVRA where it "d[oes] not rely upon individualized information or investigation to determine which names from the voter registry to remove" but instead "use[s] a mass computerized data-matching process to compare the voter rolls with other state and federal databases." *Id.* at 1344.

HB 991 doesn't allow for systematic mass removal. Citizenship is verified for each individual application, whether it's a new registration or an update to an existing one, based on credible and reliable information such as data from DHSMV. HB 991 §§ 3-5, codified at Fla. Stat. §§ 97.0525(4)(c), 97.053(6), 97.057(11). In the case of a previously registered voter, only after an

14

initial assessment by the Department of State is the registration sent to the relevant supervisor of elections for further action. HB 991 § 8, codified at Fla. Stat. § 98.075(6)(a). In all cases, the supervisor must notify the voter, allow the voter to respond, hold a hearing when requested, and make an individualized and final determination before removal. HB 991 § 8, codified at Fla. Stat. § 98.075(7)(a). An erroneously removed name can be restored even within 90 days of an election. Fla. Stat. § 98.081(2). This individualized process requires supervisors to make use of all available state and federal sources to verify citizenship—there's no mass, automatic removal that violates Section 8(c)(2)(A) or runs afoul of the Eleventh Circuit's decision in *Arcia*. *See* HB 991 § 4, codified at Fla. Stat. § 97.053(6)(b); Directive 2026-03 at ¶¶ 5, 7. It stands in contrast to a program that "involves little more than comparing [database] lists against the voter rolls." *Va. Coal.*, 803 F. Supp. 3d at 473. So this NVRA claim, like all the others, should be dismissed.

**II.     Plaintiffs' undue burden claims under the First and Fourteenth Amendments fail (Unidos' Counts One and Seven & NAACP's Count VI).**

Plaintiffs present three undue burden claims. Unidos Plaintiffs' Count One and NAACP Plaintiffs' Count VI overlap and are discussed together; they concern the citizenship verification provisions. Unidos Plaintiffs' Count Seven concerns the elimination of one kind of identification as acceptable at the polls. The *Anderson-Burdick* balancing test applies to all three counts.

**A.     *Anderson-Burdick* is a flexible test and not a one-way ratchet.**

HB 991's provisions satisfy *Anderson-Burdick* balancing. This is a "flexible standard" that assesses the effect of a regulation on the right to vote. *Burdick*, 504 U.S. at 434. The "level of scrutiny" applied to an election law "depends on the severity of the burdens" imposed by the law. *Indep. Party of Fla. v. Sec'y, State of Fla.*, 967 F.3d 1277, 1281 (11th Cir. 2020). A law that imposes a "[s]evere" burden on voting "must be narrowly tailored to advance a compelling state interest," while a "reasonable, nondiscriminatory" law need only be justified by an important governmental

interest. *Id.* Mere "inconvenience[s]" can't tilt the balance. *Brnovich v. DNC*, 594 U.S. 647, 669 n.11 (2021). After all, every election law imposes a burden of some kind:

> Voting takes time and, for almost everyone, some travel, even if only to a nearby mailbox. Casting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules.… [V]oting necessarily requires some effort and compliance with some rules, [and voters] must tolerate the "usual burdens of voting."

*Id.* at 669 (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008) (plurality opinion)). "Voters must" "take reasonable steps and exert some effort to ensure" "that their ballots are submitted on time." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020).

*Anderson-Burdick* also doesn't operate as a "one-way ratchet," forever prohibiting states from modifying laws "in a way that might arguably burden some segment of the voting population's right to vote." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016). To the contrary, cognizable burdens under *Anderson-Burdick* must "represent a significant increase over the usual burdens of voting." *Curling v. Raffensperger*, 50 F.4th 1114, 1123 (11th Cir. 2022) (quoting *Crawford*, 553 U.S. at 198). They must pose a significant "risk of disenfranchisement," for example. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019).

A few other principles for assessing burdens: The alleged burdens can't be based on the "unique set of circumstances" of "specific voters." *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 716 F. Supp. 3d 1236, 1243 (N.D. Fla. 2024); *see also Crawford*, 553 U.S. at 202-03. Nor can they depend on an isolated reading of provisions in the election code—the whole code is considered. *See, e.g.*, *Brnovich*, 594 U.S. at 678-80. That's what the Eleventh Circuit held in *New Georgia Project* when concluding that Georgia's absentee-ballot deadline did "not implicate the right to vote at all," given that "Georgia has provided numerous avenues to mitigate chances that voters will be unable to cast their ballots." 976 F.3d at 1281.

And few more principles for assessing the State's interests: Post-hoc rationalizations are allowed. *See Mays v. LaRose*, 951 F.3d 775, 789 (6th Cir. 2020). The State also doesn't need to produce specific evidence that the election-related problem has already occurred before acting. The Supreme Court and Eleventh Circuit give states broad latitude to act prophylactically because the need to maintain confidence in elections justifies preventive measures before an incident occurs. *See, e.g.*, *Brnovich*, 594 U.S. at 672, 677; *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006); *Crawford*, 553 U.S. at 194-96; *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 925 (11th Cir. 2023). As the Eleventh Circuit put it, the *Anderson-Burdick* test "does not require any evidentiary showing or burden of proof to be satisfied by the state government." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009) (citing *Anderson*, 460 U.S. at 796).

### B. The citizenship verification provisions don't impose undue burdens (Unidos' Count One & NAACP's Count VI).

HB 991's citizenship verification provisions easily pass the *Anderson-Burdick* test. As an initial matter, and as discussed above, Plaintiffs' theory begins with a faulty description of HB 991. Plaintiffs assume there's a burden on the right to vote because they say HB 991 requires documentary proof of citizenship when someone registers to vote. It doesn't. No documentary proof is required for the federal form, which remains available to everyone, or the state form, which requires only an attestation concerning citizenship. Florida's election code and Directive 2026-03 instruct supervisors to register every applicant. Only if citizenship status is unknown or questioned, based on credible and reliable information, must an official verify the status based on an individualized determination. An individual notice followed by an individual hearing precedes the individualized determination. The right to cast a provisional ballot is also preserved. *See* Fla. Stat. §§ 97.053(6), 98.075(6)-(7); Directive 2026-03 at ¶¶ 3, 5, 7.

17

Even if *some* voters must later respond to a notice or provide evidence establishing their citizenship status, that's not an impermissible burden. These are "reasonable steps" that require voters to "exert some effort to ensure that their ballots are submitted on time." *New Ga. Project*, 976 F.3d at 1282. They aren't actionable burdens under *Anderson-Burdick*.

On the other side of the balance, Florida's interests in the citizenship verification provisions are weighty. No evidence is needed to conclude that the State has a compelling interest in enforcing the citizenship qualification for all voters, maintaining accurate voter rolls, and protecting the integrity and reliability of its elections. Indeed, the NVRA itself requires accurate voters rolls. HB 991 furthers those weighty and compelling interests through a thoughtful and careful process—through database checks, credible-and-reliable review, notice, an opportunity to respond and request a hearing, and access to provisional ballots.

As a matter of law, therefore, the undue burden claims under the First and Fourteenth Amendments must fail. The *Anderson-Burdick* balance tilts decidedly in the State's favor; the State's side is weighty while Plaintiffs' side is bare.

### C.     The student identification provision imposes no undue burden (Unidos' Count Seven).

Unidos Plaintiffs also take issue with HB 991's removal of student identification from the list of acceptable identification at voter polls. HB 991 § 13, codified at Fla. Stat. § 101.043(1)(a). They fail to note other identification removed by HB 991: debit and credit cards, retirement center identification, neighborhood association identification, and public assistance identification. They also fail to note the many other forms of government-issued identification that are accepted, such as a Florida driver license, Florida identification card, passport or passport card, military identification, and VA identification. And they ignore that those without an approved identification at the polls can still vote a provisional ballot. That ballot counts so long as the signature on it matches

18

the one on file, Fla. Stat. § 101.048(2)(b), and, if it doesn't, the person can still provide a valid identification within two days of the election, Fla. Stat. § 101.048(6)(a)-(d).

Plaintiffs' theory of an undue burden rests on an attenuated chain. That chain starts with a student who doesn't have an acceptable government-issued identification—no driver license for an eighteen-year-old, for example. That student also doesn't have the ability to get one of the many forms of acceptable identification for some reason. The student then chooses not to vote a provisional ballot. Or if the student votes a provisional ballot, their signature doesn't match *and* they're unwilling to provide a valid identification as a cure within two days of the election. As pled, these are the kind of mere inconveniences—the usual and expected exertions—associated with voting. They're not the kind of burdens that run afoul of the First and Fourteenth Amendments and *Anderson-Burdick* balancing. *See Crawford*, 553 U.S. at 198; *New Ga. Project*, 976 F.3d at 1282.

On the other hand, the State has a substantial interest in confirming a voter's identity and protecting the integrity and reliability of the electoral process through an identification requirement. *See Crawford*, 553 U.S. at 191-97. It follows that the State has a substantial interest in ensuring that the identification comes from trusted sources—sources that bear the imprimatur of "the Federal Government, the state, a county, or a municipality." HB 991 § 13, codified at Fla. Stat. § 101.043(1)(a). Identifications issued by schools aren't always government identification because many schools, like neighborhood associations or credit card companies, are private. Creating a carveout for public schools isn't best. Such a rule would mean, for example, that identifications issued by the University of Florida (a public school) would be allowed but not those issued by the University of Miami (a private school).

Finally, because *Anderson-Burdick* doesn't operate as a "one-way ratchet," *Ohio Democratic Party*, 834 F.3d at 635, the State can change its preferences for acceptable forms of

identification. That's what it did here. It did so through a change that applies evenhandedly to all voters and leaves other identification and cure options available. Unidos Plaintiffs' Count Seven should therefore be dismissed.

### III. The standalone equal protection clause claim fails (NAACP's Count VII).

NAACP Plaintiffs also bring a standalone equal protection claim. The Eleventh Circuit has applied *Anderson-Burdick* balancing to election-related cases rather than the traditional equal protection test. *See, e.g.*, *Jones v. Governor of Fla.*, 15 F.4th 1062, 1065-67 (11th Cir. 2021) (discussing Eleventh Circuit cases). And, as discussed above, Plaintiffs fail *Anderson-Burdick*. They fail the traditional equal protection test, too—one that requires Plaintiffs to plead discriminatory intent and discriminatory effect. *See, e.g.*, *Washington v. Davis*, 426 U.S. 229, 239-41 (1976). More specifically, Plaintiffs must plead that government officials "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Plaintiffs face two problems under the traditional equal protection framework.

First, their premise is faulty. NAACP Plaintiffs' theory is that HB 991 treats federal form registrants more favorably than state form registrants because, in their view, federal form applicants can vote in federal elections without documentary proof of citizenship while state form applicants cannot. *See* Doc.90 at ¶¶ 199-201. As discussed above, however, this claim stems from the same notion that HB 991 requires documentary proof when registering. It doesn't. The election code and the Secretary's implementation of that code make clear that HB 991 imposes a post-registration regime—a "check" to borrow from Unidos Plaintiffs. Doc.89 at ¶ 3. This post-registration process for verification applies equally to everyone regardless of whether they use the federal form or the state form. *See, e.g.*, *Browning*, 569 F. Supp. 2d at 1257 (explaining that "[t]he

impact of non-verification, moreover, is equal as to all applicants, regardless of whether the applicant provided a driver's license number or the last four digits of his Social Security number" because "[a]ll unverified applicants validate their numbers in the same way: by presenting their card or sending a copy to local election officials").

Second, even if Plaintiffs are right, they simply can't plead a traditional equal protection claim. The adversely affected group in Plaintiffs' complaint is state form registrants. Set aside for a moment that this isn't a suspect classification subject to some heightened protection. Plaintiffs can't point to anything that suggests that the State intentionally discriminated against this group when enacting HB 991. Effect without intent isn't enough for a traditional equal protection claim. *See Feeney*, 442 U.S. at 279; *Davis*, 426 U.S. at 239-41.

### IV.   Plaintiffs can't sue Deputy Secretary Williams—they lack standing and can't get past the Eleventh Amendment (Unidos' Count Five).

Separately, Unidos Plaintiffs lack standing to sue DCF Deputy Secretary Williams. Nor can they get past Eleventh Amendment immunity.

#### A.   Plaintiffs lack standing to sue Deputy Secretary Williams.

Article III standing requires Plaintiffs to establish (1) an "injury in fact" that is (2) "fairly traceable to the challenged action of the defendant" and (3) "likely, as opposed to merely speculative, [to] be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotations, omission, and alteration removed). Plaintiffs must satisfy each element separately as to each defendant and each claim. That's because "[s]tanding is not dispensed in gross." *Davis v. FEC*, 554 U.S. 724, 734 (2008).

Unidos Plaintiffs name Deputy Secretary Williams "in her official capacity as the DCF's current highest-ranking executive" because "[t]he DCF is responsible for administering public benefit programs, including programs that have responsibilities under Section 7 of the NVRA to

provide the federal voter registration form, or its equivalent, to prospective registered voters." Doc.89 at ¶ 95. In Count Five, Unidos Plaintiffs allege a violation of NVRA Section 7 generically "against all Defendants," the only count that includes Deputy Secretary Williams. Doc.89 at ¶ 265.

Even if Plaintiffs' scant allegations plead an injury from HB 991, Plaintiffs still can't satisfy the traceability and redressability requirements. Plaintiffs' allegations confirm that neither Deputy Secretary Williams nor DCF plays a role in creating, administering, or enforcing HB 991's citizenship verification regime. Deputy Secretary Williams and DCF don't define what counts as documentary proof of citizenship, HB 991 § 1, codified at Fla. Stat. § 97.021(10); they don't operate the online voter registration system or compare applicant information against DHSMV records, HB 991 § 3, codified at Fla. Stat. § 97.0525(4); they don't verify any applicant's citizenship, notify any applicant of potential ineligibility, or administer provisional ballots, HB 991 § 4, codified at Fla. Stat. § 97.053(6); and they don't identify potentially ineligible registered voters or remove anyone from the rolls, HB 991 § 8, codified at Fla. Stat. § 98.075(6)-(7). Their only connection to this case is DCF's pre-existing—and unchanged—obligation to make Florida's voter registration application available to public-assistance applicants. Doc.89 at ¶ 95.

The Eleventh Circuit's decision in *Jacobson* forecloses standing on these facts. In *Jacobson*, the court said that the plaintiffs lacked standing to sue the Secretary of State over a statute that dictated the order of candidates on the ballot because the supervisors, and not the Secretary, were responsible for printing the ballots. 974 F.3d at 1254-56. Relief would've also required an injunction to run against the supervisors and not the Secretary. *Id.* The Secretary's general supervisory authority wasn't enough to establish standing. *Id.*

*Jacobson*'s reasoning applies with greater force to the facts here. Neither Deputy Secretary Williams nor DCF has any supervisory authority. They design nothing. They administer nothing.

They verify nothing. And an injunction directed at Deputy Secretary Williams and DCF wouldn't alter any forms or procedures. Deputy Secretary Williams should therefore be dismissed.

### B.  Deputy Secretary Williams isn't the right *Ex parte Young* defendant.

The Eleventh Amendment problem parallels the standing problem. The *Ex parte Young* exception to Eleventh Amendment immunity permits prospective relief against a state official only when the official has the necessary connection to the enforcement of the challenged law. *Ex parte Young*, 209 U.S. 123, 157 (1908). As noted above, neither Deputy Secretary Williams nor DCF enforces HB 991. DCF hands out forms. That's it. And that isn't enough to make Deputy Secretary Williams a defendant in this case. A necessary connection is more than a general duty to follow state law. *See, e.g.*, *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1203-04 (11th Cir. 2021); *Women's Emergency Network v. Bush*, 323 F.3d 937, 949-50 (11th Cir. 2003).

### *Conclusion*

For the foregoing reasons, this Court should dismiss both complaints. The complaints rest on a version of HB 991 that doesn't exist; perceived burdens that are minimal at most; claims of unequal treatment that don't follow from HB 991; and a claim against the DCF Deputy Secretary that can't get past Article III standing or Eleventh Amendment immunity.

Respectfully submitted,

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Martin C. Wolk (FBN 1065532)
HOLTZMAN VOGEL BARAN TORCHINSKY &
JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, FL 32301
(850) 270-5938
mjazil@holtzmanvogel.com
mwolk@holtzmanvogel.com
kgordon@holtzmanvogel.com

*Counsel for Florida Secretary of State,*
*Florida Department of Highway Safety and Mo-*
*tor Vehicles Executive Director, and*
*Florida Department of Children and Families*
*Deputy Secretary*

Dated: August 12, 2026

Ashley E. Davis (FBN 48032)
  General Counsel
Bilal A. Faruqui (FBN 15212)
  Deputy General Counsel
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 South Bronough Street
Tallahassee, FL 32399
(850) 245-6531
ashley.davis@dos.fl.gov
bilal.faruqui@dos.fl.gov
jenna.mclanahan@dos.fl.gov

*Counsel for Florida Secretary of State*

24

## LOCAL RULE 7.1(c) CERTIFICATION

The undersigned certifies that, pursuant to the Court's Order Granting Motion to Exceed Page Limit, Doc.115, the foregoing does not exceed thirty pages.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## CERTIFICATE OF SERVICE

I certify that on August 12, 2026, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

25