**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 1:26-cv-22257-JB/Torres**

FLORIDA STATE CONFERENCE OF BRANCHES AND YOUTH UNITS OF THE NAACP and FLORIDA ALLIANCE FOR RETIRED AMERICANS,

*Plaintiffs*,

v.

CORD BYRD, in his official capacity as Secretary of State of Florida, *et al.*,

*Defendants*.

**FLORIDA NAACP PLAINTIFFS' OPPOSITION TO STATE DEFENDANTS' MOTION TO DISMISS**

Plaintiffs Florida State Conference of Branches and Youth Units of the NAACP and the Florida Alliance for Retired Americans ("FL NAACP Plaintiffs") file this opposition to the State Defendants' (collectively, "the Secretary") Motion to Dismiss. *See* ECF No. 120 ("Mot.").

**INTRODUCTION**

The FL NAACP Plaintiffs' amended complaint sets forth the many ways Florida House Bill 991 ("HB 991") violates the National Voter Registration Act ("NVRA"), a law Congress enacted "to promote the exercise of" the "fundamental right" to vote. 52 U.S.C. §§ 20501(a)(1), (2); *see also* ECF No. 90 ¶¶ 150–185 ("Am. Compl."). The Secretary's motion to dismiss does not contest the substance of Plaintiffs' NVRA claims. Instead, he insists that HB 991 sidesteps the NVRA entirely by enacting a "post-registration" verification process that does not otherwise impede registration—even though an applicant cannot cast a ballot that will count until they comply with this new prerequisite. Mot. 3. In other words, the Secretary asks this Court to believe the fiction that HB 991 complies with the NVRA because it permits an applicant to be "registered"—just not able to vote.

The Court should not indulge the Secretary's make-believe: HB 991 indisputably adds new requirements to Florida's registration process as a matter of state and federal law. Under HB 991, a voter registration application is not "complete" until the voter satisfies the law's new citizenship verification process. Fla. Stat. § 97.053(2). The Secretary's motion conspicuously avoids this provision—declining to cite it even once—while doubling down on his *post hoc* effort to reshape the plain meaning of the statute.

Federal courts consistently reject the sort of gamesmanship the Secretary ventures here, and rightly so. The NVRA's protections would be a dead letter if states could nominally "register" an applicant only to forbid them from actually voting. Accordingly, "the labels that state law places on individuals are not binding for purposes of the NVRA." *U.S. Student Ass'n Found. v. Land*, 546 F.3d

373, 383 (6th Cir. 2008). Instead, "a person becomes a 'registrant,' for the purposes of the NVRA, from the first moment that he or she is actually able to go to the polls and cast a regular ballot." *Id*. Under HB 991, that moment is *after* an applicant satisfies the law's new proof of citizenship rules. Fla. Stat. § 97.053(6)(a). The Secretary cannot evade the NVRA's strictures through word-games that label an applicant as "registered" but then forbids them from voting.

Once the Secretary's legal shell game is set aside, little is left to his motion. He does not offer a *single* other argument against the FL NAACP Plaintiffs' NVRA claims, each of which is plausibly stated. Nor does the Secretary offer a sufficient basis for dismissing Plaintiffs' undue burden claim, which requires the Court to engage in a fact-intensive analysis about the burdens imposed by HB 991, weighed against the state's purported interests. This legal test does not lend itself to resolving such claims at the pleading stage, where it is "impossible" for reviewing courts "to undertake . . . [the] proper review." *Duke v. Cleland*, 5 F.3d 1399, 1405 (11th Cir. 1993). For that reason, courts in the Eleventh Circuit and elsewhere rarely, if ever, dismiss such claims prior to discovery. And in view of the amended complaint's well-pled allegations regarding the burdens imposed by HB 991, the Secretary falls well short of showing that this is the rare instance where Plaintiffs' undue burden claim can be dismissed as a matter of law.

## BACKGROUND

### I. The NVRA restricts adding unnecessary burdens to the voter registration process.

The NVRA requires states to provide simplified, voter-friendly systems for registering to vote. In enacting the NVRA, Congress aimed to increase access to the franchise by establishing "procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and "enhance[] the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. §20501(b)(1)-(2). Several NVRA requirements are relevant here.

Section 9 of the NVRA directs the U.S. Election Assistance Commission to "develop a mail voter registration application form for elections for Federal office" in consultation with state election officials. 52 U.S.C. § 20508(a)(2) ("Federal Form"). The Federal Form "may require *only* such identifying information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id*. § 20508(b)(1) (emphasis added). This includes a sworn voter attestation that "specifies each eligibility requirement (including citizenship)" and requires the applicant to attest, under penalty of perjury, "that the applicant meets each such requirement." *Id*. § 20508(b)(2); *see also id.* § 20508(b)(3), (4). The Federal Form does not—and never has—required applicants to submit documentary "proof" of citizenship alongside the voter attestation.

The NVRA further prevents states from imposing registration requirements that are more burdensome than those on the Federal Form. Section 6 requires states to "accept and use" the Federal Form for voter registration by mail. *Id*. § 20505(a)(1). Thus, a state cannot "requir[e] a Federal Form applicant to submit information beyond that required by the form itself." *Arizona v. Inter Tribal Council of Ariz., Inc.* ("*ITCA*"), 570 U.S. 1, 20 (2013). States may develop their own registration forms ("State Form"), but those too can "require only such identifying information . . . and other information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration." 52 U.S.C. § 20508(b)(1).

The NVRA also requires states to offer voter registration forms to citizens (1) when they apply for (or apply to renew) a driver's license or other identification document at a state motor vehicle authority, and (2) at certain offices the state designates as "voter registration agencies," including those that provide public assistance and disability services. *Id.* §§ 20504, 20506. Voter registration applications offered at state motor vehicle authorities "may require only the minimum

amount of information necessary to . . . enable State election officials to assess the eligibility of the applicant." *Id*. § 20504(c)(2)(B). And if state voter registration agencies offer any form other than the Federal Form, it must be "equivalent" to the Federal Form. *Id.* § 20506(a)(6)(A)(ii).

## II. HB 991 makes sweeping changes to Florida's voter registration process.

Governor DeSantis signed HB 991 into law in April 2026. *See* Am. Compl. ¶¶ 1, 71. Under HB 991, when a Floridian registers to vote or updates their existing registration, the registration system will attempt to verify their citizenship status using Department of Highway Safety and Motor Vehicle ("DHSMV") records. Fla. Stat. § 97.0525(4). If the system cannot do so "at registration," then the applicant's Supervisor of Elections will be notified, and they must verify the applicant's legal status "using available state and federal governmental sources." Fla. Stat. § 97.053(6)(b). If the Supervisor cannot verify the applicant's citizenship status, the applicant will not be allowed to cast a regular ballot. Instead, unverified applicants may only cast a provisional ballot that will not count unless and until they can provide documentary proof of citizenship ("DPOC"). *Id.* § 97.053(6)(a).

HB 991 makes clear that an applicant—whether registering for the first time or updating their existing registration—is only truly "registered" once they have their citizenship verified to the law's specification, including by providing DPOC when necessary. "A voter registration application is complete and becomes the official voter registration record of that applicant when all information necessary to establish the applicant's eligibility . . . is received by a voter registration official and verified pursuant to subsection (6)." Fla. Stat. § 97.053(2). Under subsection 6, "if the records of the [DHSMV] indicate that the applicant is not a United States citizen or has not provided a document acceptable as evidence of United States citizenship," the applicant "must provide a document acceptable as evidence of United States citizenship." *Id.* § 97.053(6)(a). Only "[i]f the applicant provides the necessary evidence" may "the supervisor . . . place the applicant's name on the

registration rolls as an active voter." *Id.* If they try to vote, "the applicant must be provided a provisional ballot" only, which will be counted only if they can supply qualifying DPOC within two days of casting their provisional ballot. *Id.*

Both the Governor and the Legislature well understood that HB 991 adds new requirements for registering to vote. Governor DeSantis's press release announced that HB 991 "[r]equires verification of U.S. citizenship data . . . for new and updated voter registrations."[1] And at the bill's signing ceremony, he forthrightly explained that HB 991 "protects and expands integrity in our voter registration process by requiring the verification of US citizenship when you're doing your voter registration."[2] HB 991's primary sponsor in the House likewise explained it "requires citizenship verification at the time of voter registration."[3] Another legislator stated that "we are going to significantly change the way Floridians register and maintain their vote status."[4] One of HB 991's sponsors in the Senate explained that the bill uses "DHSMV's REAL ID data to verify citizenship of voter registration applicants,"[5] and that "registration time is when [applicants] would be required to provide proof of citizenship."[6] And another legislator explained that, under HB 991, "[w]hen you register to vote, that's when you prove that you're a citizen."[7]

---

[1] Press Release, Exec. Off. of the Gov., *Governor Ron DeSantis Signs Florida SAVE Act To Strengthen Election Integrity and Security* (Apr. 1, 2026), https://perma.cc/HF2S-MPJ9.

[2] Apr. 1, 2026, Governor Ron DeSantis Signing of HB 991, 00:18:05, https://thefloridachannel.org/videos/4-1-26-signing-of-hb-991-elections/.

[3] Feb. 25, 2026, Fla. H.R. Sess., 05:35:28, https://flhouse.gov/VideoPlayer.aspx?eventID=11166.

[4] Feb. 25, 2026, *supra* note 3, at 07:04:10.

[5] Mar. 11, 2026, Fla. S. Sess., 00:46:05, https://www.flsenate.gov/media/VideoPlayer/6288.

[6] *Id.* at 01:43:15.

[7] *Id*. at 01:16:38; *see also* Mar. 12, 2026, Fla. H.R. Sess., 04:37:09 (House sponsor indicating HB 991 provides a "process to verify citizenship of voter registration applicants.") https://www.flhouse.gov/VideoPlayer.aspx?eventID=11252.

### III. The FL NAACP Plaintiffs allege that HB 991 violates the NVRA, as well as the First and Fourteenth Amendments to the U.S. Constitution.

On July 22, 2026, the FL NAACP Plaintiffs filed their amended complaint. The pleading sets out seven claims. Counts I through V allege that HB 991 conflicts with Sections 5 through 9 of the NVRA. *See* Am. Compl. ¶¶ 150–185. Count VI alleges that HB 991 places an undue burden on the right to vote in violation of the First and Fourteenth Amendments. *See id.* ¶¶ 186–195; *see also id.* ¶¶ 79–149. Finally, Count VII alleges that HB 991 disparately treats applicants depending on whether they apply to vote using the Federal Form or Florida's state form. *See id.* ¶¶ 196–201.

### IV. The Secretary attempts to recast HB 991 to avoid obvious conflicts with the NVRA.

In late July, Secretary Byrd issued a directive to Supervisors of Election, advising them on the implementation of HB 991. *See* ECF 120-1 ("Directive"). The Directive acknowledges that the NVRA places meaningful limitations on state voter registration laws and specifically requires states to "register every applicant to vote in federal election" upon the submission of a "complete application based solely on an affirmation, under penalty of law," of eligibility—including as to citizenship. Directive ¶ 3 (citing *ITCA*, 570 U.S. 1 (2013)). But it then chastises certain "misinformed Supervisors" for believing that HB 991 prohibits registration. *Id.* ¶ 2. Instead, the Directive attempts to recast the law as a mere check that "operates post-registration," *id.* ¶ 3; *but see* HB 991, Fla. Stat. § 97.053(2) (statutory text stating that voter registration application is "complete and becomes the official voter registration record of that applicant" only after citizenship is verified). The Directive acknowledges that an "applicant" who lacks proof of citizenship "receives a provisional ballot if the applicant presents himself or herself to vote," Directive ¶ 5.

On August 12, the Secretary moved to dismiss. His motion rests largely on the Directive's fictitious notion that HB 991 does not prohibit registration and therefore does not run afoul of the NVRA. *See* Mot. 7–15. It further asks the Court to dismiss FL NAACP Plaintiffs' constitutional

claims, notwithstanding their fact-intensive nature. *See id.* at 15–20.

## LEGAL STANDARD

A complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified). "The plausibility standard is not akin to a 'probability requirement.'" *Id.* Plaintiffs need only allege enough factual content to "raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court must "accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019).

## ARGUMENT

### I. The FL NAACP Plaintiffs have stated claims under the NVRA.

The Secretary's motion does not dispute the substance of Plaintiffs' NVRA claims. Instead, it vainly attempts to recast HB 991 as merely supplying a "post-registration process for verification," Mot. 20, rather than a new requirement for registering to vote. That effort runs headlong into HB 991's plain text and NVRA case law. Simply put, the Secretary cannot mislabel his way out of the NVRA's requirements, dooming his lodestar argument against Plaintiffs' NVRA claims. *See id.*

#### A. HB 991 imposes new registration requirements, and the Secretary cannot simply define his way around the NVRA's protection.

##### 1. The plain text of HB 991 confirms that a voter registration application is not "complete" without proof of citizenship.

The plain text of HB 991 is what governs its meaning—not the Secretary's *post hoc* effort to recast it. *See Ham v. Portfolio Recovery Assocs., LLC*, 308 So. 3d 942, 946 (Fla. 2020) ("[T]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012)); Fla. Const., Art. V, § 21 ("In interpreting a state statute or rule, a state

court . . . may not defer to an administrative agency's interpretation of such statute or rule, and must instead interpret such statute or rule de novo."). Thus, applying Florida's statutory interpretation rules, federal courts have previously rejected the Secretary's argument that his administrative guidance can change the meaning of plain text. *See Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd*, 680 F. Supp. 3d 1291, 1302 (N.D. Fla. 2023) (rejecting Secretary's request to "regulate away any constitutional concerns" in challenged law given Florida Constitution's requirement that agencies receive no deference in construing state statutes (citing Fla. Const., Art. V, § 21)).

Florida law, as amended by HB 991, makes clear that a voter registration application "is complete and becomes the official voter registration record of that applicant" only "when all information necessary to establish the applicant's eligibility pursuant to s. 97.041 is received by a voter registration official *and verified pursuant to subsection (6)*." Fla. Stat. § 97.053(2) (emphasis added). Subsection 6, in turn, requires citizenship verification either through DHSMV records, a Supervisor's search through a state or federal database, *or* "the applicant['s]" provision of "the necessary evidence," namely "a document acceptable as evidence of United States Citizenship." Fla. Stat. § 97.053(6)(a). Only once that part of the application process is complete must a Supervisor "place the applicant's name on the registration rolls as an active voter." *Id.* If the would-be voter fails to supply necessary DPOC at that juncture, HB 991 continues to treat them as a mere "applicant" who has not yet completed the registration process and may not cast a ballot that will be counted. *Id*. Remarkably, the Secretary's motion never once cites § 97.053(2), even though that provision defines when a voter registration application is "complete." Fla. Stat. § 97.053(2).

HB 991 contains yet further textual proof that it imposes a new registration requirement. Under HB 991, Floridians are only "place[d] . . . on the registration rolls as an active voter" upon

proof of citizenship. Fla. Stat. § 97.053(6)(a). HB 991 repeatedly ties the new citizenship verification requirements to the submission of a voter registration application. *See, e.g.*, Fla. Stat. § 97.053(6)(b) (explaining that notices sent to voters to "verify [their] legal status as a United States citizen" are sent "[u]pon receipt of a voter registration application"). And the bill's own title explains that it "requir[es] an applicant to provide certain evidence to the supervisor of elections to prove the applicant's legal status[.]" HB 991, Title. Even the Secretary unwittingly acknowledges that prospective voters under HB 991 are deemed *applicants* absent proof of citizenship. *See, e.g.*, Mot. 5 (citing Fla. Stat. § 97.053(6)) (explaining supervisors must notify "applicants of what documents will verify their citizenship; the right of an applicant to request a hearing; and the right of an applicant to cast a provisional vote"). Florida's post-registration rules, by contrast, consistently refer to "registered voters" or "electors." *See, e.g.*, Fla. Stat. §§ 98.075, 98.093(1) (providing procedures for identifying "registered voters" who should be removed from the "voter registration system"); *id.* § 97.071(1) ("A voter information card must be furnished by the supervisor to all registered voters residing in the supervisor's county."); *id.* § 97.1031(1)(a) (requiring "elector[s]" to notify supervisors of change of address); *id.* § 97.021 (defining "'Elector' [as] synonymous with the word 'voter' or 'qualified elector or voter'"); *see also id.* § 97.0585(1)(c) (requiring confidentiality of personal information of both "voter registration applicant[s]" and "voter[s]"). In short, the Secretary's attempt to repackage an obvious registration requirement as something divorced from the registration process is belied by the very statute he seeks to defend.

**2. Courts consistently reject similar efforts to evade the NVRA.**

Even if HB 991 could fairly be characterized as a "post-registration requirement" under Florida law, the NVRA does not countenance laws that nominally "register" voters without allowing them to vote. Congress adopted the NVRA's protections to facilitate voting—not as a meaningless

technical exercise. Congress memorialized this goal in the Act's text, noting the NVRA "establish[es] procedures that will increase the number of eligible citizens who register *to vote in*" federal elections. 52 U.S.C. § 20501(b)(1) (emphasis added). The same provision makes clear that registration is not an end unto itself, but rather meant to "enhance[] the participation of eligible citizens *as voters* in elections for Federal office." *Id.* § 20501(b)(2) (emphasis added).

Federal courts have therefore rejected attempts by states to define their way out the NVRA's protections by imposing "post-registration" requirements on applications that indisputably would violate the NVRA if included directly on a registration form. For example, the Ninth Circuit held that Arizona could not limit *how* certain registrants could vote based on whether they supplied DPOC when registering. *See Mi Familia Vota v. Fontes ("MFV")*, 129 F.4th 691, 710–11 (9th Cir. 2025). Were it otherwise, a state could nominally "register" an applicant to comply with the NVRA but then make it functionally impossible or extremely difficult for them to cast a ballot that would count. *Id.* "Such a narrow view of the NVRA's purpose is contrary to the text of the NVRA which declares the right 'to vote' is a fundamental right and establishes purposes beyond registration." *Id.* at 711 (citing 52 U.S.C. § 20501). The Ninth Circuit thus rejected the argument that the NVRA "regulate[s] only 'registration' in isolation from the rest of the voting process[.]" *Id*. In other words, a state cannot defeat the NVRA's purpose—to promote the right to vote—simply by moving a burdensome registration requirement to the ballot-casting phase of the voting process. *See id*. That is exactly what Florida has done here by endeavoring to relabel a voting-eligibility requirement—proof of citizenship—as a post-registration prerequisite to voting. As *MFV* makes clear, the NVRA does not tolerate such shell games.[8]

[8] The Secretary attempts to distinguish *MFV* but misstates the facts. He claims that case involved "an

The Sixth Circuit applied similar logic in *Land*. In that case, Michigan cancelled the registration of any applicant whose voter ID was returned as undeliverable in the mail. *See* 546 F.3d at 376. Michigan defended the practice by claiming that an applicant did not become a "registrant" under the NVRA until they received their voter ID, meaning such applicants were not entitled to the NVRA's protections against premature removal. *Id.* at 382. The Sixth Circuit rejected Michigan's effort to contort the term "registrant" to evade the NVRA. *Id.* at 382–86. As it explained, "the labels that state law places on individuals are not binding for purposes of the NVRA," *id.* at 384, as any other rule would "permit[] states to decide when they will be bound by the [NVRA's] requirements." *Id.* at 382 (quoting *U.S. Student Ass'n Found. v. Land*, 585 F. Supp. 2d 925, 938 (E.D. Mich. 2008)).

The same logic holds here. Florida cannot simply label applicants as registered voters solely to assert technical compliance with the NVRA, only to turn around and require *more* application material from those same individuals when they seek to cast a ballot. The NVRA forbids treating a voter as "registered" if they "will not be permitted to cast regular ballots if they appear at the polls on election day." *Land*, 585 F. Supp. 2d at 929. Instead, "a person becomes a 'registrant,' for the purposes of the NVRA, from the first moment that he or she is actually able to go to the polls and cast a regular ballot." *Land*, 546 F.3d at 383. HB 991 flunks that functional test, as applicants *cannot* cast a "regular ballot" if they fail to provide proof of citizenship during the application process. Fla. Stat. § 97.053(6). They are therefore in no way "registered," as the Secretary pretends.

The Secretary cannot cite anything that supports his tunneled view of the NVRA. He is wrong to claim that *ITCA* gave a green light to so-called post-registration requirements like those in HB

---

ex-ante documentary-proof condition for registration." Mot. 10. That is wrong. The Ninth Circuit enjoined a requirement that *registered* voters provide DPOC to cast a ballot by mail—the most common method of voting in Arizona. *MFV*, 129 F.4th at 710–11. In other words, the voters in *MFV* had been nominally permitted to "register" without DPOC—and were permitted to vote in person—but had their ability to cast a regular mail ballot restricted due to their inability to supply DPOC. *Id.*

991. *ITCA* held unlawful an Arizona statute requiring a Federal Form application to be "accompanied" by DPOC. 570 U.S. at 5. In doing so, it did not bless simply moving the same requirement to the back end of the registration process; to the contrary, it made clear states must accept the Federal Form "*as sufficient* for the requirement it is meant to satisfy," namely to be "registered *to vote in an election*." *Id.* at 10–11 (quoting 52 U.S.C. § 20505(a)(1)) (emphasis added). According to the Secretary, under HB 991, Florida law no longer treats the Federal Form as "complete and sufficient" to register to vote in an election. *Id.* at 9. It now expressly treats such forms as *in*complete absent proof of citizenship—precisely what *ITCA* proscribed. *See supra* Argument § I.A.1.

The Secretary highlights that *ITCA* recognized that not all Federal Form applications will successfully result in registration. Mot. 8 (citing *ITCA*, 570 U.S. at 15). That is merely because *ITCA* acknowledged the undisputed point that the NVRA "does not preclude States from denying registration based on information *in their possession* establishing the applicant's ineligibility." *ITCA*, 570 U.S. at 15 (citation modified). Nothing in *ITCA* can be read to approve the scheme HB 991 creates here, which conditions *every* "registered" voter's ability to cast a ballot on providing information the NVRA indisputably prohibits Florida from requiring alongside a registration form in the first instance.

The Secretary's reliance on *Virginia Coalition for Immigrant Rights v. Beals* is likewise misplaced. Mot. 9 (citing 803 F. Supp. 3d 454 (E.D. Va. 2025)). The order challenged in that case directed Virginia's elections commission to administer a list-maintenance program to identify registered voters with "inconsistent DMV records" and to then require those voters to provide DPOC to remain registered. *Va. Coal. for Imm. Rights*, 803 F. Supp. 3d at 461. But the Governor's one-off order did not otherwise "interfere[] with the registration process." *Id.* at 477. Accordingly, the

plaintiffs in *Beals* could "not allege that Defendants' program prevented individuals from properly registering to vote in the first instance." *Id*. Indeed, they could not even "allege facts demonstrating how Defendants' program is part of the registration process." *Id.* That is plainly not true here, as the FL NAACP Plaintiffs have plausibly alleged that HB 991 *does* interfere with Florida's registration process by requiring *every* new applicant, as well as *every* applicant seeking to update an existing registration, to satisfy the law's proof of citizenship requirement before casting a regular ballot. *See, e.g.*, Am. Compl. ¶¶ 71–78, 150–185; *see also* Fla. Stat. § 97.0525(4). Those allegations plausibly state that HB 991 causes many applicants to never be truly "registered" in the first place since they cannot "go to the polls and cast a regular ballot," *Land*, 546 F.3d at 383.[9]

### B. The Secretary fails to otherwise dispute the substance of the FL NAACP Plaintiffs' NVRA claims.

The Secretary offers no basis for dismissing the FL NAACP Plaintiffs' NVRA claims beyond his request that the Court indulge his make-believe argument that HB 991 does not impose registration requirements. Thus, once the Secretary's attempt to circumvent the law is set aside, there appears to be little dispute that the FL NAACP Plaintiffs have plausibly stated valid NVRA claims.

***Count I (NVRA Section 5).*** Under Section 5, states must treat any driver's license application as a voter registration application, and in so doing, state motor vehicle authorities "may require only the minimum amount of information necessary to . . . enable state election officials to assess the eligibility of the applicant." 52 U.S.C. § 20504(c)(2)(B)(ii). The Federal Form's requirements establish the "presumptive minimum amount of information necessary for a state to carry out its eligibility-assessment and registration duties." *Fish v. Kobach* ("*Fish I*"), 840 F.3d 710, 737–38 (10th

[9] The order in *Beals* also only impacted individuals with "inconsistent" citizenship records, 803 F. Supp. 3d at 461, whereas HB 991 subjects applicants to a DPOC requirement based solely on the *absence* of affirmative evidence of citizenship in their DHSMV records.

Cir. 2016). To rebut that presumption and show that DPOC is "necessary" to verify eligibility, a state must establish that "a substantial number of noncitizens ha[d] successfully registered" despite the attestation requirement. *Id.* at 739 (citation omitted). The Secretary does not dispute that the FL NAACP Plaintiffs have plausibly alleged that the State will not be able to overcome that presumption. *See* Am. Compl. ¶¶ 70, 124–34, 150–56. Accordingly, Count I states a valid claim.

***Count II (NVRA Section 9).*** Section 6 of the NVRA permits states to develop and use their own mail voter registration form, *see* 52 U.S.C. § 20505(a)(2), but under Section 9, such a form may demand only the information "necessary to enable" the Supervisors "to assess the eligibility of the applicant." 52 U.S.C. § 20508(b)(1). A DPOC requirement is not "necessary" where "attestation sufficiently confirms the eligibility of registered voters." *MFV*, 129 F.4th at 713 (citing 52 U.S.C. § 20508(b)(1) and collecting dictionary citations). Plaintiffs plausibly allege that additional proof of citizenship is not "necessary" to assess eligibility where the citizenship attestation has sufficed to ensure the eligibility of 99.999% of Florida's registered voters. *See* Am. Compl. ¶ 133; *see also id.* ¶¶ 157–165 (Count II). Indeed, Congress itself determined when it enacted the NVRA that a DPOC requirement is "not necessary or consistent with the purposes of this Act." H.R. Rep. No. 103-66, 1993 WL 235764, at *23 (1993) (Conf. Rep.). Thus, Count II also states a valid claim.

***Count III (NVRA Section 6).*** Section 6 of the NVRA requires states to "accept and use" the Federal Form. 52 U.S.C. § 20505(a)(1). To comply with this directive, a state cannot "requir[e] a Federal Form applicant to submit information beyond that required by the form itself." *ITCA*, 570 U.S. at 20. "[A] state-imposed requirement of evidence of citizenship not required by the Federal Form is 'inconsistent with' the NVRA's mandate that States 'accept and use' the Federal Form." *Id.* at 15. By requiring certain Federal Form applicants in Florida to present DPOC to complete their registration and to effectively cast a regular ballot, HB 991 violates Section 6's directive to "accept"

and "use" the Federal Form. *See* Am. Compl. ¶¶ 166–170 (Count III). The Secretary's Directive *concedes* the NVRA requires acceptance of the Federal Form, Directive ¶ 3, but resists Count III solely on the fictional notion that Florida does "accept" Federal Forms, even as it refuses to "use" them in registering applicants as active voters, *id.* Count III states a plausible legal claim.

***Count IV (NVRA Section 7).*** For the same reason, HB 991 also violates Section 7's mandate that state registration agencies distribute either the Federal Form or another form that is "equivalent" to the Federal Form. 52 U.S.C. § 20506(a)(6)(A)(ii). To comply with this provision, any voter registration application available at voter registration agencies must be "virtually identical" to the Federal Form. *MFV*, 129 F.4th at 713. Any application at a voter registration agency that requires providing DPOC to be properly registered is not "virtually identical" to the Federal Form. *See id.* (holding that a documentary proof of residence requirement violated Section 7 for the same reason). Count IV therefore states a plausible claim too. Am. Compl. ¶¶ 171–180 (Count IV).

***Count V (Section 8).*** Finally, because a voter whose citizenship cannot be verified through government databases is not a properly "registered" voter until they provide DPOC, HB 991 violates Section 8's requirement to ensure the timely registration of eligible voters who submit NVRA-compliant voter registration applications. *See* Am. Compl. ¶¶ 182–185 (Count V). This final NVRA count is thus well-stated too.

## II. The Secretary fails to show that Count VI can be dismissed as a matter of law.

The Secretary agrees that Count VI—which asserts that HB 991 imposes an unconstitutional burden on the right to vote—is governed by the *Anderson-Burdick* framework. *See* Mot. 15. That framework requires a court "to weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burdens imposed by the rule, taking into consideration the extent to which those justifications require the burden to

plaintiffs' rights." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). That standard "requires courts to conduct fact-intensive analyses," *Gill v. Scholz*, 962 F.3d 360, 365 (7th Cir. 2020), and for that reason courts within this Circuit rarely, if ever, dismiss such claims at the pleading stage. *E.g.*, *Fla. State Conf. of NAACP v. Lee*, 566 F. Supp. 3d 1262, 1286 (N.D. Fla. 2021) ("Because the *Anderson-Burdick* test 'emphasizes the relevance of context and specific circumstances,' it is particularly difficult to apply at the motion to dismiss stage.") (quoting *Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1346 (11th Cir. 2020)); *League of Women Voters of Fla., Inc. v. Lee*, 566 F. Supp. 3d 1238, 1258 (N.D. Fla. 2021) (explaining *Anderson-Burdick* "is particularly difficult to apply at the motion to dismiss" and denying dismissal motion); *Black Voters Matter Fund v. Raffensperger*, 478 F. Supp. 3d 1278, 1324 (N.D. Ga. 2020) (similar); *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1278 (N.D. Ga. 2021) (similar). Indeed, the Eleventh Circuit has cautioned that dismissal of an *Anderson-Burdick* claim at the pleading stage often "makes it impossible" for a reviewing court "to undertake the proper review required by the Supreme Court." *Duke*, 5 F.3d at 1405 (reversing dismissal of *Anderson-Burdick* claim). Asking the Court to resolve the *Anderson-Burdick* analysis prior to discovery asks it do so "blindfolded and stuck holding empty scales." *Fla. State Conf. of NAACP*, 566 F. Supp. 3d at 1286 (citation omitted).

The Secretary falls far short of establishing that this is the rare case where an *Anderson-Burdick* claim can be disposed of as a matter of law. The amended complaint sets forth detailed allegations regarding the burdens imposed by HB 991's requirements, including obtaining DPOC. *See* Am. Compl. ¶¶ 88–95. The Secretary does not grapple with these allegations whatsoever, effectively conceding the amended complaint "alleges facts which, if true, tend to support" an undue burden claim. *Cruz v. Melecio*, 204 F.3d 14, 22 (1st Cir. 2000) (reversing dismissal of *Anderson-Burdick* claim where well-pled facts alleged an undue burden). Moreover, many of those allegations

concern the burdens experienced by voters in other states that enacted DPOC laws, which in turn led to court rulings against such laws. *See* Am. Compl. ¶¶ 49–63. It is hard to fathom how dismissal could be appropriate at this phase when other courts have held similar DPOC requirements to be burdensome and unlawful. *See, e.g.*, *Fish I*, 840 F.3d at 719; *N.H. Youth Movement v. Scanlan*, 833 F. Supp. 3d 93, 134 (D.N.H. 2026); *cf. Red Wine & Blue v. LaRose*, Case No. 1:25-cv-1760, ECF No. 57 at 30–38 (N.D. Ohio Aug. 25, 2026) (concluding plaintiff organizations and their members suffered injury from DPOC requirement). Indeed, the New Hampshire court specifically declined to dismiss a similar *Anderson-Burdick* claim challenging a DPOC law given the fact-dependent nature of such a claim. *See Coal. for Open Democracy v. Scanlan*, 794 F. Supp. 3d 28, 49 (D.N.H. 2025). The Secretary ignores this precedent, even as it illustrates how FL NAACP Plaintiffs have plausibly alleged an undue burden claim here.

The only arguments the Secretary advances as to Plaintiffs' alleged burden are twofold. *First*, he notes that even voters subject to HB 991's DPOC requirement can still submit a provisional ballot. Mot. 17. But that argument is circular—that provisional ballot will not count unless the voter submits DPOC within two days after the election. *See* Fla. Stat. § 101.048. Accordingly, the Secretary's argument runs headlong into the very burden the FL NAACP Plaintiffs allege. *See* Am. Compl. ¶¶ 79–123. *Second*, he notes that only "*some* voters" will have to produce DPOC under HB 991. Mot. 18. But he cites no authority for the proposition that an *Anderson-Burdick* claim requires pleading that *all*—or even *most* voters—will be burdened. Eleventh Circuit precedent cuts the other way. *See Democratic Exec. Comm. of Fla.*, 915 F.3d at 1321 (finding a serious burden on the right to vote based on signature matching rule that disqualified 4,000 ballots out of nine million cast (citing *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014)); *see also Fish v. Schwab*, 957 F.3d 1105, 1127 (10th Cir. 2020) (affirming rule that DPOC law

unconstitutionally burdened the right to vote even though it did not burden all voters). Moreover, Justice Stevens' controlling plurality opinion in *Crawford* construed *Anderson-Burdick* to reach claims concerning burdens placed on a subset of the electorate. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (plurality op.).[10]

Finally, the Secretary claims he can establish an adequate state interest, even with "[n]o evidence." Mot. 18. Whether the Secretary wishes to introduce evidence on that score is his choice, but he is dead wrong to suggest an *Anderson-Burdick* claim can be defeated at the pleading stage by merely invoking any state interest. *See Soltysik v. Padilla*, 910 F.3d 438, 448–49 (9th Cir. 2018) (rejecting argument that merely stating an interest can "justify *any* regulation that burdens" voting rights "*as a matter of law*" (emphases in original)); *see also Eakin v. Adams Cnty. Bd. of Elections*, 149 F.4th 291, 316 (3d Cir. 2025) (finding a law "must reasonably further" an otherwise "legitimate interest" for the court "to weigh it"), *petitions for cert. pending sub nom RNC v. Eakin*, No. 25-962, 25-967 (U.S. Feb. 13, 2026). In fact, courts routinely rely upon the evidentiary record to determine what weight to afford a purported state interest. *See, e.g.*, *Fish*, 957 F.3d at 1132 (discounting proffered interest where Secretary "point[ed] to no concrete evidence" to support it); *Obama for Am. v. Husted*, 697 F.3d 423, 433 (6th Cir. 2012) (similar); *N.H. Youth Movement*, 833 F. Supp. 3d at 142–43 (similar). And contrary to the Secretary's assertion (at 17), the Eleventh Circuit has, if anything, cast doubt on reliance on *post hoc* rationalizations. *Cf. League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905 (11th Cir. 2023) (crediting a state interest because it was "by no means a 'post-hoc litigation position'" and found record support). Indeed, *Anderson-Burdick*

[10] Indeed, the only case the Secretary cites on this score—*New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020)—concerned a preliminary injunction appeal and therefore did not address pleading burdens. Moreover, that case concerned materially different facts—a generally applicable absentee ballot receipt deadline, rather than a law imposing an evidentiary burden on voters to establish their citizenship with documents they may lack or be unable to afford. *Id.*

would be a pointless standard if a state could always defeat claims at the pleading stage by merely imagining a state interest after-the-fact. *Cf. Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (courts must "determine the legitimacy and strength" of proffered state interests). Even if the Secretary is permitted to invoke state interests in the abstract, the Court still must consider them against the well-pled facts. *See* Am. Compl. ¶¶ 124–149 (describing mismatch between HB 991 and state's purported interests, including by noting that Florida's own statistics show at most 0.001 percent of registered voters *might* be noncitizens). Accordingly, the Court cannot blindly give the Secretary's purported interest dispositive weight at the pleading stage.

## III. To the extent HB 991 treats Federal Form applicants differently than identically situated State Form applicants, it violates the Equal Protection Clause.

As the Secretary acknowledges, the Supreme Court has previously held "that states cannot 'require[] a Federal Form applicant to submit information beyond that required by the form itself.'" Mot. 7 (quoting *ITCA*, 570 U.S. at 20). Accordingly, *ITCA* guarantees that Federal Form applicants be *fully* registered to vote upon proper submission of the Federal Form, even absent DPOC.

Despite this clear holding, neither HB 991 nor the Secretary's Directive squarely addresses whether Federal Form applicants are treated differently than State Form applicants when it comes to complying with HB 991's proof of citizenship rules. Given this ambiguity, Plaintiffs assumed the Secretary would comply with *ITCA* by registering Federal Form applicants for federal elections, while refusing to register State Form applicants. The equal protection claim was premised on that reading. Am. Compl. ¶¶ 196–201. That concern was hardly fanciful—it is precisely what occurred in Arizona after *ITCA*. *See MFV*, 129 F.4th at 703–04. Such differential treatment of identically situated voters seeking to exercise a fundamental right would violate equal protection. *See* Am. Compl. ¶ 198; *see also Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 666, 670 (1966).

The Secretary now insists that no differential treatment will occur because *both* Federal Form

and State Form applicants will be subject to HB 991's requirements, Mot. 20, notwithstanding that *ITCA* squarely prohibits doing so to the former. In other words, the Secretary essentially concedes an NVRA violation—*i.e.*, that Federal Form applicants who do not meet HB 991's proof of citizenship requirements will be denied effective registration—while assuring that the same harm will be imposed on State Form applicants. If that is true, then Plaintiffs' equal protection claim *may* now be moot.

The Secretary, however, is not the only Defendant in this case—so, too, are each of Florida's Supervisors of Election. *See* Am. Compl. ¶¶ 30–31. While the Secretary is empowered to "[p]rovide written direction and opinions to the supervisors of elections," Fla. Stat. § 97.012(16), his directives do not formally bind Supervisors, *see Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (holding that "Supervisors are independent officials under Florida law who are not subject to the Secretary's control"). And the Secretary's own Directive provides confirmation that at least some Supervisors are enforcing HB 991 to "prohibit[] registration of applicants," Directive ¶ 2, meaning they may well plan to accept Federal Form applicants on the logic of *ITCA* while rejecting State Form applicants per HB 991.

Accordingly, the FL NAACP Plaintiffs are willing to dismiss Count VII provided that both the Secretary *and* the Supervisors litigating this case confirm that they intend to enforce HB 991 to require all applicants to comply with its proof of citizenship requirements, regardless of whether they use the Federal or State Form. Absent such confirmation, however, a factual dispute remains as to whether at least some Supervisors plan—as reflected by the Directive—to enforce HB 991 in the unconstitutional manner set forth in Count VII.

## CONCLUSION

For the foregoing reasons, the Court should deny the State Defendants' Motion to Dismiss.

Dated: September 2, 2026

Respectfully submitted,

*/s/ Frederick S. Wermuth*

**FREDERICK S. WERMUTH**
Florida Bar No. 0184111
**QUINN B. RITTER**
Florida Bar No. 1018135
KING, BLACKWELL, ZEHNDER
& WERMUTH, P.A.
25 East Pine Street
Orlando, FL 32801
Telephone: (407) 422-2472
fwermuth@kbzwlaw.com
qritter@kbzwlaw.com

**ABHA KHANNA***
**WALKER McKUSICK***
ELIAS LAW GROUP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
Telephone: (202) 948-1135
akhanna@elias.law
wmckusick@elias.law

**CHRISTOPHER D. DODGE***
**NICOLE E. WITTSTEIN***
ELIAS LAW GROUP
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
Telephone: (202) 948-1135
cdodge@elias.law
nwittstein@elias.law

** Admitted Pro Hac Vice*

*Attorneys for Plaintiffs Florida State Conference of Branches and Youth Units of the NAACP and Florida Alliance for Retired Americans*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 9th day of September, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Frederick S. Wermuth*
**FREDERICK S. WERMUTH**
Florida Bar No. 0184111
**QUINN B. RITTER**
Florida Bar No. 1018135
**KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.**
25 E. Pine Street
Orlando, FL 32801
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com
qritter@kbzwlaw.com
courtfilings@kbzwlaw.com
agonzalez@kbzwlaw.com