**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 26-cv-22257-JB

UNIDOSUS, *et al.*,

*Plaintiffs*,

*v.*

CORD BYRD, *et al.*,

*Defendants*.

---

**UNIDOSUS PLAINTIFFS' RESPONSE IN OPPOSITION TO STATE DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ i

INTRODUCTION ........ 1

BACKGROUND ........ 1

LEGAL STANDARD ........ 3

ARGUMENT ........ 3

I. Defendants' Motion Mischaracterizes HB 991 and the NVRA. ........ 3

A. Plaintiffs plausibly plead that HB 991 implicates voter registration. ........ 3

B. The NVRA rejects Defendants' irrelevant and formalistic distinctions. ........ 6

II. Plaintiffs Plausibly Allege that HB 991 Violates the NVRA. ........ 8

A. Plaintiffs plausibly allege that HB 991 violates NVRA Sections 6 & 7. ........ 8

B. Plaintiffs plausibly allege that HB 991 violates NVRA Section 5(d). ........ 12

C. Plaintiffs plausibly allege that HB 991 violates NVRA Section 8(b). ........ 13

D. Plaintiffs plausibly allege that HB 991 violates NVRA Section 8(c). ........ 14

III. Plaintiffs Have Plausibly Alleged That HB 991 Unduly Burdens the Right to Vote in Violation of the First and Fourteenth Amendments. ........ 15

A. *Anderson-Burdick* claims are ill-suited for dismissal at this stage. ........ 15

B. Plaintiffs have sufficiently pled that the Challenged DPOC Provisions unduly burden the right to vote. ........ 17

C. Plaintiffs have sufficiently pled that eliminating student ID unduly burdens young voters' voting rights. ........ 19

CONCLUSION ........ 20

## INTRODUCTION

State Defendants defend a Potemkin version of House Bill 991 (HB 991). In an attempt to obscure clear violations of the National Voter Registration Act (NVRA), Defendants claim that HB 991's provisions requiring documentary proof of citizenship (DPOC) do not implicate voter registration because they apply after a voter submits a registration form. These and other formalistic arguments fail in light of HB 991's plain text—which requires a voter to provide DPOC in order to be "place[d] . . . on the voter registration rolls as an active voter"—and the NVRA's robust protections of the right to register to vote and cast a ballot. They also elide the fact that HB 991's registration requirements operate separately from its list maintenance provisions, which will independently cause eligible voters to be removed from the rolls, again violating the NVRA.

Defendants' arguments about HB 991's constitutionality fare no better. The applicable legal framework calls for a fact-intensive inquiry ill-suited to resolution on a motion to dismiss. The First Amended Complaint contains abundant allegations as to the unconstitutional ways HB 991 will make voting harder, particularly for groups of already-vulnerable Floridians.

Defendants offer only strained misreadings of HB 991 and conclusory denials of the law's predictable impacts. The motion to dismiss, Dkt. No. 120 (MTD), should be denied.

## BACKGROUND

On April 1, 2026, Florida enacted HB 991. First Am. Compl. (FAC), Dkt. No. 89, ¶¶ 97–98. Plaintiffs challenge its DPOC-related provisions (the "Challenged DPOC Provisions"):

- **General DPOC Registration Provisions** (Fla. Stat. § 97.053(6)) – If Department of Highway Safety and Motor Vehicles (DHSMV) records indicate that a voter registration applicant "is not a [U.S.] citizen or has not provided a document acceptable as evidence of [U.S.] citizenship," the applicant "must be notified and . . . must provide a document acceptable as evidence of [U.S.] citizenship." Once they do so, "the supervisor [of elections] must place the applicant's name on the voter registration rolls as an active voter." If an applicant cannot provide an acceptable document, they are given a provisional ballot, which is only counted if they later provide DPOC. FAC ¶ 99. For already-registered voters updating their

registration, if DHSMV records indicate they are not a citizen or have not provided DPOC, supervisors must verify citizenship status using available governmental sources and initiate removal proceedings if citizenship cannot be verified. *Id.* ¶ 100.

- **Online Voter Registration Application Provisions** (Fla. Stat. § 97.0525(4)) – Voters cannot register to vote or update their registration online unless they have previously provided DPOC to DHSMV. If DHSMV records indicate that a registrant is not a citizen or has not provided DPOC, the Department of State (DOS) must notify the relevant supervisor of elections. FAC ¶ 101.

- **Retroactive DPOC Provisions** (Fla. Stat. § 98.075(6)) – DOS has a continuing obligation to verify registered voters' citizenship. DOS must "compar[e] or receiv[e] information from other governmental entities" and, should it find the information "credible and reliable," notify the relevant supervisor, who must then initiate removal proceedings. FAC ¶¶ 102–03.

- **DPOC Type Provision** (Fla. Stat. § 97.021(10)) – Only certain documents qualify as sufficient DPOC: a U.S. birth certificate; a valid, unexpired U.S. passport; a naturalization certificate; a consular report of birth abroad; certain state and federal driver licenses and IDs that indicate citizenship; or a federal court order granting citizenship. This excludes certificates of citizenship, DHS documents establishing citizenship for those who derive it through their parents. FAC ¶¶ 104–05.

Plaintiffs further challenge:

- **Mandatory Update Provision** (Fla. Stat. § 98.093(8)(d)) – When a voter updates their driver license or state ID card, DHSMV must report all information regarding change of address to DOS, which forwards this to the county supervisor who *must* update the voter's registration records. FAC ¶ 183.

- **Student ID Ban** (Fla. Stat. § 101.043(1)(a)) – HB 991 also eliminates student identification as an acceptable form of voter ID. FAC ¶¶ 186–87.

The Challenged DPOC Provisions will disproportionately flag eligible naturalized citizens and older voters for improper removal. FAC ¶¶ 129–33, 138–42. Elderly Black voters, Puerto Rican-born voters, young people, unhoused people, and those displaced by natural disasters are more likely to lack access to the forms of DPOC required by HB 991, and voters with disabilities may face additional difficulties responding to requests for DPOC. *Id.* ¶¶ 134–37, 143–63, 194–204, 230–31, 279, 281. Transgender individuals, married women, and others who have changed

their names are doubly burdened, as they are disproportionately likely both to be flagged for improper removal and to struggle to prove citizenship. *Id.* ¶¶ 7, 164–69, 282–83. The Student ID Ban also imposes a substantial and disproportionate burden on students. *See id.* ¶¶ 184–204.

## LEGAL STANDARD

A complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A court evaluating a motion to dismiss must take the complaint's factual allegations as true and draw all reasonable inferences in Plaintiffs' favor. *Barat v. Navy Fed. Credit Union*, 127 F.4th 833, 835 (11th Cir. 2025).

## ARGUMENT

### I. Defendants' Motion Mischaracterizes HB 991 and the NVRA.

Defendants' motion is predicated on two false assumptions: (1) HB 991 does not affect the registration process because it only requires DPOC after prospective voters submit a registration application, and (2) the NVRA permits laws that frustrate its purpose as long as they do not technically prevent voters from submitting a registration application. Defendants' first assumption is contradicted by HB 991's text and Defendants' prior representations, as well as the allegations of the FAC. Tellingly, Defendants' first assumption chiefly relies on a *post hoc* directive, issued by the main Defendant in this lawsuit, that is outside the pleadings and lacks force of law. The second assumption is incorrect as a matter of the NVRA's text, legislative intent, and case law interpreting the NVRA to prohibit lawmakers from "circumventing" its mandates.

#### A. Plaintiffs plausibly plead that HB 991 implicates voter registration.

Defendants do not contest that HB 991 will prevent eligible Floridians from registering and staying registered as active voters and casting a ballot that counts if they do not provide DPOC. Instead, Defendants press an excessively formalistic distinction, arguing that registrants who have not submitted DPOC can submit an application with only an attestation of citizenship, while

ignoring that those registrants will be unable to complete their registration or cast a ballot that counts and will risk removal from the rolls. MTD at 2, 10–11. This argument would effectively render voter registration meaningless, leaving a voter unable to cast a ballot that counts without providing DPOC—even though the "ultimate goal of registering to vote is to permit a person actually to vote." *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 383 (6th Cir. 2008).

In any event, Defendants' highly formalistic argument is precluded by the statutory text:

> If a completed voter registration application has been received by the book-closing deadline but . . . the records of the [DHSMV] indicate that the applicant is not a [U.S.] citizen or has not provided a document acceptable as evidence of [U.S.] citizenship, the applicant must be notified and must . . . provide a document acceptable as evidence of [U.S.] citizenship. **If the applicant provides the necessary evidence, the supervisor must place the applicant's name on the voter registration rolls as an active voter**. If the applicant has not provided the necessary evidence . . . prior to the applicant presenting himself or herself to vote, the applicant must be provided a provisional ballot. **The provisional ballot must be counted only . . . if the applicant . . . presents a document acceptable as evidence of [U.S.] citizenship** no later than 5 p.m. of the second day following the election.

Fla. Stat. § 97.053(6)(a) (emphasis added). In short, if DHSMV records indicate that a registrant has not provided DPOC, the applicant is not placed "on the voter registration rolls as an active voter" until they do so. And if they try to vote, their provisional ballot will not count unless they provide DPOC. Thus, while this process may occur "*after* an applicant submits a completed form," MTD at 2, HB 991 requires that the registrant be registered "as an active voter," and may cast a ballot that counts, *only after* they provide DPOC. Existing law also provides that "[a] voter registration application is complete . . . when all information necessary to establish the applicant's eligibility . . . is . . . verified pursuant to subsection (6)"—the same subsection that HB 991 amended to include a DPOC requirement. Fla. Stat. § 97.053(2). HB 991 thus makes clear that the registration process is not complete until the registrant provides sufficient DPOC.

Defendants undercut their own argument, conceding that HB 991's DPOC requirement

uses "the same process" for verifying voter eligibility as that at issue in *Florida State Conference of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008). MTD at 10–11. That case challenged § 97.053(6)'s requirement that applicants whose driver license or Social Security numbers could not be verified provide evidence of their numbers to complete their registrations. *Browning*, 522 F.3d at 1156–57. In defending that provision, Florida's then-Secretary of State acknowledged that it was a condition of registration that ensured that election officials could "verify [applicants'] driver's license or Social Security data *before registering them to vote*." Sec'y's Initial Br. at 6, *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008) (No. 07-15932) (emphasis added). The Eleventh Circuit also recognized that § 97.053(6) "imposes a new verification process as a precondition of voter registration for . . . registrants in Florida." *Browning*, 522 F.3d at 1156. HB 991 amends this exact subsection, adding a DPOC requirement as a precondition to register. Defendants' analogy confirms that HB 991 affects registration.

Defendants focus on a directive from the Secretary of State, which acknowledges that multiple county supervisors "believe that HB 991 prohibits registration of applicants who have not been verified as [U.S.] citizens," Dkt. No. 120-1 ¶ 2—itself evidence that Plaintiffs' theory is plausible. Regardless, this directive should be given zero weight. It is outside the pleadings and cannot be considered on a Rule 12(b)(6) motion. *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007). It was issued nearly three months after Plaintiffs filed this case, and a week after they filed their amended complaint. It conflicts with HB 991's plain text. And it is a *post hoc* interpretation offered two weeks before the Secretary filed the instant motion. *See Fla. Manufactured Hous. Ass'n v. Cisneros*, 53 F.3d 1565, 1574 (11th Cir. 1995) ("We do not defer to an agency's *post hoc* convenient litigating position that is wholly unsupported by prior regulations, interpretations, rulings, or administrative practices." (quotation marks omitted)).

Moreover, even if Defendants' reading were plausible as a matter of statutory interpretation, it would at most create a factual dispute about the precise point at which the act of registration is complete. *But see* Fla. Stat. § 97.053(2). This dispute is purely academic: No one contests that the law prevents a voter who has not provided DPOC from casting a ballot that will count. But regardless, at the motion to dismiss stage, any factual disputes—including how HB 991 is likely to be implemented—must be resolved in Plaintiffs' favor. See *Barat,* 127 F.4th at 835.

Finally, Defendants' argument only pertains to *new* registrations. Plaintiffs' claims under Sections 5 and 8 of the NVRA challenge HB 991's list maintenance provisions, including its required citizenship verification and removal provisions, for *registered voters updating* their registration, *see* Fla. Stat. § 97.053(6) (covering "application[s] with a change in name, address, or party affiliation"), and its *retroactive citizenship checks* to remove *already registered* voters, *see id.* § 98.075(6)(a) ("The department shall identify those registered voters who are potentially ineligible based on their legal status regarding [U.S.] citizenship by comparing or receiving information from other governmental entities . . . ."). Defendants cannot—and conspicuously do not—argue either that (i) these provisions do not affect registration, or (ii) the timing of HB 991's DPOC requirement is a basis for dismissal of Plaintiffs' claims under Sections 5 and 8.

**B. The NVRA rejects Defendants' irrelevant and formalistic distinctions.**

Even if HB 991 created the system Defendants describe, it would still violate the NVRA. The NVRA's purpose is "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501(b)(1). As such, "[c]ourts interpreting the NVRA have found that its primary emphasis is to . . . maximize such opportunities for a state's every citizen." *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1339 (N.D. Ga. 2016) (quotation marks omitted). Even *Virginia Coalition for Immigrant Rights v. Beals*, the principal case on which Defendants rely, *see* MTD at 9, cautioned courts to "be wary of a process that would

erode the purpose of [NVRA provisions].” 803 F. Supp. 3d 454, 477 (E.D. Va. 2025).

Consistent with preemption principles, courts have routinely rejected states’ efforts to avoid the NVRA’s requirements through clever drafting. The Sixth Circuit’s decision in *Land*, which also concerned a state registration regime, is instructive. 546 F.3d at 382–83. *Land* raised the same question as this case—whether states can circumvent the NVRA by redefining when a voter becomes registered—and answered that they could not: “[A] person becomes a ‘registrant,’ for the purposes of the NVRA, from the first moment that he or she is actually able to . . . cast a regular ballot,” because “the ultimate goal of registering to vote is to permit a person actually to vote.” *Id.* at 383. *Land* reasoned that if states could artificially limit who counts as a registrant, “they could circumvent the limitations of the NVRA by simply restricting the definition, and hence the federal protections of the NVRA, to a very limited class of potential voters.” *Id.* at 382. Other courts have similarly held that states cannot draft around the NVRA’s requirements. *See, e.g.*, *Common Cause Ind. v. Lawson*, 937 F.3d 944, 962 (7th Cir. 2019) (holding states may not define laws in ways that “def[y] the [NVRA’s] structural logic”); *Common Cause/N.Y. v. Brehm*, 344 F. Supp. 3d 542, 552 (S.D.N.Y. 2018) (quoting *Land*); *Project Vote*, 208 F. Supp. 3d at 1336.

Defendants note that HB 991 still “allow[s] provisional ballot voting until US citizenship is verified.” MTD at 2, 3. Yet *Land* rejected this exact defense, noting that because “not all provisional ballots will necessarily be counted, the availability of provisional ballots may not protect those wrong[ed]” by the NVRA violation. 546 F.3d at 388. Defendants’ argument is particularly unpersuasive here because under HB 991, provisional ballots are not counted at all unless voters present DPOC. Fla. Stat. § 97.053(6)(a). It is cold comfort indeed to tell a voter who lacks access to DPOC that they can cast a provisional ballot that inevitably will be rejected.

*Beals*, cited at MTD at 9, is distinguishable. There, the challengers’ complaint never

"allege[d] that Defendants' program prevented individuals from properly registering to vote in the first instance." 803 F. Supp. 3d at 477. In contrast, the FAC extensively details how the Challenged DPOC Provisions burden registration. *See* FAC ¶¶ 1, 8, 99, 101. And, as noted above, the Eleventh Circuit (not to mention Defendants) has stated that the requirements of § 97.053(6)—the precise statute at issue here—operate as a "precondition of voter registration." *Browning*, 522 F.3d at 1156.

## II. Plaintiffs Plausibly Allege that HB 991 Violates the NVRA.

### A. Plaintiffs plausibly allege that HB 991 violates NVRA Sections 6 & 7.

Properly understood, HB 991 requires voters to provide DPOC to register and cast a ballot. HB 991 thus violates NVRA Sections 6(a) and 7 because Florida no longer provides or accepts the federal voter registration form ("Federal Form"), which requires only proof of citizenship by attestation.[1] Non-acceptance of the Federal Form also burdens the rights of groups like Plaintiffs to register voters under Section 6(b). Plaintiffs discuss each NVRA provision in turn.

**Section 6(a):** The NVRA requires that "[e]ach State shall accept and use" the Federal Form. 52 U.S.C. § 20505. As discussed above, Defendants argue that "[t]he federal form will continue being accepted" under HB 991 because the Challenged DPOC Provisions kick in only "*after* a form—federal or state—is submitted." MTD at 8. But even if voters may submit the Federal Form, the General DPOC Requirement Provision still requires them to provide DPOC to complete their registration, become an actively registered voter, avoid the risk of removal from the rolls, and cast a ballot that counts. *See* Fla. Stat. § 97.053(2), (6).

The NVRA's requirement that states "accept and use" the Federal Form acts as "both a ceiling and floor," preempting state attempts to require voter registration applicants to provide information beyond what is required by the Federal Form. *Arizona v. Inter Tribal Council of Ariz.,*

---

[1] 52 U.S. Code § 20508(b)(2)(B); U.S. Election Assistance Comm'n, Nat'l Mail Voter Registration Form (Aug. 28, 2026), https://www.eac.gov/voters/national-mail-voter-registration-form.

*Inc.*, 570 U.S. 1, 18 (2013) (*ITCA*). Defendants attempt to distinguish *ITCA* by arguing that voters whose information is already in DHSMV databases will be immediately registered without further process. MTD at 8. But it is no answer to say that a state will accept a Federal Form from *some* voters. Plaintiffs bring suit on behalf of voters who will be forced to provide DPOC, whom the NVRA protects. And while it is true that "[t]he NVRA . . . contemplates that not every submitted Federal Form will result in registration," *id.*, *ITCA* distinguished between "deny[ing] registration based on information in [a state's] possession establishing the applicant's ineligibility," which is within a state's power, and "demand[ing] that an applicant submit additional information beyond that required by the Federal Form," which the NVRA prohibits. 570 U.S. at 15.[2]

Defendants cherry-pick a quote from *Charles H. Wesley Education Foundation, Inc. v. Cox*, 408 F.3d 1349 (11th Cir. 2005), MTD at 9, but that case is largely irrelevant and, if anything, undermines Defendants' broader argument. In *Cox*, the Eleventh Circuit held that Georgia's policy of rejecting all applications mailed in by third-party voter registration groups violated the NVRA, holding that "[b]y requiring the states to accept mail-in forms, the Act does regulate the method of delivery, and by doing so overrides state law inconsistent with its mandates." 408 F.3d at 1354. *Cox* did not involve, and the Eleventh Circuit did not address, the "accept and use" provision's prohibition on compelling information beyond what is required by the Federal Form.

Defendants further suggest that HB 991's regime parallels the Virginia list maintenance program at issue in *Beals*, 803 F. Supp. 3d 454. But Virginia's program involved a "removal process" that impacted active voters who had already been placed on the rolls by local registrars. *Id*. at 477. By contrast, Plaintiffs here allege that the General DPOC Requirement Provision affects

[2] Defendants imply HB 991 helps Florida get information necessary to enforce voter qualifications. MTD at 8. Yet *ITCA* rejected this exact argument, because Arizona had "alternative means of enforcing its constitutional power to determine voting qualifications." 570 U.S. at 19–20.

*applicants* whose registrations will not be complete, and who will not be placed onto the rolls as active voters in the first place, unless they provide DPOC. Fla. Stat. § 97.053(6).

**Section 6(b):** Because Florida functionally does not accept the Federal Form under HB 991, the law also unlawfully burdens "organized voter registration programs," such as those operated by Plaintiffs, and registered third-party voter registration organizations (3PVROs) like Plaintiff Unidos. 52 U.S.C. § 20505(b). Section 6(b) creates "a legally protected interest" in the "right to conduct voter registration drives" using the Federal Form. *Cox*, 408 F.3d at 1353; *accord LWV of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1163 (N.D. Fla. 2012) ("[W]hen a state adopts measures that have the practical effect of preventing an organization from conducting a drive, collecting applications, and mailing them in, the state violates the NVRA.").

Defendants' insistence that "HB 991 operates only after registration" and thus imposes no burden on voter registration efforts, MTD at 12, both fails as a descriptive matter, *see supra*, and misunderstands how Plaintiffs do their work. To achieve their core missions, and to preserve the reputation and trust they have carefully built in the communities they serve, Plaintiffs must ensure that the registrants they assist are not just able to register, but can actually cast a counted ballot. FAC ¶¶ 25–26, 32–33, 38, 40–42, 50, 68–70, 73, 80–81, 84, 87–88, 90. The Challenged DPOC Provisions will require Plaintiffs to ensure that voters they serve have the DPOC required to cast a vote that counts. *Id.* ¶¶ 28, 43, 52, 54, 69–70, 73, 85–86, 91; *supra* Section I.A. The additional burden of ensuring these voters have the required DPOC will force Plaintiffs to spend more time on each application, resulting in fewer registrations. FAC ¶¶ 27–28, 44, 47–49, 57–59, 61, 71, 78, 86, 92. This violates the NVRA because it burdens "organized voter registration programs." 52 U.S.C. § 20505(b); FAC ¶¶ 260–64; *see LWV of Fla. v. Browning*, 863 F. Supp. 2d at 1163.

**Section 7:** Section 7 requires public assistance agencies to distribute the Federal Form or

its equivalent to the people they serve. 52 U.S.C. § 20506(a)(6)(A). Because Florida functionally no longer accepts and uses the Federal Form, it also no longer distributes its equivalent to voters. Defendants' lone defense, that the state form equivalent requires only a signed attestation, MTD at 12, ignores both HB 991's clear text and the NVRA's broad protections. *See supra* Section I.

Separately, Defendants' argument that the Section 7 claim is not justiciable as to the head of the Department of Children and Families (DCF), MTD at 21–23, fails. Defendants erroneously argue Plaintiffs cannot establish traceability or redressability because DCF's "only connection to this case" is its "obligation to make Florida's voter registration application available" to clients. MTD at 22. To the contrary, several DCF offices are "voter registration agenc[ies]" under Florida law, Fla. Stat. § 97.021(45), and are required to "create and use a voter registration application that meets the requirements of s. 97.052," which were amended by HB 991, *id.* § 97.058(3)(a); *see also* FAC ¶¶ 39, 55, 59, 95. Moreover, several DCF offices must "assist[]" each client "in registering to vote and in voting if he so requests." Fla. Admin. Code 65E-20.003(5); *accord id.* 65G-9.002(1); 52 U.S.C. § 20506(a)(6)(B); *see also* FAC ¶ 59. DCF's voting-related responsibilities require it to implement HB 991's onerous registration requirements, causing the violation.

Unlike officials in the cases Defendants rely upon, Defendant Williams—as "the head" of DCF, Fla. Stat. § 20.19(2)(a)–(b)—is solely responsible for directing DCF's activities and supervising its offices. *Compare id.* § 20.19, *with Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1204 & n.4 (11th Cir. 2021) (noting shared supervisory authority); *Women's Emergency Network v. Bush*, 323 F.3d 937, 949–50 (11th Cir. 2003) (same). Plaintiffs' injury therefore is "fairly traceable to" Defendant Williams given her "role" and corresponding "control[]" of DCF's NVRA violation. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253–54 (11th Cir. 2020) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Her "control"

also means that injunctive relief must run against her (along with the other Defendants) to redress Plaintiffs' NVRA injury completely. *Id.* at 1254–55; *see also West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1138 (11th Cir. 2023) (plaintiff states' injury was redressable by relief running against Treasury Secretary who "intends to enforce" the challenged statutory provision).

Because Plaintiffs have established standing as to Defendant Williams, she is also a proper defendant under *Ex parte Young*. *See Jacobson*, 974 F.3d at 1255 ("We may enjoin executive officials from taking steps to enforce a statute." (citation modified)); *Prison Legal News v. Sec'y, Fla. Dep't of Corrs.*, 890 F.3d 954, 977 (11th Cir. 2018) ("The buck stops with the Secretary.").

**B. Plaintiffs plausibly allege that HB 991 violates NVRA Section 5(d).**

NVRA Section 5(d) states that any address change for a driver license "shall serve" as a change for voter registration, "unless the registrant states . . . that the change of address is not for voter registration purposes." 52 U.S.C. § 20504(d). Section 5 thus allows registrants to update their driver license address without changing their voting address. Yet under HB 991, (i) DHSMV must provide DOS, on a weekly basis, "[i]nformation identifying a change in residence address on the Florida driver license or Florida identification card of any person who declined . . . to register or update his or her voter record," and (ii) DOS "must report each such change . . . to the appropriate supervisor, who [(iii)] must change the voter's registration records in accordance with s. 98.065(4)." Fla. Stat. § 98.093(8)(d). Each of these steps is mandatory, violating the NVRA. *See Rosebud Sioux Tribe v. Barnett*, 604 F. Supp. 3d 827, 833 (D.S.D. 2022) (holding that § 20504(d) requires a change of address to apply to voter registration "unless the voter opts-out").

Defendants' sole, unavailing response is HB 991's reference to the change being performed "in accordance with s. 98.065(4)." MTD at 13. The first three subsections of Section 98.065 direct the state to perform an annual "general registration list maintenance program," based in part on change-of-address information received from USPS and directly from voters. Fla. Stat.

§ 98.065(1)–(3). This program must be performed "in compliance with . . . the [NVRA]." *Id.* § 98.065(1). Subsection (4) sweeps more broadly, stating that a supervisor "must change" a voter's registration record in accordance with certain procedures when they receive information "pursuant to the activities conducted in subsection (2) . . . from [DHSMV], or from other sources . . . ." *Id.* § 98.065(4). Thus, supervisors must follow a statutory process to update a voter's address when they learn certain information, one possible source of which is an NVRA-compliant list maintenance program. Neither this, nor subsection (4)'s procedures for updating an address, change HB 991's mandate that supervisors automatically update voting addresses to match a driver license or ID—a mandate that violates Section 5, since it lacks a voter opt-out.

### C. Plaintiffs plausibly allege that HB 991 violates NVRA Section 8(b).

Section 8(b) requires list maintenance efforts to be "uniform[] [and] nondiscriminatory." 52 U.S.C. § 20507(b). The list maintenance program mandated by HB 991 is neither, because it will disproportionately burden groups of vulnerable Floridians. Requiring DOS to flag registered voters for removal using stale citizenship data will disproportionately impact naturalized citizens and elderly voters. FAC ¶¶ 129–33, 138–42. Requiring county supervisors to use the same stale data to verify the citizenship of any voter registration applicant without DPOC on file will disproportionately burden elderly, disabled, and student voters, who are less likely to have a Florida driver license or REAL ID. FAC ¶¶ 141, 156–57, 194. Requiring new registrants and voters flagged for removal to produce DPOC will further harm elderly Black, Puerto Rican-born, student, and unhoused voters, all of whom are less likely to have access to DPOC. *Id.* ¶¶ 134–37, 143–54, 196–203, 281. And transgender individuals, married women, and others who have changed their names are more likely *both* to be flagged for removal and to struggle to prove their citizenship. *Id.* ¶¶ 164–69. These foreseeable, nonuniform, and discriminatory burdens violate Section 8(b).

Defendants respond only by noting that Plaintiffs do not allege facial discrimination,

implying that facially neutral voting restrictions are immune from Section 8(b) liability. *See* MTD at 13–14. But a state "impose[s] burdensome demands in a discriminatory manner"—and thereby violates Section 8(b)—when its list maintenance programs "have a discriminatory *impact*." *United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012) (emphasis added); *accord Mi Familia Vota v. Fontes*, 129 F.4th 691, 714–15 (9th Cir. 2025), *cert. granted on other grounds*, No. 25-1017 (U.S. June 29, 2026) (Mem.); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703–04 (N.D. Ohio 2006) ("The regulations also have the discriminatory effect of imposing an undue burden primarily on poor and/or elderly voter registration workers . . . ."). Defendants' only support for a contrary interpretation of Section 8(b) is to the district court's decision in *Browning* that does not address the NVRA at all, *see* MTD at 13; Defendants' "equal[ly] as to all applicants" quotation, *id.*, refers to equal protection claims not at issue here. *See Fla. State Conf. of NAACP v. Browning*, 569 F. Supp. 2d 1237, 1257 (N.D. Fla. 2008).[3]

**D. Plaintiffs plausibly allege that HB 991 violates NVRA Section 8(c).**

The NVRA prohibits a state from conducting any program "to systematically remove the names of ineligible voters" in the ninety days before any federal election. 52 U.S.C. § 20507(d). Yet HB 991 creates obligations on state officials that persist through the ninety-day "quiet period": identifying potential noncitizen registrants "by comparing or receiving information from other governmental entities," Fla. Stat. § 98.075(6)(a), such as bulk database matching using the Department of Homeland Security's SAVE system, FAC ¶¶ 116–17, and a weekly reporting requirement for DHSMV to provide voter information to DOS, Fla. Stat. § 98.093(8).

Defendants do not contest that HB 991's provisions will operate during the ninety-day quiet

[3] Even if the Court considered this quotation, it does not apply here, where—unlike in *Browning*—the FAC plausibly pleads that *not* all Florida voters can "validate their [citizenship] in the same way." *Fla. State Conf. of NAACP*, 569 F. Supp. 2d at 1257.

period and instead assert that they do not create a "systematic" program. *See* MTD at 14–15. They concede that under binding Eleventh Circuit precedent, the NVRA prohibits "mass computerized data-matching process[es] to compare the voter rolls with other state and federal databases." *Id.* at 15 (citing *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335 (11th Cir. 2014)). This is *precisely* what HB 991 requires. *See* Fla. Stat. § 97.057(11) (requiring DHSMV and DOS "to match information in the statewide voter registration system with information in the [DHSMV's] database" to investigate registrants' citizenship). Defendants respond that the removal process is individualized, making HB 991 non-systematic. *See* MTD at 14–15. Yet the removal programs at issue in *Arcia* also prompted a "notice and removal process" for individual flagged voters, and the program was still found to be systematic and thus violative of the NVRA. 772 F.3d at 1339.

## III. Plaintiffs Have Plausibly Alleged That HB 991 Unduly Burdens the Right to Vote in Violation of the First and Fourteenth Amendments.

The FAC explains how the Challenged DPOC Provisions will force countless Floridians to produce specified forms of documentation establishing their citizenship—which many do not have and are difficult to obtain—to register, remain on the rolls, and vote a counted ballot. It details how these burdens will harm vulnerable groups and disenfranchise eligible voters. And it demonstrates how the Student ID Ban unduly burdens young voters. These allegations are sufficient, particularly because constitutional right-to-vote claims are inapt for resolution on a motion to dismiss.

### A. *Anderson-Burdick* claims are ill-suited for dismissal at this stage.

Under *Anderson-Burdick*, a court considering a constitutional right-to-vote claim must weigh "the character and magnitude of the asserted injury to the right[]" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," including "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). "A law that severely burdens the right to vote must be narrowly

drawn to serve a compelling state interest. And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019). Contrary to Defendants' suggestion, *see* MTD at 16, 18, when assessing the impact of a law, courts must analyze the burden on affected subgroups, rather than on all voters, *see Lee*, 915 F.3d at 1319 (analyzing burden to voters impacted by signature-match scheme, not voters generally); *Crawford v. Marion Cnty.*, 553 U.S. 181, 198, 201 (2008) (plurality op.) ("The burdens that are relevant to the issue before us are those imposed on persons who are eligible to vote but do not possess a [photo ID]."); *Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016) ("The right to vote is personal and is not defeated [even if] 99% of other people can secure the necessary credentials easily.").

The fact-intensive *Anderson-Burdick* inquiry is not suited to resolution on a motion to dismiss because it "emphasizes the relevance of context and specific circumstances to each challenge," and presents "a question that the district court is better equipped to address with testimony and other direct evidence." *Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1346 (11th Cir. 2020). The Eleventh Circuit has reversed pleading-stage dismissals of *Anderson-Burdick* claims to allow for factual development, *see, e.g.*, *Duke v. Cleland*, 5 F.3d 1399, 1405 (11th Cir. 1993); *Bergland v. Harris*, 767 F.2d 1551, 1554 (11th Cir. 1985), and district courts often deny motions to dismiss these claims for the same reason, *see Fla. State Conf. of the NAACP v. Lee*, 566 F. Supp. 3d 1262, 1278–79, 1289 (N.D. Fla. 2021); *Sixth Dist. of AME Church v. Kemp*, 574 F. Supp. 3d 1260, 1278 (N.D. Ga. 2021); *LWV of Fla. v. Detzner*, 354 F. Supp. 3d 1280, 1288 (N.D. Fla. 2018).

Defendants urge the Court to weigh their unsupported assertions of state interests against the FAC's well-pleaded facts. MTD at 18–19. But whether the severe burdens imposed by HB 991 are necessary to further a valid state interest is "a matter of proof." *Duke*, 5 F.3d at 1405 n.6 (11th

Cir. 1993); *accord Bergland*, 767 F.2d at 1554 ("The State must introduce evidence to justify both the interests [it] asserts and the burdens [it] imposes . . . ."). Defendants cite *Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009), to argue that they need not make "any evidentiary showing or [meet a] burden of proof," MTD at 17. Yet *Billups*—an appeal after a full trial—did not mention, much less overrule, *Duke* and *Bergland*.

The Court must take as true the FAC's allegations of how HB 991 will disenfranchise eligible Florida voters. *See* FAC ¶¶ 173–78, 187–88, 207–21. Nothing more is required; the "weighing of the alleged burden on voters . . . is not appropriate at this time." *Sixth Dist. AME Church*, 574 F. Supp. 3d at 1278; *Lee*, 566 F. Supp. 3d at 1286.

**B. Plaintiffs have sufficiently pled that the Challenged DPOC Provisions unduly burden the right to vote.**

Plaintiffs have sufficiently pled that the Challenged DPOC Provisions impose a severe burden on voting rights. Florida has nearly 13.5 million active voters, nearly 100,000 newly naturalized citizens each year, and 4.8 million residents over sixty-five, FAC ¶¶ 129, 142, meaning tens of thousands of eligible voters, if not more, could be caught in this dragnet. HB 991's mandated use of unreliable databases and systems to verify citizenship will cause Defendants to erroneously identify eligible voters, particularly Florida's naturalized citizens, as noncitizens. *Id.* ¶¶ 6, 122–27, 129–32, 170–71, 237–39, 274. Its requirement that every registration applicant, including voters updating their registration, have DPOC on file with DHSMV will further burden applicants who lack ready access to DPOC matching their current name—especially elderly, disabled, Black, Puerto Rican, low-income, unhoused, transgender, and female voters. *Id.* ¶¶ 99, 101, 136–42, 141–62, 230–31, 275–81. Every voter and voter registration applicant identified as a potential noncitizen, and every applicant who has not already submitted DPOC to DHSMV, must provide DPOC or risk disenfranchisement. *Id.* ¶¶ 8–11, 99–105. The inevitable result will be to

deprive eligible Florida voters of their right to vote. *Id.* ¶¶ 170–72, 243–44. These severe burdens are not justified by any valid, much less compelling, state interest. *Id.* ¶¶ 173–78, 244.

Defendants first argue that requiring "some" voters to prove citizenship is not an actionable burden, MTD at 18, ignoring both (i) that the *Anderson-Burdick* inquiry focuses principally on affected individuals, and (ii) the FAC's well-pleaded allegations regarding the burdens HB 991 will impose on those voters. The burdens here threaten more voters than the signature-match scheme enjoined in *Lee*, which resulted in the rejection of 4,000 ballots, 915 F.3d at 1319–20, 1322, and the DPOC regime enjoined in *Georgia Coalition for the People's Agenda, Inc. v. Kemp*, which placed 3,141 individuals in "pending" status and subjected them to citizenship verification, 347 F. Supp. 3d 1251, 1255, 1264–67 (N.D. Ga. 2018). Here, HB 991 subjects all of Florida's 13.5 million active registered voters to citizenship verification using unreliable data sources that have misidentified hundreds of thousands of eligible voters as noncitizens. FAC ¶¶ 102, 117–33, 170–71. The many voters without DPOC or the resources to obtain it will be disenfranchised "through no fault of their own." *Lee*, 915 F.3d at 1323; *see also* FAC ¶¶ 134–36, 143–44, 146–51.

Next, Defendants rely on *New Georgia Project v. Raffensperger*, a challenge to Georgia's "decades-old" Election Day receipt deadline for absentee ballots. 976 F.3d 1278, 1280 (11th Cir. 2020). The court found that the deadline was "both reasonable and nondiscriminatory" and provided numerous ways for voters to return their ballots or use a different voting method. *Id.* at 1281–82. The Challenged DPOC Provisions, in contrast, are both unreasonable—requiring eligible voters to prove their citizenship based on assertions drawn from unreliable government databases, FAC ¶¶ 106, 111–27—and discriminatory, disproportionately burdening certain groups, *see supra*. They impose a greater burden than a ballot-receipt deadline, requiring affected voters to prove their citizenship status with difficult-to-obtain documents that many voters lack. *Id.* ¶¶ 5,

7, 134–36, 141–62, 170–72, 230–31, 243–44, 276–81. And they provide no alternatives to access the vote. Without DPOC, many will lose the right to vote. *Id.* ¶¶ 99–100, 172, 243–44.

Finally, Defendants' claim that registering to vote under HB 991 does not require DPOC, MTD at 17, is both wrong, *see supra* Section I, and irrelevant to the *Anderson-Burdick* claim, which concerns the constitutional right to cast a counted ballot. Defendants do not contest that the DPOC Restrictions burden voters' ability to cast a counted ballot; it is thus immaterial to Plaintiffs' constitutional claim whether or not HB 991 *technically* allows a new registrant to register (not to mention the burdens HB 991 imposes on already-registered voters looking to remain on the rolls).

### C. Plaintiffs have sufficiently pled that eliminating student ID unduly burdens young voters' voting rights.

HB 991 singles out student ID for exclusion from the list of acceptable government-issued photo IDs. FAC ¶¶ 187–88. This impermissibly burdens Florida's more than 912,000 college students, who are disproportionately likely to lack alternative voter ID and to encounter barriers to obtaining one. *Id.* ¶¶ 189–202, 204. The State has no interest in eliminating a form of ID that had been used securely for decades. *Id.* ¶¶ 185–86, 207–21.

Defendants note that HB 991 permits alternative forms of voter ID. MTD at 20. But this does not eliminate the burden on many students, particularly those from out of state, who are disproportionately less likely to have those forms of ID, FAC ¶¶ 194–202, and who disproportionately face barriers to obtaining them, *id.* ¶¶ 147, 198, 203. Defendants also argue that student voters without other ID can vote provisionally. MTD at 19. But they ignore the fact that those ballots may not count due to the signature-matching review process mandated by Florida law. *See Lee*, 915 F.3d at 1320 ("[P]rovisional voters, through factors out of their control, are burdened with the risk that their ballots will incorrectly be rejected for signature mismatch."). Even with "uniform[] and expert[]" implementation, "rightful ballots [are] still . . . rejected" in

signature-matching systems. *Id.* At the very least, the extent to which provisional balloting burdens impacted voters—whether through incorrect rejections or through the increased wait times that provisional balloting imposes—is a factual question inappropriate to resolve at the pleading stage.

Further, the burden on young voters is not "attenuated," MTD at 19, but rather direct and severe. Every eligible Florida voter with a student ID who lacks an acceptable alternative must go to the time and expense of obtaining one, and the many young voters who do not have the means to do so are at risk of being disenfranchised. FAC ¶¶ 196–204. The similar student ID ban enjoined by a district court in Indiana, *Count US IN v. Morales*, 830 F. Supp. 3d 753, 769 & n.4 (S.D. Ind. 2026), *stayed on other grounds*, 172 F.4th 974 (7th Cir. 2026) (per curiam), involved a student population more than four times smaller than Florida's, *see* FAC ¶ 191, meaning that the number of impacted voters here is likely to be much larger. Allegations of burdens of this scale are more than sufficient to state an undue burden claim. *See Lee*, 915 F.3d at 1322.

To deflect from these well-pleaded facts, Defendants rely on inapposite caselaw. The burden of the Student ID Ban on the impacted population here is "heavier" than the burden of the photo ID requirement considered in *Crawford*, 553 U.S. 181. *See Count US IN v. Morales*, 832 F. Supp. 3d 857, 865 (S.D. Ind. 2025); *Count US IN*, 830 F. Supp. 3d at 769–70. And unlike the absentee ballot deadline in *New Georgia Project*, the Student ID Ban here is both discriminatory, FAC ¶¶ 187–88, and unreasonable, FAC ¶¶ 184–85, 207–21.

Finally, Defendants' complaint that Plaintiffs "fail to note other identification removed by HB 991," MTD at 18, is a red herring. Plaintiffs do not plead intentional discrimination. Removing other forms of ID has no bearing on the burden the Student ID Ban imposes on young voters.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Respectfully submitted September 2, 2026,

_/s/ Caroline McNamara_
Caroline McNamara (FBN 1038312)
Nicholas L.V. Warren (FBN 1019018)
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, Florida 33134
(786) 363-2738
cmcnamara@aclufl.org
nwarren@aclufl.org
dtilley@aclufl.org

Jonathan Topaz*
William Hughes*
Nina Nayiri McKay*
Sophia Lin Lakin*
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
jtopaz@aclu.org
whughes@aclu.org
nmckay@aclu.org
slakin@aclu.org

Sarah Brannon*
**American Civil Liberties Union Foundation**
915 15th Street NW
Washington, D.C. 20004
(740) 632-0671
sbrannon@aclu.org

John A. Freedman*
Rachel L. Forman (FBN 105347)
Jeremy Karpatkin*
Nicholas Casmier Anway*
Connor J. Morgan*
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5000
john.freedman@arnoldporter.com
rachel.forman@arnoldporter.com
jeremy.karpatkin@arnoldporter.com
nicholas.casmier.anway@arnoldporter.com
connor.morgan@arnoldporter.com

John Powers*
Hani Mirza*
Sonali Seth*
Nikole Miller (FBN 1031826)
Peter Ketcham-Colwill*
**Advancement Project**
1220 L Street NW, Suite 850
Washington, DC 20005
(202) 728-9557
jpowers@advancementproject.org
hmirza@advancementproject.org
sseth@advancementproject.org
nmiller@advancementproject.org
pketchamcolwill@advancementproject.org

Delmarie Alicea (FBN 1024650)
Jose Perez*
**Latino Justice PRLDEF**
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
dalicea@latinojustice.org
jperez@latinojustice.org

Jeffrey A. Miller*
**Arnold & Porter Kaye Scholer LLP**
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306
(650) 319-4500
jeffrey.miller@arnoldporter.com

Eric Padilla (FBN 1044216)
**Arnold & Porter Kaye Scholer LLP**
250 West 55th Street
New York, NY 10019
(212) 836-8000
eric.padilla@arnoldporter.com

* *Admitted pro hac vice*

*Attorneys for Plaintiffs*